**EXHIBIT 2**

**[DECLARATION OF GREGORY H. GUILLOT UNDER PENALTY OF PERJURY]**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DONNA CORBELLO,

       Plaintiff,

  vs.

THOMAS GAETANO DEVITO, *et al.*,

       Defendants**.**

CASE NO.  2:08-cv-00867-RCJ-PAL

**DECLARATION OF GREGORY H. GUILLOT UNDER PENALTY OF PERJURY**

1.      My name is Gregory H. Guillot.  I am an attorney, licensed in Texas, the District of Columbia, and Louisiana, and am President of Gregory H. Guillot, P.C., a professional corporation, organized for the practice of law in Texas.  I am lead counsel to Donna Corbello, the plaintiff in this case.  I have personal knowledge of the facts set forth herein, and if ordered to serve as a witness, I can and will competently testify thereto under oath.

2.      I take my duties to cooperate with counsel in discovery matters quite seriously, and try to anticipate and resolve discovery disputes promptly, and without court intervention, whenever possible.  However, counsel for the New Defendants do not seem to share this mindset, and, as a consequence, the discovery process in this case has been difficult.

3.      Specifically, in the course of this litigation to date, counsel for the New Defendants have, repeatedly: (a) ignored, failed to respond, or provided delayed responses to my communications concerning discovery deficiencies; (b) disregarded deadlines for responding to Plaintiff's discovery requests, instead providing documents and written responses at their leisure, often without bothering to request extensions of time; (c) withheld responsive documents and electronically-stored information ("ESI") acknowledged to be relevant, on grounds that, *in their opinion, Plaintiff does not need them yet* (for example, the New Defendants withheld financial documents while their motions to dismiss remained pending, which they still have not produced); (d) withheld relevant, responsive documents and ESI, based on allegations that Plaintiff's counsel

-1-

Corbello Exhibit 2
Page 0002

1    might alter such material, and/or disseminate it to third parties – notwithstanding the *Stipulated*

2    *Protective Order* (Doc. 94) which prohibits us from doing so; (e) withheld responsive documents

3    and ESI based on general allegations of attorney-client privilege, without identifying such material

4    or providing a privilege log, as required in this District; (f) redacted documents in their production

5    sets without advance notice, pertinent written objections, or any other effort to discuss the need for

6    such redaction before production occurred; (g) refused to negotiate a date certain for the deposition

7    of a crucial party witness, despite Plaintiff's timely service of a *Notice of Deposition* therefor,

8    ultimately forcing Plaintiff to withdraw her *Notice*, rather than flying to the noticed location for an

9    examination the party would not attend; (h) refused to provide sworn amendments to interrogatory

10   responses, even after acknowledging, by electronic mail, that a response previously provided was

11   untrue; (I) produced documents and ESI in formats other than that which Plaintiff requested, without

12   advance notice or explanation; (j) induced Plaintiff to purchase specialized software for the purpose

13   of reviewing native files that the New Defendants now refuse to produce; and, (k) refused to

14   discharge their "meet and confer" obligations under the Rules, promising they would do so, but

15   rushing to the courthouse instead.

16           4.      Due to the foregoing violations, and others, and due to the New Defendants' repeated

17   inclusion of  recklessly-false statements in their briefs, which they have refused to withdraw, it is

18   true that relations between counsel have occasionally become strained.  Nonetheless, in our filings

19   and arguments before this Court, Plaintiff's counsel, including myself, have remained professional,

20   refraining from personal attacks on opposing counsel, and focusing on the rules, law and facts

21   relevant to Plaintiff's briefs.  Similarly, Plaintiff's discharge of her own discovery obligations has

22   been exemplary – Plaintiff's counsel have provided relevant material to the New Defendants before

23   defense counsel even requested it, and have responded promptly to all discovery served, and all

24   inquiries pertaining thereto.

25           5.      The New Defendants' *Motion for Protective Order* (Doc. 298) ("Defendants'

26   Motion") tests our professionalism, as it directs malicious, unfounded allegations against me

27   personally, which are false, defamatory, have *no conceivable basis in fact*, and appear to have been

28   fabricated and presented to the Court for no other purpose than to smear and embarrass me, while

Corbello Exhibit 2
Page 0003

1    distracting the Court from defense counsel's misconduct.  I would prefer to refrain from addressing

2    these accusations entirely, and, during a telephone conference with Mr. Korzenik, shortly after

3    *Defendants' Motion* was filed, I asked that they be withdrawn.  However, though Mr. Korzenik

4    promised to consult with his co-counsel, Mr. Mayeda, regarding the matter, and revert to me

5    thereafter for further discussion, he did not do so; the allegations remain on record, and I have no

6    choice but to address them.  Accordingly, with reluctance, I will do so herein.  I do not wish to

7    address additional spurious personal attacks in this case, and should defense counsel persist in

8    advancing them, Plaintiff will move for a protective order, and pursue appropriate sanctions for any

9    further willful or reckless misrepresentations to the Court.

10          6.      My cooperation with New Defendants' counsel on matters relevant to *Defendants'*

11   *Motion* began with our first conference under Fed. R. Civ. P. 26(f), held by telephone on November

12   26, 2008.  During this conference, in compliance with Fed. R. Civ. P. 26(f)(3)(B), I specified the

13   subjects concerning which discovery would be needed, expressly mentioning, *inter alia*, all drafts,

14   treatments and scripts of the play which became *Jersey Boys*; all background material on which the

15   play was based; all outlines and notes prepared by the writers and director; and, all electronic mail

16   messages between and among the defendants and/or third parties concerning the play, Defendant

17   DeVito's participation, and other matters relevant to this case.  Pursuant to Fed. R. Civ. P.

18   26(f)(3)(A), I requested that this material be provided promptly, with the New Defendants' *Initial*

19   *Disclosures*, as said disclosures were already well past due, under Fed. R. Civ. P. 26(a)(1)(D), and

20   defense counsel had not requested an extension of time for serving them.  I also stressed, in

21   accordance with Fed. R. Civ. P. 26(f)(3)(C), that Plaintiff's counsel viewed this action as an

22   "electronic discovery case," and preferred that ESI be produced in native file format, on hard drives,

23   CD-ROM's, or DVD's, with electronic mail messages provided in native, ".PST" file format, and

24   "hard copy" documents provided as single-page, searchable, ".TIF" files, suitable for import into CT

25   Summation – the litigation software used by counsel to Plaintiff and Defendant DeVito.  Then, with

26   co-counsel, George L. Paul, Esq., I attempted to discuss the nature and extent of ESI which the New

27   Defendants possessed.  However, defense counsel were not prepared to discuss these issues.

28   Consequently, we were unable to complete the discussion required by Fed. R. Civ. P. 26(f)(3)© and

-3-

Corbello Exhibit 2
Page 0004

1   Plaintiff's counsel sought a supplemental conference for that purpose, as detailed in the *Declaration*

2   *of George L. Paul Under Penalty of Perjury* ("Paul Declaration"), filed contemporaneously herewith.

3          7.      On December 2, 2008, Mr. Paul sent a letter to defense counsel, on which I was

4   copied, memorializing our discussion of November 26, 2008, as it related to ESI.  Although the New

5   Defendants promised to respond in writing to this letter, no response was received, insofar as I am

6   aware.  A true copy of Mr. Paul's letter, as received by me, is appended to the *Paul Declaration* as

7   *Attachment 2*.  Given this absence of response, and Plaintiff's need to move forward with written

8   discovery, Mr. Paul sent an electronic mail message to defense counsel on January 6, 2009, on which

9   I was also copied, noting their failure to "meet and confer," and demanding that they communicate

10  with us, as required by the Rules.  A true copy of this letter, as I received it, is appended to the *Paul*

11  *Declaration* as *Attachment 3*.  No response to this demand was immediately received.

12         8.      As a result of the New Defendants' refusal to meet their obligations under Fed. R.

13  Civ. P. 26(f), Plaintiff's counsel had to prepare and serve her initial discovery requests without

14  knowing what forms of ESI were, or had been, in New Defendants' possession.  Interrogatories and

15  initial requests for production of documents, ESI, and things, under Fed. R. Civ. P. 33 and 34, were

16  served on Defendants Valli and Gaudio, on or about January 6, 2009.  Interrogatories and initial

17  requests for production of documents, ESI, and things, were served on Defendants Brickman and

18  Elice, the writers of *Jersey Boys*, on January 8, 2009, and similar requests were served on Defendant

19  McAnuff, the director , on January 9, 2009.  These requests expressly covered ESI, stored in any

20  medium from which information can be obtained, with reference to Fed. R. Civ. P. 34(a).

21         9.      I also communicated with Mr. Mayeda by electronic mail on January 9, 2009, and

22  true copies of these communications are appended hereto as *Attachment 1*.  Therein, I noted that the

23  New Defendants had yet to complete their *Initial Disclosures*, notwithstanding that even the

24  stipulated, extended deadline for doing so had passed.  I also pointed out that defense counsel still

25  had not responded to Mr. Paul's demand for a conference concerning ESI, and urged that this

26  conference occur promptly, as it would affect the discovery responses shortly becoming due.  Mr.

27  Mayeda's reply stated that he would schedule the requested conference with Mr. Paul, but did not

28  promise prompt completion of the New Defendants' *Initial Disclosures*.  Instead, he indicated that

-4-

Corbello Exhibit 2
Page 0005

1    *Initial Disclosure* documents would be provided on a "rolling basis," beginning the following week.

2    10.    On January 15, 2009 Plaintiff's counsel and New Defendants' counsel finally spoke

3    by telephone, for the purpose of completing the discussion required by Fed. R. Civ. P. 26(f)(3)(C),

4    which the New Defendants had not been prepared to do on November 26, 2008.   However,

5    notwithstanding the passage of almost two months, defense counsel were still not prepared to discuss

6    issues concerning the preservation and production of ESI.   Mr. Korzenik did disclose that

7    Defendants Brickman and Elice had ESI in their possession, in the form of native files for a

8    screenwriting program used to compose the play, but he was uncertain of the name of the program.

9    I asked that the program be identified, and the native files therefor produced, as they were covered

10   by Plaintiff's discovery requests, and likely contained important meta-data otherwise unavailable

11   to us.  Mr. Korzenik said he would check with his client and revert to me with the name of the

12   program, but had reservations about producing the native files, because Plaintiff's counsel might

13   "alter" the scripts contained therein, and/or disseminate same to third parties.  I responded that this

14   reservation was unfounded, because: (a) the accusation that Plaintiff's counsel would engage in such

15   conduct was irrational; (b) the New Defendants possessed the original files and could easily

16   determine if alterations had been made; (c) the New Defendants could produce the files in "read-

17   only" format, so that no such changes could occur; and, (d) the New Defendants were protected

18   against unauthorized dissemination of such material by the *Stipulated Protective Order* (Doc. 94)

19   in this case.  Both Mr. Paul and I clearly stated that "PDF" printouts of the scripts (and drafts

20   thereof) for *Jersey Boys* would not be sufficient – especially if the program used to read these files

21   was readily obtainable by Plaintiff's counsel.  Mr. Korzenik then suggested that Plaintiff bear the

22   cost of purchasing the program, along with additional licenses for defense counsel's use.  Plaintiff's

23   counsel were not particularly amenable to the latter idea, but promised to consider it after learning

24   the identify of the program, and the purchase price.

