1   Gregory H. Guillot, *Admitted Pro Hac Vice*
    ggmark@radix.net
2   GREGORY H. GUILLOT, PC
    13455 Noel Road, Suite 1000
3   Dallas, TX 75240
    Telephone: (972) 774-4560
4   Facsimile: (214) 515-0411

5   John L. Krieger (Nevada Bar No. 6023)
    Jkrieger@lrlaw.com
6   LEWIS & ROCA, LLP
    3993 Howard Hughes Pkwy, Suite 600
7   Las Vegas, NV 89169
    Telephone: (702) 949-8200
8   Facsimile: (702) 949-8398

9   George L. Paul, *Admitted Pro Hac Vice*
    Gpaul@lrlaw.com
10  Robert H. McKirgan, *Admitted Pro Hac Vice*
    RmcKirgan@lrlaw.com
11  LEWIS & ROCA, LLP
    40 North Central Avenue, Suite 1900
12  Phoenix, AZ 85004
    Telephone: (602) 262-5311
13  Facsimile: (602) 262-5747

14  Attorneys for Plaintiff,
    DONNA CORBELLO
15

16                  **UNITED STATES DISTRICT COURT**

17                      **DISTRICT OF NEVADA**

18

19  DONNA CORBELLO,                          CASE NO.  2:08-cv-00867-RCJ-PAL

20              Plaintiff,              **PLAINTIFF'S OPPOSITION TO *NEW***
                                        ***DEFENDENTS' MOTION FOR***
21      vs.                             ***PROTECTIVE ORDER;***
                                        **CROSS-MOTION TO COMPEL**
22  THOMAS GAETANO DEVITO, *et al.*,    **PRODUCTION OF NATIVE FILES,**
                                        **PERFORMANCE SCRIPTS, DRAFT**
23              Defendants              **SCRIPTS, AND ANSWERS TO**
                                        **INTERROGATORIES; MOTION FOR**
24                                      **SANCTIONS; AND CONSOLIDATED**
                                        **MEMORANDUM IN SUPPORT**
25
        Plaintiff, Donna Corbello, by her attorneys, and pursuant to, *inter alia*, Fed. R. Civ. P. 26(b),

26  26(c)(2), 34(b)(2)(D), 37(a)(1), and 37(a)(3-5), and LR 7-2 and 26-7(a-b), herewith opposes the *New*

27  *Defendants' Motion for Protective Order As To Plaintiff's Demand for Certain Forms of Electronic*

28

*Discovery* (Doc. 298) ("Defendant's Motion"),[1] and files her own: (1) *Cross-Motion to Compel Production*, from Defendants Brickman and Elice,[2] of : (A) all "native" MovieMagic® Screenwriter files in which notes, scripts, or drafts of scripts for *Jersey Boys* are contained, referenced, or embodied; (B) all "hard copy" versions of scripts for *Jersey Boys* within their possession, custody or control, including drafts of scripts, script fragments and notes, and all scripts which have ever been enacted or performed on-stage for paying audiences, together with an index of information concerning: (i) the date of each script, (ii) whether it was a "draft," or a version enacted or performed for paying customers; and, (iii) which Defendant (Brickman or Elice) possessed each script produced; and, (C) all emails pertaining to the subject matter of this litigation sent or received by said Defendants; (2) *Cross-Motion to Compel Answers to Certain Interrogatories*, against Defendants Brickman and Elice, namely, interrogatories relating to scripts, drafts of scripts, notes, emails, ESI, and said Defendants' preservation efforts; and, (3) *Cross-Motion for Sanctions* against said Defendants, and/or their counsel, for withholding these materials without substantial justification; failing to satisfy their "meet and confer" obligations; and, inducing Plaintiff to purchase specialized software for native files said Defendants now refuse to produce.

## INTRODUCTORY STATEMENT

*Defendants' Motion* should be denied and Plaintiff's *Cross-Motions to Compel* and *Motion for Sanctions* should be granted, because: (1) Plaintiff specified a desired form (native files) of electronically stored information ("ESI"), and Defendants Brickman and Elice did not produce native files, but instead, produced documents in PDF format, without objecting to Plaintiff's requested form, or specifying the form in which said Defendants intended to produce, in violation of Fed. R. Civ. P. 34(b)(2)(D), and their obligations under Fed. R. Civ. P. 26(c)(1); (2) the native files operate by means of an application which, with defense counsel's encouragement, Plaintiff's counsel have

---

[1] This *Opposition* is filed within the time period specified in the *Stipulation* (Doc. 316) filed with the Court on May 3, 2010.

[2] Although *Defendants' Motion* was filed in the name of the New Defendants generally, Plaintiff's counsel has confirmed with defense counsel that the native files in dispute are held solely by Defendants Brickman and Elice. Accordingly, this opposition, and Plaintiff's cross-motions, are directed solely to said Defendants.

purchased; contain valuable imbedded data; and may also contain, *inter alia*, notes and "chat logs" by and between Defendants Brickman and Elice, along with other discoverable information reasonably anticipated to shed light on their use of the Work; (3) such ESI is discoverable; (4) despite legitimate requests, Defendants have not produced "hard copy" versions of all scripts for *Jersey Boys*, reflecting all variations of the script which have been enacted/performed for paying ticket-holders, on-stage; (5) said Defendants have not identified which of them possessed or produced which script to Plaintiff, making it impossible to know whether each has complied with her discovery requests; (6) said Defendants have not identified and produced their email files, or even hard copies of all email messages sent or received concerning the subject matter of this litigation, but instead, have ignored Plaintiff's requests for this material and/or advanced specious objections; (7) Defendants have not properly answered Plaintiff's interrogatories concerning scripts, emails, and ESI, including interrogatories regarding their preservation efforts; and, (8) Defendants have resorted to personal attacks and malicious fabrications against Plaintiff's counsel as a smokescreen to distract the Court from their own, serious violations.  Finally, in view of the foregoing violations; defense counsels' refusal to "meet and confer" before the filing of *Defendants' Motion*; and their unnecessary, irrelevant personal attacks, which were expensive and time-consuming to rebut, monetary sanctions should be awarded to Plaintiff, under Fed R. Civ. P. 37.  In support thereof, the following is shown.

### STATEMENT OF FACTS ("SOF")

1.      On August 12, 2008, Plaintiff filed her *First Amended Complaint* (Doc. 51), joining New Defendants, including Brickman and Elice, to this action, and adding claims against Defendants Brickman and Elice for copyright infringement, and contributory copyright infringement, arising from their unauthorized use, copying, and distribution of copies, of an unpublished literary work (the "Work") co-authored by Plaintiff's husband, Rex Woodard, and Defendant DeVito, in connection with the hit musical stage-play, *Jersey Boys*.  *(See* Doc. 51.)  On February 27, 2009, Plaintiff filed a *Second Amended Complaint* (Doc. 107) ("SAC"), joining Defendant, JB Viva Vegas, LP, and including claims against New Defendants, in various combinations, for, *inter alia*, copyright infringement (*SAC* ¶¶ 198-221); vicarious copyright infringement (*id*. ¶¶ 222-226); and contributory

infringement (*id.* ¶¶ 227-235), arising from: (a) their unauthorized licensing, sublicensing, and assignment of rights in the Work for *Jersey Boys*; (b) their reproduction of the Work, and distribution of copies; (c) their copying from the Work, and preparation of derivative works based upon it (namely, *Jersey Boys*, in its various incarnations, and collateral goods which include excerpts from the infringing *libretto*); and, (d) the performance and distribution of these infringing works throughout the United States.[3]  The *SAC* also includes actions, in the alternative, against Defendants Valli, Gaudio, Dodger Theatricals, Ltd., and DSHT, Inc., for an equitable accounting of profits obtained from the use or licensing of the Work in connection with the *Jersey Boys* production.  (*Id.*, ¶¶ 16, 188, 197.)

2.     Central to these claims, and Plaintiff's claims against Defendant DeVito, is the allegation that Defendants Brickman and Elice, the writers of *Jersey Boys*, used, referenced, copied, and/or adapted the Work's expression for the play, producing a new script within a few months of receiving the Work in early-2004, after an earlier, longstanding treatment was rejected. (*Id.* ¶¶ 51, 229 & *Ex. 27* at 3-4, Ex. 23 at 22.)  Thus, the personal notes and emails of Defendants Brickman and Elice relating to the production, and their writing process; the scripts, and drafts of scripts, they prepared for the play, before and after reviewing the Work; the sources of information available to them when drafting; and, information regarding all revisions made to the play, from its debut in California in Fall 2004 to the present, are among the most important items of discoverable evidence in this case.  Additionally, every script performed or enacted on-stage for an audience, in the U.S. or other countries covered by the *SAC*, is evidence of a distinct act of copyright infringement, and Plaintiff is entitled to information about changes made to these "performance scripts" over time. However, defense counsel have not been cooperative or forthcoming in providing this information and material to Plaintiff, resulting in the present dispute.

3.     Plaintiff's counsel's attempts to cooperate with defense counsel in matters relevant to *Defendants' Motion* began with the parties' conference under Fed. R. Civ. P. 26(f), held on

---

[3]The *SAC* also includes actions for copyright infringement against the New Defendants under the laws of the U.K., Canada, and Australia.  (*See SAC* ¶¶ 236-273) (Counts 18-20).

