1   Gregory H. Guillot
    ggmark@radix.net
2   *Admitted Pro Hac Vice*
    GREGORY H. GUILLOT, PC
3   13455 Noel Road, Suite 1000
    Dallas, TX 75240
4   Telephone: (972) 774-4560
    Facsimile: (214) 515-0411
5
    John L. Krieger (Nevada Bar No. 6023)
6   JKrieger@lrlaw.com
    LEWIS & ROCA, LLP
7   3993 Howard Hughes Pkwy, Suite 600
    Las Vegas, NV 89169
8   Telephone: (702) 949-8200
    Facsimile: (702) 949-8398
9
    George L. Paul
10  Gpaul@lrlaw.com
    *Admitted Pro Hac Vice*
11  Robert H. McKirgan
    RmcKirgan@lrlaw.com
12  *Admitted Pro Hac Vice*
    LEWIS & ROCA, LLP
13  40 North Central Ave., Suite 1900
    Phoenix, AZ 85004
14  Telephone: (602) 262-5311
    Facsimile: (602) 262-5747
15
    Attorneys for Plaintiff,
16  DONNA CORBELLO

17

18                    UNITED STATES DISTRICT COURT

19                         DISTRICT OF NEVADA

20   DONNA CORBELLO, an individual,        CASE NO. 2:08-cv-00867-RCJ-PAL

21              PLAINTIFF,

22        vs.                              **PLAINTIFF'S MOTION FOR
                                           RECONSIDERATION BY THE
23   THOMAS GAETANO DEVITO, an             UNITED STATES MAGISTRATE
     individual, *et al.*,                 JUDGE OF HER *ORDER* DATED
24                                         NOVEMBER 12, 2010 (DOC. 345)**
                DEFENDANTS.
25

26        Plaintiff, Donna Corbello, by her attorneys, herewith moves the Honorable Peggy A. Leen,

27   United States Magistrate Judge, to reconsider her *Order* (Doc. 345) of November 12, 2010 ("Order")

28

                                          -1-

concerning Plaintiff's *Cross-Motion to Compel* (Doc. 326) and *Cross-Motion for Sanctions re: Discovery* (Doc. 327),[1] based on the availability of new evidence, including evidence of improper certifications under Fed. R. Civ. P. 26(g)(3); the need to correct clear error, and, to prevent manifest injustice.[2]

**INTRODUCTORY STATEMENT**

1.   On November 12, 2010, the Court entered its *Order*, denying the New Defendants' *Motion for Protective Order* (Doc. 298), granting in part, and denying in part, Plaintiff's *Cross-Motion to Compel* (Doc. 326), denying Plaintiff's *Cross-Motion for Sanctions* (Doc. 327), and, ruling on other disputes identified in the *Joint Status Report* (Doc. 335), filed after Court-ordered discovery conferences in July and August 2010, discussed at a hearing held on August 12, 2010, and briefed in *Proposed Findings and Orders* filed by the parties on August 13 and 16, 2010, respectively.  (*See* Docs. 337 & 339.)

.    2.   The Court's *Order* relied, for key findings of fact, on representations made and certified by Defendants and their counsel, in: (a) *Declarations Under Penalty of Perjury* signed by Defendants Brickman and Elice, and attorney, David Korzenik; (b) the *Motion for Protective Order*, *Response*, *Reply*, *Joint Status Report*, and *Proposed Findings and Order,* signed by defense counsel, under penalty of Fed. R. Civ. P. 26(g)(3); and, (c) the arguments of defense counsel at the hearings held by the Court.  (*See, e.g.,* Doc. 345 at 3, 4, 5 6-7, 9-10.)  Although Plaintiff believed that documents filed with her *Cross-Motions* and *Reply* (Doc. 331) amply called these representations into question, the Court stressed, at the July 13, 2010 hearing, that they must be deemed true, absent evidence to the contrary, due, *inter alia*, to the seriousness of the certifications, and the penalties

---

[1]Reconsideration is not sought with respect to the denial of the New Defendants' *Motion for Protective Order* (Doc. 298.)

[2]This *Motion* is not intended to comprise "objections" for the United States District Judge under Fed. R. Civ. P. 72, but is a request for reconsideration by the Magistrate Judge of her own ruling, for the reasons cited herein.  Plaintiff reserves the right to file objections if her present request is rejected, noting that the time limit for filing objections does not run while a timely motion for reconsideration is pending.  *See, e.g., Comeau v. Rupp*., 142 F.R.D. 683 (D. Kan.1992); *Epperly v. Lehmann Co.*, 161 F.R.D. 72 (D. Ind.1994).

1    associated with violations of the Rule, as shown in the following colloquy between the Court and

2    Plaintiff's counsel, concerning Defendants' production of scripts, and drafts of scripts, for *Jersey*

3    *Boys*:

4        **THE COURT**: -- and ***you have read the declarations of the clients and you've read***
    ***the declarations of opposing counsel and you've read the representations that are***

5        ***made under penalties of Rule 11 about what they produced and they've given you***
    ***absolutely every draft that they have***, **what reason do you have to believe that**

6        **those representations are not accurate** other than you still want the native files?