25   11.    On that same date, January 15, 2009, Mr. Paul sent a letter to New Defendants'

26   counsel by electronic mail, on which I was copied, entitled, "Suggestions Re Electronic Discovery,"

27   which requested responsive action, including an index of available ESI, by January 26, 2009.  A true

28   copy of this letter, as I received it, is appended to the *Paul Declaration* as *Attachment 4.*  Defense

-5-

1    counsel did not respond to this letter, although New Defendants provided certain documents past due

2    for their *Initial Disclosures*, between January 16 and January 17, 2009.  These documents were not

3    presented in the form requested by Plaintiff during the parties' November 26, 2008 conference under

4    Fed. R. Civ. P. 26(f).

5          12.    Whereas, Plaintiff's counsel had not received any of the information sought in Mr.

6    Paul's letter as of January 26, 2009 – the date by which it was demanded – both Mr. Paul and I wrote

7    to the New Defendants' counsel on that date.  True copies of these messages, as I sent and/or

8    received them, are appended to the *Paul Declaration* as *Attachment 5*.  The messages concerned a

9    variety of discovery failures, and beseeched defense counsel to work with us to resolve them.

10   Therein, I again requested that defense counsel identify the screenwriting software used to produce

11   the native files of the various scripts for *Jersey Boys*, so we could purchase it, to enable our review

12   thereof.  No response to these urgent messages were received.  Instead, Mr. Mayeda served

13   additional, belated *Initial Disclosure*-related documents on January 26, 2009 – which were not in

14   the form requested by Plaintiff during the parties' November 26, 2008 Rule 26(f) conference;

15   informed us that Defendant Valli had served discovery requests on Plaintiff by mail; and, indicated

16   that the New Defendants had still not completed their *Initial Disclosures*, and would provide further

17   documents in connection therewith, at a later date.

18         13.    On February 6, 2009, my co-counsel, Robert H. McKirgan, Esq., served

19   interrogatories and production requests upon Defendant, DSHT, Inc., a producer of *Jersey Boys*,

20   under Fed. R. Civ. P. 33 and 34.  On February 9, 2009, Mr. McKirgan served similar interrogatories

21   and production requests upon Defendant, Dodger Theatricals, Ltd., another *Jersey Boys* producer.

22   At that point, defense counsel had still failed to identify the name of the relevant screenwriting

23   program, and accordingly, we simply began demanding production of ESI in native form.

24         14.    On February 11, 2009, I sent an electronic mail message to Messrs. Mayeda and

25   Korzenik, entitled, "Electronic Discovery Issue – Screenwriter's Software Program," which

26   reiterated our request for the identify of the program used to create the native files, and stressed its

27   importance to our review of changes made to the scripts for *Jersey Boys* over time.  A true copy of

28   this electronic mail message, as dispatched, is appended to the *Paul Declaration* as *Attachment 6*.

-6-

1  Defense counsel did not respond to this message, although it was marked "urgent," and a response

2  was requested "ASAP," by "today or tomorrow."

3       15.    On the evening of February 16, 2009, I spoke with Mr. Korzenik by telephone, and

4  was finally advised that the name of the screenwriting program used to create and review the *Jersey*

5  *Boys* scripts and drafts, was MovieMagic® Screenwriter.  During this conversation, I advised Mr.

6  Korzenik that we would be purchasing the software, and he again requested that Plaintiff purchase

7  additional licenses for defense counsel's use.  I advised Mr. Korzenik that I was leaving for a

8  mediation in New York the next morning, but would investigate the matter following my return to

9  Dallas.  During this conversation, Mr. Korzenik also promised to provide responses to the

10  interrogatories and production requests served on Defendants Brickman, Elice, and McAnuff, by

11  Tuesday, February 24, 2009, and it was my understanding that these responses would include the

12  native files for the MovieMagic® Screenwriter program.

13       16.    Following my return to Dallas, on Saturday, February 21, 2009, I reviewed

14  information concerning the MovieMagic® Screenwriter software on the World Wide Web, and

15  found at least two sites offering the software for purchase.  Based on this review, I determined that

16  it was not possible to purchase multiple "license" for the software – it was sold only as a standalone

17  product, and in an "enterprise" or "network" edition, and it appeared that a separate package had to

18  be purchased for each location where the product would be used.  At that time, I purchased two

19  copies of the software for Plaintiff's counsel, for $379.85 – one in downloadable form, and one

20  boxed copy to be shipped by mail.  I did not purchase additional copies for defense counsel at this

21  time, but did discuss Mr. Korzenik's request with my co-counsel on Monday, February 23, 2009.

22       17.    On February 23, 2009, I also contacted Mr. Korzenik by telephone, and advised him

23  that we had purchased the MovieMagic® Screenwriter software, but did not believe it would be fair

24  to require Plaintiff to purchase copies for defense counsel – particularly given that the New

25  Defendants already had one or more copies of the program.  Mr. Korzenik said this was "ok," and

26  that defense counsel would purchase their own copies.  In return, I told him that I would provide

27  information on the source for our purchase, which appeared to have the lowest price.  I prepared

28  notes concerning this conference immediately thereafter, and am willing to provide the Court and

Corbello Exhibit 2
Page 0008

1  defense counsel with copies thereof, but only if it is stipulated that this will not waive the attorney-

2  client privilege, or applicable work-product immunity protection.

3      18.     The New Defendants did not respond to the discovery propounded to Defendants

4  Brickman, Elice, and McAnuff on February 24, 2009 as promised.  Instead, during our conversation

5  of February 23, 2009, Mr. Korzenik requested a two-week extension of time, which Plaintiff granted

6  on February 24, 2009, making the responses due by March 10, 2009.  At no time during these

7  communications did Mr. Korzenik indicate that these responses would not be accompanied by the

8  native files, for which the MovieMagic® Screenwriter software had been purchased.

9      19.     On March 9, 2009, Mr. Korzenik contacted me again by telephone, requesting a

10  further extension of time, through March 13, 2009, in which to tender the discovery responses of

11  Defendants Brickman, Elice, and McAnuff.  On March 10, 2009, Mr. Korzenik sent us an electronic

12  mail message confirming this extension, and I responded with a message seeking confirmation that

13  the MovieMagic® Screenwriter native files would be included with these responses, while providing

14  a link to a site where defense counsel could purchase the software, as promised.  True copies of these

15  electronic mail messages are appended to the *Paul Declaration* as *Attachment 7*.  Mr. Korzenik did

16  not respond to my inquiry concerning the native files.   Nor did we receive responses to the

17  discovery requests served on Defendants Brickman, Elice, and McAnuff on March 13, 2009.

18  Instead, Mr. Korzenik requested a further extension of time, through Monday, March 16, 2009.

19      20.     On March 16, 2009, defense counsel finally served written responses to Plaintiff's

20  discovery requests to Defendants Brickman, Elice, and McAnuff by mail, and I received them on

21  March 20, 2009.  However, the responses were not accompanied by any documents, things, or ESI,

22  native or otherwise.  For more than fifteen days, Plaintiff's counsel waited for these materials, but

23  they never came.

24      21.     On April 6, 2009, Mr. Paul sent a letter to Messrs. Mayeda and Korzenik, on which

25  I was copied, entitled, "When Can We Expect Your Documents," pointing out that the New

26  Defendants' production delays were delaying our response to Defendant DeVito's dispositive

27  motion, for which we might need to rely on such material; repeating our demand for the

28  MovieMagic® Screenwriter native files, and reminding that the New Defendants had yet to respond

-8-

1   to our demands for information concerning available ESI, the format(s) thereof, and their

2   preservation efforts.  Mr. Korzenik responded by electronic mail, stating, *inter alia*: "As to 'native

3   files' I am looking further into that and how to do it. I do not presently have the software.  But will

4   touch base with Greg also by end of week on this."  True copies of these messages, as received by

5   me, are appended to the *Paul Declaration* as *Attachment 8*.  Mr. Korzenik gave no indication that

6   the New Defendants intended to withhold the native files; only that he did not have the software and

7   needed to look into "how to do it."  I responded personally to this message, reminding Mr. Korzenik

8   that we had already provided information about where the software could be obtained.  I also

9   explained that, because we had purchased and installed the software, all we needed from the New

10   Defendants were the actual files, on a disk.  A true copy of this message, as sent on April 6, 2009,

11   is appended to this *Declaration* as *Attachment 2*.

12       22.    Notwithstanding the foregoing messages, and Mr. Korzenik's promise to "meet and

13   confer" about the native files issue by April 10, 2009, he did not do so.  Moreover, as of April 22,

14   2009, we *still* had not received: (a) documents, things, or ESI responsive to the production requests

15   we served in early-January on Defendants Brickman, Elice, or McAnuff; (b) written responses or

16   documents responsive to discovery requests served in early-February upon Defendants Dodger

17   Theatricals and DSHT; or (c) *Initial Disclosures* from Defendant, JB Viva Vegas, LP, which were

18   long overdue.  Moreover, defense counsel had not requested extensions of time for providing these

19   items.   Accordingly, I wrote counsel for the New Defendants on that date, outlining these

20   deficiencies, and requesting a response.  Although Mr. Mayeda responded with an electronic mail

21   message, stating that he was sending documents responsive to the Elice and Brickman production

22   requests by courier, he did not mention the documents due from Defendant McAnuff, and ignored

23   the remaining deficiencies identified in my message.  I noted this refusal to confer in a response sent

24   by electronic mail, which also sought confirmation that the material Mr. Mayeda would be sending

25   for Brickman and Elice would include the MovieMagic® Screenwriter native files.  True copies of

26   these electronic mail messages, as sent and received by me, are appended to the *Paul Declaration*

27   as *Attachment 9*.  Mr. Mayeda never responded to my second message.  Instead, the next day, on

28   April 23, 2009, he filed three motions to dismiss Plaintiff's *Second Amended Complaint*.

Corbello Exhibit 2
Page 0010

23.     The documents finally received from Defendants Brickman and Elice, on April 24, 2009, were not presented in the formats requested by Plaintiff.  Instead, they were in PDF format, despite our request for searchable, single-page TIF files, suitable for import into CT Summation. Nor were the MovieMagic® Screenwriter native files included, despite our repeated demands for same; our purchase of the requisite software for reviewing them (with defense counsel's encouragement); and, the lack of any objection by the New Defendants to their production.