November 26, 2008. Therein, in compliance with Fed. R. Civ. P. 26(f)(3)(B), Plaintiff's lead counsel, Gregory H. Guillot, Esq. set forth the subject matter of anticipated discovery, expressly mentioning, *inter alia*, all drafts, treatments and scripts of the play that became *Jersey Boys*; all background material on which it was based; all outlines and notes prepared by the writers and director; and, all electronic mail messages between and among the defendants and/or third parties, concerning the play, and other matters relevant hereto. Pursuant to Fed. R. Civ. P. 26(f)(3)(A), Plaintiff's counsel requested that this material be provided promptly, with the New Defendants' *Initial Disclosures*, as said disclosures were already past due, under Fed. R. Civ. P. 26(a)(1)(D), and defense counsel had not requested an extension of time for serving them. Mr. Guillot also stressed, under Fed. R. Civ. P. 26(f)(3)(C), that Plaintiff's counsel viewed this as an "electronic discovery case," and preferred that ESI be produced in native file format, on hard drives, CD-ROM's, or DVD's, with electronic mail messages produced in ".PST" file format, and "hard copy" documents provided as single-page, searchable, ".TIF" files, for import into CT Summation – the litigation software used by counsel to Plaintiff and Defendant DeVito. Then, with co-counsel, George L. Paul, Esq., Mr. Guillot attempted to discuss the nature and extent of ESI New Defendants possessed. However, defense counsel were not prepared to discuss these issues. Thus, the parties could not complete their Fed. R. Civ. P. 26(f)(3)(c) conference, and Plaintiff's counsel sought a supplemental conference for that purpose, as detailed in the *Declaration of George L. Paul Under Penalty of Perjury* ("Paul Declaration "), attached hereto as *Exhibit 1*, ¶¶ 4, 6, and the *Declaration of Gregory H. Guillot Under Penalty of Perjury* ("Guillot Declaration"), attached as *Exhibit 2*, ¶ 6.

4. Defense counsel's lack of preparation, and inability to discuss these matters at the initial conference, were violations of Fed. R. Civ. P. 26(f)(2) and 26(f)(3)(C) (parties must be prepared to discuss "any issues about disclosure of electronically stored information, including the form or forms in which it should be produced."). Accordingly, on December 2, 2008, Mr. Paul sent a letter to defense counsel, a copy of which is appended to the *Paul Declaration* as *Attachment 2*, memorializing the parties' November 26, 2008 discussion relating to ESI. However, though defense counsel promised to respond to this letter, they did not. (*See Ex. 1*, ¶ 7 & *Att. 2*; *Ex. 2*, ¶ 7.) Given this lack of response, and Plaintiff's need to move forward with discovery, Mr. Paul sent an email

to defense counsel on January 6, 2009, noting their failure to "meet and confer," and demanding that they do so, as required by the Rules, a copy of which is appended to the *Paul Declaration* as *Attachment 3*. (*See Ex. 1*, ¶ 7 & *Att. 3*; *Ex. 2*, ¶ 7.)

5.     Mr. Paul's January 6, 2009 email pointed out that, despite their promise, Defendants had never answered his December 2, 2008 letter, and had not satisfied their Rule 26(f)(3)(C) obligation to discuss ESI during the Rule 26(f) conference. The email entreated that there were "technical issues where we might be able to reach an agreement, but simply refusing to talk almost always ensures problems and more litigation."  The message also emphasized that "[having] a cooperative discussion about what you have, and what you did to preserve it . . . will . . . allow us to discuss the immediate production issues, ***such as form of production***, and other technical issues, etc, that we must now discuss since you will be getting document requests . . . and . . . producing this ESI to us very shortly.  Please let us know a convenient time to talk on the phone.  I don't think a long exchange of emails will get the job done here as there needs to be a dialogue." (*Ex. 1*, ¶ 7 & *Att. 3*.)

6.     Due to New Defendants' refusal to meet their obligations under Fed. R. Civ. P. 26(f), Plaintiff's counsel had to serve her initial discovery requests without knowing what forms of ESI were, or had been, in their possession.  Interrogatories and requests for production of documents, ESI, and things, under Fed. R. Civ. P. 34, were served on Defendants Valli and Gaudio, on January 6, 2009; interrogatories and requests for documents, ESI, and things, were served on Defendants Brickman and Elice on January 8, 2009; and, similar requests were served on Defendant McAnuff, the *Jersey Boys* director, on January 9, 2009.  These requests expressly covered ESI, stored in any medium from which information can be obtained, with reference to Fed. R. Civ. P. 34(a).  (*See Ex. 2*, ¶ 8.) True copies of the relevant portions of Plaintiff's discovery requests to Defendants Brickman and Elice are attached hereto as *Exhibit 3*.

7.     On January 9, 2009, Mr. Guillot also communicated with defense counsel, Dan Mayeda, Esq., by email, and true copies of their communications are appended to the *Guillot Declaration* as *Attachment 1.*  Therein, Mr. Guillot noted that the New Defendants had yet to complete their Initial Disclosures, notwithstanding that even the stipulated, extended deadline for

doing so had passed.  He also pointed out that defense counsel had not responded to Mr. Paul's demand for a conference concerning ESI, and urged that the conference occur promptly, as it would affect the discovery responses becoming due.  Mr. Mayeda's reply said he would schedule the requested conference with Mr. Paul, but did not promise prompt completion of the New Defendants' Initial Disclosures.  Instead, it indicated that Initial Disclosure documents would be provided on a "rolling basis," beginning the next week.  (*See Ex. 2*, ¶ 9 & *Att. 1*.)

8.     Plaintiff's counsel and defense counsel finally spoke by telephone on January 15, 2009, to complete the discussion required by Fed. R. Civ. P. 26(f)(3)(C), that defense counsel had been unprepared for on November 26, 2008.  However, notwithstanding the passage of almost two months, defense counsel were still unprepared to discuss ESI preservation and production, although Mr. Korzenik did disclose that Defendants Brickman and Elice possessed ESI, in the form of native files for a screenwriting program he could not name, which they used to compose the play.  Mr. Guillot asked that the program be identified, and its native files produced, as they were covered by Plaintiff's discovery requests, and likely contained important "meta-data" otherwise unavailable.  Mr. Korzenik promised to investigate and revert to Mr. Guillot with the program name, but expressed reservations about producing the native files, because Plaintiff's counsel might "alter" them and/or the scripts, or disseminate them to third parties.  Mr. Guillot replied that this reservation was unfounded, because: (a) the accusation that Plaintiff's counsel might do this was irrational; (b) Defendants had the original files and could determine if alterations were made; (c) Defendants could produce the files in "read-only" format, so no such changes could occur; and, (d) Defendants were protected against unauthorized dissemination of such material by the *Stipulated Protective Order* (Doc. 94) herein.  Both Messrs. Paul and Guillot indicated that "PDF" printouts of the scripts (and drafts thereof) for *Jersey Boys* would be insufficient - especially if the program used to read the native files was readily obtainable.  Mr. Korzenik then suggested that Plaintiff pay for the program, including extra licenses for defense counsel's use.  Plaintiff's counsel were not particularly amenable to the latter idea, but promised to consider it after learning the identify of the program and its price. (*See Ex. 2*, ¶ 10.)

9.     Following this conference, on January 16, 2009, Mr. Paul sent defense counsel an

email documenting the call.  (*See Ex. 1*, *Att. 4*.)  Therein, Mr. Paul requested an index of what ESI was available, and in what format, so **"we can shortly thereafter discuss what application, or format, we will try to agree on to read the evidence."**  The email said, **"Please also describe and identify the applications, or programs, that interact with the data so we can decide if we will go the PDF route you suggested, or whether we will request native files**.  If you tell us what you have, it will allow us to better try to reach an agreement with you. . . . After we get your index, which we would propose to have a week from Monday, January  26th, *we can talk about such things as do we just want a printout of an email, or must we have the native file; how to handle the proprietary script writing files and application*,  the PDF option, and so on. I hope this is agreeable.  It seems a pretty modest suggestion."  (*Id*.) (*See also, Ex. 1*, ¶ 11; *Ex. 2*, ¶ 11.)

10.     Whereas, Plaintiff's counsel had not received the information sought in Mr. Paul's communication as of January 26, 2009 – the date by which it was demanded – both Messrs. Paul and Guillot wrote defense counsel on that date.  True copies of these messages are appended to the *Paul Declaration* as *Attachment 5*.  The emails concerned a variety of discovery failures, and beseeched defense counsel to work with Plaintiff to resolve them.  Therein, Mr. Guillot again requested that defense counsel identify the software used to produce the native files of the *Jersey Boys* scripts, so Plaintiff could purchase it, to enable counsel's review. *(Ex. 2*, ¶ 12 & *Att. 5*.)  Meanwhile, Mr. Paul's January 26, 2009 message reminded counsel that the information sought was needed so the parties could have a **"friendly, collaborative talk about the most efficient and lowest cost way . . . to produce that stuff, and as it is due in a few business days, we should begin talking about those issues now, rather than after certain actions have been taken that will make things more expensive for everyone."**  Importantly, he cautioned: **"Last minute fire drills producing ESI in formats we have not agreed to will only increase expense, as things might have to be done twice. Let's work together on it."** (*See Ex. 1*, ¶ 12 & *Att. 5*; *Ex. 2*, ¶ 11.)  Plaintiff's counsel never received a response.  (*Ex. 1*, ¶ 12; *Ex. 2,* ¶ 11.)  Instead, Mr. Mayeda served more belated Initial Disclosure-related documents on January 26, 2009, that were not in the form requested by Plaintiff during the Rule 26(f) conference; advised that Defendant Valli had served discovery requests on Plaintiff; and, stated the New Defendants had not completed their Initial Disclosures, and would