7        **MR. PAUL**: And we have to take their word for that because of, you know --

8        **THE COURT**: *Everybody has to take everybody's word for discovery responses,*
    *don't you? When you sign a discovery response under penalty of Rule 11 and when*

9        *your client verifies Answers to Interrogatories, that is* --

10       **MR. PAUL:** Yeah. But we -- we've had --

11       **THE COURT**: -- *a representation*.

12   (Doc. 334 at 39) (emphasis added).[3]

13       3.    Based on this reliance, the Court accepted, as true, the following representations by

14   Defendants and their counsel: (1) that Defendants Brickman and Elice produced to Plaintiff, before

15   the August 12 hearing, or shortly thereafter, all information contained in the MovieMagic®

16   Screenwriter native files, in PDF format (Doc. 345 at 3, ¶ 2); (2) that said Defendants also produced

17   during this period, "absolutely every draft [of the Jersey Boys script] they have" (*id.,* and Doc. 334

18   at 39), including drafts of the abridged *libretto* in the *Jersey Boys* coffee table book (Doc. 345 at 4),

19   rendering the native files duplicative (*id.*); (3) that said Defendants had similarly produced all

20   responsive emails and ESI in their possession, for the period preceding January 2007 (*id*., at 6-7);

21   (4) that January 1, 2007 marked the end of the "creative period" for *Jersey Boys*, warranting temporal

22   limitations on certain discovery (*id*, at 10); (5) that communications with or between the writers after

23   January 1, 2007 would not likely provide information regarding their engagement (*id*., at 9); (6) that

24

25   _____

26       [3]The Court referred to "Rule 11" at the hearing, but for discovery motions, responses, and
objections, the applicable Rules are Fed. R. Civ. P. 26 through 37, and, in particular, Fed. R. Civ.

27   P. 26(g) and 37(a)(4).  *See* Fed. R. Civ. P. 11(d); Fed. R. Civ. P. 26(g) *Advisory Committee Notes*
(1983 Amendments); *ClearValue, Inc. v. Pearl River Polymers, Inc*., 242 F.R.D. 362, 375 (E.D. Tex.

28   2007); *Project 74 Allentown, Inc. v. Frost*, 143 F.R.D. 77, 84-85 (E.D. Pa. 1992).

discovery of communications with and between said Defendants, relating to their compensation and income from *Jersey Boys* should be barred following January 1, 2007, because documents regarding these topics "will continue to be produced" by Defendant, Dodger Theatricals (*id*.); (7) that defense counsel have produced the locations and dates of *Jersey Boys* performances in "numerous ways," making the production of post-January 1, 2007 communications on these topics unnecessarily burdensome (*id*.); and, (8) that Plaintiff's concerns regarding the adaptation of *Jersey Boys* for film are speculative, or pertain only to prospective infringements, and do not support the discovery of communications concerning same. (*Id*.). The Court further accepted as true, representations in the *New Defendants' Disclosure of Document Retention and Preservation* (Doc. 317-18), signed and served by defense counsel on March 18, 2010, and the *Declarations Under Penalty of Perjury* of Defendants Brickman and Elice (Docs. 298-1 & 298-2), that the writers generally collaborated in person, exchanging emails only rarely, and that Defendant McAnuff, the *Jersey Boys* director, did not use email at all during the "creative period." (*See* Docs. 317-18, at 5-6; 298-1, at 3-4; 298-2, at 3; 334 at 42-43.)[4]

       3.     Unfortunately, based on newly-available evidence, it appears that the Court's reliance on these representations was misplaced, and the certifications of Defendants Brickman, Elice, and their counsel, were "improper," under Fed. R. Civ. P. 26(g)(3). Specifically, documents obtained from the New Defendants, and third parties, after the August 12, 2010 hearing, after the submissions of *Proposed Findings and Orders*, and both before, and after, the November 9, 2010 Status Conference, as described in the *Declaration of Gregory H. Guillot Under Penalty of Perjury* ("Guillot Declaration"), attached as *Exhibit 1*, reveal facts that cannot be reconciled with the representations on which the *Order* relied. These documents show, *inter alia*: (1) that Defendants Brickman and Elice misled Plaintiff and the Court concerning their use of the *MovieMagic®*

---

[4]At the July 13, 2010 hearing, apparently referencing these *Declarations*, and the *Disclosure of Document Retention and Preservation*:, the Court noted: "And if you had only, in my view, provided the specificity that you contain in your papers about what you did and when you did and what documents you have and what you don't and in what format, this matter could have and should have been resolved long ago." (Doc. 334 at 10.)