24.     The belated document production for Defendants Brickman and Elice in late-April 2009 was also incomplete in other ways.  First, defense counsel were continuing to produce documents on an unscheduled, "rolling basis," at their own convenience, without regard for Plaintiff's discovery needs, and this initial production set did not even include all versions of the *Jersey Boys* script that had been enacted/performed at all locations.  In fact, it does not appear that all such scripts have been produced even as of the present date – the "performance scripts" provided much later by said Defendants did not include the scripts used during preview performances, attended by paying ticket holders in the weeks before each formal opening night.  Second, neither this initial production, nor any subsequent production set, of which I am aware, included all electronic mail messages between the writers; the writers and director; the writers and third parties, or the writers and their counsel (or privilege logs concerning same), although this material had been expressly requested by Plaintiff.  Third, although more than two hundred script-related PDF documents ultimately were produced by the New Defendants, many were mere fragments; the dates on which they were written, and the identities of the writers, could not be readily ascertained; and, it was impossible to determine which script or fragment came from whom.  For example, we expected that *both* Defendants Brickman and Elice would have copies of certain scripts or fragments in their possession, but it did not appear that the duplicate copies of each Defendant were provided. Fourth, the fragments and scripts produced seemed to be "clean printouts" from computer files - I did not see PDF scans of "hard copy" scripts or fragments, which might include handwritten notes or annotations.  In sum, although Defendants Brickman and Elice provided many pages of script-related material, due to the manner and form of the New Defendants' production, Plaintiff's counsel could not readily reconstruct the evolution of *Jersey Boys*; identify all changes made to performing

-10-

1  versions of the script, determine when these changes were made or the dates on which such

2  variations were performed; or, identify which writer (Brickman or Elice) was responsible for what

3  material in various portions of the play.

4       25.    Whereas, the New Defendants continued to produce material responsive to Plaintiff's

5  discovery requests on a "rolling basis," on dates of their choosing, for the remainder of 2009, and

6  did not object to the production of the native files during this period, Plaintiff's counsel hoped, with

7  the receipt of each production set, to find the items mentioned in the preceding paragraph, including

8  the native MovieMagic® Screenwriter files, all draft and performing versions of the *Jersey Boys*

9  script, the various electronic mail messages requested from Brickman and Elice and the other New

10  Defendants, and a privilege log for any documents withheld due to privilege or work product

11  immunity claims.  However, this never occurred.  Defense counsel produced further documents on

12  behalf of various New Defendants on or around May 26, 2009, June 24, 2009, July 16, 2009,

13  September 2009, April 9, 2010, April 14, 2010, and April 15, 2010, but none of these production sets

14  remedied the foregoing discovery deficiencies of Defendants Brickman and Elice.  Moreover,

15  defense counsel were *even less diligent* in responding to discovery requests propounded to other

16  New Defendants.  For example, despite the fact that Plaintiff served document production requests

17  on Defendant Dodger Theatricals on February 9, 2009, it was not until December 23, 2009 that said

18  Defendant provided a written response, and the New Defendants did not bother to request extensions

19  of time for months.  Nonetheless, at some point, in an attempt to resolve the dispute without Court

20  intervention, and provide an incentive for the New Defendants to comply with discovery, Plaintiff

21  agreed to waive objections to the untimeliness of the New Defendants' extant responses, *provided*

22  all such responses were received by a certain date.  New Defendants' counsel  did not meet this

23  deadline either, but began requesting extensions of time by telephone thereafter.

24       26.    On October 18, 2009, I sent an electronic mail message to counsel for the New

25  Defendants, outlining, *inter alia*, the deficiencies in their production of scripts, and drafts of scripts,

26  up to that point, and again noting that the native files had not been produced.  A true copy of this

27  electronic mail message, redacted, to delete an unrelated discovery inquiry, is appended hereto as

28  *Attachment 3*.  Mr. Korzenik responded to the unrelated discovery inquiry on October 20, 2009 by

Corbello Exhibit 2
Page 0012

1  electronic mail, and asserted that all scripts in his possession had been produced.  However, he

2  ignored the issue of whether he had obtained all relevant materials from his clients, as well as my

3  continued demand for the native files.  A true copy of Mr. Korzenik's response, redacted to include

4  only the pertinent aspects thereof, is appended hereto as *Attachment 4*.

5      27.     On December 18, 2009, I sent another electronic mail message to defense counsel,

6  in response to a request for an extension of briefing deadlines, which we granted, reiterating the

7  foregoing discovery deficiencies, including the inadequacy of the New Defendants' script

8  production, and their continued failure to produce the MovieMagic® Screenwriter native files held

9  by Defendants Brickman and/or Elice.  A true copy of this message, as dispatched, redacted to

10 include only information pertinent to this dispute, is appended hereto as *Attachment 5*.  As reflected

11 in this message, it was my belief by this time that the New Defendants' noncompliance with

12 discovery, and refusal to meaningfully address Plaintiff's concerns, was motivated by a belief that

13 they would prevail on their motions to dismiss, rendering their noncompliance moot.

14 Characteristically, defense counsel did not respond to this aspect of my message.  However, as of

15 this late date, the New Defendants still had not objected to the production of the native files, and we

16 continued to expect them, albeit, perhaps, only when and if the New Defendants' extant motions to

17 dismiss were denied.

18      28.     On March 4, 2010, following the Court's hearing on the extant dispositive motions,

19 Plaintiff's counsel convened a telephone conference with defense counsel to discuss these and other

20 outstanding issues.  Mr. Paul, Mr. McKirgan, and I participated on behalf of Plaintiff, and the New

21 Defendants were represented by, *inter alia*, Messrs. Korzenik and Mayeda.  During this conversation,

22 Plaintiff's counsel attempted to discuss the ongoing dispute concerning ESI, including the New

23 Defendants' failure to produce the native files.  However, the conference was cut short when Mr.

24 Korzenik declared that there were too many outstanding issues to deal with by telephone, and alleged

25 that we were raising these particular issues for the first time.  In response, I pointed out that Mr.

26 Korzenik's latter statement was inaccurate, mentioning the various messages and demands discussed

27 in this *Declaration*, and the contemporaneously-filed *Declaration* of Mr. Paul.  Mr. Korzenik then

28 claimed that our scattershot email messages were difficult to keep up with and/or follow-up on, and

-12-

1    suggested that, rather than discussing the matters further, Plaintiff's counsel summarize her demands

2    in writing, and defense counsel would review the letter, and then talk with us further.  In the spirit

3    of cooperation, we agreed to proceed in this manner.

4           29.    On March 10, 2010, Mr. Paul sent a letter to the New Defendants' counsel, as

5    promised, in an attempt to resolve the extant disputes concerning, *inter alia*, the identification of all

6    ESI and the New Defendants' efforts to preserve it, and the production of the MovieMagic®

7    Screenwriter native files, the *Jersey Boys* scripts and drafts, and the electronic mail messages of

8    Defendants Brickman and Elice.  A true copy of this letter, on which I was copied, is appended to

9    the *Paul Declaration* as *Attachment 10*.   However, contrary to Mr. Korzenik's representations in

10   our March 4, 2010 conference, defense counsel did not call to resume our discussions after receiving

11   Mr. Paul's correspondence.  Instead, on March 18, 2010, at approximately 7:00 p.m., Central

12   Standard Time, Mr. Korzenik's co-counsel, Mr. Couvillier, filed *Defendants' Motion* with the Court.

13   Then, at 7:13 p.m., Central Standard Time – after *Defendants' Motion* had been filed – Mr. Korzenik

14   sent an electronic mail message to Mr. Paul and me, with a memorandum regarding ESI preservation

15   which:  did not identify the ESI in New Defendants' possession (it merely stated that ESI existed,

16   on the computers of Defendants Brickman and Elice); alleged that all scripts had been provided to

17   Plaintiff; and, neglected to address fully Plaintiff's inquiry concerning the failure to produce all

18   relevant electronic mail messages from or to Defendants Brickman and Elice.  True copies of Mr.

19   Korzenik's March 18, 2010 electronic mail message, and its attachment, are appended hereto as

20   *Attachment 6*.

21          30.    Mr. Korzenik's March 18, 2010 message also included the first express indication

22   that the New Defendants did not intend to produce the native files which Plaintiff had sought for

23   more than a year without objection.  Therein, Mr. Korzenik stated: "[The attached memorandum]

24   does not treat the subject of native files of drafts of scripts – an issue on which we are at an impasse

25   and will need to deal with in other ways."  The message did not specify the nature of the impasse or

26   articulate the grounds for the New Defendants' objection to production.  It also misstated Plaintiff's

27   native file request, which encompassed the native files for all scripts, rather than merely drafts

28   thereof.

-13-

Corbello Exhibit 2
Page 0014

31.     Material and information concerning the MovieMagic® Screenwriter software, with which the native files are used, is appended hereto as *Attachment 7*.  Included are scanned images of the front and back cover of the software package, which I possess; descriptive material concerning its features, which I downloaded to my computer from Internet Web sites at the point of sale, as identified on each printed page thereof; and, screen shots of various features and windows within the program, showing the types of data and metadata that may be included in native files created by and/or opened within the application.  As shown in this material, and based on my personal experience with the software following our purchase, the program is not simply a word-processor – it is a likely source of a variety of evidence reasonably likely to be admissible in this dispute.  For example, the program has areas in which notes can be stored, and integrated or associated with portions of scripts; tagging and color-coding schemes, not visible in PDF printouts like those provided by the New Defendants; outlining features, for drafting preparation; an "iPartner" collaboration tool, through which writers may work together on a document, and "chat" concerning ideas and revisions, without resorting to standalone electronic mail or chat programs; an electronic "index card" system, for editing and rearranging scenes; ten levels of "undo" information; "auto-revision" markings, which automatically mark editing changes over time; reporting features, capable of generating full production reports, and a variety of other reports; "NaviDoc" technology, to facilitate location of information within scripts; and revision tracking, including a repository of all versions of, and revisions to, scripts.  Additionally, if both Defendants Brickman and Elice worked with the software, as represented, it is possible that information can be gleaned concerning which writer is responsible for certain portions of the *Jersey Boys* scripts, and when discrete contributions thereto were made.

32.     Plaintiff's counsel, including myself, believe that the foregoing information is crucial to her case, as the adjudication thereof requires a comprehensive examination of*, inter alia*, the manner and speed in which *Jersey Boys* was created; which Defendants made specific infringing or non-infringing contributions to the play; and, the extent to which the writers used the Work in issue, as opposed to other sources, for their drafting (which may be evident from the notes, index cards, and/or iPartner features within the native files).  Indeed, the native files may comprise the only

-14-

Corbello Exhibit 2
Page 0015

means for Plaintiff to verify that all drafts and performing scripts of *Jersey Boys* have been produced, and will make Plaintiff's review of those documents easier, when opened within the MovieMagic® Screenwriter program.  The causes of action in this case, as they relate to the New Defendants, hinge upon their <u>use</u> of the Work in connection with *Jersey Boys* (Plaintiff's equitable accounting claims), as well as their alleged copying therefrom (certain of Plaintiff's infringement claims), and, to prove her claims, Plaintiff's counsel must have access to all notes, scripts, markings, written communications, and other material of every kind that may shed light on the creative process, and/or evidence material variations in the play, as performed in numerous locations, on thousands of occasions, since 2004.