1  provide further documents at a later date. *(See Ex. 2, ¶ 12.)*

2      11.    On February 6, 2009, Plaintiff's counsel, Robert H. McKirgan, Esq., served discovery

3  requests on Defendant, DSHT, Inc., a *Jersey Boys* producer, and on February 9, 2009, he served

4  similar requests on Defendant, Dodger Theatricals, Ltd.  At that point, defense counsel had still

5  failed to identify the name of the relevant screenwriting program, and accordingly, Plaintiff simply

6  began demanding production of ESI in native form. (*See Ex. 1, ¶ Ex. 2, ¶* 13.)  Then, on February 11,

7  2009, Mr. Guillot sent an electronic mail message to Messrs. Mayeda and Korzenik, entitled,

8  "Electronic Discovery Issue - Screenwriter's Software Program," reiterating Plaintiff's request for

9  the name of the program used for the native files, and stressed its importance to Plaintiff's review

10  of changes made to the *Jersey Boys* scripts over time.  A true copy of this email message is appended

11  to the *Paul Declaration* as *Attachment 6*.  Defense counsel did not respond to this message, although

12  it was marked "urgent," and a response was requested "ASAP," by "today or tomorrow." (Ex. 2, ¶

13  14.)  The text of the February 11, 2009 email read: "In preparation for your forthcoming production

14  of documents, ESI, and things, ***I wanted to find out ASAP the name of the screenwriter's software***

15  ***program you mentioned, so that we can buy it immediately and be prepared to work with the data***

16  ***files you will be providing containing the various scripts, treatments, or whatever***." (*Ex. 1, Att. 6.*)

17      12.    On the evening of February 16, 2009, Mr. Guillot spoke with Mr. Korzenik by phone,

18  and was finally advised that the name of the subject screenwriting software was MovieMagic®

19  Screenwriter.  Mr. Guillot advised that Plaintiff's counsel would be purchasing the software, and Mr.

20  Korzenik again requested that Plaintiff purchase extra licenses for defense counsel's use.  Mr. Guillot

21  advised that he was leaving for New York the next morning, but would investigate the matter

22  following his return to Dallas.  During this conversation, Mr. Korzenik also promised to provide

23  responses to the interrogatories and production requests served on Defendants Brickman, Elice, and

24  McAnuff, by February 24, 2009, and Mr. Guillot understood that these responses would include the

25  native files for the screenwriting program. (*Ex. 2, ¶ 15.*)  Accordingly, after his return to Dallas, on

26  Saturday, February 21, 2009, Mr. Guillot reviewed information concerning the MovieMagic®

27  Screenwriter software on the Internet, and found two sites offering same for purchase.  Based on this

28  review, Mr. Guillot determined that it was not possible to buy multiple "license" for the software,

so he purchased two copies for Plaintiff's counsel, for $379.85 - one in downloadable form, and a second, boxed copy to be shipped by mail. (Ex. 2, ¶ 16.)

13.    On February 23, 2009, Mr. Guillot contacted Mr. Korzenik, and advised him of Plaintiff's purchase of the subject software, but stated he did not believe it fair to require Plaintiff to purchase copies for defense counsel - particularly given that Defendants Brickman and Elice already had the program.  Mr. Korzenik indicated this was "ok," and said defense counsel would purchase their own copies.  In return, Mr. Guillot told Mr. Korzenik that he would provide information on the source for Plaintiff's purchase, which appeared to have the lowest price.  Mr. Guillot prepared notes regarding this conference, and Plaintiff is willing to provide the Court and defense counsel with same, but only if it is stipulated that this will not waive the attorney-client privilege, or applicable work-product immunity protection.  (*Id.*, ¶ 17.)

14.    Defendants Brickman and Elice (and McAnuff) did not respond to Plaintiff's discovery requests on February 24, 2009 as promised.  Instead, during the foregoing conversation, Mr. Korzenik requested an extension of time, which Plaintiff granted, making the responses due by March 10, 2009.  At no time during these communications did Mr. Korzenik indicate the responses would not be accompanied by the native files, for which the MovieMagic® Screenwriter software had been purchased.  (*Id.*, ¶ 18.)

15.    On March 9, 2009, Mr. Korzenik again contacted Mr. Guillot by telephone, requesting more time, through March 13, to serve the discovery responses of Defendants Brickman, Elice, and McAnuff.  On March 10, 2009, Mr. Korzenik dispatched an email confirming this extension, and Mr. Guillot responded, seeking confirmation that the native files would be produced, and providing a link to a site where defense counsel could purchase the screenwriting software, as promised.  Copies of these messages are appended to the *Paul Declaration* as *Attachment 7*.  Mr. Korzenik did not respond to Mr. Guillot's inquiry concerning the native files.  Nor did Plaintiff's counsel receive responses to the discovery requests served on Defendants Brickman, Elice, and McAnuff on March 13, 2009, as promised.  Instead, Mr. Korzenik requested a further extension, through Monday, March 16, 2009. (*Ex. 2*, ¶ 19.) On March 16, 2009, defense counsel finally served these responses, but they were not accompanied by any documents, things, or ESI – native or

otherwise. For more than fifteen days, Plaintiff's counsel waited for these materials, but they never came. (*Id.*, ¶ 20.)

16. Information regarding the MovieMagic® Screenwriter software, with which the native files are used, is appended to the *Guillot Declaration* as *Attachment 7*, including images of the packaging; material describing the program's features; and, screen shots of various windows within the program, showing the types of data and metadata that may be included in native files created by or opened therewith. As shown in this material, and based on Plaintiff's counsel's experience with the software, the native files are a likely source of information reasonably calculated to constitute admissible evidence in this dispute. For example, the program has sub-features in which notes can be stored, and associated with portions of scripts; tagging and color-coding schemes, not visible in PDF printouts; outlining features; an "iPartner" collaboration tool, through which writers may work together, and "chat" concerning ideas and revisions, without using standalone email or chat programs; an electronic "index card" system for scenes; ten levels of "undo" information; "auto-revision" markings, which automatically mark script changes over time; reporting features, capable of generating a variety of production reports; "NaviDoc" technology, to facilitate location of information within scripts; and revision tracking, including a repository of all versions of, and revisions to, scripts. (*Id.*, ¶ 31 & *Att. 7*.) Additionally, assuming both Defendants Brickman and Elice worked with the software, it is possible that information can be gleaned concerning which writer is responsible for certain portions of the scripts, and when his contributions thereto were made. (*Id.*)

17. Plaintiff believes the foregoing information is crucial, as the adjudication of her case requires a comprehensive examination of, *inter alia*, the manner and speed in which *Jersey Boys* was created; which Defendants made specific contributions to the play; and, the extent to which the writers used the Work, and not other sources, for their drafting (which may be evident from the notes, index card, and/or iPartner features within the files). Indeed, the native files are likely the only means for Plaintiff to verify that all scripts of *Jersey Boys* have been produced, and will make Plaintiff's review of those documents easier, when opened in the screenwriting program. Plaintiff's causes of action against the New Defendants herein, hinge upon their use of the Work in connection

with *Jersey Boys* (Plaintiff's accounting claims), and their copying therefrom (certain of Plaintiff's infringement claims), and, to prove these claims, Plaintiff must have access to all notes, scripts, markings, written communications, and other material that may shed light on the creative process, and/or evidence material variations in the play, as performed in numerous locations, on thousands of occasions since 2004.  (*Id.*, ¶ 32.)

18.     True copies of the relevant portions of Defendant Brickman's and Elice's written responses to Plaintiff's discovery requests, as served on March 16, 2009 – after counsels' foregoing discussions about the screenwriting software, and Plaintiff's desire for the native files – are attached hereto as *Exhibit 4*.  Plaintiff's *Request for Production No. 4*, was identical for both Defendants, and appears below, with their consolidated response:

**REQUEST NO. 4:**  All drafts, treatments, notes, revisions, summaries, dictation, other documents, or electronically stored information or things relating to any play, film, television show or production of any kind concerning the Four Seasons or their music.

**RESPONSE NO. 4:**  Defendants objects to this request on the ground that the phrase "things relating to any play, film, television show or production of any kind concerning the Four Seasons or their music" are vague and ambiguous. Defendant further objects that because "things" as well as the preceding list of requested items are not defined terms, it is uncertain what would properly be comprehended or not comprehended by this request.  This shot-gun Request is overbroad and confusing since it arguably includes anything "relating" to the Four Seasons and it lacks the reasonable specificity that Document Requests must properly and fairly have.  Defendants further object to this interrogatory on the ground that it lacks foundation and it arguably calls for anything that Defendant has "relating" to the Four Seasons.  ***Without waiving any of these objections, Defendants will produce documents in their possession that reflect their respective work on the script of Jersey Boys***.  Defendants further object to the production of anything pertaining to future works that are not the subject of the copyright claims in this case and Defendants have no obligation to produce anything in advance so that plaintiff can decide if she has any claim.  Such works, if they are the subject of this request, should be specifically identified so that Defendants can object specifically object to such a request.  ***Without waiving any of these objections, Defendant will be producing non-privileged materials that include drafts, treatments and versions of the script for Jersey Boys, the play***.

(Ex. 4, at 21-22) (emphasis added).  Plaintiff's *Request for Production No. 17*, was also identical for both Defendants, and appears below, with their consolidated response:

**REQUEST NO. 17:**  All documents, electronically stored information or things evidencing any modifications made to the *Jersey Boys* script since it debuted in La Jolla in 2004.