1   *Screenwriter* software, which they actually worked with for more than two years, both during the

2   writing of "Oh What a Night," *Jersey Boys*' predecessor, and during the primary *Jersey Boys* creative

3   period, with Elice sending contributions to Brickman for incorporation into the text, while Brickman

4   maintained "master copies" of the scripts in a *MovieMagic*® directory on his computer; (2) that

5   additional notes, not previously disclosed, including notes prepared by Defendant Gaudio, were

6   maintained by Defendant Brickman in *MovieMagic*,® and provided to Defendant Elice in that

7   format; (3) that Brickman used color coding, available within *MovieMagic*,® to distinguish current

8   drafts from earlier ones; (4) that Defendants Brickman and Elice, as of August 12, 2010, had

9   produced only a ***fraction*** of the *Jersey Boys* scripts, drafts, and notes they possessed, rather than

10  "every draft they have," as represented, and over 30,000 pages of additional scripts, drafts, and notes

11  were "dumped" on Plaintiff 's counsel just prior to the November 9, 2010 Status Conference; (5) that

12  said Defendants, contrary to their sworn representations, communicated by email almost daily about

13  the *Jersey Boys* script and revisions during the primary creative period, sometimes exchanging

14  messages more than once per day; (6) that Defendant McAnuff also communicated frequently by

15  email during the primary creative period, rather than "not at all," as represented; (7) that Defendants

16  Brickman and Elice had not produced as of August 12, 2010, and still have not produced, all

17  responsive emails and ESI in their possession for the period preceding January 2007; (8) that the

18  *Jersey Boys* creative period did not end in January 2007, and material revisions are still being made

19  to the script; (9) that relevant, responsive documents exist concerning the engagement, income, and

20  compensation of Brickman and/or Elice for *Jersey Boys* after January 1, 2007; (9) that Plaintiff

21  cannot rely on financial documents from Defendant, Dodger Theatricals, to verify the *Jersey Boys*-

22  related income of the writers, because, *inter alia*, Dodger Theatricals no longer owns the production,

23  having transferred its rights in *Jersey Boys* to Jersey Boys Broadway Limited Partnership – a detail

24  the New Defendants have withheld from Plaintiff; and, (10) that Plaintiff's concerns regarding the

25  adaptation of *Jersey Boys* for film are not speculative, as a deal has been reached for such adaptation,

26  and another document indicates that the original Broadway production of the musical may have been

27  filmed, in high-definition format, with surround sound, for future theatrical use.

28          4.      Whereas, the improper certifications of Defendants and their counsel, materially

1   impacted the *Order*, and/or were repeated as findings therein, and whereas, the *Order* will likely

2   deprive Plaintiff of essential discovery, Plaintiff respectfully asks the Court to reconsider, and

3   modify the *Order*, based on the new evidence herein supplied.[5]  In support whereof, the following

4   is shown.

5                                        **ARGUMENT**

6   I.    **THE MAGISTRATE JUDGE SHOULD RECONSIDER, AND MODIFY THE *ORDER***
        **BASED ON NEWLY-AVAILABLE EVIDENCE, INCLUDING EVIDENCE OF**
7       **DISCOVERY MISCONDUCT.**

8         A.    **The Applicable Standard.**

9         Although the Federal Rules of Civil Procedure do not mention petitions for rehearing or

10  motions for reconsideration, it is well-settled that district courts have the inherent power to revise,

11  correct, and alter interlocutory orders at any time prior to entry of a final judgment, *Akers v. Keszei*,

12  2010 U.S. Dist. LEXIS 108159, 5-6 (D. Nev. Oct. 7, 2010) (citing *Sch. Dist. No. 5 v. Lundgren*, 259

13  F.2d 101, 105 (9th Cir. 1958); *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir.

14  2006)); *Wentner v. Ridgewood Energy Corp.*, 1993 U.S. Dist. LEXIS 21249, 7-9 (N.D. Cal. Sept.

15  30, 1993), and a magistrate judge may reconsider her own rulings.  *See, e.g.,* Wright, Miller &

16  Marcus, *Federal Practice and Procedure*: Civil 2d § 3069, 31769-31771 (2010)*; Chase Manhattan*

17  *Bank v. Iridium Africa Corp.*, 294 F.Supp.2d 634 (D. Del.2003).   However, motions for

18  reconsideration are not vehicles for unsuccessful parties to "rehash" arguments previously presented.

19  *E.g., Coleman v. Schwarzenegger*, 2008 U.S. Dist. LEXIS 51343 (E.D. Cal. June 17, 2008)*.

20  Henderson v. Alameda County Med. Ctr.*, 2007 U.S. Dist. LEXIS 83679 (N.D. Cal. Nov. 2, 2007).

21  Instead, the grounds which justify reconsideration "involve an intervening change of controlling law,

22  the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."

23  *Henderson v. Alameda County Med. Ctr.*, 2007 U.S. Dist. LEXIS 83679 (N.D. Cal. Nov. 2, 2007)

24  (citing *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989); *United*

25

26         [5]Plaintiff does not seek reconsideration of the Court's rulings regarding the discovery of
27  documents from the two copyright litigations in which the New Defendants were recently involved
    (Doc. 345 at 11), the production of privilege logs (*id*. at 12), or the identification of purely passive
28  *Jersey Boys* investors. (*Id.* at 14-15.)

                                             -6-

1   *States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970)).  All these grounds, with the

2   exception of a change in controlling law, exist in this case.