33.    Concerning the allegation that I am prosecuting this case for reasons other than professional ones, and that there is some factor personal to me that is "significantly distorting discovery issues and discovery planning" herein (*Defendants' Motion* at 12) – it is false.  As should be evident from the foregoing discussion, and my conduct before this Court, I am a serious advocate for my client, and Plaintiff's need for the materials requested from the New Defendants in discovery arises from the well-pleaded claims in her *Second Amended Complaint* (Doc. 107) ("SAC"), rather than a personal agenda of my own – or a conspiracy between myself and unidentified third parties, as the New Defendants recklessly and scandalously allege.  My work in this case has nothing to do with "Four Seasons fanaticism," and, with due respect for the New Defendants, their counsels' claims regarding the nature of my interest in the band; my role in an email discussion group composed of individuals interested in their recordings; and, my degree of familiarity, and personal interaction with, other such "e-group" participants, outside the context of the group discussions, is grossly exaggerated, and upon information and belief, willfully so.  Other allegations advanced in *Defendants' Motion*, concerning the composition of Plaintiff's witness list; the manner in which I met my client; the manner in which we obtained a DVD of *Jersey Boys* for use as evidence in this case; and, "oozing" "resentment" by a "rejected" "fan club," of which I am supposedly a member, and which I supposedly share, are completely false, and defense counsel had no conceivable basis for advancing them, other than to distract the Court, embarrass me personally, and/or attempt to damage my relationship with my client, who is relying on me to prosecute her case objectively,

-15-

Corbello Exhibit 2
Page 0016

1    effectively, and in pursuit of her interests, rather than my own.

2        34.    My credentials relevant to this litigation speak for themselves, and, briefly

3    summarized, are as follows.  I have been licensed to practice law for 24 years, and have focused

4    exclusively upon copyright, trademark, and mass media/communications law matters for 26 years,

5    including two years of supervised practice in copyright litigation and licensing matters before my

6    formal admission in Louisiana.  During this time, I have represented clients before a wide range of

7    federal agencies, courts and other tribunals, including, but not limited to, the United States Copyright

8    Office; the U.S. Copyright Board of Appeals; the Copyright Royalty Tribunal; the Copyright Review

9    Board; Copyright Arbitration Royalty Panels (CARP); the Register of Copyrights; the United States

10   Patent and Trademark Office; the Trademark Trial and Appeal Board; the Federal Communications

11   Commission ("FCC"); the FCC Review Board; various FCC Administrative Law Judges; United

12   States District Courts in California, Florida, Kentucky, Louisiana, Missouri, Minnesota, Nebraska,

13   Nevada, New York, Ohio, and Texas; the U.S. Court of Appeals for the D.C. Circuit; and, the

14   Supreme Court of the United States, where I briefed and argued the case, *Metro Broadcasting, Inc.*

15   *v. FCC*, 497 U.S. 547 (1990).  I received an AV®-Rating from Martindale-Hubbell when first

16   evaluated in 1992; have maintained this rating through to the present (my current rating is "AV®-

17   Preeminent, 5 out of 5"); have been listed in the *Bar Register of Preeminent Lawyers* in the

18   copyright, trademark, and communications law fields, for each of the years 1993-1995 and 1998-

19   2010; and, am a member of a number of local and federal bar associations (and divisions or

20   committees thereof), concerned with copyright and trademark law.  Upon information and belief,

21   these credentials, and the experience represented thereby, were important factors in Plaintiff's

22   decision to engage me as lead counsel in this case.

23       35.    The seriousness of my advocacy in this proceeding is also a matter of record, and is

24   reflected in the *SAC*; in the various briefs filed on Plaintiff's behalf in this case; and, by the fact that

25   this Court, in a 41-page opinion (Doc 300), denied four motions to dismiss the *SAC*, and granted our

26   own cross-motion for summary judgment on an affirmative defense asserted by one of the

27   defendants.  This Court found Plaintiff's actions against the New Defendants to be plausible, and

28   sufficiently supportable in fact to preclude dismissal under Fed. R. Civ. P. 12(b)(6), and it is

-16-

1  precisely these plausible causes of action that call for production of the materials we have requested

2  in discovery, which are now in dispute.

3         36.     For the record, I am not now, nor have I ever been, a member of a Four Seasons fan

4  club – much less a "zealous member" of such a club.  Upon information and belief, no such fan club

5  exists – the last Four Seasons fan club, which was located in the United Kingdom, disbanded in

6  2002.  However, even if there were such a club, it is inconceivable that I would be a member – I have

7  never joined a fan club for any musical group.  Moreover, I am not enamored of celebrity.  I do not

8  believe in approaching celebrities for autographs, or intruding upon them after performances, and

9  my interest in an artist's work is not generally accompanied by an interest in the details of his or her

10 personal life.  I have represented a number of celebrities in my practice, including prominent

11 television personalities, and have not viewed them differently than any of my other clients.  I have

12 also interviewed musical artists for live and pre-recorded radio broadcasts, and assisted others with

13 concert logistics and accommodations, and frankly, view the notion of fawning over them – or

14 joining fan clubs therefor – as distasteful, awkward, and embarrassing, for both artist and fan.

15        37.     I am, however, deeply interested in music, which is the reason I entered the copyright

16 field in the first instance.  I was a disc-jockey for seven years, while in college and law school; wrote

17 album reviews for the *Vanderbilt Hustler* as a student; and, was a member of the Student

18 Government Association Concert Committee, which booked bands for school concerts, provided

19 concert security, and arranged for accommodations and transportation for the artists.  I am also an

20 amateur music historian, with thousands of recordings in various media, covering a wide variety of

21 genres, and a small library of books regarding various musical artists, music theory, and aspects of

22 music history.  Generally, my tastes lie outside the realm of popular music, encompassing free jazz,

23 jazz-fusion, progressive rock, world music, and avant garde rock and classical music, and I enjoy

24 exposing people to music they have never heard, and would not encounter on commercial radio.  I

25 have played rudimentary guitar since I was ten years old, and many of my friends are musicians.  I

26 also have friends throughout the country, and internationally, with whom I communicate

27 electronically regarding music matters and topics.

28        38.     Specifically, since the early-1990's, I have participated in a variety of Internet

-17-

Corbello Exhibit 2
Page 0018

1    discussion groups concerning different bands and musical genres.  Initially, these discussion groups

2    were on "UseNet," accessible through "Gopher," an early Internet protocol, now largely-defunct.

3    Subsequently, I joined a number of "email discussion groups," to which users subscribe by sending

4    an email to a designated server, and, once added to the group mailing list, can send a message to the

5    central discussion group address and it will be delivered automatically to all group members.  Thus,

6    if a subscriber posts a question or comment, other members can respond, creating a multi-way email

7    "conversation."  These conversations, or "threads," as they are called, often continue for some time

8    and move on to other subjects, unrelated to the original posting.  In the late-1990's, as the World

9    Wide Web largely supplanted these services, I joined a number of Web-based "e-discussion groups,"

10   hosted by "E-Groups," and accessible via the URL, www.e-groups.com.   These groups operate

11   similarly to the older discussion groups, except that, in addition to relaying messages to all group

12   members, they maintain online archives of all messages dispatched, and new messages can be posted

13   via the group's Web portal, as well as by electronic mail.  For "public" groups, the message archives

14   are accessible to anyone visiting the e-group site.  For private groups, the archives are accessible only

15   to subscribers, who must log in with a password to view them.  "E-Groups" was purchased by Yahoo

16   in August 2000, and the groups to which I subscribed ultimately became "Yahoo!Groups," accessible

17   via the URL, http://groups.yahoo.com.   I now subscribe to more than 20 music-related

18   Yahoo!Groups and email discussion groups, including several pertaining to the "progressive rock"

19   musical genre; several relating to experimental and electronic music; several devoted to the

20   progressive rock bands King Crimson and Gentle Giant; one devoted to The Residents; one focusing

21   on avant garde music; groups concerning individual musicians, such as Robert Fripp, Brian Eno,

22   Fred Frith, John Wetton, Brian Wilson, Chick Corea, and Bill Bruford; and a group devoted to

23   "Smile" – an experimental Beach Boys' album that was never completed or released.  I am generally

24   an active participant in the groups to which I subscribe.  I can type over 100 words per minute, so

25   I dispatch comments and/or replies on various topics quickly, throughout the day and night, while

26   doing other work.

27        39.    The membership composition of these discussion groups is international, and anyone

28   who has an interest in the subject matter of a group may join, though moderator approval is

Corbello Exhibit 2
Page 0019

1    sometimes required, to screen out advertisers and spam.  Due to this diversity, in my experience,

2    there is no unified "position," "opinion," or "agenda" among those who participate in such groups

3    – the wide range of matters discussed are often matters of personal opinion, and many times there

4    is good-natured, or even vehement, disagreement about a topic.  Nonetheless, over time, a

5    camaraderie develops, as subscribers become more familiar with one another, and enjoy having a

6    forum in which they can freely express and debate their views.  Moreover, in my experience, it is not

7    uncommon for members, and past members, of bands under discussion to subscribe to these groups,

8    providing opportunities to pose questions directly to them and receive responses.  Several groups in

9    which I am involved also organize periodic "gatherings," so participants can meet, in person, the

10   people they have befriended online, and some of these are held outside the United States.  Over the

11   years, I have also moderated at least two e-groups, one for fans of King Crimson who reside in

12   Dallas, Texas, and one comprised of college friends, which is not music-related.  I also subscribe to

13   other groups that have nothing to do with music, and involve other personal interests.  I routinely

14   receive and/or respond to dozens of messages from these various groups each day.

15          40.    On May 30, 2004, I was browsing the available Yahoo!Groups list, and noticed two

16   e-groups relating to the Four Seasons, one of which included the caption, *Genuine Imitation Life*

17   *Gazette*, which I knew to be the title of the band's only "concept album."  This album had been

18   discussed in my progressive rock discussion groups, and was one of the few Four Seasons records

19   I still owned.  I was intrigued by the existence of a discussion group inspired, at least in part, by this

20   recording, and wanted to hear what people had to say about it.  Accordingly, on that date, I joined

21   both groups – the *Genuine Imitation Life Gazette* group, entitled, *FrankieValliandTheFourSeasons*,

22   and the second, called *ValliSeasons*. True copies of the Web "portals" to these groups, as they appear

23   today on the Yahoo!Groups Web site, are appended hereto as *Attachment 8*.  Upon information and

24   belief, this is not the way these pages appeared when I subscribed, but the original pages are not

25   available for comparison.  Both groups were and remain "private," with archives inaccessible to the

26   public.  Moreover, when I subscribed, I had no knowledge of, and had not read, any of the thousands

27   of postings preceding my membership, and the groups had existed for years before I discovered

28   them.

-19-

Corbello Exhibit 2
Page 0020

41.     My participation in the *ValliSeasons* group initially lasted less than 15 days.  After subscribing, I had seen messages relating to the surreptitious recording of live concerts, and was "attacked" by several members when my first post asked whether the Four Seasons had an official stance on such taping.  The question was posed innocently, as various bands have different positions on the matter, but apparently, this had become a sensitive topic long before I joined the discussion, and a previous member had been ejected from the group due to arguments over that controversy. Two subscribers accused me of being that same person, attempting to rejoin using a different identity, which, of course, was untrue.  Others, upon learning that I was a copyright attorney, wrote disparaging comments about lawyers.  This was a very different atmosphere from other e-groups in which I was involved, which either discouraged bootlegging activities and file sharing, or had the band's blessing to engage in them.  Accordingly, I unsubscribed from *ValliSeasons*, on June 14, 2004, and became active in the *Genuine Imitation Life Gazette/FrankieValliandTheFourSeasons* group instead.