**RESPONSE NO. 17:**  Defendants object to this request because it is overbroad, unduly burdensome, vague as to what it might include or not include; on the grounds that it seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence; and that it calls for information that has no possible or reasonable bearing on any possible issues in this case.  ***Without waiving these objections, Defendant is providing copies of drafts of the Script for Jersey Boys and plaintiff can identify from them any changes that they might be interested in.***

(*Id*. at 25-26) (emphasis added).  Plaintiff's *Interrogatory No. 6* and *Interrogatory No. 7* were also identical as to Defendants Brickman and Elice, and appear below, with their identical responses:

**INTERROGATORY NO. 6:**  Identify all variations of every formative document, including, but not limited to, treatments, outlines, or scripts which you created, in whole or in part, in connection with the play that became *Jersey Boys*, and specify the date(s) of authorship for each.

**RESPONSE NO. 6:**  Defendant objects to this Interrogatory on the grounds that it is unduly and extremely burdensome; that it seeks an unduly lengthy narrative covering years of work on a production much of which would have no possible connection to the issues in this litigation; that the question posed is unfairly broad, unfocused, aimless and lacking in the kind of specificity that would permit an effective answer; that it is designed to impose unnecessary costs on Defendant; that it turns on undefined and vague terms such as "all variations" and "every formative document" and "which you created" that have no clear or fair reference or definition; that the language of the interrogatory is unclear and confusing since it asks Defendant to "identify all variations" to documents to which Defendant "created" - a type of contribution that, for example, would include contributions of ideas. Defendant and other defendants are producing all available treatments, scripts, outlines, etc for JERSEY BOYS (which involve hundreds of different documents) and Plaintiff can then identify the specific "variations" to specific "formative documents" that she wishes Defendant to discuss. ***This interrogatory is a patently unfair and unfocused and over-burdensome request.  Documents (scripts, treatments, communications, etc.) have been and are being produced that will allow plaintiff to find answers that she needs with respect to "formative documents" relating to the play and the "variations" made to it; and the task of narrating and summarizing these documents is one that is properly borne by the plaintiff.***

**INTERROGATORY NO. 7:**  Identify all variations of every formative document, including treatments, outlines, or scripts created by others, in whole or in part, in connection with the play that became *Jersey Boys*; specify the date(s) of authorship for each such formative document or variation, and identify the author(s) thereof.

**RESPONSE NO. 7:**  Defendant objects to this Interrogatory on the grounds that it is unduly and extremely burdensome; that is seeks an unduly lengthy narrative covering years of work on a production much of which would have no possible connection to the issues in this litigation; that the question posed is unfairly broad, unfocused, aimless and lacking in the kind of specificity that would permit an effective answer; that it is designed to impose unnecessary costs on Defendant; that it turns on undefined and vague terms such as "all variations" and every formative document" and "created by others in whole or in part" that have no clear or fair reference or definition; that the language on the interrogatory is unclear and confusing since it asks Defendant to "identify all variations" to documents.  Defendant and other defendants are producing all available treatments, scripts, outlines, etc. for JERSEY BOYS (which involve hundreds of different documents) and Plaintiff can then identify the specific "variations" to specific "formative documents" that she wishes Defendant to discuss.  This interrogatory is a patently unfair and unfocused and over-burdensome request. ***Documents (scripts, treatments, communications, etc.) have been and are being produced that will allow plaintiff to find answers that she needs with respect to "formative documents" relating to the play and the "variations" made to it; and the task of narrating and summarizing these documents is one that is properly borne by the plaintiff.***

(*Id*. at 6-8, 15-17) (emphasis added).  These responses indicated that Defendants Brickman and Elice would be producing notes, drafts, treatments, and versions of the scripts for *Jersey Boys*.  (*See e.g., Ex. 4* at 22.)  Moreover, although objections were made, ***none concerned the native files requested by Plaintiff, for which Plaintiff had already purchased the appropriate software, with defense***

1  *counsel's encouragement.  **Nor did the responses identify any form for production differing from**

2  **that demanded by Plaintiff**.* (*See Ex. 1*, ¶ 16.)  Finally, Defendants' interrogatory responses swore

3  that documents and things would be produced in lieu of written responses – meaning the form of the

4  forthcoming production was represented as sufficient for Plaintiff to obtain all details she had

5  requested concerning these materials, just as easily as Defendants Brickman and Elice – who could

6  do so within the MovieMagic® Screenwriter program, with its various navigation and revision-

7  tracking features.  *See* Fed. R. Civ. P. 33(d)..

8       19.    Given the lack of actual production with these responses, on April 6, 2009, Mr. Paul

9  sent a letter to Messrs. Mayeda and Korzenik, entitled, "When Can We Expect Your Documents?,"

10  pointing out that their production delays were delaying Plaintiff's response to Defendant DeVito's

11  dispositive motion (for which Plaintiff might need to rely on such material); repeating Plaintiff's

12  demand for the MovieMagic® Screenwriter native files, and reminding that defense counsel had yet

13  to respond to Plaintiff's demands for information concerning available ESI, the format(s) thereof,

14  and Defendants' preservation efforts (*Ex. 1*, *Att. 8*; *Ex. 2*, ¶ 21.)  This email stated, *inter alia*:

15  > Some time ago, we received your response to the document requests we propounded
16  > to Mr. Brickman, Elice and McAnuff.  A couple of things: (1) When can we expect
   > production of the responsive documents? . . . (2) ***Where are the native files of the***
17  > ***various versions of the script/book?***  We purchased the Movie Magic Screenwriter
   > software.  As we have written you several emails about ESI, and unfortunately, ***you***
18  > ***have simply ignored each one of these communications***, I would like to hear from
   > you, and possibly confer about this, before filing any motions.  Many thanks.  ***Let's***
19  > ***keep out of trouble in the discovery arena***.

20  (*Ex. 1*, ¶ 17 & *Att. 8*.)  Mr. Korzenik responded by email, stating: "As to 'native files' I am looking

21  further into that and how to do it. I do not presently have the software.  But will touch base with Greg

22  also by end of week on this." (*Id*. at *Att. 8*.)  Mr. Korzenik did not state he intended to withhold the

23  native files; only that he did not have the software, and needed to look into "how to do it."  Mr.

24  Guillot responded, by reminding that he had already advised Mr. Korzenik where the software could

25  be bought, and explaining that, because Plaintiff had installed the software, all that was needed were

26  the native files, on a disk. *(See Ex. 2*, ¶ 21 & *Att. 2*.)

27       20.    Despite these messages, and Mr. Korzenik's promise to "meet and confer" about the

28  native files issue by April 10, 2009, he did not.  Moreover, as of April 22, 2009, Plaintiff still had

not received documents, things, or ESI responsive to the production requests served in early-January upon Defendants Brickman and Elice.  Accordingly, Mr. Guillot wrote defense counsel that day, outlining these and other discovery deficiencies, and requesting a response.  Mr. Mayeda responded with an email, stating he was sending documents responsive to the Elice and Brickman production requests, but ignored the remaining deficiencies listed in Mr. Guillot's message.  Mr. Guillot noted this refusal to confer in an email response, which also sought confirmation that the material Mr. Mayeda was sending for Brickman and Elice would include the MovieMagic® Screenwriter native files.  Copies of these messages, are appended to the *Paul Declaration* as *Attachment 9*.  Mr. Mayeda never responded to Mr. Guillot's second message.  Instead, the next day, on April 23, 2009, he filed three motions to dismiss the *SAC*.  (*See Ex. 1, Att. 9; Ex. 2,* ¶ 22.)

21.     The documents finally received from the subject Defendants, on April 24, 2009, were not in the formats requested by Plaintiff; instead, they were in PDF format.  Nor were the MovieMagic® Screenwriter native files included, despite Plaintiff's repeated demands for same; her purchase of the software, with defense counsel's encouragement; and, the lack of any objection to their production. (*Ex. 2,* ¶ 23.) Defendants simply unilaterally produced PDF files of various scripts, drafts, and fragments, without consulting Plaintiff, without objecting, and without placing Plaintiff on notice of production in a form different than what she requested..  There was no opportunity to discuss the matter. (*Ex. 2,* ¶ 23.)  Moreover, the belated production was incomplete in other ways.  First, defense counsel were continuing to produce documents on an unscheduled, "rolling basis," at their leisure, and this initial production set did not even include all versions of the *Jersey Boys* script that had been enacted/performed at all locations.  In fact, not all such scripts have been produced even as of the present date -- the "performance scripts" provided much later by said Defendants did not include the scripts used during preview shows, attended by paying audiences in the weeks before each opening night.  Second, neither this production, nor any subsequent production set, included all emails between the writers; the writers and director; the writers and third parties, or the writers and their counsel (or privilege logs concerning same), though this material had been requested by Plaintiff.  Third, though more than 200 script-related PDF documents ultimately were produced, many were mere fragments; the dates on which they were written, and the identities of the writers,

could not be universally ascertained; and, it was impossible to determine which script or fragment came from whom. For example, Plaintiff's counsel expected that both Brickman and Elice would possess copies of certain scripts, but it did not appear that each Defendant's duplicate copies were provided. Fourth, the fragments and scripts produced were "clean printouts" from computer files – they did not include scans of "hard copy" scripts/fragments, which might reveal handwritten notes or annotations. In sum, though Defendants Brickman and Elice provided many pages of script-related material, due to the manner and form of their production, Plaintiff's counsel could not readily reconstruct the evolution of *Jersey Boys*; identify all changes made to performance scripts, determine when such changes were made or the dates on which such variations were performed; or, identify which writer (Brickman or Elice) was responsible for what material in the play. (*Ex. 1*, ¶¶ 20-21; *Ex. 2*, ¶ 24.)