3       **B.    The *Order's* Findings and Conclusions Regarding Scripts, Drafts of Scripts,**
           **"Change Pages" for the *Jersey Boys* Script, and, the Production of the**
4          ***MovieMagic® Screenwriter* Native Files Should be Modified in View of Newly-**
           **Available Evidence.**

5           The *Order*'s central finding regarding Plaintiff's *Cross-Motion to Compel* the production of

6   scripts, drafts of scripts, change pages for scripts, and, the *MovieMagic® Screenwriter* native files,

7   is that Defendants Brickman and Elice, alone, or in conjunction with Defendant, Dodger Theatricals,

8   had, by August 12, or shortly thereafter, "produced absolutely every draft that they have."  (Doc. 345

9   at 4; Doc. 334 at 39.)  In fact, this finding is treated as irrefutable, as the *Order* includes no directive

10  to the subject defendants to produce all remaining such materials within their possession, custody,

11  or control.   The finding was based on Defendants' ongoing representations, in their briefs,

12  *Declarations Under Penalty of Perjury*, and the oral arguments of counsel, that the 270 scripts,

13  drafts, fragments, and notes previously produced were all that Defendants' possessed, and more than

14  Plaintiff deserved, as defense counsel intentionally "erred" in producing "everything of a kind," even

15  though he did not deem the material relevant.  (*See* Docs. 334 at 7-8; 325-3 at 3; 317-18 at 4; 325-1

16  at 3; 298-1 at 3; 298-2 at 3; 336 at 7.)   This finding was also crucial to the Court's ruling that the

17  production of *MovieMagic® Screenwriter* native files would be "needlessly burdensome and

18  duplicative."  (Doc. 345 at 3.)  But the finding was erroneous, as the Defendants' representations on

19  which it was based were false.

20          As set forth in the *Guillot Declaration*, at ¶¶ 7-8, on October 27, 2010, the New Defendants

21  sent a disk to Plaintiff's counsel which initially could not be processed due to data corruption, but

22  was corrected, using replacement files provided by defense counsel, on November 4, 2010.  (*Ex. 1*,

23  ¶¶ 7-8.)  This disk, served months after the August 12, 2010 hearing, and long following the

24  certifications described above, included approximately **31,368** pages of scripts, drafts of scripts, and

25  fragments of scripts, in **582** documents.  (*Id*.)  This was 1,500 more pages of material than the New

26  Defendants had produced up to that point, in response to all of Plaintiff's discovery requests, to every

27  New Defendant, on every topic.  (*Id*.)   It was also more than twice the number of script-related

28

1   documents served by the New Defendants previously in the case.  Thus, Defendants' multiple

2   certifications concerning the completeness of their script production, were actually made when less

3   than half the scripts in their possession had been produced.  Plaintiff submits it would have been less

4   burdensome, and not needlessly duplicative, to produce the native files at that point, rather than

5   photocopying, Bates-numbering, scanning, and processing, 31,368 new pages of scripts for

6   production to Plaintiff.  Moreover, this behavior, and Defendants' associated misrepresentations,

7   give rise to suspicions, if not inferences, of greater misconduct, evidencing a motivation to avoid

8   production of the native files at all costs.

9        Documents produced following the August 12, 2010 hearing also contradict the sworn and

10   certified representations of Defendants and their counsel concerning the scope, nature, and timing

11   of their use of the *MovieMagic® Screenwriter* program.  For example, Defendant Elice's

12   *Declaration Under Penalty of Perjury*, dated June 10, 2010 (Doc. 325-1), infers that he used Word

13   and RTF files,[6] between 2002 and 2004, and states that experimented with *MovieMagic®* "only

14   within the period from" February through November 2005, when he tried to familiarize himself with

15   the program.  (*Id.* at 3.)  However, as shown in the true copies of emails between Defendants

16   Brickman and Elice, attached under seal, as *Exhibit 2*, the parties actually began collaborating with

17   the program at least as early as **April 3, 2002**, when writing "Oh What A Night," the predecessor

18   of *Jersey Boys*, and script files used with the program at that time were stored in a directory labeled,

19   "C:\Movie Magic Screenwriter\Scripts\."  (*Ex. 2* at 2-3.)  These messages evidence that Defendant

20   Brickman maintained the "master scripts" on his computer, incorporating Defendant Elice's changes

21   thereto (*id.* at 5, 7-10), and, that used the program's color coding features to distinguish recent scripts

22   from previous drafts.  (*Id.* at 9.)

23        Yet two aspects of the emails shown in *Exhibit 2* are even more significant.  First, the

24   messages establish that the writers used the *Screenwriter* program for *Jersey Boys* through August

25   6, 2004.  (*Id.* at 4-10.)  As shown in the communications attached under seal as *Exhibit 3*, this

26

27

28      [6]As noted repeatedly in Plaintiff's briefs and *Proposed Findings and Order*, *MovieMagic® Screenwriter* works with Word and RTF files, which can be imported into the program.