42.     Within a short time, I came to know the subscribers to the *Genuine Imitation Life Gazette* Yahoo! group as a friendly bunch of people, with considerable knowledge about the Four Seasons, and the album that had attracted me to the discussion.  In fact, quite a few of the members were, or had been, closely connected to the band.  For example, former Four Seasons bassist, Joe Long, who played on the *Genuine Imitation Life Gazette* album, was and remains an active member. Other members include Defendant Gaudio's daughter; Defendant Gaudio's step-daughter; Dean Egnater, Defendant Valli's manager; Bobby Valli, Defendant Valli's brother; former Four Seasons guitarists John Paiva and Clay Jordan; former Four Seasons bassist and guitarist, Don Ciccone (through his wife); Charles Alexander, a former editor of *Time* magazine, who wrote an article about the "Four Seasons Partnership" for *Time*, in or around 1986, is a friend to Defendant Gaudio, and an official Four Seasons writer/biographer; Peter Bennett, attorney for the "Four Seasons Partnership;" Tom DeCillis, a broadcaster, disc-jockey, record producer, and manager, who had befriended Four Seasons members Nick Massi and Defendant DeVito in 1957, worked with them in the 1960's, and recorded their music; Frank Rovello, who started the group, with a man named Stuart Miller, discussed below, and created a comprehensive Web site concerning the band,

-20-

Corbello Exhibit 2
Page 0021

1   accessible via the URL, www.genuine-imitation-life-gazette.com; Russ McClelland, a fan, who

2   created an earlier Four Seasons Web site, accessible via the URL,

3   www.angelfire.com/music/SeasonologyInstitute, and is credited for non-musical contributions in

4   liner notes for two Four Seasons' compilation albums; Dr. William Bozeman, a university professor,

5   author, and musicologist, who is working on a book concerning "Doo Wop" music, in which the

6   Four Seasons, and/or its predecessor, the Four Lovers, are featured; several individuals in the United

7   Kingdom, who call themselves the "Four Seasons U.K. Historical Society," conduct research

8   regarding the band's history and recordings, and host a Web site accessible via the URL,

9   http://www.seasonally.co.uk; and, more casual fans, like me, who simply discovered the group, and

10   asked to join.  All told, the group has over 400 subscribers, and there is no unified "view,"

11   "perspective," or "agenda" among them, of which I am aware, or to which I subscribe.  The only

12   commonality is a shared interest in some aspect of Four Seasons (or Frankie Valli) music, and a

13   desire to discuss it, and/or read the discussions of others.

14       43.   Since October 17, 2004, Defendant Marshall Brickman has also subscribed to the

15   *Genuine Imitation Life Gazette* e-group,  as shown in the true copy of his entry in the roster of

16   members, appended hereto as *Attachment 9*.  Moreover, on October 20, 2004, Defendant Brickman

17   sent an email message to the group's members, regarding changes to the *Jersey Boys* script, which,

18   insofar as I can determine, he has not produced in discovery, notwithstanding that it is relevant, and

19   covered by Plaintiff's discovery requests.  A true copy of Defendant Brickman's subject message,

20   as downloaded to my computer from the Yahoo!Groups archive, is appended hereto as *Attachment*

21   *10*.

22       44.   Long prior to the date on which this action was filed, well before *Jersey Boys* debuted

23   in La Jolla, and years before I met or knew of Plaintiff, I participated in many "threads" within the

24   foregoing e-group, and became acquainted with several members, through their writings, in that

25   context.  These threads covered many topics, including album reviews; recording trivia; band

26   personnel; favorite songs; instruments used in recordings; lyrics; comparisons between the Four

27   Seasons and the Beach Boys; Defendant Valli's voice, age, and current touring ensemble; concert

28   reviews posted by others; concert choreography; YouTube® videos featuring the band or its songs;

-21-

1   news articles about the band; stereo equipment; "tribute" bands; the Four Seasons' trademark;

2   historical concert appearances; concert etiquette; proper grammar and writing style; and occasionally,

3   personal matters, such as life experiences; political views (though discouraged); a member's loss of

4   job; mental health issues affecting one or more members; family estrangements; births; deaths;

5   health problems (including my own); and other matters which would be embarrassing and injurious

6   if disseminated publicly.  Later, when *Jersey Boys* was announced and debuted, the e-group's

7   discussions naturally expanded to include that topic, and various subscribers posted reviews of the

8   play when it debuted in California, and again, after it moved to New York.  In fact, I saw the play

9   in New York in April 2006, and posted a brief review to the e-group.

10       45.     Over time, as a result of these e-discussions, and long before this action was filed, I

11   developed superficial but friendly relations with several members of the foregoing e-group, most

12   notably, Frank Rovello and Charles Alexander.  Early on, Mr. Rovello helped me locate, and

13   purchase, a 1992 Four Seasons album I had not heard, when I asked about it in the context of the

14   group discussion.  Mr. Alexander complimented and encouraged my writing, even when our

15   opinions widely-differed on various topics – some of which had nothing to do with the Four Seasons

16   – and made me feel comfortable within the e-group.  Later on, Bobby Valli sent free samples of his

17   recordings to me by mail, and corresponded with me briefly, "off-list," about his music.  I had no

18   relationship with these individuals outside of the group; had never met them, and we had never

19   spoken by telephone.  Nonetheless, over the years, in the context of the group discussions, I shared

20   impressions and experiences with these and other e-group members, and came to consider them

21   friends – even though I knew nothing of their lives outside the e-group.  Virtually all of these e-

22   exchanges are recorded in the e-group archives, and are accessible to subscribers, including Peter

23   Bennett, attorney for Defendants Valli and Gaudio, with whom I later had several conversations,

24   after this case commenced.

25       46.     I am not personally aware of any ongoing friction, feelings of resentment, rejection,

26   or other discord between the *Genuine Imitation Life Gazette* e-group and Defendants Valli, Gaudio,

27   or DeVito, and in fact, my experience has been the opposite – that the discussion group, and its

28   members, are appreciated by the surviving members of the Four Seasons, and that relations are both

-22-

1    cordial, and appropriately distanced, due to the number of individuals so close to the band who

2    participate (including family members and management); due to the activities of such subscribers

3    as Mr. Rovello, Mr. Alexander, Mr. McClelland, and John Hornsby, for which the Four Seasons

4    have expressed their appreciation; and, due to Mr. Rovello's Web site, the scope and content of

5    which are remarkable.

6          47.      In late-2004, I did learn that Stuart Miller, who resides in the United Kingdom and

7    co-founded the e-group, but by then was largely inactive, had negative feelings toward Four Seasons'

8    attorney Peter Bennett, and had complained about him to the group, in a message posted months

9    before I became a subscriber, which accused him and the Four Seasons of not appreciating the fans.

10   However: (a) I have no personal knowledge of those events, as Mr. Miller withdrew from active

11   participation in the group before I joined; (b) I had never read Mr. Miller's subject message until

12   searching the group's archives, after *Defendants' Motion* was filed; and, (c) upon reviewing said

13   archives in connection with *Defendants' Motion*, it appears that Mr. Miller's views were personal,

14   and not widely-shared; were addressed quickly, and diplomatically, by Mr. Alexander; and,

15   expressed the feelings of a small U.K. contingent of subscribers, rather than a large number of

16   participants.  I can only speculate that the New Defendants' unsubstantiable accusations about me

17   have something to do with those events, but I was not a part of them.  Nonetheless, to shed light on

18   the matter, and place the subject material on record, rather than relying on hearsay and innuendo, true

19   copies of Mr. Miller's subject message, and Mr. Alexander's response, as downloaded to my

20   computer from the Yahoo!Groups archive, and printed to PDF format, are appended hereto as

21   *Attachment 11*.

22         48.      Mr. Miller's subject message, posted in January 2004, and my review of earlier-

23   archived messages in connection with *Defendants' Motion*, do indicate, which I had not previously

24   known, that, for a two-week period in 2002, the e-group and associated Web site were intended to

25   be associated with an "official" fan organization.  However, this plan was apparently abandoned

26   almost immediately, when Mr. Miller was unwilling to accept the terms, conditions, and

27   requirements thereof, which included relinquishment of some control over content.  These events,

28   if they occurred, would have transpired two years before I joined the e-group, and I have no personal

-23-

knowledge of them.  Moreover, upon information and belief, the composition of the e-group has changed, and grown, since 2002.  In sum, defense counsel are clearly attempting to smear me, by falsely portraying me as an architect or proponent of events that occurred, or may have occurred, years before I subscribed to the e-group, involving a long-inactive U.K. member, of which I have no personal knowledge.  Moreover, *Defendants' Motion* attempts to cover-up this fabrication, by refraining from tendering the underlying documents, which show that the views expressed were not those of a "group," and that, in any event, I was not involved.  Had I been a subscriber to the e-group's messages at that time, and assuming there was any truth to Mr. Miller's statements, my views would likely have been similar to those expressed in Mr. Alexander's response – if I would have formed any views on the subject at all.  I did not subscribe to the discussion group for updates on Defendant Valli's current tours, or Valli's and Gaudio's current activities – I viewed the Four Seasons primarily as a historical band, which disbanded decades ago, and my interest involved historical, musical matters.  Additionally, as a copyright attorney, I would have understood fully, the importance of maintaining control over an "official" Web site or discussion list, and accordingly, could not have sympathized with Mr. Miller's alleged complaints against Four Seasons attorney Peter Bennett regarding same.

49.    In fact, as I noted in a message posted to the *Genuine Imitation Life Gazette* e-group in 2005, from which *Defendants' Motion* clips a phrase out of context (see *Defendants' Motion* at 14), any allegation that the Four Seasons did not appreciate their fans was not supported by the conduct I read about, or was exposed to, in the group.  As shown in the true copies of that message, and others, sent to the e-group on August 29, 2005, appended hereto as *Attachment 12*, Mr. Rovello and Mr. Alexander were invited by Defendant Gaudio to attend the recording session for the original *Jersey Boys* cast album in New York; report on the session to the e-group members; and, transmit a special message of appreciation thereto.  As stated in Mr. Alexander's email of that date:

> Bob Gaudio knows we fans are out there, and he appreciates us immensely, even if he is understandably shy about direct communication. He has asked me to thank all of you for your support of *Jersey Boys*.

I responded with a message stating, "Wow! How'd you guys get to do that? I thought the Partnership

Corbello Exhibit 2
Page 0025

wasn't friendly to us, etc. That's pretty neat that they invited you and let you be there."  Mr. Alexander responded as follows:

> It all goes back to Frank [Rovello's] 's website. BG [Bob Gaudio] apparently likes what he sees there.  He read the reviews of *Jersey Boys* we fans posted, and I was lucky enough to be contacted to write the liner notes to [the] *Jersey Boys* cast album.