22. Whereas, New Defendants continued to produce material responsive to Plaintiff's discovery requests on a "rolling basis," on dates of their choosing, for the remainder of 2009, and did not object to the production of the native files during this period, Plaintiff's counsel hoped, upon receipt of each production set, to find the items mentioned, *supra*, at ¶ 21, including the native screenwriting software files, all draft and performing versions of the *Jersey Boys* script, the various email messages requested from Brickman and Elice, and a privilege log for any documents withheld for that reason. However, this never occurred. Defense counsel produced further documents on behalf of various New Defendants on or around May 26, 2009, June 24, 2009, July 16, 2009, September 2009, April 9, 2010, April 14, 2010, and April 15, 2010, but none remedied the discovery deficiencies of Defendants Brickman and Elice.

23. On October 18, 2009, Mr. Guillot sent an email to defense counsel, outlining, *inter alia*, the deficiencies in their production of scripts, and drafts, up to that point, and again noting that native files had not been produced. A true copy of this mail message, redacted, to delete an unrelated inquiry, is appended to the *Guillot Declaration* as *Attachment 3*. Mr. Korzenik responded to the unrelated inquiry on October 20, 2009, and asserted that all scripts he possessed had been produced. However, he ignored the question of whether his clients had provided all responsive material to him, as well as Mr. Guillot's demand for the native files. A copy of Mr. Korzenik's message, redacted

to include only the pertinent portions, is appended to the *Guillot Declaration* as *Attachment 4*. (See Ex. 2, ¶ 27 & Att. 3, 4.)

24.   On December 18, 2009, Mr. Guillot sent another email to defense counsel, in response to a request for an extension of briefing deadlines, which Plaintiff granted, reiterating the foregoing deficiencies, including the inadequacy of Defendants' script production, and continuing failure to produce the MovieMagic® Screenwriter native files. A copy of this message, redacted to include only information pertinent to this dispute, is appended to the *Guillot Declaration* as *Attachment 5*. As reflected in this message, it was Mr. Guillot's belief by this time that defense counsels' noncompliance with discovery, and refusal to address Plaintiff's concerns, was motivated by a belief that the New Defendants would prevail on their motions to dismiss, rendering the noncompliance moot. Characteristically, defense counsel did not respond to this aspect of Mr. Guillot's message, but, as of this late date, they still had not objected to production of the native files, and Plaintiff continued to expect them. (*Ex. 2*, ¶ 27.)

25.   On March 4, 2010, after the hearing on all extant dispositive motions, Plaintiff's counsel convened a telephone conference with defense counsel to discuss these and other issues. Messrs. Paul, McKirgan, and Guillot participated for Plaintiff, and New Defendants were represented by, *inter alia*, Messrs. Korzenik and Mayeda. Plaintiff's counsel attempted to discuss the ongoing dispute concerning ESI, including defense counsel's failure to produce the native files. However, the conference was aborted when Mr. Korzenik declared that there were too many outstanding issues to discuss by phone, and alleged that Plaintiff was raising certain of these issues for the first time. Mr. Guillot pointed out that the latter statement was inaccurate, mentioning the various messages and demands discussed in the *Guillot Declaration*. Mr. Korzenik then claimed that Plaintiff's "scattershot" email messages were difficult to keep up with, and asked that, rather than discussing the matters further, Plaintiff's counsel place their demands in writing, and defense counsel would consider the letter, and confer further thereafter. In the spirit of cooperation, Plaintiff's counsel agreed to proceed in this manner. (*Ex. 2*, ¶ 28.) Then, on March 10, 2010, Mr. Paul sent a letter to the defense counsel, as promised, in an attempt to resolve the extant disputes, a copy of which is appended to the *Paul Declaration* as *Attachment 10*. However, contrary to Mr. Korzenik's March

4, 2010 representations, defense counsel did not call to resume discussions.  Instead, on March 18, 2010, at approximately 5:00 p.m., defense counsel filed *Defendants' Motion* with the Court.  Then, at 5:13 p.m. – after *Defendants' Motion* was filed, Mr. Korzenik sent an email to Messrs. Paul and Guillot, with a memo regarding ESI preservation that: (a) did not identify the ESI in New Defendants' possession (it merely stated ESI existed, on the computers of Brickman and Elice); (b) alleged that all scripts had been provided to Plaintiff; and, (c) neglected to address fully, Plaintiff's inquiry regarding the failures of Defendants Brickman and Elice to produce all relevant email messages.  Copies of Mr. Korzenik's March 18, 2010 email, and its attachment, are appended to the *Guillot Declaration* as *Attachment 6*.  (*See Ex. 2*, ¶ 29 & *Att. 6*.)

26.     Mr. Korzenik's March 18, 2010 email comprised the first express indication that defense counsel did not intend to produce the native files Plaintiff had sought for more than a year without objection. Therein, Mr. Korzenik stated: "[The attached memo] does not treat the subject of native files of drafts of scripts - an issue on which we are at an impasse and will need to deal with in other ways."  The message did not state the nature of the impasse or the grounds for counsel's objection to production.  It also misstated Plaintiff's native file request, which encompassed native files for all scripts, not than merely drafts thereof.  (*Ex. 2*, ¶ 31 & Att. 6.)

27.     The relevant portions of Plaintiff's identical discovery requests to Defendants Brickman and Elice concerning email messages and correspondence, as served on January 8, 2009, together with their responses, as served on March 16, 2009, are as follows:

**PRODUCTION REQUEST NO. 9:**  All documents, electronically stored information or things relating to any communications, including electronically stored correspondence, between ay of the parties in this action, between December 1999 and the present, which mention or Concern *Jersey Boys*; Rex Woodard; the Work; this litigation; biographies of the Four Seasons or its members; books about the Four Seasons or its members; or, screenplays, scripts, librettos, plays, movies, musicals, teleplays, or television programs in which the members of the Four Seasons are mentioned or in which their names appear.

**RESPONSE NO. 9:**  Defendants object to this request on the grounds that it is grossly and aimlessly overbroad, unduly burdensome and oppressive and that it seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object on the grounds that this request is exceedingly vague; that it inappropriately includes almost everything that refers to the Four Seasons and Jersey Boys without any reasonable limitation for over a decade; it also fails to provide any guidance or definition to vague terms such as "things relating to;" it is also an overreaching request that would unavoidably include attorney-client communications. ***Without waiving any of these objections, Defendants would respond as follows: There are no communications between the Defendants and any other party referring to Rex***

1

*Woodard or this litigation prior to Defendant's learning of the filing of the Amended Complaint naming Defendants*.

2

**PRODUCTION REQUEST NO. 16:** All correspondence of any type, including electronically-stored correspondence, with Peter C. Bennett, Jay Julien, Peter Conti, Nick Macioci, Joseph Labracio, Nick DeVito, Joe Pesci, Richard Hammer, Tom DeCillis, Ed Strong, Joseph Grano, Michael David, David Case, Charles Alexander, Holly Cote, Broadway Books; the Palazzo Hotel and Casino, Randy Valli, any of the actors who have portrayed any of the members of the Four Season in JERSEY BOYS, and all other persons not a party to this action, from 1999 to the present, which contains any referenced to *Jersey Boys*; Rex Woodard; the Work; this litigation; the life story of any member of the Four Seasons; biographies of the Four Seasons; books about the Four Seasons; or screenplays, scripts, librettos, plays, movies, musicals, teleplays, or television programs in which members of the Four Seasons are mentioned or in which their names appear.

8

**RESPONSE NO. 16:** Defendants object to this request on the grounds that it is grossly and aimlessly overbroad, unduly burdensome and oppressive and seeks documents that are patently irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Because this question is so vague, ill-defined in scope and lacking in any fair specificity, it also includes documents that are covered by the attorney-privilege. Defendants also object to this request on the grounds that it asks for "All correspondence of any type" from "all other persons" as well as all those listed "from 1999 to the present" which "contains any reference to JERSEY BOYS" as well as the life stories of any of the Four Seasons, etc. and as such it has no valid purpose beyond imposing a wasteful task on Defendants that would substantially increase the costs of this litigation. *Without waiving these objections, Defendant notes that there are no such documents referring to Rex Woodard. There are no communications of any kind with <u>most</u> of the persons named*.

14

**INTERROGATORY NO. 24:** Identify all documents, including correspondence, and electronic mail messages, relating to communications you have had with any of the other parties concerning the subject matter of this litigation.

16

**RESPONSE NO. 24: Concerning the litigation, I believe that there are none, except an email from Michael David informing me that this litigation had commenced. That email will be produced**, if and when it is located. **There was some communication with Peter Bennett** and others about our legal representation in this case, but I do not presently believe that I have any record of that communication. **Communications with counsel are not called for by this request**, but they would be privileged.

19

(*See Ex. 4* at 9-10, 16, 18, 23.)

20

      28.     Plaintiff's identical interrogatories to Defendants Brickman and Elice concerning the

preservation of ESI, as served on January 8, 2009, together with their identical responses, served on

March 16, 2009, are as follows:

23

**INTERROGATORY NO. 3:** Describe all efforts you have undertaken to preserve evidence in this case (including evidence which may be found within electronically stored information), specifying the date(s) of such efforts; the steps taken to preserve such evidence, and all evidence preserved as a result of such efforts.