1   coincides precisely with the principal "creative period" for the musical, as the initial completed script

2   was dispatched to Defendants Valli and Gaudio in mid-June 2004; was approved by these

3   Defendants on July 7, 2004, and the "Full Draft Final," was completed on August 3, 2004 *(Ex. 3* at

4   2-3, 6.)  Thus, the principal initial writing of *Jersey Boys*, commencing shortly after Defendants

5   received of a copy of the Work, and leading to the initial rehearsals in La Jolla, California, was

6   accomplished using the *MovieMagic® Screenwriter* program, and this is the primary period in which

7   the principal adaptation, use, and copying of the Work would have occurred.  Moreover, as set forth

8   in Defendant Elice's earlier *Declaration* (Doc. 325-1), his use of the program continued through

9   November, 2005, when Jersey Boys debuted on Broadway – meaning the *MovieMagic®* software

10  was actually used from the time of *Jersey Boys'* creation to its Broadway debut.  As such, the native

11  files, including the files contained in the *MovieMagic®* "scripts" directory, almost certainly contain

12  the most comprehensive information and material relating to the creation of the allegedly infringing

13  derivative work.  Second, the fourth email included in *Exhibit 2*, indicates that the *MovieMagic®*

14  file sent to Defendant Elice by Defendant Brickman on June 30, 2004 included "notes" from Bob

15  [Gaudio]. (Ex. 3 at 5.)  Upon information and belief, no such notes have been produced to Plaintiff,

16  although they are clearly discoverable, and presumably, still available, within the native files.

17      Plaintiff submits that the foregoing evidence, which was not available during the briefing or

18  oral argument phases of her *Cross-Motions*, establishes that the subject Defendants, and their

19  counsel, have abused the discovery process, in violation of Fed. R. Civ. P. 26(g), by misrepresenting

20  the role of the *MovieMagic® Screenwriter* software in the creation of *Jersey Boys,* tendering false

21  statements regarding the dates on which it was used, and misrepresenting the discoverable material

22  contained therein.  Additionally, the foregoing evidence reveals that further scripts are likely

23  available within the native files, which have yet to be produced, in any form.  Upon information and

24  belief, Defendants Brickman and Elice have never produced drafts, fragments or notes relating to

25  their work on "Oh What a Night," even though they have alleged that material in *Jersey Boys* which

26  Plaintiff views as similar to the Work actually was derived from the "Oh What a Night" script. (See,

27  e.g., Doc. 325-1 at 4-5; 325-2 at 4-5.)  Plaintiff is entitled to this material, which Defendants have

28  interposed as a defense, and the desired format of such production remains the *MovieMagic*

1    *Screenwriter*® native files.

2            Finally, as noted in the *Guillot Declaration* at ¶ 9, many, if not most, of the new scripts,

3    fragments, and drafts, contained in the New Defendants' October 27/November 3 production disks

4    are undated, making it impossible to determine which script was prepared when, and by whom, and

5    impossible to construct a sequence or time line of script revision events. (*Ex. 1*, ¶ 9.) Exemplary

6    cover pages from several of the 31,368 pages of recently-produced scripts are attached, under seal,

7    as *Exhibit 4*. As the Court can see, each first page differs, but there is no indication of when these

8    drafts were prepared, or even which production of *Jersey Boys* to which they pertain. (*Id.*) Nor will

9    it be possible to reconstruct the script chronologies in a 7-hour deposition with one of the writers.

10   The New Defendants offer no solution to this problem, but one exists, in the form of the

11   *MovieMagic*® *Screenwriter* software. The ".SCW" files included within the software, coupled with

12   a copy of the "scripts" directory, which may include Word, RTF, or other types of files, will permit

13   Plaintiff's counsel to navigate, as easily as Defendants, the various changes that have been made to

14   the *Jersey Boys* script, as well as to the script for "Oh What a Night." In view of Defendants'

15   obfuscation, false certifications, and misleading testimonies, and the difficulties involved in working

16   with thousands of pages of undated, but closely-related documents, Plaintiff's submits that her need

17   for the native files significantly outweighs any burden their production would cause Defendants.

18   Indeed, it is difficult to conceive of what Defendants' burdens would be – all that is required is to

19   copy the "scripts" directory, and native SCW files to a thumb drive, and provide it to Plaintiff's

20   counsel, and Plaintiff will be happy to supply a thumb drive for this purpose.

21           In sum, Plaintiff respectfully requests that the Court reconsider its *Order* pertaining to the

22   production of scripts, fragments, drafts of scripts, and native files, and direct Defendants Brickman

23   and Elice to produce all such documents which remain in their possession, in *Screenwriter*-

24   compatible format. Alternatively, if the Court still feels such production is inappropriate,

25   notwithstanding the evidence presented herein, Plaintiff requests that said Defendants be ordered to

26   produce an index, at minimum, identifying the date of each script or fragment, and the production

27   to which it pertains. Without one of these modifications to the *Order*, Plaintiff's ability to

28   effectively use and refer to the scripts and drafts in this litigation will be impaired, as will her work

with her expert witness(es), who must be able to reasonably track the evolution of the play.[7]

C.   **The _Order's_ Findings and Conclusions Regarding Emails and Correspondence Requested in Plaintiff's Requests for Production Nos. 9 and 16, and the Temporal Limitations Imposed on Discovery, Should Also Be Modified in View of Newly-Available Evidence, and to Prevent Manifest Injustice.**

The Court's _Order_ concerning Plaintiff's _Cross-Motion to Compel_ the production of responsive emails from Defendants Brickman and Elice, is also grounded, in large part, in certifications made by said Defendants, and their counsel, under Fed. R. Civ. P. 26(g), which newly-available evidence indicates were "improper."  Fed. R. Civ. P. 26(g)(3).