Further messages were posted to this "thread" by me and others, but those in *Attachment 12* make the point.  They certainly do not evidence "rejection," "feelings of rejection," "oozing resentment," or an "agenda" against the band.  My comment merely observed that Mr. Miller's supposed complaints (which again, I had not read) did not appear to be accurate – this was not the kind of treatment an artist accords disliked persons or groups.  Moreover, in my experience, these were not the Four Seasons' only friendly overtures.  For a gathering of e-group members in 2008, mentioned further below, Defendants Valli and Gaudio sent a special message, along with cards and gifts (*Jersey Boyz*® apples) for the attendees, and supplied a door prize (an early *Jersey Boys* script) which was awarded in a drawing.  And, when a beloved subscriber had a heart attack last year, and reported it to the e-group, he sent a follow-up message shortly thereafter, indicating that he had received a surprise "get well" package from Defendants Valli and Gaudio.  Kindnesses of this nature do not breed feelings of resentment or rejection, and certainly did not do so for me.

50.   The foregoing messages also evidence that defense counsel's unsubstantiated claim that Mr. Rovello's *Genuine Imitation Life Gazette* Web site "oozes with resentment" (*id*. at 14), is also false – by admission of defense counsel's own client.  As recounted in Mr. Alexander's message, Defendant Gaudio's appreciation for the site ["BG likes what he sees there"], and the reviews of *Jersey Boys* posted thereto, are what led him to invite Messrs. Rovello and Alexander to attend the *Jersey Boys* cast album recording session in New York, and to select Mr. Alexander to write the liner notes for the CD.  As further reported in Mr. Alexander's account:

> Then [Bob Gaudio] looked back and grinned at me and Frank [Rovello].  Frank was treated like royalty when people heard that he runs *genuine-imitation-life-gazette.com*.  Several cast members said that they visit the website when they have questions about the Seasons.  John Young said that he had listened to Valli interviews on the website to hear how Frankie talks.

(*Attachment 12* at 2, 4.)  I do not believe Defendant Gaudio and the *Jersey Boys* cast members would

-25-

Corbello Exhibit 2
Page 0026

1    feel this way if the Web site were "oozing with resentment," as alleged in *Defendants' Motion*, and

2    in fact, the New Defendants have relied on the site in this case, arguing that certain material in *Jersey*

3    *Boys* was independently created by Defendants Brickman and Elice, based on material and

4    information obtained therefrom, rather than the Work.  In sum, I cannot understand how defense

5    counsel could make such claims, for which there is absolutely no factual support, and considerable

6    evidence to the contrary, and affix their signatures to *Defendants' Motion* in good faith.

7            51.     Similarly specious and defamatory are defense counsel's assertions that I personally

8    share (and that the *SAC* "oozes with") the same (nonexistent) feelings of (nonexistent) rejection and

9    resentment as the (nonexistent) "fan club."  (*Defendants' Motion* at 14.)  First, as stated previously,

10   I have never been a member of a Four Seasons "fan club," and was not even a participant in the

11   *Genuine Imitation Life Gazette* e-group when Stuart Miller wrote about his alleged conflicts with

12   Peter Bennett, which have nothing to do with me, to which I am unsympathetic, and in which I have

13   no interest.  Second, I have never felt "rejected" by the "Four Seasons Partnership," or harbored any

14   personal resentments with respect thereto.  On the contrary, although I joined the discussion group

15   in 2004 with minimal expectations, hoping simply to "converse" with other, unknown persons about

16   the *Genuine Imitation Life Gazette* album, to my surprise, on at least two occasions, Defendant

17   Gaudio acknowledged my inquiries and contributions, leading to feelings of "acceptance" and

18   "comfort," rather than "rejection" or "resentment."  As shown in the true copies of messages posted

19   to the discussion group in 2006 and 2007, appended hereto as *Attachment 13*, on November 21,

20   2006, Defendant Gaudio (and former Four Seasons bassist Joe Long), responded, through Mr.

21   Alexander, to my posted observation that there were errors in the liner notes for a recent CD re-

22   release of *Genuine Imitation Life Gazette*.  (*Id*. at 2.)  A year later, in October 2007, Defendant

23   Gaudio responded favorably, again through Mr. Alexander, to a review I posted concerning

24   Defendant Valli's newly-released solo album, which was his first such release in many years.  (*Id*.

25   at 3-4.)  In sum, there simply were and are no bases for feelings of rejection or resentment on my part

26   – I was not rejected, and there is nothing to resent, other than the libelous statements in *Defendants'*

27   *Motion*.  Finally, the *SAC* (Doc. 107) does not "ooze" with resentment, and I invite the Court to

28   review it, for its independent assessment.

Corbello Exhibit 2
Page 0027

52. Defense counsel's express and implied allegations of collusion between me and other subscribers to the discussion group (*Defendants' Motion* at 14) are similarly baseless. First, for the record, I did not discuss this action with anyone in the e-group prior to filing Plaintiff's *Complaint* (Doc. 1) on December 28, 2007 – no one in the e-group knew I was working on the case, and I have never posted a message to the group concerning this lawsuit, either before or after that date. Shortly after the *Complaint* was filed, I did contact Mr. Rovello and Mr. Alexander, as a courtesy, to inform them that they were mentioned in a *Complaint* filed against Defendant DeVito, and that I had attached as *Exhibits*, material bearing their names. I also sent each of them a copy of the *Complaint*, so they could see the context in which they were mentioned. Neither of them were pleased. In fact, Mr. Alexander indicated that, while he was happy to continue interacting with me socially within the e-group, or at a gathering therefor, he would not discuss any aspect of this action unless he were subpoenaed, and he did not want copies of any further filings in the case. The following day, he contacted me again, to inform me that he had forwarded the *Complaint* to Four Seasons attorney, Peter Bennett, and to reiterate his unwillingness to discuss the matter, or any issue relating thereto, unless subpoenaed. Mr. Rovello also stressed his unwillingness to become involved, and his lack of knowledge of any relevant facts. He further stated that he would not be commenting on the lawsuit within the e-group, and did not intend to post anything about it on the *Genuine Imitation Life Gazette* Web site, and, insofar as I am aware, he has done neither. However, he did request copies of public, unsealed documents filed in the case, for his own personal review, and from time to time, I have forwarded such documents to him. Other than Messrs. Rovello and Alexander, I have only shown the *Complaint* and other unsealed, publicly-filed documents to one other e-group subscriber – Dr. William Bozeman, one of Plaintiff's witnesses, who provided a *Declaration* filed in response to Defendant DeVito's motion for summary judgment. In sum, I have not colluded with anyone in this case, other than Plaintiff and my co-counsel. I have not advanced any position on behalf of myself, or any person or group, other than Plaintiff. My advocacy is guided solely by the merits of this case, and my sense of professionalism.

53. Defense counsel's allegation that "many of Plaintiff's proposed witnesses and deposition witnesses are names drawn from the fan club chat room" (*Defendants' Motion* at 14), is

Corbello Exhibit 2
Page 0028

1    also recklessly false.  First, there is no fan club, as previously noted.  Second, there is no "chat room"

2    associated with the *Genuine Imitation Life Gazette* e-discussion group.  Third, of the numerous

3    witnesses named in Plaintiff's *Initial Disclosures*, and listed on her behalf in the parties'

4    *Supplemental Joint Status Report* (Doc. 89), only two, to my knowledge (other than Defendant

5    Brickman), have ever posted to the subject Yahoo!Group – Charles Alexander and Frank Rovello,

6    independently-important witnesses, whose areas of possible testimony also relate, in part, to

7    admissions posted in the group.  A third witness, Dr. William Bozeman, who also participates in the

8    discussion group, is not listed in the foregoing documents, but has already testified on Plaintiff's

9    behalf, knew Rex Woodard personally, and is an independently-important witness.  Three witnesses

10   out of nearly forty do not comprise "many of Plaintiff's proposed witnesses," and it is difficult to

11   understand how defense counsel, in good faith, could affix their signatures to a motion tendering

12   such demonstrably false statements to the Court.

13       54.    For example, as the New Defendants well know, Mr. Alexander, far from being a

14   member of a "fan club" with "resentment" towards the band and *Jersey Boys* (see *Defendants'*

15   *Motion* at 14), is an official writer/biographer for the Four Seasons, who, in addition to activities

16   already mentioned above, wrote the *Preface* to the officially-sanctioned and produced *Jersey Boys*

17   coffee table book; has written liner notes and other material for Four Seasons albums, including

18   *Jersey Beat* – the most significant Four Seasons compilation now in print; has written press material

19   for the band, including the biographical essay published on the group's official record company Web

20   site, accessible via the URL, http://www.frankievallifourseasons.com/index.html; was instrumental

21   in organizing a reunion of surviving original Four Seasons members, DeVito, Gaudio and Valli, in

22   connection with *Jersey Boys'* Broadway debut; and, has published articles about the group in *Time*

23   magazine, one of which has been produced by the New Defendants in discovery.  Additional

24   information concerning Mr. Alexander's involvement with the band, in his own words, from true

25   copies of messages posted to the *Genuine Imitation Life Gazette* e-group, is appended hereto as

26   *Attachment 14*.  Moreover, as defense counsel well know, Mr. Alexander is named in the *SAC*, and

27   as a witness in this case, because he put Mr. Woodard's sister, Cindy Ceen, in touch with Defendant

28   DeVito, in September 2005, concerning the possible publication of the Work, and thus possesses

-28-

Corbello Exhibit 2
Page 0029

1    relevant information regarding DeVito's fraud, and other actionable behavior.

2         55.    The second of Plaintiff's two previously-listed witnesses who have posted to the

3    *Genuine Imitation Life Gazette* Yahoo! discussion group is Frank Rovello, discussed above, who co-

4    founded the e-group, and created the associated *Genuine Imitation Life Gazette* Web site which

5    Defendant Gaudio, and many others, respect.  Far from being a member of a "fan club" "oozing"

6    with "resentment" of the band and play, Mr. Rovello, as previously reported, is a well-respected fan,

7    who was invited to attend the official recording of the *Jersey Boys* cast album.  Mr. Rovello was

8    cited in an *Exhibit* to the *SAC* because he made a statement in connection with an early *Jersey Boys*

9    "podcast," indicating that the writers of *Jersey Boys* had relied, in part, on the Work at issue herein.

10   Moreover, as defense counsel know – which is why they did not identify Mr. Rovello by name in

11   *Defendants' Motion*, even as they smeared his Web site – Defendant Elice has testified under oath

12   that he consulted Mr. Rovello, in connection with the writing of *Jersey Boys*, and downloaded

13   material from Mr. Rovello's site, as part of his research.  Thus, Mr. Rovello may be knowledgeable

14   concerning: (a) the truthfulness of Defendant Elice's prior testimony; and/or, (b) the evolution of the

15   *Jersey Boys* script, and the creative process of Defendants Brickman and Elice.  Plaintiff's

16   identification of Mr. Rovello as a witness does not evidence any "agenda" other than to elicit

17   relevant testimony in this case.