26

**RESPONSE NO. 3:** Defendant objects to this interrogatory on the ground that the phrase "evidence in this case" is vague and ambiguous. Defendant further objects that the interrogatory seeks information protected from disclosure by the attorney-client privilege. Defendant further objects that this interrogatory assumes that Defendant has the impossible burden to prove a negative, to wit, that Defendant has not destroyed any evidence. Defendant further objects to this interrogatory on the

1   ground that the phrase "all evidence preserved as a result of such efforts," would appear to require
2   Defendant to identify every piece of evidence in his possession, custody or control and, to that
    extent, the interrogatory is grossly overbroad, unduly burdensome, oppressive, harassing, and seeks
3   information this is irrelevant and not reasonably calculated to lead to the discovery of admissible
    evidence.  Without waiving these objections and reserving the right to reassert them, Defendant
4   responds as follows:  ***Although Defendant does not recall the exact date, he knows that from the***
    ***first date that Defendant learned about this lawsuit, Defendant has not destroyed or deleted any***
5   ***hard copies or electronically stored information relating to JERSEY BOYS.  Defendant has***
    ***reviewed the contents of his computers - which include scripts, treatments, notes and***
6   ***communications etc. - and has checked any paper records that he has in his possession and***
    ***control***.

7   (*See Ex. 4,* at 4-5, 13-14.)

8                              **ARGUMENT**

9   I.   ***DEFENDANTS' MOTION*** **SHOULD BE DENIED AND PLAINTIFF'S** ***CROSS-***
         ***MOTION TO COMPEL*** **SHOULD BE GRANTED**

10       A.    **The Legal Standard Governing Discoverability.**

11       Fed.R.Civ.P. 26(b)(1) provides that "[p]arties may obtain discovery regarding any
12   nonprivileged matter that is relevant to any party's claim or defense." *Id.*  "For discovery purposes,
13   relevance means only that the materials sought are reasonably calculated to lead to the discovery of
14   admissible evidence." *Eicholtz v. J.C. Penney Co., Inc.*, 2006 WL 2520321, *2 (D. Nev. 2006)
15   (citing *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978)). Further, "[u]nder the Federal
16   Rules, the scope of discovery is broad, and discovery should be allowed unless the information
17   sought has no conceivable bearing on the case." *Jackson v. Montgomery Ward & Co.*, 173 F.R.D.
18   524, 528 (D. Nev. 1997). *See also Akers v. Keszei*, 2009 U.S. Dist. LEXIS 106247, 3-4 (D. Nev. Oct.
19   27, 2009).  The Rules are designed to permit the parties to obtain the "fullest possible knowledge"
20   of the issues and facts before trial, *Hickman v. Taylor*, 329 U.S. 495, 501 (1947), and discovery is
21   not limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that
22   are unrelated to the merits.  *Oppenheimer*, 437 U.S. at 351.

23       Under Fed. R. Civ. P. 34(a), a party must produce, and permit the requesting party to inspect
24   and copy, any documents falling within the scope of Fed. R. Civ. P. 26(b) that are in the "possession,
25   custody or control" of the party on whom the request is served.  *Id.*  Similarly, under Fed. R. Civ.
26   P. 33(a)(2), a party must respond to interrogatories relating to any matter that may be inquired into
27   under Fed. R. Civ. P. 26(b).  *Id.*  As long as the information, documents, ESI, or things requested are
28

relevant to the subject matter of the litigation, a defendant must provide and produce them, under the Federal Rules. If a defendant fails to do so, the plaintiff may move to compel. Fed. R. Civ. P. 37(a)(1), 37(a)(3-4).

### B.    The Requested Native Files Are Discoverable and It Is Defendants' Fault, Under Fed. R. Civ. P. 34(b)(2)(D), If Any Information Must Be Produced Twice

Litigants have duties to cooperate to discharge discovery obligations. Fed. R. Civ. P. 1, 26(g)(1), and 37. Indeed, there is a widely-accepted *Cooperation Proclamation*, published by *The Sedona Conference*,® a copy of which is appended to the *Paul Declaration* as *Attachment 1*, that has been endorsed by more than 95 judges and cited in 13 judicial decisions as of October 2009. *(Ex. 1, Att. 1*.) Plaintiff takes these obligations seriously.[4] As shown in the *SOF*, her counsel tried diligently, **for over a year**, to cooperate with defense counsel – including cooperation regarding the production of native files for the MovieMagic® Screenwriter software, which contains drafts, notes, and performing versions of the *Jersey Boys* scripts in issue. Yet *Defendants' Motion* misrepresents that Plaintiff only "**later** raised the issue of obtaining native files . . .," *id.* at 8, and offers "no justification" for the waste of time involved in "**producing again**" the documents at issue. *Id.* at 9. Many times, *Defendants' Motion* even uses misleading phraseology, such as Plaintiff "**now** complains;" "**now** insists;" and "wants production **now.**"    It even represent to the Court that:

> The Plaintiff did not specifically seek "native" files in her Requests for Documents; but Plaintiff's counsel later said in conversations and emails to New Defendant's counsel that they wanted the same documents also produced in "native" files. Specifically, they wanted the same documents in Screenwriter software format.

*Defendants' Motion* at 3 (emphasis added). The implication is that Plaintiff only asked for native files after the production of the hard copy scripts. But the truth is quite different, as the *SOF* shows.

Plaintiff's counsel began inquiring about the native files as early as the November 26, 2008 Rule 26(f) conference, *SOF* ¶ 1, and thereafter dispatched numerous emails and letters, and had repeated telephone conferences concerning (and demanding) the native file production, starting on

---

[4] *See* George L. Paul and Bruce H. Nearon, *The Discovery Revolution: The E-Discovery Amendments to the Federal Rules of Civil Procedure* (ABA Publishing 2006) (noting in *Preface*, at ix: "One of the themes of this book is that the new complexity demands a new collaboration. The profession must undergo an evolution in its human relationships and attitudes.")

-21-

December 2, 2008, *SOF*, ¶ 2, and continuing on January 6, 2009, *id.*, ¶¶ 3, 4; January 9, 2009, *id.*, ¶ 6 ; January 16, 2009, *id.*, ¶ 8; January 26, 2009, *id.,* ¶¶ 9,10; February 11, 2009, *id.,* ¶¶ 13, 14; February 16, 2009, *id.,* ¶  15; February 23, 2009, *id.,* ¶ 17, and March 10, 2009.  *Id.,* ¶¶ 18,19. Defendants Brickman and Elice answered Plaintiff's interrogatories and production requests on March 16, 2009, but did not object to the production of native files.  Nor did defense counsel indicate they would produce in any form other than what Plaintiff had requested. *Id.,* ¶ 23. Afterwards, Plaintiff's counsel dispatched an email, repeating the demand for native file production. *Id.*, ¶¶ 24, 25, and Mr. Korzenik answered that he was still trying to figure out how to do it.  *Id.,* ¶ 26.  Follow-up emails were sent, again demanding the files.  *Id.,* ¶ 27.  On April 24, 2009, Defendants began a rolling production of documents, but did not produce the files, though Plaintiff waited patiently for them. *Id.,* ¶ 22.  Instead, Defendants produced documents in PDF format, which Plaintiff's counsel had unequivocally rejected by that time.  *Id.*  This was a violation of Fed. R. Civ. P. 34(b)(2)(D), which states: "The response may state an objection to a requested form for producing electronically stored information.  If the responding party objects to a requested form -- or if no form was specified in the request -- the party must state the form or forms it intends to use." *Id.*  The *Advisory Committee Note* to Fed. R. Civ. P. 34 explains the policy:

> ***A party that responds to a discovery request by simply producing electronically stored information in a form of its choice, without identifying that form in advance of the production in the response required by Rule 34(b) runs a risk that the requesting party can show that the produced form is not reasonably usable and that it is entitled to production of some or all of the information in an additional form*** . . . If the requesting party is not satisfied with the form stated by the responding party, or if the responding party has objected to the form specified by the requesting party, ***the parties must meet and confer*** under Rule 37(a)(2)(B)[sic] in an effort to resolve the matter before the requesting party can file a motion to compel…. But the option to produce in a reasonably usable form ***does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation***.

Fed. R. Civ. P. 34(b) advisory committee's note (2006 Amendment).   Accordingly, Plaintiff continued to expect production of native files, and on March 4, 2010, her counsel tried to convene a conference about these issues.  Defense counsel asked that Plaintiff instead write a letter, so the parties could confer after the issues had been framed. *SOF* ¶¶ 34, 35, 36.  In good faith, Plaintiff did

so. But instead of following through with the conference, Defendants filed their preemptive motion. *Id.*

Defendants Brickman and Elice now argue that *draft* scripts (as opposed to "performing scripts") are not discoverable, because they are never relevant in a copyright case. But this is not true. Substantial similarity between finished works is not the only issue in a copyright case. Even where there is such similarity, a defendant may argue that his infringing work was "independently created." *See Simmons v. Western Publishing Company, Inc.*, 834 F. Supp. 393 (D. Ga. 1993). For this reason, draft scripts are admissible at trial, to negate the inference of independent creation, by showing the manner and speed in which the infringing work was produced. *See, e.g.*, *Miller v. Universal Studios, Inc.*, 650 F.2d 1365, 1375 (5th Cir. 1981). But more important, this case also concerns the *use* of the Work at issue – a different concept than copying or similarity. *See SAC*, ¶¶ 188-197. Certainly, early drafts of *Jersey Boys* scripts, as well as all associated fragments and notes are relevant to show *use* of the Work. Such information is contained in the data, and meta-data, included in the MovieMagic® Screenwriter files.