As a threshold matter, it is now apparent, based on newly-available evidence, that Defendants Brickman and Elice improperly certified the extent of their "email" relationship, in an attempt to avoid the production of incriminating emails to Plaintiff.  In their belated _Disclosure of Document Retention and Preservation_, under Fed. R. Civ. P. 26(a)(1)(A)(ii) and 26(f)(3)(C), said Defendants certified, through Mr. Korzenik, their attorney, that "[i]t was not their practice to use email to do substantive work on the play" (Doc. 317-18 at 4-5), and identical statements were contained in their _Declarations Under Penalty of Perjury._  (Docs. 298-1 at 3, 298-2 at 3.)  Yet, the evidence now indicates that said Defendants communicated _frequently_ by email, at least several times per week, and often more than once per day, and such emails were generally devoted to substantive work on the _Jersey Boys_ script, including work on portions cited as infringing in Plaintiff's _Second Amended Complaint_ (Doc. 107.)  A sampling of such emails is attached under seal as _Exhibit 5,_ and a review of the content reveals glaring conflicts with Defendants' representations to Plaintiff and this Court. For example, one email in _Exhibit 5_ concerns the drafting of the "Walk Like A Man" scene in _Jersey Boys_, which Plaintiff has alleged was appropriated almost _verbatim_ from the Work.  (_Ex. 5_ at 3.) Others discuss changes to dialogue, the development of the Tommy DeVito character, modifications to sequences involving "Lorraine," a character Plaintiff alleges was adapted from the Work, the mob "sit-down" scene, which Plaintiff also alleges was unlawfully appropriated, and the introduction of

---

[7]In this regard, Plaintiff further notes that the Dodger Theatricals "master list" of script changes does not facilitate her efforts to track changes in the play.  Although the "master list" does indicate, for each page, the date on which the most recent change occurred, it does not identify what the change was, or provide access to the previous version of the dated page.

1    new verbiage, in September 2004, taken directly from the Work ("We weren't a social movement

2    like the Beatles"). (*See* generally, *Ex. 5.*)

3         Additionally, as shown in the email correspondence attached under seal as *Exhibit 6*, while

4    certifying falsely, in their *Disclosure of Document Retention and Preservation,* that they did not use

5    email for substantive work on the play, Defendants Brickman and Elice were also withholding

6    emails with incriminating admissions about the Work, including admissions that they were aware

7    it was not written solely by DeVito, and admissions that they intended to duplicate and distribute it,

8    though they had been instructed not to do so.   (*Id.*)   Had Plaintiff not proceeded with her *Cross-*

9    *Motion to Compel*, she would not likely ever have received this material.   Nonetheless, there is

10   evidence that other responsive, incriminating emails exist, that are still being withheld from Plaintiff.

11   Attached under seal as *Exhibit 7*, is a July 2005 email from Defendant Elice to nonparty witness,

12   Charles Alexander, obtained by *subpoena duces tecum*, which has not been produced by Elice in this

13   case.  The email contains admissions regarding Elice's familiarity with Mr. Woodard, his awareness

14   that Mr. Woodard wrote most of the Work, and the importance of the Work to *Jersey Boys*, while

15   also stating falsely, that he returned the Work to Defendant DeVito shortly after it was obtained, and

16   was unable to spend much time reviewing it.   It is particularly curious that this email has not been

17   produced, given that emails from this time period are represented in Defendant Elice's production.

18   However, the motive for such non-production is apparent, in a case involving willful copyright

19   infringement.

20        The Court's *Order* presumes that all unprivileged, responsive emails from the computers of

21   Defendants Brickman and Elice, relating to the so-called "creative period," prior to January 1, 2007,

22   were produced to Plaintiff by August 12, 2010.  (Doc. 345 at 6.)  The *Order* incorporates this

23   presumption because defense counsel represented this to be true in the *Proposed Findings and Order*

24   signed under penalty of Rule 26(g), filed on August 13, 2010.  (*See* Doc. 337 at 4.)  However, this

25   certification, like the others discussed hereinabove, was false when made, and upon information and

26   belief, remains so.  First, although Defendants' production disk dated "August 10, 2010" contained

27   many emails from and to Defendants Brickman and Elice (which were not available for review by

28   Plaintiff's counsel until September 10, 2010), *Guillot Declaration* at ¶ 3, many of the emails

referenced attachments – even showing the file names therefor – but none were produced.  *Id.*, ¶ 4.
Plaintiff's counsel raised this issue with Mr. Korzenik, and was advised that he would "look into"
why they were not included, but Mr. Korzenik never followed up on this request.  Thus, much of the
production tendered to Plaintiff on the "August 10, 2010" disk, consisted of material like that
attached hereto under seal, as *Exhibit 8*.  This cannot comprise "complete production" of responsive
ESI predating January 1, 2007, and accordingly, Defendants' certification was improper.  Moreover,
the New Defendants produced numerous additional emails from and to Defendants Brickman and
Elice which pre-dated January 1, 2007, in late-October/early-November 2010, months after the
certification was made.  *Guillot Declaration*, ¶ 8.