18        56.    The third and final witness Plaintiff may call who has posted to the *Genuine Imitation*

19   *Life Gazette* discussion group – Dr. Bozeman – is likewise not a member of a fan club with

20   "resentment" of the band and play, and has no nefarious agenda.  As set forth above, Dr. Bozeman

21   is, instead, a noted author and musicologist with a scholarly interest in the Four Seasons.  He is a

22   witness because he collaborated with Rex Woodard on a writing project immediately preceding

23   Woodard's creation of the Work, and thus, possesses information relevant to Woodard's authorship,

24   and the fact that Woodard was primarily a writer, rather than an attorney for Defendant DeVito, as

25   argued in DeVito's motion for summary judgment.  The latter issue has been removed from this

26   case, because the Court ruled, as a matter of law, that Defendant DeVito's "attorney-client"/fiduciary

27   arguments had no merit, and granted Plaintiff's cross-motion for summary judgment on that issue.

28   (*See* Doc 300).  Nonetheless, Dr. Bozeman's testimony regarding the "authorship" issue remains

                                        -29-

1  relevant to Plaintiff's actions against Defendant DeVito.  In sum, the allegation that "many" of

2  Plaintiff's proposed witnesses are members of a fan club with resentment of the Four Seasons and

3  *Jersey Boys*, is completely and recklessly false, and the few witnesses who happen to subscribe to

4  the subject Yahoo! discussion group, possess, or may possess, information relevant to Plaintiff's

5  case.

6        57.    Equally false, and as recklessly so, is the allegation that I met my client, Plaintiff,

7  Donna Corbello, via a "fan site." (*Defendants' Motion* at 13.)  For the record, Plaintiff has never

8  subscribed to, or participated in, the *Genuine Imitation Life Gazette* e-group, or any other Four

9  Seasons-related email discussion group of which I am aware, and I did not meet her "via" any such

10  group.  I did first meet Mr. Woodard's sister, Cindy Woodard Ceen, who resides here in Dallas, via

11  the e-group, as she joined in late-2005, and was briefly a subscriber.  Moreover, in January 2006,

12  I responded, in general terms, within the group, to a question posed by Mrs. Ceen regarding how to

13  determine whether Mr. Woodard had registered his copyrights in the Work.  However, this did not

14  lead to immediate, further, detailed discussions on that topic, much less a legal engagement, and we

15  subsequently participated in e-group discussions together on a variety of topics, along with other

16  subscribers, and became friends.  I was not introduced to Ms. Corbello until more than a year later,

17  and that introduction had nothing to do with the Yahoo!Group.  Moreover, I was not engaged by

18  Plaintiff until May 2007, and the initial engagement was not for a litigation, but to investigate the

19  copyright status of Mr. Woodard's work.  My formal engagement by Ms. Corbello in this matter did

20  not occur until August 11, 2007, two years after meeting Mrs. Ceen via the e-group.  I do not,

21  however, see the relevance of this issue, as the way I was introduced to Ms. Corbello was completely

22  ethical, and has no bearing on the New Defendants' obligations to comply with discovery.

23        58.    The allegation that I purchased a bootleg DVD of *Jersey Boys* at a "Fan Site

24  Convention" (*Defendants' Motion* at 14), is also false, and again, I do not understand how defense

25  counsel can, in good faith, affix signatures to a motion making positive declarations of fact which

26  there is no evidence to support.  If defense counsel suspected that I obtained the *Jersey Boys* DVD

27  in that manner, that is what should have been stated in their brief. Alternatively, they could have

28  served a discovery request on Plaintiff, seeking information regarding the DVD's origin, to build

-30-

1 evidence for whatever argument they hoped to make.  Instead, Mr. Korzenik and his co-counsel

2 decided to tender this unfounded statement, and others, to the Court, gambling that one or more of

3 their unfounded allegations might prove true.  It has been extremely time-consuming and costly for

4 Plaintiff and her counsel to prepare and file brief-after-brief in this case, focused largely upon

5 refuting such false and insupportable allegations, and I sincerely hope this will not continue to be

6 necessary.

7        59.     The manner in which I came into possession of the subject DVD had nothing to do

8 with any "Fan Site," or the *Genuine Imitation Life Gazette* e-discussion group.  Rather, I purchased

9 the DVD online, from a completely-unrelated source.  Due to the unavailability of any script, or copy

10 of any performance, of the infringing *Jersey Boys* production when this action was filed, this

11 publicly-available copy of an early Broadway performance comprised valuable and necessary

12 evidence, and in fact, was used in the briefs and at the hearing which resulted in the *Order* in (Doc.

13 300.)  Again, however, this issue appears completely irrelevant, as my purchase of this publicly-

14 available material was ethical; had nothing to do with a non-existent fan club; and, has no bearing

15 on the New Defendants' duties to comply with discovery, or meet and confer, before seeking

16 protective orders from this Court.

17        60.     I attended a combined gathering of subscribers to the *Genuine Imitation Life Gazette*

18 and *Valli/Seasons* e-groups, in November 2008, to meet my e-friends of almost five years; to meet

19 and interview Dr. Bozeman; and to speak with one or two other persons mentioned in Mr.

20 Woodard's personal notes and records, who I expected to attend.  To the best of my knowledge, no

21 goods of any kind were sold at this gathering, and I saw no *Jersey Boys* DVD's.  Various e-group

22 members had "show and tell" sessions one morning in which they shared interesting items from their

23 collections, and traded items they owned for items of interest owned by others.  Most of the function

24 consisted of scheduled talks and meals, and I did not discuss this action with anyone at the gathering,

25 other than Plaintiff's disclosed witnesses, and potential witnesses, familiar with Mr. Woodard, with

26 one exception – at the end of the final meal, at the conclusion of the gathering, Mr. Alexander looked

27 at me and said something to the effect of, "So you had to add Frankie and Bob to the suit?," and

28 there were others at the table who heard his comment.  I looked at them and said something to the

Corbello Exhibit 2
Page 0032

1    effect of, "you mean, you guys have known that I was involved in the case all weekend and have said

2    nothing?"  Several people nodded, we all smiled, and shortly thereafter, I returned to my room.  I

3    left early the following morning, having refrained from discussing any substantive issues in this case

4    with these other e-group members, and, as of the present date, I still have not done so.  Moreover,

5    although I have continued to participate in the e-group, posting and responding to messages on

6    unrelated topics, my postings have decreased since this action was filed, and I have not engaged in

7    any conduct intended to elicit admissions for this case.  Nor are my postings anonymous – each bears

8    my name and personal email address.  I would never breach the confidences of my client, violate the

9    *Stipulated Protective Order* in this case, alter evidence, or engage in other improper conduct.  Most

10   importantly, for purposes of *Defendants' Motion*, there is no collaboration or collusion between me

11   and any member of the *Genuine Imitation Life Gazette* e-discussion group.  I act for Plaintiff.

12        61.    Contrary to the assertions in *Defendants' Motion* (see *Defendants' Motion* at 13), I

13   have also never "contributed" to Mr. Rovello's *Genuine Imitation Life Gazette* Web site, or any other

14   site relating to the Four Seasons.  Rather, following the discussion group gathering discussed, *supra*,

15   at ¶ 60, Mr. Rovello sent a message to the e-group, requesting photographs from the gathering, for

16   posting to the site.  In response, I sent several photographs I had taken, which Mr. Rovello posted

17   to the site, along with photographs taken by all the other attendees.  I have absolutely no

18   involvement with Mr. Rovello's subject site.

19        62.    Defense counsel's allegation that "Mr. Guillot believes he knows more about the

20   [Four Seasons] than any one of them knows about themselves [SIC]" (*Defendants' Motion* at 14)

21   is also false, preposterous, and indeed, to attribute such beliefs to someone is to label them irrational.

22   There is an allegation that "he thinks," referring to me, that this case will bring out that I know truths

23   about the Four Seasons which they will not reveal.  That allegation is also false, and ridiculous.  For

24   the record, although this should be obvious without my testimony:  I have absolutely no personal

25   knowledge regarding any aspect of, or incident in, the lives of Defendants Gaudio, Valli, and DeVito

26   (or Nick Massi), other than that I have seen Defendant Valli perform twice in concert, and

27   accordingly, know where he was for at least two hours on each of those evenings.  I simply have

28   no personal knowledge of any "life event" relevant hereto.

-32-

Corbello Exhibit 2
Page 0033

63.     Nonetheless, I do possess *evidence* concerning certain matters, which Plaintiff has properly disclosed in discovery and/or filed with the Court, including admissions from the New Defendants themselves, and admissions by Peter Bennett, Esq. – some of which are cited in the *SAC* – which are relevant, which must be explored in discovery, and which, coupled with defense counsel's lack of diligence, if applicable, could make it appear that I know more about certain life events than said *counsel*.  However, I do not – these issues are evidentiary, and do not involve my personal opinions, and that is why they are emerging in discovery.

64.     For example, one important issue in Plaintiff's actions for copyright infringement is whether certain events discussed in the Work, and appropriated in *Jersey Boys*, actually occurred. If not, and the Work's accounts are fictional, the New Defendants appropriation of these elements may constitute infringement, even if the literal expression of those events in the respective works are relatively dissimilar.  Another important issue is the extent to which accounts in *Jersey Boys* are fact or fiction, as this is probative of an element of the fair use defense – if *Jersey Boys* is entertainment, rather than a *bona fide* historical account of the Four Seasons' lives, it may not presumptively make "fair use" of Plaintiff's copyrighted material.  Thus, truths and fictions in the Work and play are highly relevant to this case, and Plaintiff bears the burden of proof on certain of these issues.  Plaintiff has identified the Work's account of a "roman orgy," at which Defendant Gaudio supposedly lost his virginity, as one example of a fictional account in the Work which *Jersey Boys* appropriated with similar expression, including some verbatim copying.  Plaintiff also has alleged that the Work's account of Defendant Valli's failure to attend an "after-party" held by Defendant DeVito following the Four Seasons' induction into the Rock and Roll Hall of Fame is fictitious.  Defense counsel have argued repeatedly in their briefs, and in Court, that these events, and others, "really happened," and have been dismissive of Plaintiff's claims (and now disparage me for asserting) that there are factual disputes on these points.  Yet, as shown in a message posted by Mr. Alexander to the *Genuine Imitation Life Gazette* e-group on October 16, 2008, appended hereto as *Attachment 15*, Defendant Gaudio has made a contrary admission regarding the "roman orgy."  As stated therein:

Interestingly, in Jersey Boys the Seasons are portrayed as less square

-33-

Corbello Exhibit 2
Page 0034

than people thought, even  passing along a joint at a party. <u>But Gaudio has told me that such a scene was an aberration and not normal behavior for the Seasons.  And of course the notion that Gaudio lost his virginity in 1963 at such a party is total fiction. It's what's known as dramatic license.</u>

*Id*. (emphasis added).  And, during several conversations with Peter Bennett, Esq., after this action was filed against Defendant DeVito, Mr. Bennett explained to me that the Hall of Fame "after-party" event "never happened," and indicated that Defendant Gaudio disliked the "roman orgy" scene, and would prefer that it be removed, because it is not true.  My discussion of these admissions comprise two examples of what defense counsel characterize as assertions that I know more than the Four Seasons do about their lives.  But in fact, I am questioning defense counsel's blanket assertion that "everything really happened that way," based on admissions by Defendant Gaudio and his attorney-in-fact.  I have no personal knowledge, no untoward agenda, and no desire to "prove to the world" that Defendant Gaudio did or did not lose his virginity during a roman orgy, or that Defendant Valli was rude to DeVito after the Hall of Fame Induction ceremony.  However, my client must establish, for her case, whether these events are "total fiction," reflecting "dramatic license," as Defendant Gaudio and Mr. Bennett have said, or were literally truthful events.  Defense counsel's attempt to thwart necessary discovery, and preclude Plaintiff from even inquiring about party admissions, by characterizing such routine requests as a zealous personal quest on "Guillot's" part, is transparently irrational.  It is this irrationality, and defense counsel's numerous false accusations, rules violations, and refusals to "meet and confer," that have impeded discovery in this case.  There is no material which I, or my co-counsel have requested in this proceeding for any purpose other than obtaining the evidence needed to prosecute Plaintiff's case.