It is well-settled that computer files are discoverable in native format. *See* Fed. R. Civ. P. 34(b)(1)(C); *Cenveo Corp. v. Southern Graphic Systems*, No. 08-5521 (JRT/AJB), 2009 U.S. Dist. LEXIS 108623 (D. Minn. Nov. 18, 2009);  *FSP Stallion 1 v. Luce*, No. 2:08-cv-01155-PMP-PAL, 2009 U.S. Dist. LEXIS 68460 (D. Nev. July 21, 2009); *Covad Communications Co. v. Revonet, Inc*, 254 F.R.D. 147 (D.D.C. 2008); *Manual for Complex Litigation*, § 11.446 (4th Ed.); *In Re Classicstar Mare Lease Litigation*, No. 5:07-cv-353-JMH, 2009 U.S. Dist. LEXIS 9750 (E.D. Ky.  Feb. 2, 2009); *John B. v. Goetz*, No. 3:98-0168, 2010 U.S. Dist. LEXIS 8821 (M.D. Tenn. Jan. 28, 2010). As detailed in the *SOF* at ¶¶ 21, 22, the MovieMagic® Screenwriter Program stores embedded data that has been denied to Plaintiff through defense counsel's refusal to produce native files. Plaintiff's counsel believe such information is crucial.

Whereas, Plaintiff requested native files before defense counsel produced non-native files; whereas, Defendants neither objected to nor conferred about the form of production; whereas, it is highly likely that discoverable information is in those files, the information in the MovieMagic® Screenwriter native files is discoverable, and Plaintiff hereby moves to compel the production of all

such native files of scripts, drafts of scripts, and all associated fragments and notes.

**C.     The Court Should Order That All Versions of All Scripts, Whether Drafts or Performing Versions, Be Produced With An Index of Dates, and Other Identifying Information**

There were many deficiencies in Defendants Brickman's and Elice's belated document production, starting in late-April 2009, as detailed at *SOF* ¶ 30.   Moreover, extrinsic evidence suggests there have been many *Jersey Boys* script revisions that have not been produced to Plaintiff. For example, Defendant Brickman has stated the play was changed after the first few performances in La Jolla, because certain characters had been omitted.  (*See Ex. 2,*¶ 43 & *Att. 10).*  Defendant Elice testified, in Defendant Valli's divorce proceeding, that "major" revisions were made during La Jolla preview performances, before the show moved to Broadway;  that many script revisions bore the same date (August 17, 2004), but were different, with changes made on a daily basis; that Defendant Valli insisted on changes; and, at one point, the play's director sued to prevent more changes, so the actors could remember their lines, as shown in the extracts from his testimony, filed under seal, as *Exhibit 5*.  In a deposition on May 6, 2006, in the same case, Defendant Gaudio swore there were constant changes to the script in La Jolla; that the play was "in flux;" and that the La Jolla script was never "locked," as shown in his testimony, filed under seal as *Exhibit 6*.   In a deposition on July 26, 2007, Defendant Dodger Theatrical's principal, Michael David testified that the "product is ever changing;" that La Jolla was a "laboratory;" and the show changed in "dozens of small ways," and included one "drastic change," between La Jolla and Broadway, as shown in the extracts from this testimony, filed under seal as *Exhibit 7*.   Critically, Mr. David testified, regarding *Jersey Boys* touring shows, that "every one" changes a little bit.   *Id*.   And, in a recent interview for *BroadwayWorld.com*, Mr. David said: "shows are never finished. . . . Each manifestation is a glorious opportunity to do it again," and, "there are certain things that we changed in Vegas that are now reflected [in London]," as shown in the copy attached as *Exhibit 8*.  Finally, as shown in a *Jersey Boys* script attached hereto as *Exhibit 9*, bearing the date of the show's Broadway opening, which Plaintiff independently obtained, and Defendants have not produced, unredacted copies of the script bear dates in the upper left corner of each page, reflecting the date on which each page was last "revised."  *Id*.  Upon information and belief, it appears that Defendants have not produced all

such scripts to Plaintiff.  Upon information and belief, these date-stamps originate in the MovieMagic® Screenwriter program, and without access to this information, and the script changes evidenced thereby, Defendants Brickman and Elice will continue to evade discovery.

Nothing could be more relevant in this case than the various forms of infringing material, and evidence showing how it was created.  These scripts, drafts, and notes are crucial in discovery, and there is no justification for Defendants not to have produced them in an organized form.  For this reason, Plaintiff requests that Defendants Brickman and Elice be ordered to produce all versions of all scripts, for all countries where *Jersey Boys* has ever been performed, labeled as to source (*i.e.*, which Defendant possessed or wrote it) and dated.

### D. Defendants Must Identify and Produce All Emails Requested, and Privilege Logs for Any Emails Withheld Due to Privilege.

Plaintiff asked Defendants Brickman and Elice to identify "all documents and electronically stored information or things relating to any communications . . . which mention or concern *Jersey Boys* . . .," and their answers were evasive and non-responsive.  *See Ex. 4*, at 9-10, 18-19.  Therein, said Defendants stated that "***There are no communications between the Defendants and any other party referring to Rex Woodard or this litigation prior to Defendants' learning of the filing of the Amended Complaint naming Defendants***."  *Id.*  This *Response* does not purport to produce responsive emails or other correspondence **concerning** *Jersey Boys*, as requested, but is limited to emails about Rex Woodard, or this litigation, and even then, to emails prior to the date this action was filed.  This is a form of word game.  Such communications as requested are discoverable.  *See* discussion, *supra*, at 20-21.  Moreover, Defendants have not identified privileged documents encompassed by this request, which they must do by providing a privilege log for any document(s) withheld.  *See, e.g.*, *In Diamond State Insurance Co. v. Rebel Oil Co.*, 157 F.R.D. 691, 698 (D.Nev. 1994).  Similarly, Plaintiff asked Defendants Elice and Brickman to identify emails and other communications "you have had with any of the other parties concerning the subject matter of this litigation."  *Id*. In response, Defendants answered, with, *inter alia*: "***Concerning the litigation, I believe that there are none***, except an email from Michael David informing me that this litigation had commenced . . . . " *Id*.  The interrogatory (No. 24) requested emails concerning the subject

matter of this litigation.  The evasive answer is limited to emails concerning the litigation itself.

Again, this is a form of word game and such emails are discoverable.  Plaintiff is entitled to all such

emails and hereby moves to compel their production under Fed. R. Civ. P. 37(a).  Indeed, there is

evidence that such emails have been withheld – specifically, Defendant Brickman's email to a Four

Seasons email discussion group, on October 20, 2004, concerning changes to the *Jersey Boys* script,

which he has not produced.  *See Ex. 2*, *Att. 14*.

### E.   Defendants Brickman and Elice Must Answer Interrogatories About Their Preservation Efforts.

The Court should inquire into Defendants' preservation efforts, which are defective on their

face.  After tendering a block of generic, boilerplate objections, Defendants Brickman and Elice

provided evasive answers about their preservation efforts, answering Plaintiff's interrogatories about

same, in pertinent part, as follows:

> ***Although Defendant does not recall the exact date, he knows that from the first date that Defendant learned about this lawsuit, Defendant has not destroyed or deleted any hard copies or electronically stored information relating to JERSEY BOYS. Defendant has reviewed the contents of his computers - which include scripts, treatments, notes and communications etc. - and has checked any paper records that he has in his possession and control***.

*See SOF* ¶ 28.  In the December 2, 2008 letter Plaintiff wrote Defendants about preservation, *SOF*

¶ 4, Plaintiff's counsel urged defense counsel to become familiar with the preservation obligations

set forth in *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 312 (S.D.N.Y. 2004) ("Zubulake V").

Defendants' answers to Plaintiff's interrogatory on preservation efforts make it highly likely there

has been a spoliation of evidence.  All Defendants Brickman and Elice have done is represent that

they have not deleted information from computers.  Yet they continue to use the same computers and

same programs, thus potentially altering the evidence through overwriting.  They have not indicated

that they created images of any hard drives, so the parties can learn the state of the evidence at the

time a litigation hold was put into place.  Further, Plaintiff knows of no written litigation hold, which

is required for there to be a fulfillment of the duty to preserve evidence.  Otherwise, spoliation is

presumed.  *See Pension Committee of the University of Montreal v. Band of America Securities*,

2010 U.S. Dist. LEXIS 28204 (S.D.N.Y. Mar. 23, 2010)

Moreover, Defendants' boilerplate objections to this interrogatory (*see SOF* ¶ 28) lack merit. In *Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal. 2006), the Court explained that the party opposing discovery has the burden of showing it is overly broad, unduly burdensome or irrelevant. *See also Graham v. Casey's General Stores*, 206 F.R.D. 251, 253-4 (S.D.Ind. 2000). To meet this burden, the objecting party must specifically detail the reasons why each request is irrelevant. *Id.* (citing *Schaap v. Executive Indus., Inc.*, 130 F.R.D. 384, 387 (N.D. Ill. 1990)). Boilerplate, generalized objections are inadequate, and tantamount to making no objections at all. *Walker v. Lakewood Condominium Owners Assoc.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). *See also Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3rd Cir. 1982) (mere statement that interrogatory is "overly broad, burdensome, oppressive and irrelevant" is inadequate). The party opposing discovery must demonstrate the overbreadth, burdensomeness or irrelevancy, *Graham v. Casey's General Stores*, 206 F.R.D. 251, 253-4 (S.D. Ind. 2000), and detail the reasons why. *Id.* (citing *Schaap*, 130 F.R.D. at 387).