Due to Defendants' persistent, improper certifications, false *Declarations*, and withholding
of relevant, responsive documents, Plaintiff cannot be confident that Defendants will comply with
discovery unless they are ordered to do.  Unfortunately, the *Order* includes no general directive that
Defendants Brickman and Elice produce all responsive emails in their possession, pre-dating January
1, 2007.  Instead, it presumes such emails have been produced.  Plaintiff respectfully requests that
Defendants be ordered to produce this material, even though they have certified that this has been
accomplished.  Otherwise, Defendants will simply focus on the search term procedure outlined for
certain post-January 2007 discovery, and forget about the past.

For the same reasons, Plaintiff respectfully requests reconsideration of those portions of the
*Order* which require a search term procedure for the relevant, post-January 1, 2007 communications
of Defendants Brickman and Elice.  In view of the New Defendants' extensive noncompliance with
discovery, which Plaintiff will outline further in her forthcoming motions to compel, Plaintiff
reasonably fears that the search term procedure will be abused, resulting in the withholding of
relevant, responsive documents known by Defendants to exist, which nonetheless, were not retrieved
by the search terms devised by Plaintiff.  "A party's failure to produce relevant discovery is not
excused because the volume of records to be searched is vast . . . ."  *Stout v. Wolff Shoe Co.*, 2007
U.S. Dist. LEXIS 24833, 5-6 (D.S.C. Mar. 31, 2007) (citing *Danis v. USN Communications, Inc.*,
No. 98 C 7482, 2000 U.S. Dist. LEXIS 16900, at 150 (N.D. Ill. Oct. 20, 2000) (party "responsible
for knowing what documents are discoverable and where to find them" even if volume of records

1   is vast).  Moreover, given that Defendants are capable of producing 45,000 documents, in short

2   order, when it suits their purpose, *Guillot Declaration*, ¶ 7, they should also be able to review a far

3   lower number of emails for documents responsive to Plaintiff's valid discovery requests.

4          Newly-available examples of the difficulties that may arise from such temporal limitations

5   on discovery in this case are attached under seal as *Exhibit 9*.  The first document, dated August 20,

6   2007, is crucial, yet would not likely appear in any search terms Plaintiff could devise.  The

7   document consists of a letter from Defendant Elice to Ed Strong, confirming Elice's investment in

8   the Las Vegas company of Jersey Boys, and enclosing a check for his initial investment.  The letter

9   is significant because it evidences that, in addition to the royalties Defendant Elice will receive from

10  the production as book-writer, he is also part of the investment pool, entitled to a separate profit

11  stream.  (*Id*.)  The words, *Jersey Boys* are not contained in the document; it simply refers to "the

12  Vegas company" of "our show."  Whereas, part of defense counsel's objection of undue burden is

13  based on the fact that Defendant Elice has a number of shows operating simultaneously, this would

14  be precisely the type of letter defense counsel would prefer not to search for, and it would not likely

15  be found.  Nonetheless, it is crucial to Plaintiff case, and also evidences that documents relating to

16  Defendant Brickman's income or compensation relating to Jersey Boys will follow January 1, 2007.

17  The communications which follow in *Exhibit 9* concern financial arrangements for the Jersey Boys

18  Book, and bear dates in June 2007, when the deal was being negotiated.  Although this document

19  may appear in a targeted search, Plaintiff should not have to gamble with a search term procedure

20  to obtain it, as it is crucial to her claim for damages.  Finally, the last pages of *Exhibit 9* evidence that

21  Defendant Elice subscribes to *Google Alerts* for "Jersey Boys," and Plaintiff's initial action in Texas

22  against Defendant DeVito was reported in such alerts.  Such material is relevant to the "willfulness"

23  of Defendant's infringement, and Plaintiff should be able to obtain it, rather than hoping it might

24  surface in a search and be produced.

25         Plaintiff also submits, based on newly-available evidence, that such temporal limitations are

26  not justified by a purported "creative period" for *Jersey Boys* which allegedly passed in or around

27  January 2007.  Charles Alexander, an official biographer for Frankie Valli, and an authority on

28  *Jersey Boys*, who wrote the Forward to the *Jersey Boys* Book, has interviewed Defendant Gaudio

-14-

for hours on its creation, and has seen the play 94 times, recently testified, in a deposition held in New York on November 11, 2010, that, with respect to the script,  "there are a lot of line changes. They've been noodling – they've noodled on the individual lines all along."  *See Excerpt from Deposition of Charles Alexander*, attached hereto as *Exhibit 10*.  Indeed, Mr. Alexander also referred to a recent change in the verbiage for in a "fake murder" scene in the front seat of Frankie Valli's car, which has been cited by Plaintiff as a scene adapted from the Work.  *Ex. 10* at 6.  This new evidence confirms the evidence previously tendered by Plaintiff that potentially material modifications to the Jersey Boys script are made on an ongoing basis, and Plaintiff has a right to discover such changes as they occur, rather than hoping that they arise in a keyword search.