65.     Finally, although irrelevant to Plaintiff's discovery requests, and the New Defendants' discovery violations, *Defendants' Motion* superfluously and falsely asserts that I have made statements in the *Genuine Imitation Life Gazette* e-group which reveal that I do not believe in arguments advanced herein, or which undermine them in some way. *(Defendants' Motion* at 13). Specifically, *Defendants' Motion* claims that I have admitted, to the foregoing e-group, that several events in *Jersey Boys* regarding the Four Seasons' lives are public knowledge, or have been reported in publicly-available sources, even as I have identified the *Jersey Boys* accounts of those events as

-34-

Corbello Exhibit 2
Page 0035

1  examples of copyright infringement.  These allegations are not only false, but repeat earlier

2  misrepresentations about Plaintiff's case by defense counsel which this Court has already

3  acknowledged are inaccurate.  Moreover, even though my uninformed personal opinions, as

4  expressed casually in an Internet e-group, long before this action was filed, do not constitute

5  evidence, cannot serve as admissions, and, do not comprise legal opinions, in fact, there is no

6  inconsistency between those earlier statements, and Plaintiff's arguments in this case.

7        66.     Specifically, defense counsel's current accusations are grounded in the ongoing

8  spurious assertion that Plaintiff is somehow claiming ownership of the Four Seasons' "life stories"

9  through this case – a claim the Court agreed, at the hearing on February 5, 2010, that Plaintiff has

10  not made.  Instead, Plaintiff's infringement claims are based on allegations that the Work's

11  *expression* was unlawfully appropriated for *Jersey Boys*, and that the play is an unauthorized

12  "derivative work."  (*See, e.g.*, Doc. 283 at 18-19, 26, 28, 35.)  In fact, I emphasized at the hearing,

13  that this case does not involve the ownership of "life events," and that defense counsel's arguments

14  to the contrary reflected fundamental misunderstandings (or misrepresentations) of Plaintiff's claims:

15          **MR. GUILLOT:**  I think the defendants misunderstand us, but I

16  think the Court appears to understand us. We don't own these guys'
   life story. We don't want it, we don't have any interest in it legally .

17  . . our client, is a co-owner of the Work with DeVito and owns that
   work and derivative works based on it and can recover for
   infringements of that work, and we believe that Jersey Boys is both

18  infringing and it's an adaptation.  We don't own Frankie Valli's life
   story. . .

19

20  (Doc. 283 at 136.)  I also explained at the hearing that defense counsel's misapprehension of

21  Plaintiff's claims extended to their arguments concerning the *Table of Similarities* between the Work

22  and *Jersey Boys* filed as an attachment to two of Plaintiff's briefs:

23          **MR. GUILLOT:** [O]ur table of similarities has been misunderstood
   because the defendants are looking at it and saying, okay, look at it,
   it says Frankie Valli and Bob Gaudio went and did this, or this

24  happened and this happened. That's not protectible, that event. *We
   would never claim that it is.*  What they missed that we are claiming

25  is that the structure of the Work is part of the expression.

26  (*Id*. at 139) (emphasis supplied).

27          **MR. GUILLOT:**  Because -- for example, there's a big story in the
   book about an arrest, they were arrested at the -- in Ohio after a

28  concert for defrauding an innkeeper because their manager had not

-35-

Corbello Exhibit 2
Page 0036

> paid the guy -- the hotel the year before, and that account appears in the work, and it's situated in the same location between the same two things that are in Jersey Boys, but in Jersey Boys it's in a different city, different things happened. It happens at the World's Fair instead of where it happened in the book at the -- after a Mike Douglas show, et cetera. *They took the structure . . .*

(*Id*. at 140-141.)   What defense counsel are alleging now is the same false accusation rejected previously, transformed into an unfounded personal attack.  *Defendant's Motion* claims I admitted, years ago, in messages to the e-group, that several events portrayed in *Jersey Boys* about the Four Seasons are public knowledge, or can be read about in publicly-available sources, and, *Defendants' Motion* focuses particularly upon statements made regarding: (a) the Four Seasons' arrest in Ohio, for failing to pay a hotel bill; (b) producer Bob Crewe's sexual orientation; and, (c) the Four Seasons' relationship with mobster, Gyp DeCarlo.  (*Defendants' Motion* at 13.)   Yet with respect to the first statement, as demonstrated by my above-referenced arguments at the hearing, Plaintiff claims no "ownership" in the "fact" that the Four Seasons were arrested in Ohio – rather it is the *expression* of that event which Plaintiff alleges has been unlawfully appropriated, as well as its role within the respective "structures" of *Jersey Boys* and the Work.  Thus, there is no conflict between my statement to the e-group that an arrest in Ohio "really happened," and my arguments in this case that such an arrest "really happened," and that *Jersey Boys'* account of that arrest was copied unlawfully from the Work.  Similarly, my statement, to the e-group, that information regarding Bob Crewe's sexual orientation is publicly-available, is not inconsistent with Plaintiff's arguments in this case that Bob Crewe is, in fact, "really gay," but that the characterization of Bob Crewe in *Jersey Boys*, as well as dialogue spoken thereby, were copied unlawfully from the Work.  Finally, my statement to the e-group that information is publicly-available showing some connection between the Four Seasons and Gyp DeCarlo, is not inconsistent with Plaintiff's arguments in this case that there "really was" a connection between the Four Seasons and Mr. DeCarlo, but his characterization *in Jersey Boys*, the anecdotes involving him (which may also be fiction or fact), and the manner in which his character is structurally-integrated into the play, were copied unlawfully from the Work. In sum, there is no substance to defense counsel's accusations – my casual comments to the e-group, made before I ever read the Work or met Plaintiff, are consistent with Plaintiff's arguments in this

-36-

Corbello Exhibit 2
Page 0037

1  case.

2        67.    As usual, defense counsel attempt to camouflage the falsity of their accusations by

3  presenting them as "hearsay summaries" (see *Defendants' Motion* at 13), rather than filing the

4  messages with the Court.  Accordingly, appended to this *Declaration* as *Attachment 16* are true

5  copies of the messages comprising the "thread" in question, as downloaded to my computer, and

6  printed in PDF form.  As shown therein, on May 31, 2006, Mr. Alexander noted a number of items

7  portrayed in *Jersey Boys* which, despite his extensive knowledge about the Four Seasons, he had

8  never known before seeing the play, and he challenged other e-group members who had seen the

9  play to discuss revelations that were new to them.  I responded the same date, indicating that I had

10  read that Bob Crewe was gay; that the Ohio arrest had been reported at the Web site,

11  www.thesmokinggun.com, and that I had *not* known about the Four Seasons' association with Gyp

12  DeCarlo, but upon conducting research had found "juicier" material about that association.  In

13  addition to the points made *supra*, at ¶ 65, two aspects of this message, strike me as significant.

14  First, the reference to the availability of information concerning the Four Seasons' Ohio arrest at the

15  "Smoking Gun" Web site, reinforces, rather than undermines the notion that the *Jersey Boys* account

16  was adapted from the Work.  Appended hereto as *Attachment 17*, is a true copy of the material

17  referenced in my message, as downloaded from the URL, www.thesmokinggun.com. The subject

18  site contains only two sentences of information, which was certainly insufficient to construct the

19  *Jersey Boys* account, but additional material concerning this event was contained in, and adapted

20  from, the Work.  And, the "juicer" information about Gyp DeCarlo reported as having been

21  previously shared with the e-group, pertained to an entirely different event that is not depicted in

22  *Jersey Boys* at all.  A true copy of my earlier message transmitting that information, on May 8, 2006,

23  as downloaded from the e-group archives, is appended hereto as *Attachment 18*.   Notably, after

24  describing the "publicly-available" information, I stated," There's nothing in the play about that."

25  In sum, none of these messages contain statements, much less admissions, which contradict

26  Plaintiff's positions herein.

27        68.    Approximately one month before the New Defendants were joined to this action, I

28  contacted Four Seasons attorney, Peter Bennett, as a courtesy, to advise him that Plaintiff had no

-37-

1  choice but to add Defendants Valli and Gaudio to this case, given the various license and assignment

2  agreements involving the Work which we discovered in Mr. Valli's divorce proceeding.  During this

3  conversation, Mr. Bennett indicated that my presence in the case gave it credibility; that he hoped

4  Defendants Elice and Brickman had not copied from the Work; and, that Defendants Valli and

5  Gaudio wanted me to know that they understood I was doing what I believed to be right for my

6  client, and they harbored no ill feelings.  I thanked Mr. Bennett for his statement, but also indicated

7  that I sincerely believed in Plaintiff's case, and would do everything possible to obtain justice for

8  her.  Those are still my positions.

9       69.     My foregoing statement includes everything I intend to say in this case on the

10  subjects of my subscription to the *Genuine Imitation Life Gazette* e-group, and my relationships with

11  other subscribers.  I have no personal knowledge relevant to this action, and am involved in no

12  conspiracy with others.  Every fact to which I have attested herein may be independently adduced

13  from documents exchanged in discovery, and through witnesses such as Plaintiff, Mrs. Ceen, Mr.

14  Alexander, Mr. Rovello, Dr. Bozeman, and Mr. Bennett.  However, none of these issues have any

15  bearing on the conduct of discovery in this action; Plaintiff's need for the documents, native files,

16  and information and material requested; or, the New Defendants' refusal to comply with basic

17  discovery requests or meaningfully "meet and confer" on discovery issues.  Moreover, I respectfully

18  request that defense counsel begin focusing on this case, rather than me.

19       70.     I further declare, under penalty of perjury, that the foregoing statements are true and

20  correct, to the best of my knowledge and ability, and are made in good faith.

21       Signed at Dallas, Texas, on this 3rd day of May, 2010.

22

23                                    _  /s/Gregory H. Guillot

24                                       Gregory H. Guillot

25

26

27

28

-38-