For the foregoing reasons, this Court should inquire into Defendants Brickman's and Elice's preservation efforts, and order complete responses by each Defendant to Plaintiff's *Interrogatory No. 3*, concerning ESI.   Plaintiff is entitled to discovery on this issue, because the objections are without merit, and the answers provided to date provide *prima facie* evidence that there is no written litigation hold, and that preservation efforts are defective.

### F.   The Court Should Not Be Distracted by *Ad Hominem* Attacks on Plaintiff's Counsel, or Disparagement of Plaintiff's Case as "The Revenge of the Rejected Fan Club"

In an attempt to influence the Court to take Plaintiff's discovery rights less than seriously, *Defendants' Motion* mischaracterizes Plaintiff's discovery requests as a "Fan Club Discovery Agenda," which "oozes with resentment," rather than constituting proper litigation discovery (*Id.* at 12-14.)   In doing so, Defendants mount a completely false *ad hominen* attack on one of Plaintiff's lawyers, which they had no basis for filing, and have been asked to withdraw, but have refused to do so.   (*See Ex. 2*, ¶ 5.)

If the Court has any doubt about the seriousness of Plaintiff's advocacy in this case, Plaintiff respectfully refers the Court to *SAC*, which certainly does not "ooze with resentment." Additional

examples of the seriousness of Plaintiff's prosecution of this case may be found in (Docs. 166, 167, 168, and 184.)  This Court recently denied four motions to dismiss the *SAC* – three of which were tendered by New Defendants – in a 41-page written opinion.  (Doc. 300.)

Just as defense counsel have misrepresented the record on their own lack of cooperation in discovery, they have brazenly misrepresented facts about a long-defunct Four Seasons Fan Club (of which Plaintiff's counsel has never been a member), which they then disparage, along with Plaintiff's counsel, so they can disparage Plaintiff's case without record support, or any other evidence, and contrary to law.  Although these allegations have no proper role in this case, and certainly not in *Defendants' Motion*, which concerns routine discovery requests, because of the nature of defense counsel's claims, and their refusal to withdraw them, despite Plaintiff's request, Plaintiff's counsel has been forced to expend considerable amounts of time addressing these allegations comprehensively, and has done so in his *Declaration*, the relevant portions of which are incorporated herein by reference.  *See Guillot Declaration* (*Ex. 2*), ¶¶ 3-5, 33-69.

Briefly summarized, Plaintiff's subject counsel has never been a member of a Four Seasons fan club; upon information and belief, there is no such club; Plaintiff's counsel did not meet Plaintiff in a "chat room" or "via" a Four Seasons Fan Club, Plaintiff did not purchase the *Jersey Boys* DVD placed on record in this case at a fan club gathering; Plaintiff has not "contributed" to any Web site concerning the Four Seasons, and knows of no such site which "oozes with resentment" towards the band; it is not true that "many" of Plaintiff's witnesses are drawn from a "fan club" – in fact, none of them are, although 3, out of nearly 40, subscribe to a Four Seasons email discussion group, and each possesses independently important information relevant to this case; Plaintiff's counsel has never made any statement, in any email discussion group, which undermines, or contradicts, arguments advanced herein by Plaintiff; and, Plaintiff's counsel is not in collusion or consultation with, any fan-related third party in this action, and acts for Plaintiff alone.  Moreover, none of defense counsel's defamatory allegations have any bearing on their obligation to comply with discovery in this case.

II.     **DEFENSE COUNSEL SHOULD BE SANCTIONED FOR VIOLATING DISCOVERY RULES AND CAUSING UNNECESSARY EXPENSE WITH THEIR IRRELEVANT ATTACKS AND SPURIOUS OBJECTIONS**

*Defendants' Motion* fails to set forth the text of the relevant discovery requests from which Defendants seek protection, and pays mere lip service to the "meet and confer" requirements of Fed. R. Civ. P. 37 and LR 26-7 – undoubtedly due to the fact that counsel did not discharge their "meet and confer" responsibilities.   LR 26-7(a) is unambiguous: "[a]ll motions to compel discovery or for protective order shall set forth in full the text of the discovery originally sought and the response thereto, if any."   This Court has stated that submission of the full text of the discovery requests and responses at issue is "a ***prerequisite to judicial consideration of a [discovery motion]***."   *Shuffle Master, Inc. v. Progressive Games, Inc*., 170 F.R.D. 166, 170 (D. Nev. 1996).  *Defendants' Motion* is devoid of any text remotely resembling a discovery request and response, let alone any reference to such information.  More importantly, defense counsel rushed to the court house to file *Defendants' Motion*, without engaging in any meaningful discussion with Plaintiff's counsel on the contested issues, and after reaching an agreement to do so before court filings would be made.  *SOF* ¶¶ 35-36.

In *Shuffle Master*, the Court explained that compliance with Rule 37 and the local rule requires moving party's counsel to "personally engage in two-way communication with the non-responding party to meaningfully discuss each contested discovery dispute in a genuine effort to avoid judicial intervention."   170 F.R.D. at 171 (citing *Nevada Power Co. v. Monsanto Co.*, 151 F.R.D. 118, 120 (D. Nev. 1993)).  Parties must "deliberate, confer, converse, compare views, or consult with a view to resolve the dispute without judicial intervention . . . by determining precisely what the requesting party is actually seeking; what responsive documents or information the discovering party is reasonably capable of producing; and what specific, genuine objections or other issues, if any, cannot be resolved without judicial intervention."   *U.S. Philips Corp. v. Synergy Dynamics Int'l, LLC*, No. 2:05-cv-00577-PMP-GWF, 2007 WL 1110730 at *2 (D. Nev. April 11, 2007).  Here, however, after receiving Plaintiff's counsel's March 10, 2010 letter, which evidences Plaintiff's own attempts to resolve the dispute, defense counsel said nothing; refused to engage in conversation to resolve the issue; and ran to the court house and filed the instant motion.  There was no adequate and sincere conferment between the parties.  *See Shuffle Master*, 170 F.R.D. at 171-72. *Defendants' Motion* should therefore be denied on these bases alone.  *See SOF* ¶¶ 35, 36.

"Fed. R. Civ. P. 37 authorizes sanctions for a party's failure to make disclosures or cooperate in discovery. Rule 37(c)(1) provides, in relevant part: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. *Oracle USA, Inc. v. SAP AG*, 2009 U.S. Dist. LEXIS 91432, 13-15 (N.D. Cal. Sept. 17, 2009). Rule 37(a)(3) explicitly provides that an evasive or incomplete disclosure, answer, or response to a discovery obligation "is to be treated as a failure to disclose, answer, or respond."

In the Ninth Circuit, "[t]he district court is given broad discretion in supervising the pretrial phase of litigation." *Continental Lab.*, 195 F.R.D. at 677 (quoting *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 369 (9th Cir. 1985)). If full compliance with Rule 26(a) is not made, Rule 37(c)(1) **mandates** some sanction, "the degree and severity of which are within the discretion of the trial judge." *Keener v. United States*, 181 F.R.D. 639, 641 (D.Mont. 1998).

Given the conduct of defense counsel, which forced an unnecessary, expensive *Opposition* to a *Motion for Protective Order*, and a *Cross-Motion to Compel*; and given the clear discoverability of the material involved, and the New Defendants' unnecessary and irrelevant disparagement of Plaintiff's lead counsel, Mr. Guillot, which also required a thorough response, defense counsel should be sanctioned through the imposition of fees necessary to respond to the premature motion for protective order.

## III.  <u>CONCLUSION</u>.

IN VIEW OF THE ABOVE, Plaintiff respectfully requests that Defendants' Motion be denied, and her *Cross-Motions* granted.

RESPECTFULLY SUBMITTED:

Dated: May 4, 2010                           By: /s/ George L. Paul
                                                  Gregory H. Guillot
                                                  George L. Paul
                                                  John L. Krieger
                                                  Robert H. McKirgan

                                                  Attorneys for Plaintiff, Donna Corbello

1

## CERTIFICATE OF SERVICE

2

I, Gregory H. Guillot, do hereby certify that a true and correct copy of the foregoing document was served, by CM/ECF on this 4th day of May, 2010, upon each of the following:

3

4  Daniel M. Mayeda
   LEOPOLD, PETRICH & SMITH, P.C.
5  2049 Century Park East, Suite 3110
   Los Angeles, California 90067-3274

6  David S. Korzenik
   MILLER KORZENIK SOMMERS LLP
7  488 Madison Avenue, Suite1120
   New York, New York 10022-5702

8
   Samuel S. Lionel
9  Todd Kennedy
   LIONEL, SAWYER & COLLINS
10 300 So. 4t Street # 1700
   Las Vegas, Nevada 89101

11
   Attorneys for Defendants, Frankie Valli, Robert J. Gaudio,
12 Marshall Brickman, Eric S. Elice, Des McAnuff,
   DSHT, Inc., and Dodger Theatricals, Ltd.

13
   L. Bradley Hancock
14 Christopher B. Payne
   Greenberg Traurig, LLP
15 1000 Louisiana, Suite 1800
   Houston, TX 77002

16
   Booker T. Evans, Jr.
17 Greenberg Traurig LLP
   2375 East Camelback Road, Suite 700
18 Phoenix, AZ 85016

19 Alma Chao
   Greenberg Traurig, LLP
20 3773 Howard Hughes Parkway
   Suite 500 North
21 Las Vegas, NY 89169

22 Attorneys for Defendant,
   Thomas Gaetano DeVito

23
                                    /s/ Gregory H. Guillot
24  _                          _____
                                    Gregory H. Guillot
25

26

27

28