The Court's *Order* held that Plaintiff's would not be entitled to discovery of communications relating to the adaptation of *Jersey Boys* into film, on grounds that Plaintiff's allegations regarding the movie are speculative, based only on information and belief.  Reconsideration of this aspect of the *Order* is also respectfully requested, based on newly-available evidence, attached under seal as *Exhibit 11*.  Two items of newly-available evidence are included.  First attached is a proposal from Broadway Worldwide, concerning an option to film the original Broadway production of *Jersey Boys* in high-definition, with surround sound, for ultimate theatrical presentation.  Such a film would infringe Plaintiff's rights to the same extent that a live performance of *Jersey Boys* does so.  Second attached, are documents relating to an agreement with GK Films, LLC, to adapt Jersey Boys into a motion picture, and as shown therein, Defendants Brickman and Elice have been named as the screen writers.  *Id*.  Clearly, Plaintiff's concerns are not merely speculative, and Defendants Brickman and Elice, as the writers of the new film, are likely to have discoverable information regarding it. Plaintiff needs access to this information and material, in order to effectively prosecute her case.  For the same reasons, Plaintiff's requests for communications concerning said Defendants' engagements relating to *Jersey Boys*, should not be cut off at January 1, 2007.

Plaintiff also requests reconsideration of the Court's limitation on discovery concerning communications relating to compensation and profits accorded to Defendants Brickman and Elice for *Jersey Boys*, again based on newly-available evidence.  Specifically, the Court's holding that such materials can be obtained from Defendant, Dodger Theatricals, is no longer acceptable based

on newly-discovered evidence that Dodger Theatricals is no longer the owner of the *Jersey Boys* production.  As shown in the documents attached under seal as *Exhibit 12*, the current owner of *Jersey Boys* is Jersey Boys Broadway Limited Partnership, and it is that entity, rather than Dodger, that licenses the production in this District.  Whereas, Plaintiff is still developing information on this topic, Plaintiff submits it is premature, under the circumstances, to limit her discovery of financial information to an entity which formerly owned the production in suit.

**D.  The *Order* Should Be Modified to Impose Sanctions on Defendants, and/or Their Counsel, Under, Inter Alia, Rule 26(g)(3)**

The Court's *Order* denied Plaintiff's *Motion for Sanctions*, and reconsideration of this decision is also respectfully requested, in view of the evidence submitted herewith.  Plaintiff submits that the subject Defendants have been unreasonable in discovery, have made false certifications to Plaintiff and the Court, resulting in many hours of wasted time and unnecessary expense, and have actively impeded Plaintiff's attempts to obtain discovery of information and documents fundamental to her case.  Additionally, reconsideration is requested, based on the newly-available evidence attached under seal as *Exhibit 13*.  This material, consisting of an email to Charles Alexander from Four Seasons attorney, Peter Bennett; a response from Mr. Alexander; and a further acknowledgment from Mr. Bennett, is self-explanatory, and shows that as early as September 2008, defense counsel were aware that the allegations ultimately advanced against Plaintiff's lead counsel, in their *Motion for Protective Order*, were groundless.

## II.   CONCLUSION

IN VIEW OF THE ABOVE, Plaintiff respectfully requests that the Court reconsider and modify the Order, as outlined above, or as it deems appropriate, based on the new evidence submitted.

///

///

///

///

///

1

2                                          RESPECTFULLY SUBMITTED:

3

4  Dated: November 29, 2010               By : /s/Gregory H. Guillot

5                                                Gregory H. Guillot
                                                 George L. Paul
6                                                John L. Krieger
                                                 Robert H. McKirgan
7
                                                 Attorneys for Plaintiff,
8                                                DONNA CORBELLO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         -17-

**CERTIFICATE OF SERVICE**

I, Gregory H. Guillot, do hereby certify that a true and correct copy of the foregoing document was served, by CM/ECF, on this, the 29th day of November 2010, upon each of the following:

Daniel M. Mayeda
LEOPOLD, PETRICH & SMITH, P.C.
2049 Century Park East, Suite 3110
Los Angeles, California 90067-3274

David S. Korzenik
MILLER KORZENIK SOMMERS LLP
488 Madison Avenue, Suite1120
New York, New York 10022-5702

Samuel S. Lionel
Todd Kennedy
LIONEL, SAWYER & COLLINS
300 So. 4t Street # 1700
Las Vegas, Nevada 89101

Attorneys for Defendants, Frankie Valli, Robert J. Gaudio,
Marshall Brickman, Eric S. Elice, Des McAnuff,
DSHT, Inc., and Dodger Theatricals, Ltd.

L. Bradley Hancock
Christopher B. Payne
Greenberg Traurig, LLP
1000 Louisiana, Suite 1800
Houston, TX 77002

Booker T. Evans, Jr.
Greenberg Traurig LLP
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016

Alma Chao
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, NY 89169

Attorneys for Defendant,
Thomas Gaetano DeVito

/s/Gregory H. Guillot
Gregory H. Guillot

-18-