1  Gregory H. Guillot
   ggmark@radix.net
2  *Admitted Pro Hac Vice*
   GREGORY H. GUILLOT, PC
3  13455 Noel Road, Suite 1000
   Dallas, TX 75240
4  Telephone: (972) 774-4560
   Facsimile: (214) 515-0411
5
   John L. Krieger (Nevada Bar No. 6023)
6  JKrieger@lrlaw.com
   George L. Paul
7  Gpaul@lrlaw.com
   *Admitted Pro Hac Vice*
8  Robert H. McKirgan
   RmcKirgan@lrlaw.com
9  *Admitted Pro Hac Vice*
   LEWIS & ROCA, LLP
10 3993 Howard Hughes Pkwy, Suite 600
   Las Vegas, NV 89169
11 Telephone: 702-949-8200
   Facsimile: 702-949-8398
12
   Attorneys for Plaintiff,
13 DONNA CORBELLO

14            UNITED STATES DISTRICT COURT

15                 DISTRICT OF NEVADA

16 ┌─────────────────────────────────────┐
   │ DONNA CORBELLO, an individual,
17 │                                         CASE NO.  2:08-cv-00867-RCJ-PAL
   │            PLAINTIFF,
18 │                                         **PLAINTIFF'S THIRD AMENDED**
   │      vs.                                **COMPLAINT FOR DECLARATORY**
19 │                                         **JUDGMENT; ACCOUNTING;**
   │ THOMAS GAETANO DEVITO, FRANKIE          **BREACH OF CONTRACT; UNJUST**
20 │ VALLI, ROBERT J. GAUDIO,                **ENRICHMENT; BREACH OF**
   │ MARSHALL BRICKMAN, ERIC S. ELICE        **IMPLIED COVENANT OF GOOD**
21 │ a/k/a RICK ELICE, DES McANUFF, and      **FAITH; CONSTRUCTIVE FRAUD;**
   │ MICHAEL S. DAVID, all individuals, and, **FRAUD; FRAUDULENT**
22 │ DSHT, INC.  (formerly, "DODGER STAGE    **CONCEALMENT; CONVERSION;**
   │ HOLDING THEATRICALS, INC.), a           **COPYRIGHT INFRINGEMENT,**
23 │ Delaware corporation; DODGER            **CONTRIBUTORY COPYRIGHT**
   │ THEATRICALS, LTD., a New York           **INFRINGEMENT AND FOREIGN**
24 │ corporation; JB VIVA VEGAS, LP,         **COPYRIGHT INFRINGEMENT,**
   │ JERSEY BOYS BROADWAY LIMITED            **SEEKING DECLARATORY,**
25 │ PARTNERSHIP, and JERSEY BOYS            **MONETARY AND INJUNCTIVE**
   │ RECORDS LIMITED PARTNERSHIP, all        **RELIEF, INCLUDING**
26 │ New York limited partnerships; SKUNK,   **CONSTRUCTIVE TRUSTS**
   │ INC., a New York corporation; and
27 │ GETTING HOME, INC., a Nevada            **JURY DEMAND**
   │ corporation,
28 │            DEFENDANTS.
   └─────────────────────────────────────┘

Plaintiff, Donna Corbello, by her attorneys, and pursuant to, *inter alia*, Fed. R. Civ. P. 15(a)(2), 8(d)(2)-(3), 19(a)(1) and/or 20(a)(2), 17 U.S.C. § 501(b), and the Court's *Order* (Doc. 351) of December 10, 2010, hereby alleges the following for her *Third Amended Complaint* against the above-named Defendants:

## BASIS FOR FEDERAL JURISDICTION

### [Local Rule 8-1]

1.     This Court has subject matter jurisdiction over this action, under 28 U.S.C. § 1338(a) [actions arising under Acts of Congress relating to copyrights]; 28 U.S.C. § 1331 [actions arising under the Constitution, laws or treaties of the U.S.], and 28 U.S.C. § 1367(a) [supplemental jurisdiction over related claims, including claims involving joinder of parties and foreign copyright infringement claims]. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), in that the parties are citizens of different States; the amount in controversy exceeds $75,000.00 as to each Defendant, exclusive of interest and costs, and the exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a) is consistent with the jurisdictional requirements of 28 U.S.C. § 1332, in accordance with 28 U.S.C. § 1367(b).

## THE PARTIES

2.     Plaintiff, Donna Corbello, an individual, domiciled in College Station, Texas, is the widow and heir of Rex Conrad Woodard, who authored an unpublished, biographical work regarding Defendant DeVito and the pop group, the Four Seasons (the "Work") in Beaumont, Texas, which was completed shortly before his death in 1991. Plaintiff inherited Mr. Woodard's rights in the Work and is his successor in an agreement with Defendant DeVito regarding same.

3.     Defendant, Thomas Gaetano DeVito ("DeVito"), an individual, domiciled in Las Vegas, Nevada, was an original member of the Four Seasons, serving, *inter alia*, as lead guitarist and baritone vocalist, and formed the Variety Trio, the Varietones, and the Four Lovers, its predecessor groups. Defendant DeVito participated with Mr. Woodard in the creation and revision of the Work; entered into an agreement with Mr. Woodard regarding the Work; transacted business with Mr. Woodard and his heirs concerning the Work; and, years following Mr. Woodard's death, issued an "exclusive license" encompassing the Work to Defendants Frankie Valli and Robert J. Gaudio, who

-2-

subsequently sublicensed and/or transferred said rights, or portions thereof, to the remaining Defendants herein (ultimately assigning same to Defendants, DSHT, Inc. and/or Dodger Theatricals, Ltd., which in turn, assigned same to Jersey Boys Broadway Limited Partnership), leading to the Work's use and adaptation for the musical production, *Jersey Boys*, as Defendant DeVito actively concealed these facts from Plaintiff.

4.    Defendant, Frankie Valli ("Valli"), an individual, domiciled in Calabasas, California, was an original member of the Four Seasons, serving as lead vocalist therefor; was a member of the Varietones and the Four Lovers, its predecessor groups; and, continues to perform with a modern version of the Four Seasons.  Defendant Valli is a party to an agreement with Defendant DeVito which purports to transfer certain exclusive rights in the Work to Defendant Valli and Defendant, Robert J. Gaudio, and Defendant Valli, with Defendant Gaudio, further licensed and/or transferred these rights, or portions thereof, to the remaining Defendants herein (ultimately assigning same to Defendants DSHT, Inc. and/or Dodger Theatricals, Ltd., which in turn, assigned same to Jersey Boys Broadway Limited Partnership), resulting in the use and adaptation of the Work for *Jersey Boys*, and collateral products, and the distribution of copies thereof.  Upon information and belief, Valli and Gaudio are involved in a longstanding, informal partnership and/or joint venture, occasionally doing business as "The Four Seasons Partnership," which operates from an office in Santa Monica, California.

5.    Defendant, Robert J. Gaudio ("Gaudio"), an individual, domiciled in Nashville, Tennessee, was also an original member of the Four Seasons, serving as a vocalist, principal composer and keyboard player, and frequently, as arranger and producer for the group, and was a member of the Four Lovers, its predecessor group.  Defendant Gaudio is named, with Defendant Valli, as an exclusive licensee of certain rights in the Work under an agreement with Defendant DeVito, and Gaudio, with Valli, further licensed and/or assigned these rights, or portions thereof, to the remaining Defendants herein (ultimately assigning same to Defendants DSHT, Inc. and/or Dodger Theatricals, Ltd., which in turn, assigned same to Jersey Boys Broadway Limited Partnership), resulting in the use and adaptation of the Work for *Jersey Boys*, and collateral products, and in the distribution of copies thereof.  Upon information and belief, Defendant Gaudio is involved

in a longstanding, informal partnership and/or joint venture with Defendant Valli, occasionally doing business as "The Four Seasons Partnership," which operates from an office in Santa Monica, California. Defendants Gaudio and Valli are sometimes referred to collectively hereinafter as "the Four Seasons Partnership."

6.   Defendant, Marshall Brickman ("Brickman"), an individual, domiciled in New York, New York, is a musician, writer, and screenwriter, who co-authored the *libretto* for *Jersey Boys* with Defendant Eric S. Elice, and used and adapted the Work therefor, in concert with Defendant Des McAnuff, by authorization of Defendants Gaudio and Valli, pursuant to the "exclusive license" issued by Defendant DeVito thereto; by authorization of Defendant DSHT, Inc., under a secondary "exclusive license" and/or assignment from the Four Seasons Partnership; by authorization of Defendant Dodger Theatricals, Ltd., under a further sublicense, lease, and/or assignment from Defendant DSHT, Inc. and/or Defendants Valli and Gaudio, and/or by authorization of Defendant, Jersey Boys Broadway Limited Partnership, under an assignment from Defendant Dodger Theatricals, Ltd.

7.   Defendant, Eric S. Elice, a/k/a Rick Elice ("Elice"), an individual, upon information and belief domiciled in New York, New York, is a writer, director, producer, performer, and a creative consultant for Walt Disney Studios, who co-authored the *libretto* for *Jersey Boys* with Defendant Brickman, using and adapting the Work in connection therewith, in concert with Defendant, Des McAnuff, by authorization of Defendants Gaudio and Valli, under the "exclusive license" issued by Defendant DeVito thereto; by authorization of Defendant DSHT, Inc., under a secondary "exclusive license" and/or assignment from the Four Seasons Partnership; by authorization of Defendant, Dodger Theatricals, Ltd., under a further license, lease, and/or assignment from Defendant DSHT, Inc. and/or Defendants Valli and Gaudio, and/or by authorization of Defendant, Jersey Boys Broadway Limited Partnership, under an assignment from Defendant Dodger Theatricals, Ltd.

8.   Defendant, Des McAnuff, an individual, domiciled in New York, New York, is a founder member of Defendant Dodger Theatricals Ltd., and an award-winning director of Broadway musical productions, who staged and directed *Jersey Boys*, and used, referenced, and adapted the

Work in connection therewith, along with Defendants Brickman and Elice, by authorization of Defendants Gaudio and Valli, under the "exclusive license" issued by Defendant DeVito thereto; by authorization of Defendant DSHT, Inc., under a secondary "exclusive license" and/or assignment from the Four Seasons Partnership; by authorization of Defendant Dodger Theatricals, Ltd., under a further sublicense and/or assignment from Defendant DSHT, Inc. and/or Defendants Valli and Gaudio, and/or by authorization of Defendant, Jersey Boys Broadway Limited Partnership, under an assignment from Defendant Dodger Theatricals, Ltd..

9.     Defendant, Michael S. David ("David"), an individual, domiciled in New York, New York, is an established  Broadway and off-Broadway producer, a founder member, controlling principal, officer, and shareholder of, Defendant, Dodger Theatricals, Ltd., and was an officer and/or shareholder of, Defendant, DSHT, Inc. in 2004, when said Defendant agreed to produce *Jersey Boys* in La Jolla, California. Upon information and belief, Defendant David, in his capacity as a controlling officer of Defendants, Dodger Theatricals, Ltd. and DSHT, Inc., is also the signatory to the various agreements through which rights in the Work were licensed and/or assigned to and from these companies for *Jersey Boys*, and to and from other entities in which Defendant Dodger Theatricals, Ltd., is a general partner.

10.     Defendant, DSHT, Inc., formerly Dodger Stage Holding Theatricals, Inc. ("DSHT"), a Delaware corporation, with a principal office in New York, New York, is a producer of Broadway and off-Broadway musicals, and is identified as "Producer" of J*ersey Boys* in an agreement with the Four Seasons Partnership, through which the exclusive rights in the Work which Defendant DeVito purportedly transferred to Valli and Gaudio, were in turn transferred to DSHT, along with the right to issue further licenses to, *inter alia*, other production companies controlled by DSHT principals. Upon information and belief, DSHT was owned for a time by principals of Defendant Dodger Theatricals, Ltd. and Stage Holding, a business organized and operating in the Netherlands, but was subsequently reorganized, and no longer shares principals with Defendant Dodger Theatricals, Ltd. Upon information and belief, Defendants DSHT, Dodger Theatricals, Ltd., Jersey Boys Broadway Limited Partnership, and their licensees or transferees, are responsible for productions and performances of *Jersey Boys* throughout the world, including the permanent production produced

-5-

in this District and unofficial Division by Defendant, JB Viva Vegas, LP, and serve, *inter alia*, as clearinghouses for revenues generated by the musical, and the distribution and/or allocation of royalties therefor.

11.    Defendant, Dodger Theatricals, Ltd. ("Dodger Theatricals"), a corporation, organized under the laws of New York, with a principal office in New York, New York, is a producer of Broadway and off-Broadway musicals, including *Jersey Boys*, and is signatory to the agreement between Defendants Valli, Gaudio, and DSHT, through which the exclusive rights in the Work which Defendant DeVito purportedly transferred to Defendants Valli and Gaudio were further licensed exclusively and/or assigned to Dodger Theatricals and/or DSHT, for use and adaptation in connection with *Jersey Boys*.  Upon information and belief, Dodger Theatricals, DSHT, and their lessees, licensees, or transferees, are responsible for productions and performances of *Jersey Boys* throughout the world, including the permanent production in this District and unofficial Division by Defendant, JB Viva Vegas, LP, and serve, *inter alia*, as clearinghouses for revenues generated by the musical, and the distribution and/or allocation of royalties therefor.

12.    Defendant, Jersey Boys Broadway Limited Partnership ("Jersey Boys Broadway"), a limited partnership, organized under the laws of New York, in which Defendant Dodger Theatricals is the general partner, has a principal office in New York, New York; is the producer of *Jersey Boys* on Broadway, and upon information and belief, is now the owner of the *Jersey Boys* production, by virtue of an assignment from Defendant, Dodger Theatricals, which included the exclusive rights in the Work which Defendant DeVito purportedly transferred to Defendants Valli and Gaudio.  Jersey Boys Broadway later sublicensed those rights to Defendant, JB Viva Vegas, LP, for the permanent production of *Jersey Boys* in this District and unofficial Division, and upon information and belief, Jersey Boys Broadway, along with Dodger Theatricals, DSHT, and various licensees or transferees, is responsible for productions and performances of *Jersey Boys* throughout the world.

13.    Upon information and belief, Defendant, JB Viva Vegas, LP ("JB Viva Vegas") is a limited partnership, organized under the laws of New York, in which Defendant Dodger Theatricals is the general partner; has a principal office in New York, New York; is a purported

-6-

licensee of exclusive rights in the Work ostensibly obtained by Defendant Jersey Boys Broadway from Defendant Dodger Theatricals, which Dodger Theatricals and/or DSHT ostensibly obtained from Defendants Valli and Gaudio, following the initial transfer of such rights from Defendant DeVito thereto; is producer of a permanent production of *Jersey Boys* in this District and unofficial Division; and, serves, *inter alia*, as a clearinghouse for revenues generated by the musical in Las Vegas, Nevada.

14.    Upon information and belief, Defendant, Jersey Boys Records Limited Partnership ("Jersey Boys Records") is a limited partnership, organized under the laws of New York, in which Defendant Dodger Theatricals is the general partner; has a principal office in New York, New York; is a licensee of Dodger Theatricals and/or Jersey Boys Broadway, and, along with Jersey Boys Broadway, is responsible for the *Jersey Boys 2005 Broadway Cast Recording* ("Jersey Boys Cast Recording"), which includes spoken dialogue copied and/or adapted from the Work.

15.    Upon information and belief, Defendant, Skunk, Inc. ("Skunk"), a corporation, organized under the laws of New York, with a principal office in New York, New York, is the "loan-out" company through which Defendant McAnuff's services as director of *Jersey Boys* have been provided since August 1, 2005, and is a signatory to agreements with, *inter alia*, Jersey Boys Broadway, under which all payments for Defendant McAnuff's services are tendered to Skunk, which in turn, is responsible for Defendant McAnuff's compensation.

16.    Upon information and belief, Defendant, Getting Home, Inc. ("Getting Home") is a corporation, organized under the laws of Nevada, with a registered agent in Carson City, Nevada; is a "loan-out" company through which certain of Defendant Elice's services as a writer of *Jersey Boys* are provided, with payments made by the *Jersey Boys* producers to Getting Home, which in turn, is responsible for Defendant Elice's compensation; and, is a signatory to, *inter alia*, an agreement with Jersey Boys Broadway and Rhino Entertainment, concerning the *Jersey Boys Cast Recording*, which includes spoken dialogue copied and/or adapted from the Work.

**NATURE OF THIS ACTION**

17.    This is an action against Defendant DeVito for declaratory relief under the *Federal Declaratory Judgment Act* [28 U.S.C. § 2201] and Sections 101 and 201 of the Copyright Act of

1976, as amended [17 U.S.C. §§ 101 and 201], seeking declarations: (a) that the Work is a "joint work" within the meaning of 17 U.S.C. § 101; (b) that Mr. Woodard was, at minimum, a co-author of the Work, and co-owner with Defendant DeVito thereof, under 17 U.S.C. § 201(a); (c) that Plaintiff is an "author's widow" with respect to the Work, as defined by 17 U.S.C. § 101, and is, at minimum, a co-owner of the Work, under 17 U.S.C. §§ 201(a) and (d)(1); (d) that Plaintiff has the right to publish and exploit the Work, and to enjoy, exercise, and enforce all other rights, benefits, and causes of action accorded to copyright owners with respect thereto, under, *inter alia*, 17 U.S.C. §§ 106, 501(b), 502, 503, 504, and 505; (e) that U.S. Copyright Reg. No. TXu 454 118 for the Work, which was obtained by Defendant DeVito in his name only, was secured, and has been held, in constructive trust for Mr. Woodard and Plaintiff, and should be amended to reflect Mr. Woodard's authorship and ownership interest, in accordance with 17 U.S.C. § 201(a), and his status as an original copyright "claimant," under 37 C.F.R. § 202.3(a)(3), so that Plaintiff may record her status as heir and successor to this interest under 17 U.S.C. § 205; (f) that Defendant DeVito lacked the authority and requisite copyright ownership interest, under 17 U.S.C. §§ 201(a) and (d)(2), to issue the "exclusive," "irrevocable," and "perpetual" license encompassing the Work which he purportedly granted to Defendants Valli and Gaudio, in the absence of Plaintiff's express consent, and that said exclusive license was void *ab initio*, insofar as it covered the Work; or, (g) that Defendant DeVito's said "exclusive license" to Defendants Valli and Gaudio amounted to only a nonexclusive license, which said Defendants could not further sublicense, assign, or otherwise transfer, under 17 U.S.C. § 201(d)(2), in the absence of Plaintiff's express consent; or, (h) that said "exclusive license" constituted an assignment to Defendants Valli and Gaudio of Defendant DeVito's entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of such right by Plaintiff (50%) and Defendants Valli and Gaudio (50%), under 17 U.S.C. §§ 201(a) and (d)(2).  This action for declaratory judgment is brought to resolve an actual controversy between the parties, as Defendant DeVito disputes Mr. Woodard's co-authorship of the Work; has registered the copyrights therein in his own name and refuses to amend or supplement the registration; has issued "exclusive licenses" and/or assigned rights in the Work to others (namely, Defendants Valli and Gaudio), without

Plaintiff's consent; and, has refused to account to Plaintiff for profits derived from, *inter alia*, the use and adaptation of the Work for *Jersey Boys*, and the "exclusive license" granted to Defendants Valli and Gaudio purportedly authorizing same.

18.     This is also an action in equity for an accounting from Defendant DeVito of profits obtained from the use and benefit of the Work, and/or works adapted or derived therefrom, including, but not limited to, profits obtained from the "exclusive license" granted to Defendants Valli and Gaudio, authorizing the use and adaptation of the Work for *Jersey Boys*, and/or profits obtained from the assignment of Defendant DeVito's entire share of certain exclusive rights in the Work to said Defendants. Further, this is an action for breach of contract against Defendant DeVito, arising from his failure to credit Mr. Woodard as co-author of the Work; his failure to account for and share equally with Plaintiff in profits arising directly or indirectly therefrom; and, his assignment, or attempted transfer, of exclusive rights in the Work, in violation of an agreement between Defendant DeVito and Mr. Woodard, dated December 1, 1988.

19.     This is further an action against Defendant DeVito for unjust enrichment; breach of the implied covenant of good faith and fair dealing in the performance of contractual obligations in the context of a special and confidential relationship; constructive fraud, fraud, and fraudulent concealment, arising from, *inter alia*, Defendant DeVito's failure to disclose to Plaintiff his licensing and/or assignment of exclusive rights in the Work, or his receipt of profits therefrom, notwithstanding the existence of a special and confidential relationship; and, fraudulent conversion of profits and/or royalties received, which rightfully belong to Plaintiff. Finally, this is an action for copyright infringement against Defendant DeVito, under the laws of the United Kingdom, Canada, and Australia, arising from Defendant DeVito's unilateral grant of rights to Defendants Valli and Gaudio to use, adapt, and further license or transfer rights in the Work, as necessary for productions and performances of *Jersey Boys* in these countries, without Plaintiff's express prior consent.

20.     This is also an action for declaratory relief against Defendants Valli, Gaudio, DSHT Dodger Theatricals, and Jersey Boys Broadway, under the *Federal Declaratory Judgment Act* [28 U.S.C. § 2201] and Section 201 of the Copyright Act of 1976, as amended [17 U.S.C. § 201], seeking declarations: (a) that the "exclusive," "irrevocable," and "perpetual" license encompassing

-9-

the Work which Defendant DeVito granted to Defendants Valli and Gaudio, was void *ab initio*, under 17 U.S.C. §§ 201(a) and (d)(2); or, (b) that Defendant DeVito's said "exclusive license" to Defendants Valli and Gaudio amounted to only a nonexclusive license, which said Defendants could not further sublicense, assign, or otherwise transfer, under 17 U.S.C. § 201(d)(2), in the absence of Plaintiff's express consent; or, (c) that said transfer of exclusive rights constituted an assignment to Defendants Valli and Gaudio of Defendant DeVito's entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants Valli and Gaudio (50%), under 17 U.S.C. §§ 201(a) and (d)(2); and, (d) that as transferees of less than Defendant DeVito's entire share in the exclusive rights comprising the copyright in the Work, Defendants Valli and Gaudio could not further license or assign the rights so obtained, under 17 U.S.C. § 201(d)(2), in the absence of Plaintiff's express consent, rendering all subsequent non-exclusive licenses, exclusive licenses, assignments, leases, and/or other transfers of said rights by said Defendants void and invalid, including, but not limited to, the licenses and/or assignments granted by Defendants Valli and Gaudio to Defendants Brickman, Elice, McAnuff, DSHT, and/or Dodger Theatricals, and the subsequent assignment of rights from Dodger Theatricals to Jersey Boys Broadway; (e) that Defendants DSHT, Dodger Theatricals, and Jersey Boys Broadway have no rights to use, adapt, or perform adaptations of the Work, or to authorize others to do so, by virtue of any such grant, in the United States, or abroad; or, (f) that Defendants Valli's and Gaudio's transfer of the exclusive rights in the Work obtained from Defendant DeVito, to Defendants DSHT and Dodger Theatricals, was effective, and constituted an assignment of Valli's and Gaudio's entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants DSHT and/or Dodger Theatricals (50%), under 17 U.S.C. §§ 201(a) and (d), and that (g) Defendant Dodger Theatricals' subsequent transfer of said exclusive rights to Defendant Jersey Boys Broadway was effective, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendant Jersey Boys Broadway (50%), under 17 U.S.C. §§ 201(a) and (d).  This action for declaratory judgment is brought to resolve an actual controversy between the parties, as Defendants

-10-

Valli, Gaudio, DSHT, and Dodger Theatricals are aware, and have been advised, of Plaintiff's ownership claims concerning the Work, but refuse to enter licensing negotiations with Plaintiff, or to desist and refrain from performing, publishing, or authorizing the performance and/or publication of, unlicensed adaptations of the Work in the United States and abroad.

21.   This is also an action in equity for an accounting from Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, of profits obtained from the use and benefit of the Work and/or works adapted or derived therefrom, including *Jersey Boys*, pled in the alternative, under FED. R. CIV. P. 8(d)(2)-(3), seeking payment to Plaintiff of her fifty (50%) *pro rata* share of such profits, once determined, from each such Defendant, during the period in which it co-owned exclusive rights in the Work with Plaintiff, in the event that Defendant DeVito's purported transfer of exclusive rights to Valli and Gaudio is found to constitute an assignment of his entire share in the subject rights in the Work, under 17 U.S.C. § 201(d), as set forth in Paragraph 17(h) hereof, and in the event that the subsequent transfers of such exclusive rights by Defendants Valli and Gaudio to Defendants DSHT and/or Dodger Theatricals, and by Defendant Dodger Theatricals to Defendant Jersey Boys Broadway, are found to constitute an assignment of their entire shares in the subject rights in the Work thereto, under 17 U.S.C. § 201(d)(2), as set forth in Paragraph 20(f) and (g) hereof.

22.   This is further an action against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey Boys Records, for copyright infringement, under Section 501(a) of the Copyright Act of 1976, as amended [17 U.S.C. § 501(a)], based on their unlicensed and unlawful exercise of exclusive rights in the Work which are reserved to authors and copyright owners, under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and Defendant DeVito, as co-owners of the joint Work, including: (a) the authorization of others to prepare derivative works based upon the Work by Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway; (b) the authorization of others to reproduce and distribute copies of the Work, by Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway; (c) the preparation of derivative works based upon the Work by Defendants Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys

Broadway, and Jersey Boys Records; (d) the performance and distribution of derivative works based upon the Work by Defendants DSHT, Dodger Theatricals, Jersey Boys Broadway, and their purported lessees and/or "sublicensees," including JB Viva Vegas; (e) the reproduction of the Work by Defendants Brickman, Elice, and McAnuff; and, (e) the distribution of copies of the Work by, *inter alia*, Defendants Brickman, Elice, and McAnuff.  Additionally, this is an action for vicarious copyright infringement against Defendants Valli, Gaudio, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home, who had the right and ability to supervise and control the infringing acts, and received direct financial benefits from the infringements.  This is also an action for contributory copyright infringement against Defendants Valli, Gaudio,  Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records, who knew, should have known, and/or had reason to know of the infringing activity, and induced, caused and/or materially contributed to the infringing conduct of other Defendants herein.

23.     Finally, this is an action against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, for copyright infringement under the laws of the United Kingdom, Canada, and Australia, arising from their dealings in respect of the Work in said countries, and their authorization of infringing acts therein, from within, and outside, the United States; their exercise of exclusive rights in the Work in such countries, which are reserved to copyright owners therein, including, but not limited to, the authorization of performances of adaptations of the Work therein, and acts of adapting the Work for such performances; their production and oversight of such performances, and collection and sharing of revenues therefrom; and, their participation in agreements licensing, transferring, and/or otherwise disposing of exclusive and/or nonexclusive rights in the Work, all in the absence of Plaintiff's consent, notwithstanding her status as a co-owner of the Work.

## PERSONAL JURISDICTION AND VENUE

24.     This Court has personal jurisdiction over Defendant DeVito, as he is a resident of this State, and the Court in which this action was initially filed held that personal jurisdiction is proper over Defendant DeVito herein.  This Court also has personal jurisdiction over Defendant, Getting

Home, Inc., as it incorporated in this State, and has a registered agent for service of process in this State.  This Court has personal jurisdiction over Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, JB Viva Vegas, LP, Jersey Boys Broadway, Jersey Boys Records, and Skunk, as they regularly transact business within this State, and/or with citizens hereof; derive royalties and other compensation from the performance and sale of derivative works based on the Work within this State; have committed acts of copyright infringement, vicarious copyright infringement, and/or contributory copyright infringement in this State, giving rise to the injuries complained of herein; and/or have established long-term agreements and obligations with citizens of this State, forming the subject of Plaintiff's requests for declaratory relief.

25.     Venue is proper in this District and unofficial Division, under 28 U.S.C. §§ 1400(a) and 1391(b)(2) and (c), in that Defendant DeVito resides in this District and unofficial Division, and the Court which transferred this action hereto held that venue is proper as to Defendant DeVito herein; the remaining individual, corporate, and limited partnership Defendants or their agents "may be found" herein, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.  Alternatively, venue is proper under 28 U.S.C. § 1391(a)(2) and (c), in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## STATEMENT OF FACTS

26.     Plaintiff's husband, Rex Conrad Woodard, was a well-respected member of the Beaumont, Texas legal establishment between 1975 and 1991, and a distinguished journalist with a national reputation in the field of classic rock and roll music.  Born in Dallas, Texas on April 10, 1950, Mr. Woodard moved to Beaumont in 1975, after obtaining his law degree from the Baylor University School of Law and passing the Texas Bar Exam.  He began his legal career as an associate with Sanders & Sanders, and in 1977, founded Woodard and Lindsay, where he practiced law through October 1984.  He established a successful solo trial practice thereafter, and was certified in civil trial law by the Texas Board of Legal Specialization in 1987.  Mr. Woodard met Plaintiff in 1981, and the two were married on May 17, 1986.

27.     Mr. Woodard had been enamored of writing and music from an early age, and his

skill with the written word, knack for compelling story-telling, and knowledge of popular music developed into an avocation he hoped would form a career.  As a child of four or five years old, he "dictated" elaborate stories of wartime to his mother, who would type them for the entire family to ponder and enjoy.  As he grew older, he wrote stories about baseball to share with friends, and articles concerning coins, and his coin collection.  In high school, he served on the editorial staff of the yearbook and was a member of the Journalism Club.  During law school, he was Editor of the Student Bar Association's newspaper, and later, while maintaining his full-time law practice, he pursued a secondary career as a freelance writer, publishing articles about 1960's popular music – the subject with which he was most engaged.  An avid record collector throughout his life, and a rock trivia buff since the early-1960's, when he would listen to AM radio until dawn with his sister, and compete in music trivia contests on radio, and on "Sumpin' Else," a Dallas television show, he began writing for *Goldmine Magazine* in the late-1970's, authoring articles about Terry Cashman, lead singer of the Chevrons; Dave Dee, Dozy, Beaky, Mick & Tich, a 1960's German pop group with hit singles in the United States and Europe, and others.

28.    Rex Woodard's best work, however, was reserved for the Four Seasons, who, with lead singer Frankie Valli, writer and keyboard player, Bob Gaudio, lead guitarist, Tommy DeVito, bassists Nick Massi and (later) Joe Long, and writer/producer Bob Crewe, were his favorite musical artists.  Mr. Woodard had, *inter alia*, tracked every public development in the Four Seasons' history since purchasing the 45 RPM single, "Candy Girl," at age 13; collected the band's records and maintained a comprehensive discography of its recordings, including rare bootlegs and limited edition fan club releases; compiled an extensive collection of rare photographs and newspaper clippings concerning the group, and contributed to a Four Seasons "fanzine" published in the U.K.  Moreover, the Four Seasons were aware of his interest and writings, as evidenced by the true copy of a memo sent to Mr. Woodard by Defendant Gaudio's office on October 17, 1980, attached hereto as *Exhibit 1*.  Accordingly, Mr. Woodard was both enthusiastic and well-prepared when the opportunity arose to write a feature article about the group for *Goldmine* in 1981.  A true copy of this article, entitled, *THE FOUR SEASONS A Lesson in Survival*, as published in August 1981 is attached hereto as *Exhibit 2*.  The article was well-received by fans and rock historians, and to date,

remains the definitive published history of the Four Seasons' "lost years" – between 1970, when the group slipped from public consciousness, and 1975, when a reconstituted line-up returned to chart-topping status with the singles, "Who Loves You" and "December 1963 (Oh What a Night)."

29.    Upon information and belief, Mr. Woodard's 1981 *Goldmine* article garnered respect from Defendants Valli, Gaudio, and DeVito, as well as former group members Nick Massi and Joe Long, and whetted Mr. Woodard's own curiosities concerning the earliest history of the Four Seasons group.  Accordingly, shortly after his August 1981 *Goldmine* article was published, Mr. Woodard conducted extensive research and interviews with early members of the group, in preparation for a second article that would focus on the formation of the Four Seasons, and, in particular, its direct predecessor, the Four Lovers, which Defendant DeVito led.  On December 9, 1981, for this article, Mr. Woodard interviewed Defendant DeVito for the first time, covering a wide range of topics.  A true copy of a representative excerpt of Mr. Woodard's handwritten notes from this interview is attached hereto as *Exhibit 3*.  On December 23, 1981, Mr. Woodard interviewed Defendant DeVito's brother, Nick DeVito, who was an early member of the Four Lovers, and its predecessors, the Varietones and the Variety Trio, and Defendant DeVito was also present, occasionally interjecting his own perspectives.  A true copy of a sample page from Mr. Woodard's notes concerning his December 1981 interview with Nick DeVito is attached hereto as *Exhibit 4*, and true copies of representative notes from his interview with Defendant DeVito on that date are attached hereto as *Exhibit 5*.   On January 8, 1982, Mr. Woodard also interviewed Nick Massi – a revolving member of the Four Lovers, the Varietones, and the Variety Trio, and a founder member of the Four Seasons, who rarely granted interviews.  True copies of representative notes from this interview are attached hereto as *Exhibit 6*.  The resulting article, published in the June 1982 issue of *Goldmine Magazine*, and entitled, *THE FOUR LOVERS Forerunners to the Fabulous Four Seasons*, was, like Mr. Woodard's first, a definitive piece, providing information regarding the group's origins that had not previously been made public, and which is still referenced by rock historians and fans.  A true and correct copy of this article, as published, is attached hereto as *Exhibit 7*.

30.    Mr. Woodard would later observe, with respect to the interviews leading to his 1982

-15-

*Goldmine* article, that as an attorney who had taken numerous depositions, he suspected he was not getting "the whole story" from Nick Massi and the DeVito brothers. Of particular interest to Mr. Woodard were the "gaps" between the real ages of the Four Seasons' members and their "published" ages, which appeared in promotional press releases – a gap of eight years for Defendant DeVito and Nick Massi, and several years for Defendant Valli and early-member Nick DeVito. Whereas, such discrepancies were not unusual in the entertainment industry, what was intriguing was each member's inability (or unwillingness) to account for his activities during those "missing years." These gaps would be filled five or six years later, when Defendant DeVito would present Mr. Woodard with the scoop of his rock journalism career. Meanwhile, Mr. Woodard continued his independent research, fan-related writing, collecting, and news-clipping activities, while keeping in contact with individuals close to the band, and the band itself. As shown in the true copy of a June 10, 1983 letter from Defendant Valli to Mr. Woodard, attached hereto as *Exhibit 8*, Mr. Woodard sent items from his personal Four Seasons collection to Defendant Valli that year, for inclusion in a souvenir tour book then under consideration, and both Plaintiff and Mr. Woodard were Defendant Valli's guests at a Four Seasons concert in Houston, Texas on September 24, 1983. Mr. Woodard also kept in touch with Defendant DeVito, as shown in the true copies of exemplary notes and cards he received from said Defendant between 1982 and 1986, attached hereto as *Exhibit 9*.

31.     Upon information and belief, Mr. Woodard's writings appeared in a tour program for a Four Seasons line-up performing in the 1980's, along with photographs from Mr. Woodard's personal collection. Sometime thereafter, Mr. Woodard received an unexpected telephone call from Defendant DeVito, who, while no longer a member of the Four Seasons, had obtained a copy of the program, and marveled at the photographs, some of which he had never seen. A dialogue ensued, and Defendant DeVito informed Mr. Woodard that he had a sensational story to tell, but was not a writer, and wanted Mr. Woodard to write it.

32.     Shortly after this conversation, in November 1988, Mr. Woodard flew to Las Vegas, with Plaintiff and their youngest daughter, and began a series of intensive interviews with Defendant DeVito, during which Defendant DeVito shared, for the first time with any journalist, the true story of his unaccounted-for years. According to Defendant DeVito, most of those years, for himself and

1  the other band members – excluding Defendants Valli and Gaudio – were devoted to various
2  criminal enterprises and long stretches in prison.  Moreover, according to Defendant DeVito, these
3  experiences led to underworld contacts, some of which continued throughout the Four Seasons'
4  popular era.  These accounts differed radically from the public's perception of the Four Seasons as
5  clean-cut "kids" singing in tuxedos on the *Ed Sullivan Show*, and Mr. Woodard was intrigued.  Mr.
6  Woodard was also excited by the nature of the opportunity offered – not a mere scoop for a magazine
7  article, but the opportunity to write Defendant DeVito's authorized biography, and tell the Four
8  Seasons' story to the world.  Though Defendant DeVito wanted to share his experiences, he had
9  achieved only an eighth grade education, and could not write the Work, and accordingly, asked Mr.
10  Woodard to do so, with full credit for his efforts, and an equal share in any resulting profits.  The
11  Work was to be based on the Las Vegas interviews, which Mr. Woodard recorded, and any other
12  information or material Mr. Woodard might deem beneficial, subject to Defendant DeVito's
13  approval of the final text.  Mr. Woodard agreed to undertake the project, and returned to Beaumont,
14  Texas to begin the process of creating the Work.

15          33.     Two weeks later, on December 1, 1988, Mr. Woodard sent a letter agreement to
16  Defendant DeVito, at Defendant DeVito's request, memorializing the parties' understandings
17  regarding the Work, and Defendant DeVito signed this document, under the heading,
18  "APPROVED," and returned it to Mr. Woodard by mail.  A true copy of the executed letter
19  agreement is attached hereto as *Exhibit 10*.  The key understandings therein were as follows: (a) Mr.
20  Woodard would write Defendant DeVito's authorized biography, based on the interviews Defendant
21  DeVito had given, "plus any other relevant information that would benefit the book;" (b)  Mr.
22  Woodard would "do all of the actual writing;" (c) Defendant DeVito would have control over the
23  final text of the Work; (d) Mr. Woodard and Defendant DeVito would "be shown as co-authors [of
24  the Work] with [Defendant DeVito] receiving first billing;" (e) Mr. Woodard and Defendant DeVito
25  would "share equally in any profits arising from [the Work], whether they be in the form of royalties,
26  advances, adaptations fees,  or whatever;" and, (f) the agreement would be binding upon the parties
27  without limitation of term, and upon their heirs, as to obligations and benefits, if Mr. Woodard,
28  Defendant DeVito, or both, should die.  *Exhibit 10* at p. 2 (emphasis added).  In sum, the parties

intended that they be considered co-authors, and that the Work be treated as a "joint work."

34.    Mr. Woodard labored over the Work for the next two years, drawing on every shred of knowledge and research he had compiled regarding the Four Seasons over a lifetime in the process, including, *inter alia*, his previous articles for *Goldmine*; his interviews with Nick Massi and Nick DeVito; his two interviews with Defendant DeVito in 1981, and the series of interviews conducted with Defendant DeVito in 1988; his extensive collection of newspaper clippings, record albums, fanzines, and photographs; and the various discographies he had compiled.  Mr. Woodard also employed skills he had acquired as an attorney to gather information for the Work, including the filing of requests under the *Freedom of Information Act* with local law enforcement agencies and the Federal Bureau of Investigation, to obtain Defendant DeVito's criminal records and confirm alleged U.S. government efforts to link Defendant DeVito and/or the Four Seasons to organized crime.  Mr. Woodard also created a series of questionnaires for Defendant DeVito, covering all aspects and phases of his life, including such minutiae as favorite foods, the layout of his childhood home, his first sexual experience, his first wife's hair color, and hundreds of additional factual details, which Defendant DeVito provided.  Upon information and belief, an additional questionnaire was prepared, and further interviews conducted, following the Four Seasons' induction into the Rock and Roll Hall of Fame in 1990, an event described in the Work.  From this material, Mr. Woodard constructed a comprehensive outline of Defendant DeVito's life; selected, organized, placed, and rephrased the anecdotes, recollections, and minutiae he found most compelling, and drafted the entire text of the Work, based on his perceptions of life through Defendant DeVito's eyes, presented in a "first-person," narrative style appropriate to said Defendant, and the other characters therein, but utterly original to Mr. Woodard.  Mr. Woodard worked night and day on the Work, retreating to his music room at home in the evenings to make notes that would guide his dictation the following day, and dictating the Work during the day at his office, for transcription by his secretary, Myrtle Locke.  Mr. Woodard's law practice suffered as a result of his devotion to the Work, but the Work was more important to him.

35.    Mr. Woodard remained in close contact with Defendant DeVito throughout the drafting of the Work, by telephone, by mail, and through personal meetings at Defendant DeVito's

Las Vegas home, Mr. Woodard's office, and Plaintiff's and Mr. Woodard's home in Beaumont, Texas, which Defendant DeVito visited with his wife. As Mr. Woodard completed each chapter of the Work, he also sent a copy to Defendant DeVito by mail, and Defendant DeVito would contact Mr. Woodard to discuss any desired changes, sometimes marking changes to the text in pen, and other times simply requesting that particular facts be added or removed. Mr. Woodard would then revise the subject text and send replacement pages to Defendant DeVito, for retention in a notebook containing the latest version of each page of the Work. True copies of correspondence between Mr. Woodard and Defendant DeVito reflecting this process, and Defendant DeVito's participation in Mr. Woodard's *Freedom of Information Act* requests, are attached hereto as *Exhibit 11*.

36.     As the Work neared completion in late-1990, Mr. Woodard began to seek a publisher, keeping Defendant DeVito apprized of his efforts. True copies of representative correspondence reflecting these efforts are attached hereto as *Exhibit 12*, and an exemplary report to Defendant DeVito is included in *Exhibit 11*, at pp. 20-21. In connection therewith, Mr. Woodard prepared a condensed, chapter-by-chapter outline of the Work for presentation to prospective publishers, a redacted true copy of which is included in *Exhibit 12*, at pp. 4-5. Defendant DeVito also participated in efforts to find a publisher, discussing at least one possible publishing deal with Mr. Woodard in mid-1989, as shown in *Exhibit 11*, at p. 4. The parties also provided a copy of Mr. Woodard's outline to actor, Joe Pesci, for the purpose of adapting the manuscript for a screenplay, as represented in the letter shown in *Exhibit 12*, at p. 3. At all times during these efforts, it was understood and agreed that, whatever use might be made of the Work, both Mr. Woodard and Defendant DeVito would share equally in the resulting profits.

37.     By December 7, 1990, Mr. Woodard was days away from completing the Work, and on December 11, 1990, he wrote Sandy Choron, of March Tenth, Inc. in New York, to solicit her services as a literary agent. A true copy of this letter is attached hereto as *Exhibit 13*. Therein, Mr. Woodard summarized the history of his involvement with the Work and his role in creating it; described the explosive revelations contained therein, identifying key "scenes" in the Work; discussed the likely impact of these revelations on public perceptions of the Four Seasons; and, confirmed that he had been approached "about doing a screenplay on the project." *Exhibit 13*, at pp.

2-3.  Ultimately, Ms. Choron declined.  However, as represented in the letter shown in *Exhibit 13*, Mr. Woodard completed the Work shortly thereafter, subject only to line editing for publication, and Defendant DeVito approved the text.  Upon information and belief, anticipating that copies of the Work might be disseminated to prospective publishers the following month, Mr. Woodard placed a copyright notice on the title page, in the following form:  "© January, 1991 Tommy Devito, Rex Woodard," with Defendant DeVito receiving top billing, as agreed.  A true copy of the cover page of Mr. Woodard's final version of the Work, together with the first page of text, is attached hereto as *Exhibit 14.*

38.    The Work, as completed by Mr. Woodard, and approved by Defendant DeVito, was not strictly a factual work, as dictated by the style and manner in which it was written.  Although it purports to be a biographical account of both Defendant DeVito and the Four Seasons musical group, the Work is presented as a first-person narrative, with Defendant DeVito speaking in the present tense as the action evolves, and much of that action is portrayed through dialogue among the "characters," including dialogue from events at which Defendant DeVito was not present.  The Work also purports to divulge what characters are thinking and feeling at various points in the story, and Mr. Woodard and Defendant DeVito were not privy to those thoughts or feelings.  Thus, in certain respects, the Work is fiction, speculation, and informed opinion, depicting what Mr. Woodard and/or Defendant DeVito envisioned may have occurred, or what may have been said by others, in view of events believed by Defendant DeVito to be true.  The Work reads like a play or screenplay, rather than a biography, with Defendant DeVito's first-person narration directed to the reader/audience, interspersed with action scenes and dialogue.

39.    Unfortunately, Mr. Woodard's initial efforts to secure an agent or publisher were unsuccessful, and, in late-1990, just weeks following his letter to Ms. Choron, his health began to deteriorate.  Although never a smoker, Mr. Woodard had been diagnosed with lung cancer in 1989, and in late-Fall 1990, it spread to his bones.  By December 27, 1990, Mr. Woodard was visibly ill, having lost significant amounts of weight, and by February or March 1991, he was bedridden.  Defendant DeVito, aware of Mr. Woodard's terminal illness, told him to "stay strong," in a December 1990 Christmas card, and Defendant DeVito purchased a Mass Card for Plaintiff in

January 1991, entitling her to five-years of Catholic Masses.  True copies of these items are attached hereto as *Exhibit 15*.

40.     Rex Woodard died on May 25, 1991, at forty-one years of age, leaving Plaintiff and three children behind.  He penned his own obituary, and a true copy, as published in the May 27, 1991 *Beaumont Enterprise*, is attached hereto as *Exhibit 16*.  Whereas, numerous achievements are highlighted therein, including his "distinguished reputation nationwide as a journalist of classic rock and roll music," the accomplishment of which Mr. Woodard was most proud is summarized as follows:  "In early-1991, he finished work on his most ambitious project, a full-length book co-authored with Tommy DeVito, a member of the Rock and Roll Hall of Fame."  *Exhibit 16*, at p. 2.

41.     Mr. Woodard's dying wish was that Plaintiff and his sister would ensure that the Work was published after his death.  Mr. Woodard also hoped that income generated by the Work, and/or adaptations thereof, would support his wife and children when he would no longer be there to support them.  In addition to Mr. Woodard's letter agreement with Defendant DeVito, through which Plaintiff was the successor and beneficiary of Mr. Woodard's rights and interests in the Work, Mr. Woodard bequeathed to Plaintiff all of his intangible property, "of whatsoever kind and character," as shown in the redacted copy of his *Last Will and Testament*, attached hereto as *Exhibit 17*.

42.     In accordance with Mr. Woodard's last wishes, both Plaintiff and Mr. Woodard's sister, Cindy Woodard Ceen, continued to press for publication of the Work after his death.  Exemplary form letters, which were customized, and sent to prospective publishers by Plaintiff and Mrs. Ceen in 1992, are attached hereto as *Exhibit 18*, along with a listing of publishers to whom Plaintiff sent a copy of Mr. Woodard's outline of the Work.  Plaintiff also engaged a literary agent in the hopes of publishing the Work, as reflected in the true copy of correspondence received therefrom in May 1997, attached hereto as *Exhibit 19*.  Unfortunately, public interest in the Four Seasons had waned by this time, and was perceived by publishers to be minimal.  Accordingly, the Work remained unpublished.  Nonetheless, both Plaintiff and Mrs. Ceen continued to seek a publisher independently of Defendant DeVito, and were continuing to do so as of September 2005, when Mrs. Ceen decided to contact Defendant DeVito directly, for collaborative assistance.

43.     Specifically, as shown in the true copies of electronic mail messages, correspondence and handwritten notes attached hereto as *Exhibit 20*, in September 2005, Mrs. Ceen informed Charles Alexander, a prominent and active member of two leading Four Seasons Yahoo! groups, that she was trying to reach Defendant DeVito to discuss publication of the Work.  On September 22, 2005, Mr. Alexander responded with the following message:

> Yesterday I was able to meet with Tommy DeVito.  During the course of our conversation, I told him of your desire to publish Rex's book and that you were trying to reach him.  He said he loved Rex and would [help] in any way he could.  Here is his cell phone number: [redacted].

*Exhibit 20*, at p. 2.  Mrs. Ceen telephoned Defendant DeVito that day, and discussed Plaintiff's ongoing desire to publish the Work.  During this conversation, Defendant DeVito was friendly and spoke kindly of Mr. Woodard; did not deny Mr. Woodard's authorship of the Work; did not deny that Plaintiff had a right to publish the Work; did not dispute Plaintiff's ownership interest in the Work; and, did not report that any use had been made of the Work, or that rights therein had been licensed or assigned to others.  Rather, Defendant DeVito indicated that he wished to update the Work, to include post-1990 developments, and "restore" some of the obscene language he felt Mr. Woodard had omitted, notwithstanding the profusion of profanities already contained within the Work.  Finally, Defendant DeVito claimed he had "lost" his copy of the Work, and asked that Mrs. Ceen send a replacement copy.  Mrs. Ceen left the conversation excited about Defendant DeVito's statements because she believed he intended to cooperate and further collaborate with her and Plaintiff, and she wrote Defendant DeVito the next day, summarizing their conversation, and providing the requested copy of the Work, as shown in the true copy of her letter included in *Exhibit 20*, at p. 3.  Mrs. Ceen's letter also informed Defendant DeVito that Plaintiff was considering self-publishing the Work, if a traditional publisher could not be found.  *Id.*

44.     Neither Plaintiff nor Mrs. Ceen heard from Defendant DeVito again following the foregoing September 22, 2005 conversation.  However, on November 2, 2005, Mrs. Ceen received a phone-mail message from Jay Julien, who identified himself as Defendant DeVito's attorney, and she returned this call on November 3, 2005.  During the ensuing conversation, Mr. Julien advised that he had spoken with Defendant DeVito regarding the Work, and concluded that the Work was

"not saleable."  Mrs. Ceen was surprised by this comment, because *Jersey Boys* was scheduled to open on Broadway a few days later, and she suggested that renewed appreciation for the Four Seasons engendered by the play would likely generate an interest in Defendant DeVito's story.  Mr. Julien appeared unmoved.  Nonetheless, he was complimentary of Mr. Woodard, and at no time disputed Mr. Woodard's authorship of the Work, Plaintiff's co-ownership thereof, or Plaintiff's right to exploit the Work independently of Defendant DeVito, whether "saleable" or not.  Nor did Mr. Julien disclose that any use of the Work had been made, or that rights in the Work had been licensed or assigned to others.  Mrs. Ceen sent a letter to Mr. Julien later that day, summarizing their conversation, and asking that Defendant reconsider his position – in view of *Jersey Boys,* Plaintiff believed the optimal time for publication had arrived, and both Plaintiff and Mrs. Ceen felt Defendant DeVito's cooperation and endorsement would be beneficial, if not crucial.  True copies of Mrs. Ceen's notes from her conversation with Mr. Julien, and her follow-up letter of November 3, 2005, are included in *Exhibit 20*, at pp. 5-6.  Meanwhile, Plaintiff concluded that it remained her burden to publish the Work, and continued to hope for a publishing deal.

45.    By the end of 2006, *Jersey Boys* had become a smash hit, recouped its initial investment, and garnered four Tony Awards.  Although Plaintiff had not seen the show, and was unaware of its specific content, she, in consultation with Mrs. Ceen, surmised that the production's success would give rise to demand for the Work, and decided to engage counsel to: (a) confirm that the copyrights in the unpublished Work had been registered before her husband's death on behalf of the coauthors/joint owners; (b) register the copyrights on behalf of the coauthors/joint owners, if no application for such registration had been filed; and, (c) contact Mr. Julien to determine whether Defendant DeVito had changed his mind regarding the marketability of the Work in view of *Jersey Boys'* success, and if so, whether he might again be interested in cooperating and collaborating with Plaintiff.

46.    A search of the online database records of the United States Copyright Office conducted by Plaintiff's counsel on or about January 3, 2007, failed to reveal any copyright registration issued to Mr. Woodard for the Work.  However, a search under the keyword, "Tommy DeVito," showed that on January 11, 1991 – a date by which Mr. Woodard's health was in steep

decline – Defendant DeVito filed an application, and obtained a copyright registration, for a literary work entitled, *Tommy DeVito – Then and Now*, under Reg. No. Txu 454 118.

47.     Whereas, the online database records of the Copyright Office provide little information beyond the title, author, and classification of a work, and Defendant DeVito holds a number of copyright registrations, Plaintiff could not determine whether the work registered by Defendant DeVito under Txu 454 118 was "the Work" at issue herein.  Accordingly, in pursuit of additional information, Plaintiff's counsel ordered a copy of the registration certificate from the Copyright Office, which arrived on or about February 23, 2007.  A true and correct copy of Reg. No. Txu 454 118, as received from the Copyright Office, is attached hereto as *Exhibit 21*.  As shown therein, only Defendant DeVito is listed as an "author" of the registered work, and only Defendant DeVito is listed as a copyright claimant.  *Exhibit 21*, at p. 2.  The registration also claims that Defendant DeVito wrote the "entire text" of the work; identifies the work as "unpublished," and represents that the work was completed in 1990 – the year Mr. Woodard completed the Work. *Exhibit 21*, at pp. 2-3.

48.     While the information contained in Registration No. Txu 454 118 was potentially alarming, the certificate did not include a copy of the material deposited with Defendant DeVito's application, so Plaintiff was still unable to determine whether the work registered by Defendant DeVito was "the Work," or some other literary work.  Moreover, the Regulations and Policies of the Copyright Office do not permit anyone other than the listed copyright claimant to obtain a copy of a deposited work, unless a *Copyright Litigation Statement* (Form LS) is ordered, filed with the Copyright Office, and approved.  After careful consideration, and in view of additional emerging facts discussed hereinbelow, Plaintiff decided to proceed with the ordering and filing of Form LS, to review the work covered by Registration No. Txu 454 118 and ascertain whether it was the Work.  The Form LS was received from the Copyright Office on May 4, 2007, and filed by Plaintiff's counsel on May 6, 2007.

49.     Plaintiff's Form LS was approved by the Copyright Office and, on or about June 8, 2007 Plaintiff finally received a copy of the work deposited with the application leading to Reg. No. Txu 454 118.  The deposited work was identical to the Work written by Mr. Woodard as described

-24-

hereinabove, with two exceptions: (a) Mr. Woodard's original title page, encaptioned, "UNTITLED TOMMY DEVITO/FOUR SEASONS BIOGRAPHY, and bearing the January 1991 copyright notice in Defendant DeVito's and Mr. Woodard's names, had been removed, and replaced with a title page reading, "Tommy DeVito – Then and Now By Tommy DeVito;" and, (b) page 264 of the Work, comprising the first page of Chapter 41, was missing.  A true copy of the title page and first textual page of the work covered by Reg. No. Txu 454 118, as received from the Copyright Office, is attached hereto as *Exhibit 22*.  A comparison of this material with that included in *Exhibit 14* shows that the *Prologue* of Mr. Woodard's and Defendant DeVito's Work is identical to the *Prologue* in the manuscript covered by Reg. No. Txu 454 118.  All remaining pages of text are also identical.  In fact, with the exception of the title page, and missing page 264, the work deposited in support of Reg. No. Txu 454 118 is a photocopy of the manuscript typed by Mr. Woodard's secretary, Myrtle Locke.  The replacement title page, on the other hand, is in a non-matching font, and appears to have been generated by a different machine.  *Exhibit 22*, at p. 2.

50.     In view of Mr. Woodard's primary authorship of the Work; the 1988 letter agreement between Mr. Woodard and Defendant DeVito; Defendant DeVito's awareness of Mr. Woodard's (and his heirs') independent attempts to publish the Work; and, the tone and content of Defendant DeVito's and Mr. Julien's conversations with Mrs. Ceen, Plaintiff was shocked to learn that Defendant DeVito had registered the Work in his name without disclosure, and in violation of the parties' agreement.  More shocking was the fact that Defendant DeVito had filed the underlying application when he knew Mr. Woodard was gravely ill, and not likely focused upon registering the Work, which, after all, had not been published, making such registration optional when Defendant DeVito obtained Reg. No. Txu 454 118.

51.     Unfortunately, this revelation was coupled with near-contemporaneous discoveries that the writers of *Jersey Boys* had obtained access to the Work; that the Work had inspired the form, structure, and content of the musical; that the perspective of the "Tommy DeVito" character therein was derived largely from the Work; that several scenes in *Jersey Boys* were adapted from the Work; that actors portraying Defendant DeVito in the play were provided with copies of the Work; and, that Defendant DeVito was financially connected to the musical, and had received royalties and/or profits

1   therefrom.

2       52.    Specifically, as shown in the true copies of published articles attached hereto as

3   *Exhibit 23*, a July 8, 2006 *Reuters* report in *Backstage Magazine* quoted Defendant McAnuff,

4   director of *Jersey Boys*, as stating that, in creating the *libretto*, Defendants Brickman and Elice relied

5   on interviews with Bob Gaudio and Frankie Valli, and "an unpublished autobiography by DeVito,"

6   *Exhibit 23*, at p. 3 (emphasis added), for the perspectives of their characters in the show, while

7   relying upon others for Nick Massi's side of the story, given his death in December 2000. *Id*. The

8   main *Wikipedia* article concerning Defendant DeVito also reported that: "DeVito has written a

9   lengthy but as-yet-unpublished autobiography (with the help of the late Rex Woodard) about his

10   days with the group, which served, along with other accounts, as background material for the

11   musical." *Exhibit 23*, at p. 4 (emphasis added). An association between *Jersey Boys* and the Work

12   was also noted in the following "Question and Answer" exchange accompanying a December 23,

13   2005 *Jersey Boys* "Podcast:"

14           Q.: Does anyone have any more information about 'THE BOOK'
        that the *Jersey Boys* Broadway production is based on written by
15           Marshall Brickman and Rick Elice?

16           A: *Book* is a term that refers to the script, so when they say book by
        Brickman and Elice they are referring to the script. The writers did
17           reference an unpublished Tommy DeVito autobiography that was
        provided by Tommy himself. This autobiography was to be, and may
18           still be, published.

19   *Exhibit 23*, at p. 5 (emphasis added). And, a published interview with Christian Hoff, who first

20   portrayed Defendant DeVito in the musical, winning a Tony Award for his performance, reported

21   further associations. According to Mr. Hoff, when casting for *Jersey Boys* began, the script for

22   *Jersey Boys* had not yet been written, and he was provided with a one and one-half (1½) page

23   distillation of the Work from which to audition, *Exhibit 23*, at p. 9, while the entire Work was made

24   available as background research. *Id*. Deven May, who portrayed Defendant DeVito in a national

25   touring company of *Jersey Boys*, reported similar access to the Work, in an interview for the June

26   2007 edition of *Backstage Magazine*:

27           I've also had the good fortune to read Tommy DeVito's unpublished
        autobiography. Hopefully, it will come out sometime soon. For me,
28           it was really a great educational tool, to get to know who Tommy

1    was.

2    *Exhibit 23*, at p. 16.  Finally, other publications reported that Defendant DeVito was financially

3    connected to *Jersey Boys*, and had received profits or royalties from Defendants Valli and Gaudio,

4    as shown in the true and correct copies of such reports attached hereto as *Exhibit 24*.  Indeed,

5    Defendant DeVito's Web site, at <www.tommydevito.com>, referred to Jersey Boys as "his SMASH

6    HIT Broadway play."  *Exhibit 24*, at p. 7 (emphasis added).

7        53.    Promptly following these discoveries, and within five days of receiving the material

8    deposited in support of U.S. Copyright Reg. No. Txu 454 118, Plaintiff's counsel wrote Mr. Julien,

9    Defendant DeVito's attorney, demanding, *inter alia*, that Defendant DeVito execute an application

10   for *Supplementary Registration* under Copyright Form CA to add Mr. Woodard as coauthor and co-

11   claimant of the Work; and provide an accounting of profits derived directly or indirectly from the

12   Work, in accordance with the parties' agreement, and their status as joint owners thereof.  A copy

13   of this demand, as dispatched to Defendant DeVito's counsel on June 13, 2007, by electronic mail

14   and overnight courier, is attached hereto as *Exhibit 25*.

15       54.    Neither Defendant DeVito nor his counsel responded in writing to Plaintiff's June

16   13, 2007 demand, but counsel for the parties spoke several times by telephone, and exchanged

17   electronic mail messages between June and October 2007, in an attempt to reach an amicable

18   resolution.  Over the course of these communications, Defendant DeVito's counsel advanced

19   numerous inconsistent factual assertions – initially claiming that Defendant DeVito had not shown

20   the Work to anyone, but later admitting that Defendant DeVito had provided a copy to *Jersey Boys*;

21   initially expressing interest in the possibility of pursuing a joint action for copyright infringement

22   against *Jersey Boys*, and later stating that Plaintiff's only recourse would be an action against

23   Defendant DeVito, as he had authorized the use of the Work; and, initially claiming that  Defendant

24   DeVito was "considering" executing the Copyright Form CA provided by Plaintiff, which would

25   supplement Registration Txu 454 118 to include Mr. Woodard's authorship and ownership claims,

26   and finally stating that Defendant DeVito would not sign the document, because Defendant DeVito,

27   rather than Mr. Woodard, was the sole author of the Work.  When questioned about the latter claim,

28   Mr. Julien stated that Mr. Woodard was merely Defendant DeVito's "scribe," and that Defendant

DeVito was the author. However, Mr. Julien could not explain, among other things, how Defendant DeVito could have authored those portions of the Work which were based on Mr. Woodard's independent research, his interviews with third parties, and material he obtained through *Freedom of Information Act* requests. Nor could Mr. Julien explain how Defendant DeVito, with only an eighth-grade education, who admittedly was "not a writer," would be capable of "dictating" the Work to Mr. Woodard (who could not type), replete with the dense factual references, invented third-party dialogue, literary techniques, and vocabulary appearing therein.

55. On July 2, 2007, following the initial talks with Defendant DeVito's counsel, Plaintiff filed an application for *Supplementary Registration* with the United States Copyright Office, under Copyright Form CA, seeking to supplement Reg. No. Txu 454 118 to include Mr. Woodard's authorship and ownership claims. A true copy of this application as filed, including the application form, check, and evidence of filing by overnight courier, is attached hereto as *Exhibit 26*. The application was finally refused by the Copyright Office on June 16, 2008, as shown in the true copy of the refusal to register appearing in *Exhibit 26*, at pp. 7-9, on grounds that it was not signed by Defendant DeVito, who filed the basic application Plaintiff sought to supplement. However, Plaintiff appealed this refusal before the Copyright Review Board on June 21, 2008; her appeal was granted, as shown in the true copy of the Review Board's decision attached hereto as *Exhibit 26A*; and a *Supplementary Registration* was issued for the Work in Mr. Woodard's name, under Reg. No. Txu1 372-636, effective July 3, 2007, as shown in the true copy of the *Certificate of Registration* attached hereto as *Exhibit 26B*. Nonetheless, the *Supplementary Registration* was not cross-indexed with Reg. No. Txu 454 118, so as to provide clear notice of Mr. Woodard's and Plaintiff's rights, because the underlying application was not signed by Defendant DeVito, under 37 C.F.R. § 201.5(b)(1), n. 1. Thus, as a result of Defendant DeVito's actions, and failures to act, Plaintiff cannot secure or readily establish clear title in or to her indivisible ownership interest in the Work, or enjoy the rights and benefits of Reg. No. Txu 454 118, which Defendant DeVito, by law, holds in constructive trust for her.

56. As negotiations with Defendant DeVito's counsel concluded unproductively in October 2007, additional facts emerged concerning the connection between the Work and *Jersey*

*Boys*.  First, as shown in *Exhibit 23*, at p. 22, a September 30, 2007 article in the *Chicago Tribune*

included the following account of the writing of the musical:

> Drafts passed back and forth.  Faced with the conflicting recollection of the surviving Seasons, Elice and Brickman hit on the politically savvy idea of using all three of them as narrators, each telling their version of the group's history at different points in the show.  <u>*As it happened, DeVito already was writing a memoir, which provided a lot of material,*</u> <u>especially on how the Seasons tap-danced around the Outfit members who controlled many of the venues in which they played, and whose loans underwrote DeVito's lifestyle.</u>

*Id*.  (emphasis added).  Then, in late-October 2007, Broadway Books, a division of Random House,

released an "official" publication authored by David Cote, and entitled, *Jersey Boys The Story of*

*Frankie Valli and the Four Seasons* (the "*Jersey Boys* book"), which provided further details.  True

copies of representative pages from this publication are attached hereto as *Exhibit 27*.  Among the

one hundred seventy-seven pages thereof were first-hand accounts from Defendants McAnuff,

Brickman, and Elice, concerning the evolution of the *Jersey Boys libretto*.  As recounted therein, the

initial treatment by Defendants Brickman and Elice was largely fictional, and did not appeal to

Defendant McAnuff when he was first approached to direct the play by Defendant David:

> DES McANUFF:  Michael [David] approached me [about *Jersey Boys*] and he was very excited but thought it needed work.  And, quite frankly – and I mean this in no way as an insult to Marshall [Brickman] and Rick [Elice], who've done a spectacular job of writing this thing – <u>the initial treatment wasn't of any interest to me.</u> <u>It was fictionalized.  There was some biographical information there, but it was largely invention, a traditional musical structure, with people on the street bursting into song, and a bunch of girls as a Greek chorus of Jersey Girls.  It didn't grab me.  I felt that Nick and Tommy were indistinguishable;</u> the story focused too much on Bob and Frankie and, quite frankly, it sentimentalized them.  It didn't appeal to me . . . .  I met with them and heard what they had to say, and then I basically told them that it wasn't for me.  Finished lunch, shook hands, thought that would be the end of it.

*Exhibit 27* at p. 3 (emphasis added).  However, the tide turned for Defendant McAnuff, according

to the *Jersey Boys* book, when he read the Work and two interviews with Defendants Valli and

Gaudio, and was struck with the concept of a biographically-inspired production that would be

narrated by the members of the Four Seasons, with each providing his personal perspectives on the

group:

> DES McANUFF:  [T]he really important documents were two long

-29-

interviews with Frankie and Bob, which were meant to be deep background for a TV movie.  <u>There was also an unpublished autobiography by Tommy DeVito that is beyond description.  It was just so delicious.  Rick and Marshall had a couple of sequences in their treatment that were clearly inspired by this autobiography.</u>

MARSHALL BRICKMAN:  <u>We hadn't at that point realized that we wanted to do a biography.</u>  We just didn't want to do a kind of retrofitting of songs to a preconceived plot, like *Mamma Mia!*

*Exhibit 27*, at p. 4.  Upon information and belief, the "sequences" referenced in Defendant McAnuff's foregoing statement, which were "clearly inspired" by Mr. Woodard's "really important" and "delicious," unpublished Work, were contained in an initial, rough treatment for *Jersey Boys* written by Defendants Brickman and Elice in February 2004, which drew from, and/or referenced, the earlier, fictionalized treatment, entitled, "Oh What a Night," as well as the Work, from which it copied dialogue and other passages *verbatim*. After reading the Work and reviewing this treatment, Defendant McAnuff agreed to direct the play; "re-outlined" the play, with the assistance of Defendants Brickman and Elice, adapting more material from the Work, and ultimately approached Defendants Valli and Gaudio for permission to do so, in view of the controversial, subject matter thereof.  Upon information and belief, this permission was granted, and the transformation of *Jersey Boys* progressed, with the Work serving as a ready deskside reference and blueprint, large portions of which were underlined, bracketed, highlighted, and/or otherwise marked, to designate material for copying and adaptation into the play, and large sections of which appeared in each draft, from the initial treatment to the various "final" performance scripts.

57.    The *Jersey Boys* which survived this transformation was extensively adapted from the Work, and is a "derivative work" thereof, under 17 U.S.C. § 101. Defendant DeVito's character, "Tommy DeVito," the primary focus of the Work, emerged as the opening narrator, mobbed-up "villain," and, in the eyes of many, the star of the show, or at least the most entertaining dramatic element thereof.  As reported in an early article from the *Star-Ledger*, a true copy of which is attached hereto as *Exhibit 28*, "it is Hoff [the actor playing "Tommy DeVito"], his hair dyed black and slicked back, who struts through the opening scenes, recounting how he plucked Valli from semi-obscurity and shaped an early version of the Four Seasons between stints at what is dubbed 'the Rahway Academy of the Arts.'" *Exhibit 28*, at p. 3.  The opening segment of the transformed *Jersey*

*Boys* resembles the opening of the Work, and *Jersey Boys* follows the flow and structure thereof, beginning with flashback narration from Defendant DeVito's character, and continuing through the Four Seasons' induction into the Rock and Roll Hall of Fame, with brief postscripts on the members thereafter.  Defendant DeVito's quarter of the show ("Spring"), and the other segments ("Summer," "Fall," and "Winter"), were drawn and adapted from the Work; include staging elements (from Defendant McAnuff) plucked directly or adapted therefrom, at the point where corresponding material appears in the play; and, are riddled with literal copying of the Work's expression.  The portrayal of Defendant Valli's primary romantic relationship in *Jersey Boys*, with a fictionalized, composite character called "Mary Delgado," draws heavily from the Work's treatments and characterizations of "Mary Mandell/Mandela" and "Mary Ann Brantley," two of Defendant Valli's ex-wives.  The *Jersey Boys* portrayal of a faked murder in the front seat of an automobile in which Defendant Valli was a passenger, was adapted and condensed from a passage presented largely through fictitious dialogue in pages 154-158 of the Work.  The Work's account, in Chapter 20, of a "Roman orgy" convened in Detroit for the band, by the Vee Jay record label, replete with gifts, liquor, fruit baskets, and naked women, was adapted for *Jersey Boys* as a Christmas party thrown by the record label in Chicago, with the same characteristics, at which Defendant Gaudio lost his virginity, and including identical gestures, emotional depictions, and dialogue.  The Work's portrayal of the band's arrest in Columbus, Ohio (under a warrant issued in Springfield), for "defrauding an innkeeper," after an appearance on the Mike Douglas Show, was adapted for *Jersey Boys* in a scene in which the band members are arrested in Cleveland, following a performance at the Ohio State Fair.  The climactic, but entirely fictional scene in *Jersey Boys* in which the band breaks up over Defendant DeVito's gambling and tax debts, during a mob "sit-down," mediated by infamous mobster, Gyp DeCarlo, was adapted from the Work's account of an identically-staged "sit-down," held years earlier by the same parties, and also mediated by DeCarlo, in which a mob family claimed a financial interest in the Four Seasons as a result of the band's discharge of an early manager connected thereto.  The penultimate scene in *Jersey Boys,* depicting the band's 1990 induction into the Rock and Roll Hall of Fame, contains dialogue copied directly from the Work, and adapts the Work's account of Defendant Valli's failure to appear at an after-party hosted by Defendant DeVito

and Nick Massi – an event which, upon information and belief, Defendants Valli and Gaudio contend never occurred. And, the *libretto* of the transformed *Jersey Boys* contains invented dialogue copied from the Work.  For example, the dialogue in *Jersey Boys'* account of the band's first rehearsal of the song, "Walk Like a Man," was copied, almost *verbatim*, from page 124 of the Work, and other dialogue from that page, attributed to Defendant Gaudio in the Work, was appropriated as a punch line for the Bob Crewe character in *Jersey Boys*, which draws great laughter from the audience.  In fact, the vast majority of *Jersey Boys'* content can be traced directly to the Work, including the most-discussed scenes, the play's framework, and its most surprising revelations – revelations the Work was supposed to first bring to light.  Upon information and belief, Mr. Woodard's December 11, 1990 summary of the Work, appearing in the letter shown in *Exhibit 13* at pp. 2-3, would be recognized as a summary of *Jersey Boys* by any ordinary observer of the play, despite the fact that it was written fifteen years before the show's Broadway debut.  And, words first fixed in a tangible medium of expression by Mr. Woodard between 1988 and 1990, appear in *Jersey Boys, verbatim*.

58.    Upon information and belief, following Plaintiff's June 2007 demands to Defendant DeVito, and the unsuccessful June through October 2007 negotiations between counsel, Defendant DeVito, through Jay Julien, his attorney, took additional steps to perpetuate the "cover-up" they had begun in 2005, to minimize the likelihood that Defendant DeVito would be held accountable to Plaintiff for profits derived from the use, exploitation, and adaptation of the Work for *Jersey Boys*. First, as recounted in the electronic mail message attached hereto as *Exhibit 29*, written by Charles Alexander, who authored the *Forward* to the *Jersey Boys* book, Defendant DeVito withdrew almost all of his quotes therefrom, well after the deadline for publication, to "save them for his forthcoming autobiography," causing a great deal of difficulty for the publisher.  *Exhibit 29*, at p. 2.  Whereas, the use of direct quotations from the Work in the *Jersey Boys* book would have required Defendant DeVito to account to Plaintiff for profits, upon information and belief, the subject material was actually removed in an attempt to conceal the relationship between the Work and the play, and to deprive Plaintiff of royalties and/or an accounting, even though such an accounting was already required, due to the inclusion of the *Jersey Boys libretto* in the *Jersey Boys* book, and headers with

quotes from dialogue in *Jersey Boys*, copied from the Work *verbatim*. Second, in an October 2007 interview for <www.JerseyBoysPodcast.com>, released in December 2007, Defendant DeVito asserted, falsely, that he had not shown the Work to anyone – when asked about the role of the Work in the musical, DeVito claimed he had only told stories to Defendants Brickman, Elice, and McAnuff, notwithstanding the contrary evidence in *Exhibit 23* and *Exhibit 27* hereof.  Third, during the same week in October 2007, Defendant DeVito dismantled his Web site, at <www.tommydevito.com>, hoping that the reference to "his SMASH HIT *Jersey Boys*" thereon, would not be noticed by Plaintiff.  Finally, in a secondary strategy to deprive Plaintiff of profits due, Defendant DeVito stated publicly, in a December 2007 interview with *Goldmine Magazine* – the publication in which Rex Woodard's original pieces concerning the Four Seasons and Four Lovers had appeared – that he had "dictated the book to a lawyer who worked for *Rolling Stone*," and that, "[i]t's not gonna come out yet."  A true copy of the relevant portion of this interview, as published, is attached hereto as *Exhibit 30*.  Upon learning of these actions, and Defendant DeVito's plain and express repudiation of Mr. Woodard's authorship, Plaintiff lodged the instant suit against Defendant DeVito, while still unaware, due to his deceptions and concealments, of the precise nature of his license to the other Defendants herein, if any, to use and adapt the Work for *Jersey Boys*, or the nature, extent, and origin of his financial interest in the production.

59.     These questions were answered in July 2008, following Plaintiff's review of certain documents made public in Defendant Valli's divorce proceedings against his third wife in Los Angeles, California, true copies of which are attached hereto as *Exhibit 31*, redacted only to obscure personal addresses.  As shown in *Exhibit 31*, at pp. 38-41, on or about August 13, 1999, Defendant DeVito entered an agreement with Defendants Valli and Gaudio, through which he issued an exclusive, irrevocable, perpetual, worldwide, assignable license thereto, to use, adapt, change, fictionalize, and otherwise modify, as they saw fit, certain "Materials," including principally his "biographies," for the purpose of creating a musical stage play based on the "life and music" of the Four Seasons.  This transfer not only encompassed the exclusive right to use and adapt the Work for "theatrical productions" but also included exclusive rights in "all ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised

versions, merchandise, and/or other works," "in all media now existing or later devised." *Id*., at pp. 39-40.   The agreement included a waiver by Defendant DeVito of any and all claims that the use and/or adaptation of such "Materials" would violate any copyrights therein, and further specified that Defendant DeVito would have no right to inspect or approve the resulting derivative works, or the manner in which the "Materials" (including the Work) were used. *Id*., at p. 39.   In consideration for this "exclusive license," the agreement provided that Defendant DeVito would be paid four-fifths (80%) of twenty-five (25%) percent of the royalties accorded Defendants Valli and Gaudio for the "underlying rights" and certain "subsidiary rights" in the prospective play, with the remaining one-fifth (20%) of this twenty-five (25%) share to be paid to Nick Massi.   The agreement does not mention Plaintiff's rights in the Work, or otherwise limit the exclusive and final nature of the purported transfer, other than providing limited rights of reversion if the play was not produced within a specific period of time, with the initial producer, or one subsequent producer.   Nor does it reserve any rights for Defendant DeVito in the "Materials" transferred, once the "underlying rights" have "merged" with the play, a contingency Defendants claim has occurred.

60.   Plaintiff is not fully informed or aware, at present, of the manner(s) in which Defendants Valli and Gaudio exercised their "rights" under the foregoing "exclusive license," between 1999, when it was executed, and May 1, 2004, when a further transfer purportedly occurred. However, upon information and belief, Defendants Valli and Gaudio issued licenses and/or sublicenses thereunder in 1999 and/or thereafter, to, *inter alia*, one or more authors commissioned to prepare an early treatment for the play, and an initial producer.   Upon information and belief, this preliminary treatment, entitled, "Walk Like a Man," was rejected, the first author(s) fired, and the agreement with the initial producer permitted to lapse, leading to the engagement (and licensing) of Defendants Brickman and Elice, who prepared the treatment described in Paragraph 57 hereof. Clearly, no further licenses issued from Defendant DeVito, as his 1999 grant to Defendants Valli and Gaudio was express and "exclusive," and left no residual derivative rights for Defendant DeVito to license or transfer to others.   Whereas, neither Plaintiff nor Mr. Woodard authorized anyone to use or adapt the Work, the only possible source of such authorization to adapt the Work for a play, film, or other audiovisual medium after 1999, when the DeVito "transfer" was executed, was the Four

Seasons Partnership, who provided such authorization to, *inter alia*, Defendants Brickman and Elice.

61.     Upon information and belief, sometime in late-2005, Defendant DeVito's "exclusive license" to Defendants Valli and Gaudio was appended as "Exhibit A" to the foundational production agreement for *Jersey Boys*, entered into by Defendants Valli, Gaudio, Brickman, Elice, DSHT, and Dodger Theatricals, and back-dated to May 1, 2004, as shown in *Exhibit 31*, at pp. 2-41. This "May 2004" agreement, *inter alia*, approved Defendants Brickman and Elice as "Bookwriters" for the play, and appointed Defendant McAnuff as director thereof, *id.*, at pp. 14-15; identified Defendant DSHT as "Producer" of the musical, *id.*, at p. 2, although Defendant Dodger Theatricals, rather than Defendant DSHT, was the sole "Dodger" signatory, *id.*, at p. 25; provided for an exclusive merger in favor of Defendant DSHT of all live stage musical rights in the life stories of Defendants Valli, Gaudio, DeVito, and Nick Massi in the United States, its territories and possessions, and Canada, upon a run of six months or more for the play, in a Broadway or West End theater, *id.*, at p. 5; accorded exclusive options to Defendant DSHT to produce and present the show elsewhere abroad, including Japan, the Far East, German-speaking countries, Scandinavia, Benelux, Spain, Portugal, Italy, Andorra, Israel, South Africa, Latin America, and Eastern Europe, in exchange for various lump-sum payments and royalties, *id.*, at pp.  6-8; permitted DSHT to lease and sublicense the rights obtained to other producers, in the U.S. and abroad, *id.*, at pp. 6, 8, 16; detailed the advances, royalties, and other compensation payable to all parties, apportioning "underlying rights," "compositional rights," "subsidiary rights," and other rights separately, *passim*; authorized royalties for Defendant McAnuff, who was not a signatory to the agreement, *id.*, at p. 12; and, in connection with all of the foregoing, underlined assigned all "Third Party" rights acquired by Defendants Valli and Gaudio – including the "exclusive rights" obtained from Defendant DeVito in the Work – to Defendant DSHT.  *Id.*, at pp. 4-5, 37-41.  The agreement required that Defendants Valli and Gaudio indemnify Defendant DSHT against claims brought by any of the "Third Parties" (namely, Defendant DeVito and Nick Massi") as a result of any failure to obtain the necessary "Third Party" rights, *Exhibit 31*, at pp. 4-5, and included general representations, warranties, and indemnifications from Defendants Valli and Gaudio concerning elements contributed thereby which might infringe the rights of other third parties.  *Id.*, at pp.  18-19. The agreement included similar representations,

warranties, and indemnifications by Defendants Brickman and Elice concerning the *libretto*, in favor of Defendant DSHT, *id*., at pp. 19-20, but also provided that Defendants Valli, Gaudio, Brickman, and Elice, would be named as additional insureds in Defendant DSHT's general liability and errors and omission insurance policies for the production of the play.  *Exhibit 31*, at pp. 18, 20.  One manifest intention of this May 1, 2004 agreement, made effective before the first performance of *Jersey Boys* in La Jolla, California, but after the initial *libretto* was drafted, was to <u>transfer</u> the exclusive right to prepare and produce derivative works based upon or adapted from the Work, in the medium of live stage musicals, from Defendants Valli and Gaudio to Defendant DSHT as of that date.  *Id*., at p. 5.

62.    Upon information and belief, the "Producer" status attributed to Defendant DSHT in the foregoing May 1, 2004 agreement, and many of the rights and obligations of "Producer" thereunder, were assigned or further sublicensed to Defendant Dodger Theatricals, billed as the primary producer of *Jersey Boys* on Broadway, and in touring productions throughout the United States, although Defendant DSHT is also sometimes credited as producer, particularly in foreign productions, such as the production of *Jersey Boys* in London's West End.  Upon information and belief, Defendants DSHT and/or Dodger Theatricals subsequently sublicensed these rights to others, and ultimately assigned them to Defendant Jersey Boys Broadway, which then sublicensed the rights to additional parties, including Defendant JB Viva Vegas, Jersey Boys Records, other limited partnerships in which Defendant Dodger Theatricals holds ownership interests, and additional persons and entities whose identities are not now known to Plaintiff.  Nonetheless, upon information and belief, Defendants DSHT, Dodger Theatricals, Jersey Boys Broadway, and their dominant principal, Michael David, in consultation with Defendants Valli and Gaudio, are responsible for the dissemination and performance of *Jersey Boys* throughout the World, and, in consultation with Defendants Valli, Gaudio, Brickman, Elice, and McAnuff, for customization and/or translation of the *libretto*, and staging of the production, for local and foreign venues.

63.    In this Circuit, the co-author/co-owner of a "joint work" may not issue an exclusive license under a copyright, as he or she does not hold exclusive rights in a work, but shares them, indivisibly, and non-exclusively with the other co-owner(s).  A co-owner may assign his or her

ownership share in any of the exclusive rights in a copyrighted work, but if less than all of his or her rights in the Work are so assigned, the transferee is entitled only to the "protections and remedies" accorded by the Copyright Act, as opposed to "rights and benefits" thereof, and may not further license, sublicense, or assign those rights to others, in the absence of his or her co-owner's consent, under 17 U.S.C. § 201(d)(2).  Thus, Defendant DeVito's August 13, 1999 grant of an "exclusive license" to Defendants Valli and Gaudio either: (a) was void insofar as it purported to cover the Work, and conferred no rights upon Defendants Valli and Gaudio to use, reference, or adapt the Work for *Jersey Boys*, or to authorize others to do so; (b) effected a complete assignment of Defendant DeVito's share in the subject exclusive rights to Defendants Valli and Gaudio, rendering them accountable to Plaintiff as co-owners thereof, but prohibiting them from sublicensing, leasing, or assigning said rights to Defendants Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, or any other person, under 17 U.S.C. § 201(d)(2), in the absence of Plaintiff's express consent, because the transfer did not encompass Defendant DeVito's entire interest in all exclusive rights in the Work; or, (c) must be construed as a non-exclusive license, which Defendants Valli and Gaudio could not further license, sublicense, assign, or otherwise transfer, in the absence of Plaintiff's express consent. Under any of these constructions, *Jersey Boys* remains an unlicensed, unauthorized, unlawful derivative work, based on the Work, and the *libretto* (including all drafts thereof), staging, performance, and distribution of *Jersey Boys*, as well as the various sublicenses, authorizations, and assignments pertaining thereto, granted by and among Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, comprise infringements of Plaintiff's copyrights in and to the Work.

64.    In the alternative, under Fed. R. Civ. P. 8(d)(2)-(3), pursuant to the reasoning of other Circuits, and certain copyright commentators, Defendant DeVito's August 13, 1999 grant of exclusive rights to Defendants Valli and Gaudio effected a complete assignment of his share in the subject rights thereto, rendering Defendants Valli and Gaudio accountable to Plaintiff as co-owners of said rights in the Work thereafter, and permitting said Defendants to assign the rights so acquired, or portions thereof to Defendants DSHT and/or Dodger Theatricals, making Defendants DSHT and/or Dodger Theatricals co-owners of such rights with Plaintiff, and accountable to Plaintiff for

her fifty (50%) percent *pro rata* share of profits obtained by the said Defendants from the use and benefit of the Work, from the date of such assignment (May 1, 2004) to the date on which Defendant Dodger Theatricals assigned such rights to Defendant Jersey Boys Broadway, at which point, Jersey Boys Broadway and Plaintiff became co-owners of such rights.

65.     Upon information and belief, Defendants Valli and Gaudio knew, or should have known, in 1999, and at all relevant times thereafter, that Defendant DeVito could not have written, and did not write the Work; was not the sole (or even primary) author thereof; and, lacked authority to issue an "exclusive license" thereto.  Moreover, any continuing use and/or licensing of the Work by said Defendants constitutes willful copyright infringement, as said Defendants have been aware of Plaintiff's claims since at least as early as December 31, 2007, but have nonetheless declined to negotiate with Plaintiff for a license, or to halt the infringing production.  Alternatively, pursuant to the reasoning set forth in Paragraph 64 hereof, any such use and/or licensing of the Work in the United States by said Defendants gives rise to additional accounting obligations to Plaintiff, and obligations to pay to Plaintiff, her fifty (50%) percent *pro rata* share, of profits obtained from such use, licensing, and/or other exploitation or adaptation of the Work, during all periods in which Plaintiff and Defendants Valli and Gaudio were, or are, co-owners of such rights..

66.     Upon information and belief, Defendants Brickman, Elice, and McAnuff, knew, at all relevant times, from the date(s) they first received and read the Work, that Defendant DeVito did not write it, and were further aware, or should have been aware, of Mr. Woodard's co-authorship thereof, when the *Jersey Boys libretto* was drafted, and/or when *Jersey Boys* was staged, directed, and produced.  Such knowledge also must be imputed to Defendants Skunk and Getting Home, the "loan-out" companies controlled by Defendants McAnuff and Elice.

67.     Upon information and belief, Defendants DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records, through their principals, Defendant David and Edward Strong, and through Defendant McAnuff, a founder member of Dodger Theatricals, knew, at all relevant times, that Defendant DeVito did not write the Work; were aware of Mr. Woodard's co-authorship thereof when the initial treatment for *Jersey Boys* was transformed and adapted from the Work and/or when *Jersey Boys* was staged, directed, and produced; and, knew that the May 1, 2004

-38-

"assignment" from Defendants Valli and Gaudio did not convey sufficient rights to permit the use or adaptation of the Work for *Jersey Boys* or collateral products, such as the *Jersey Boys Cast Recording* or *Jersey Boys Book*; the distribution of copies of the Work to performers in the play; or, the sublicensing, leasing, or further assignment of any rights therein, but said Defendants, nonetheless, have refused to negotiate with Plaintiff for a license, or to halt their infringing productions, rendering their aforesaid actions willful copyright infringement.  Alternatively, in the event that the transfer of rights in the Work from Defendants Valli and Gaudio to Defendants DSHT and/or Dodger Theatricals is deemed valid, under the reasoning set forth in Paragraph 64, such use and/or licensing of the Work in the United States by said Defendants, and by Jersey Boys Broadway, Dodger Theatricals' subsequent transferee, gives rise to additional accounting obligations to Plaintiff, and obligations to pay to Plaintiff, her fifty (50%) percent *pro rata* share, of profits obtained from such use, licensing, and/or other exploitation of or benefit from the Work, during all periods in which Plaintiff and Defendants DSHT, Dodger Theatricals, and/or Jersey Boys Broadway were, or are, co-owners of such rights..

68.    Upon information and belief, Defendant JB Viva Vegas, through principals it shares with Defendants Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records, namely, Defendant David, knew, at all relevant times, of both this litigation and Plaintiff's claims of co-ownership of the Work, when said Defendant began producing, and debuted, the permanent production of *Jersey Boys* in this District and Division, rendering its conduct willful, reckless, or, in utter disregard for Plaintiff's rights.

69.    Even if Defendant DeVito's August 13, 1999 exclusive license or assignment of certain of his rights to Defendants Valli and Gaudio were deemed sufficient to authorize one or more of the complained of activities in the United States, such license or assignment could not validate the export of *Jersey Boys* to the United Kingdom, Canada, or Australia, by Defendants, Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and/or Jersey Boys Broadway, or excuse Defendant DeVito's authorization of same, as the laws of these countries require the consent of all co-owners of a work before even a non-exclusive license may be issued to a third party, and Plaintiff has not provided such consent to any Defendant herein.

70.     According to media reports, as shown in the true copies of news articles from the *Cincinnati Enquirer* and *Cleveland Plain Dealer* attached hereto as *Exhibit 32*, *Jersey Boys* is garnering gross revenues of approximately three hundred million ($300,000,000.00) dollars per year, with profits exceeding one hundred fifty million ($150,000,000.00) dollars per year, and a present life expectancy of at least ten years, *Exhibit 32*, at pp. 3-4, making anticipated lifetime profits from performances of the show alone in excess of 1.5 billion dollars.  These reports also indicate that the Broadway *Jersey Boys* production rakes in profits of approximately thirty-three million ($33,000,000.00) dollars annually, and there are currently five additional productions, performing the show throughout the United States, and in the U.K., Canada, and Australia.  In July 2008, *Jersey Boys* set a world's box office record in Cleveland, Ohio, with nearly 1.9 million dollars in ticket sales for one week's worth of performances at the State Theater in Playhouse Square.  *Exhibit 32*, at p. 6.  The "permanent" production of *Jersey Boys* in this District and unofficial Division debuted in April 2008  – the result of a multi-million dollar deal – and upon information and belief, additional U.S. and foreign tours are planned.  Upon information and belief, the *Jersey Boys Cast Recording*, which contains excerpts from the *libretto*, pursuant to the "authorization(s)' of Defendants Valli, Gaudio, Brickman, Elice, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records, was the "No. 1" Broadway cast recording in July 2006 and February 2007, and is consistently an Amazon.com's best-seller, as is the *Jersey Boys Book*, which has distributed nationwide.  As reported in the true copy of a November 2007 article from the *New York Post*, attached hereto as *Exhibit 33*,  a motion picture version of *Jersey Boys* has long been expected, *Exhibit 33*, at pp. 2-3, and upon information and belief, a deal for such a move has been struck between Defendants Valli, Gaudio, Brickman and Elice, and GK Films, LLC, with Defendants Brickman and Elice set to author the adapted screenplay.  Upon information and belief, Defendant DeVito's profits from the production up to this point have reached seven figures, and continue to increase as new touring companies and media outlets are added, while Defendants Valli, Gaudio, Brickman, Elice, DSHT, Dodger Theatricals, and Jersey Boys Broadway, receive profits vastly exceeding this amount.  Meanwhile, Mr. Woodard, whose writings inspired, transformed, and were adapted for the show, and whose words appear therein, was never paid a penny for his efforts, and

Plaintiff continues to suffer financially from his early death.  Defendant DeVito has a duty to account to Plaintiff, and to pay Plaintiff her full share of profits attributable directly or indirectly to, *inter alia*, the use and/or adaptation of the Work for *Jersey Boys*, and collateral products, whether by license or assignment, and upon information and belief, that share exceeds, or will exceed, six million five hundred thousand ($6,500,000.00) dollars.  Defendant DeVito also must account to Plaintiff for profits attributable to other derivative works based upon the Work, as published reports indicate that Defendant has been working with a New York writer to update the Work, or prepare a new work based thereon.  *E.g.*, *Exhibit 24*, at p. 6.  Finally, Defendant DeVito must compensate Plaintiff for his breaches of contract, unjust enrichment, breaches of the implied covenant of good faith and fair dealing, acts of fraudulent concealment, conversion of Plaintiff's royalty share, and acts of foreign copyright infringement.  Meanwhile, the remaining Defendants are accountable to Plaintiff for copyright infringement, vicarious copyright infringement, and contributory copyright infringement, as a result of their unauthorized uses, adaptations, performances, and distribution of copies of the Work; their acts of foreign copyright infringement, and, in the alternative, as to Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, for fifty (50%) percent of all profits obtained from the use and benefit of the Work, during the periods in which they co-owned relevant rights with Plaintiff.

71.   Defendants, unless enjoined, will continue their unlawful and infringing conduct, and Plaintiff has no adequate remedy at law.

## COUNT I

### [Declarations of Joint Work, Copyright Ownership, and Invalidity of Exclusive License by Co-Owner]

(Against Defendant DeVito)

72.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 71 hereinabove, as if fully set forth in this Paragraph 72.

73.   Although Mr. Woodard was the primary author of the Work, Mr. Woodard and Defendant DeVito collaborated on the Work between 1988 and 1990, and contributed independently copyrightable content thereto, with the intention that their respective contributions be merged into

-41-

1   inseparable or interdependent parts of a unitary whole.

2       74.   Both Mr. Woodard and Defendant DeVito knew and understood that the Work was

3   a "joint work," before and during its creation, and intended that they be considered "co-authors"

4   thereof, as evidenced, *inter alia*, by their December 1, 1988 letter agreement and subsequent

5   correspondence.

6       75.   The Work is a "joint work" within the meaning of Section 101 of the Copyright Act

7   [17 U.S.C. § 101].

8       76.   Whereas, copyright ownership vests, initially, in the authors of a work, and the

9   authors of a joint work are co-owners thereof, under Section 201(a) of the Copyright Act [17 U.S.C.

10  § 201(a)], the copyrights in the Work vested initially in Mr. Woodard and Defendant DeVito, and

11  they were co-owners thereof.

12      77.   When the copyrights in the Work initially vested in Mr. Woodard and Defendant

13  DeVito, as alleged in Paragraph 71 hereof, Mr. Woodard qualified as a copyright "claimant" with

14  respect to the Work, under 37 C.F.R. § 202.3(a)(3).

15      78.   U.S. Copyright Reg. No. TXu 454 118, obtained by Defendant DeVito, in his name,

16  on January 11, 1991, was secured, and has been held, in constructive trust for Mr. Woodard and

17  Plaintiff, and must be supplemented to reflect Mr. Woodard's authorship of the Work, under 17

18  U.S.C. § 201(a), and his status as an original copyright claimant, under 37 C.F.R. § 202.3(a)(3), so

19  that Plaintiff may record her status as heir and successor to his interests, under 17 U.S.C. § 205.

20      79.   Upon Mr. Woodard's death on May 25, 1991, Plaintiff, an "author's widow," under

21  17 U.S.C. § 101, inherited Mr. Woodard's entire ownership interest in the Work, in accordance with

22  17 U.S.C. § 201(d)(1), and became co-owner of the Work with Defendant DeVito, under 17 U.S.C.

23  § 201(d)(1), holding an indivisible fifty (50%) percent ownership interest therein.

24      80.   As a co-owner, Plaintiff has the right to publish and exploit the Work independently

25  of Defendant DeVito, and to enjoy, exercise, and enforce all other rights, benefits, and causes of

26  action accorded to copyright owners with respect thereto, pursuant to, *inter alia*, 17 U.S.C. §§ 106,

27  501(b), 502, 503, 504, and 505, subject only to the prohibition on the issuance of exclusive licenses

28  by co-owners of copyrighted works, and Plaintiff's duty to account to Defendant DeVito for his

-42-

share of profits obtained from Plaintiff's use and exploitation of the Work, if any.

81.     Defendant DeVito has wrongfully repudiated Mr. Woodard's co-authorship of the Work, and Plaintiff's current ownership interest therein, intending to appropriate all profits from the use and exploitation of the Work for himself.

82.     A co-owner of a copyrighted work may not issue an exclusive license thereunder, without the consent of all other co-owners thereof, as a co-owner does not exclusively possess exclusive rights in a copyrighted work, but shares them, indivisibly, with his or her co-owner(s).

83.     Defendant DeVito, as a co-owner of the Work, lacked the power, authority, and/or requisite ownership interest to issue an exclusive license to Defendants Valli and Gaudio thereunder, and the "exclusive license" Defendant DeVito granted thereto, on or about August 13, 1999, was *void ab initio*, with no legal effect.

84.     Alternatively, whereas, Defendant DeVito, as a co-owner of the Work, lacked the power, authority and/or requisite ownership interest to issue an exclusive license to Defendants Valli and Gaudio thereunder, the "exclusive license" Defendant DeVito granted thereto, on or about August 13, 1999, must be construed as a non-exclusive license, which Defendants Valli and Gaudio could not lawfully license, sublicense, or assign, under 17 U.S.C. § 201(d)(2), in the absence of Plaintiff's express consent.

85.     A co-owner of a copyrighted work may <u>assign</u> his own share in the exclusive rights in a work, in whole or in part, under 17 U.S.C. § 201(d)(1), but unless he assigns all of his rights in the work, the transferee is entitled, with respect to the rights assigned, only to the "protections and remedies" accorded by the Copyright Act, and not to the "rights and benefits" conferred thereby, and may not further license, sublicense, or assign those rights, under 17 U.S.C. § 201(d)(2).  Thus, in the alternative, under FED. R. CIV. P. 8(d)(2), Defendant DeVito's August 13, 1999 "exclusive license" to Defendants Valli and Gaudio, constituted an assignment of Defendant DeVito's ownership interest in the exclusive rights to prepare derivative works based upon the Work, in the media of, *inter alia*, theater, film, and television, making Defendants Valli and Gaudio co-owners of said rights with Plaintiff, with Plaintiff holding a fifty (50%) percent ownership interest therein, and Defendants Valli and Gaudio holding a fifty (50%) percent ownership interest.

-43-

86.     Upon information and belief, Defendants DeVito, Valli, and Gaudio intended that Defendant DeVito's aforesaid grant of rights constitute an exclusive license or assignment, encompassing all relevant rights in the Work (including Plaintiff's share), without regard for Plaintiff's co-ownership of the Work or her ownership interests in the copyrights relating thereto.

87.     As a result of Defendant DeVito's unfounded, allegations that he was the sole author of the Work; as a result of Defendant DeVito's registration of the Work in his name, as sole author and copyright claimant; as a result of Defendant DeVito's refusal to supplement said registration to provide notice of Mr. Woodard's authorship, and status as a copyright claimant; as a result of Defendant DeVito's refusal to recognize Plaintiff's co-ownership of the Work; as a result of Defendant DeVito's issuance of an impermissible exclusive license thereunder; and, as a result of Defendant DeVito's refusal to account to Plaintiff, notwithstanding Defendant DeVito's exploitation, exclusive licensing, and/or assignment of rights in the Work for profit, an actual, present, and justiciable controversy exists between Plaintiff and Defendant DeVito, as to whether the Work is a "joint work;" whether Mr. Woodard was a co-author and co-owner thereof; whether Plaintiff is now co-owner of the Work, with all rights, benefits, protections, and obligations attendant to this status; and, whether Defendant DeVito's "exclusive license" to Defendants Valli and Gaudio is valid, void or constituted an assignment, or a nontransferable, non-exclusive license.

88.     Plaintiff seeks a Declaratory Judgment against Defendant DeVito, pursuant to 28 U.S.C. § 2201, decreeing that the Work is a "joint work" under 17 U.S.C. § 101; that Mr. Woodard was a co-author of the Work, and co-owner thereof, under 17 U.S.C. § 201(a); that Mr. Woodard was a qualified copyright claimant with respect to the Work, under 37 C.F.R. § 202.3(a)(3), when the Work was first fixed in a tangible medium of expression; that U.S. Reg. No. Txu 454 118 has been held in constructive trust by Defendant DeVito, and must be supplemented to reflect Mr. Woodard's status as a co-author, co-owner, and copyright co-claimant; that Plaintiff is an "author's widow" with respect to the Work, under 17 U.S.C. § 101; that Plaintiff inherited Mr. Woodard's ownership interest in the Work upon his death, pursuant to 17 U.S.C. § 201(d)(1), and became co-owner thereof with Defendant DeVito, holding an indivisible fifty (50%) percent ownership interest therein; that Plaintiff may record, with the United States Copyright Office, her status as heir and successor to Mr.

Woodard's interests in the Work, under 17 U.S.C. § 205; that Plaintiff may publish and otherwise exploit the Work, independently of Defendant DeVito, and enjoy, exercise, and enforce all other rights, benefits, and causes of action accorded to copyright owners with respect thereto; that the "exclusive license" granted by Defendant DeVito to Defendants Valli and Gaudio, in or around August 1999, was *void ab initio*, with no legal effect, or, alternatively, constituted only a nonexclusive license, which said Defendants could not license, assign, or otherwise transfer to the remaining Defendants herein; or, that said "exclusive license" constituted an assignment of Defendant DeVito's entire share in the subject exclusive rights to Defendants Valli and Gaudio, under 17 U.S.C. § 201(d)(2), making them co-owners with Plaintiff thereof, holding collectively, a fifty (50%) percent interest therein.

## COUNT II

### [Equitable Accounting]

(Against Defendant DeVito)

89.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 88 hereinabove, as if fully set forth in this Paragraph 89.

90.    Co-owners of a copyrighted work are akin to tenants-in-common, with each co-owner having an undivided, independent right to use the work, subject to a duty to account for profits to the other co-owner(s).

91.    As a co-owner of the Work, Mr. Woodard, during his lifetime, had a right to an accounting from Defendant DeVito, of any and all profits obtained as a result of Defendant DeVito's exploitation of the Work, and to payment of his fifty (50%) percent share of such profits..

92.    As a result of Mr. Woodard's death, and Plaintiff's succession to his ownership interest in the Work, Defendant DeVito has a continuing duty to account to Plaintiff for any and all income derived from the exploitation of the copyrights therein. This duty requires Defendant Devito to disclose to Plaintiff all income that he has collected from such exploitation, and to pay Plaintiff her fifty (50%) percent share of the profits.

93.    By virtue of the December 1, 1988 letter agreement between Defendant DeVito and Mr. Woodard, Defendant DeVito has a continuing duty to account to Plaintiff for "any profits arising

-45-

from" the Work, "whether they be in the form of royalties, advances, adaptations fees <u>or whatever</u>" *Exhibit 10*, at p. 2 (emphasis added) – an obligation which extends beyond profits arising only from the exploitation of copyrights, encompassing any profits attributable directly or indirectly to the Work.  This duty independently requires that Defendant DeVito disclose to Plaintiff all income he has collected as a result of the Work, and pay to Plaintiff her fifty (50%) percent share of the profits.

94.     Defendant DeVito's duty to account to Plaintiff, as aforesaid, includes a duty to account for profits obtained, derived, or flowing from, the "exclusive license" issued to Defendants Valli and Gaudio, on or about August 13, 1999, whether same is characterized as a license or assignment.

95.     Plaintiff has demanded that Defendant DeVito account for profits arising from the existence of the Work, and from Defendant DeVito's direct or indirect exploitation of the copyrights therein, but Defendant DeVito has failed and refused, and continues to fail and refuse, to render an accounting or pay Plaintiff her share of the profits.

96.     The precise nature and extent of Defendant DeVito's income attributable to the Work are unknown to Plaintiff at the present time, and Defendant DeVito's profits cannot be determined without an accounting of his transactions relating to, *inter alia*, the Work, *Jersey Boys*, the *Jersey Boys Book*, the *Jersey Boys Cast Recording*, which includes portions of the *libretto*, and the motion picture version of *Jersey Boys* which is planned.  Moreover, the facts and accounts presented are so complex that an investigation of Defendant DeVito's accounts is necessary to effect justice between the parties, and establish the value of Plaintiff's interests.

97.     Plaintiff seeks an Order from this Court that Defendant DeVito render an accounting to Plaintiff of the amounts owed, as well as a Judgment against Defendant, for a sum to be determined in the accounting, with prejudgment and post-judgment interest, as allowed by law.

## <u>COUNT III</u>

### **[Breach of Contract]**

(Against Defendant DeVito)

98.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 97 hereinabove, as if fully set forth in this Paragraph 98.

99.    The December 1, 1988 letter agreement between Mr. Woodard and Defendant DeVito attached hereto as *Exhibit 10*, constitutes a valid and enforceable contract, which was not extinguished by Mr. Woodard's death.

100.    Mr. Woodard performed fully under the December 1, 1988 letter agreement, by writing and completing the Work, and according top billing to Defendant DeVito on the title page, while showing both parties as co-authors of the Work.

101.    Plaintiff succeeded Mr. Woodard as a party to the December 1, 1988 letter agreement upon his death, and Defendant DeVito's obligations and duties to Mr. Woodard thereunder are obligations and duties now owed to Plaintiff.

102.    Defendant DeVito has breached the December 1, 1988 letter agreement between the parties by removing Mr. Woodard's name from the title page of the Work and obliterating the copyright notice placed by Mr. Woodard thereon; by distributing copies of the Work which do not credit Mr. Woodard as co-author, and by misrepresenting the nature and extent of Defendant DeVito's authorship.

103.    Defendant DeVito has breached the December 1, 1988 letter agreement between the parties by tendering an application for copyright registration with the United States Copyright Office, which failed to credit Mr. Woodard as co-author of the Work, or to list Mr. Woodard as a copyright claimant.

104.    Defendant DeVito has breached the December 1, 1988 letter agreement between the parties by refusing to share equally with Plaintiff all profits arising from the Work of whatever nature, and by refusing to account to Plaintiff for such profits.

105.    Defendant DeVito has breached the December 1, 1988 letter agreement between the parties by transferring, and/or attempting to transfer, exclusive rights in the Work to Defendants Valli and Gaudio, when the agreement does not permit such assignments, and contemplates that the rights and obligations thereunder shall be binding upon Mr. Woodard's and Defendant DeVito's heirs.

106.    Defendant DeVito has breached the December 1, 1988 letter agreement between the parties by permitting others to use and exploit the Work, while actively attempting to conceal this

fact from Plaintiff.

107.    Defendant DeVito has repudiated the December 1, 1988 letter agreement between the parties by absolutely and unconditionally refusing to perform thereunder, without just excuse. Plaintiff rejects this repudiation, however, and Defendant DeVito remains subject to all obligations of the letter agreement.

108.    Plaintiff has been damaged by Defendant DeVito's breaches of contract, beyond the loss of Plaintiff's rightful share of profits thereunder, and Plaintiff is entitled to recover from Defendant DeVito, direct damages, as well as foreseeable, consequential damages resulting from Defendant DeVito's breaches of contract, with prejudgment and post-judgment interest, as allowed by law.  Plaintiff is unable to ascertain, at present, the full extent of the direct and consequential monetary damages Plaintiff has suffered by reason of Defendant DeVito's aforesaid breaches of contract, but upon information and belief, if Defendant DeVito's conduct continues, Plaintiff will sustain damages in an amount exceeding seven million five hundred thousand ($7,500,000.00) dollars, or such other amount, to be proved at trial.

## COUNT IV

### [Unjust Enrichment]

(Against Defendant DeVito)

109.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 108 hereinabove, as if fully set forth in this Paragraph 109.

110.    As a result of Defendant DeVito's foregoing failures to account to Plaintiff for profits arising from the Work, and in the course of Defendant DeVito's foregoing breaches of contract, Defendant DeVito has received, directly or indirectly, funds to which he is not entitled, in amounts to be determined at trial, and has been unjustly enriched thereby.

111.    Defendant DeVito holds said funds in trust for Plaintiff, the rightful owner, and is liable to pay and transfer same to Plaintiff.

112.    Plaintiff is entitled to, and requests, Judgment against Defendant DeVito for her damages, together with pre-judgment and post-judgment interest, costs, imposition of a constructive trust, and other just and proper relief.

## COUNT V

### [Breach of Implied Covenant of Good Faith and Fair Dealing
### In the Performance of Contractual Obligations]

(Against Defendant DeVito)

113.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 112 hereinabove, as if fully set forth in this Paragraph 113.

114.    Mr. Woodard and Defendant DeVito had a special and confidential relationship at the time they entered into, and executed, the December 1, 1988 letter agreement.  Specifically, Mr. Woodard reposed special confidence and trust in Defendant DeVito due to his position and stature as an original member of the Four Seasons – the band with which Mr. Woodard had been obsessed since childhood – and, due to the friendship that had developed between the parties since Mr. Woodard's first interview with Defendant DeVito in 1981, and Defendant DeVito was aware, and/or should have been aware, of Mr. Woodard's special confidence and trust.  As a result of his position, and the opportunity Defendant DeVito presented – to write what would have been the first book ever published about the Four Seasons, with full credit for his efforts – Defendant DeVito had considerable influence over Mr. Woodard, and Mr. Woodard relied upon and trusted Defendant DeVito to treat him fairly.  As a result of this special confidence, Mr. Woodard de-emphasized his law practice and focused upon the Work, without compensation, at a time when he was suffering from lung cancer; had a wife and three children to support; and expenses were reaching a lifetime high due to his terminal illness, all because he believed that his life-long idol, and friend of seven years, would see the project through with him to completion (*i.e.*, through publication and/or adaptation of the Work), and would cooperate in areas extending beyond the four corners of the parties' agreement, such as the selection and compilation of photographs for the Work; arrangements for the final design and packaging therefor; collaboration on the screenplay the parties planned to develop based upon the Work; and, looking after Mr. Woodard's interests in appreciation, recognition, and just payment for his efforts, including Mr. Woodard's financial needs and those of his family following his death, by reporting any opportunities that arose concerning the Work, and promptly accounting for, and remitting, Mr. Woodard's share of any profits arising therefrom.

115.   The foregoing relationship of special confidence survived Mr. Woodard's death, and extended to Plaintiff, who similarly reposed confidence and trust in Defendant DeVito, as a result of his celebrity, and his special relationship with her husband, in the matter to which her husband had devoted the final years of his life.  Moreover, Plaintiff believed that the Mass Card she received from Defendant DeVito in mid-January 1991, as her husband approached death, was a symbol of continued caring by Defendant DeVito, and an acknowledgment of this special relationship of confidence.  Defendant DeVito was also aware, and/or should have been aware of Plaintiff's confidence, as it was manifest in Plaintiff's later contact with Defendant DeVito, through her sister-in-law, Cindy Woodard Ceen, to discuss ways in which the parties might expedite publication of the Work in view of the imminent Broadway debut of *Jersey Boys*, which Plaintiff believed would maximize the Work's potential for success, to the parties' mutual benefit.

116.   Due to the foregoing special and confidential relationship, Defendant DeVito owed a duty to Mr. Woodard and Plaintiff, who reposed their confidence in him, similar to the duty of a fiduciary, requiring Defendant DeVito to act in good faith, and to volunteer material information, with due regard for their interests, in the performance of his obligations under their December 1, 1988 agreement, and this duty is ongoing, and remains in effect.

117.   Defendant DeVito has breached the implied covenant of good faith and fair dealing in the performance of his contractual obligations, by acting in a manner that is unfaithful to the purpose of the parties' December 1, 1988 agreement, and denying the justified expectations of Mr. Woodard and Plaintiff, by registering the copyrights in and to the Work in his own name, and concealing this fact from both Mr. Woodard and Plaintiff; by licensing and/or assigning exclusive rights in the Work to others and concealing these facts from Plaintiff; by receiving (and spending) royalties and/or other payments arising from the use and adaptation of the Work, while concealing their existence from Plaintiff, and then refusing to pay under the contract when these concealments came to light; and, by publicly disparaging and humiliating Mr. Woodard's memory, by disavowing Mr. Woodard's authorship of the Work, and mischaracterizing both Mr. Woodard, and his contribution, in, *inter alia*, recorded podcast interviews, major newspaper interviews, and the very magazine in which Mr. Woodard's detailed, caring article about Defendant DeVito, his family, and

his earliest bands had first appeared; and, by treating Plaintiff as if she did not exist, and refusing to acknowledge, publicly or privately, that he is obligated to her by contract.

118.    As a direct and proximate result of Defendant DeVito's aforesaid conduct, Plaintiff has sustained substantial economic losses, including past and future compensation, and other economic benefits, such as those which may have flowed from timely publication of the Work. Plaintiff has also sustained loss of financial stability, peace of mind and future security and has suffered embarrassment, humiliation, mental and emotional distress and discomfort, all to Plaintiff's detriment and damage, in amounts not yet fully ascertained.

119.    In acting as described above, Defendant DeVito acted oppressively, maliciously, fraudulently, and outrageously towards Plaintiff, with conscious disregard for Plaintiff's known rights, and with the intention of causing unjust and cruel hardship to Plaintiff.  In acting in a deliberate, cold, callous, and intentional manner, Defendant DeVito intended to injure, and injured Plaintiff, and Plaintiff requests the assessment of exemplary and/or punitive damages against Defendant DeVito, in an amount sufficient to punish and make an example of him, in addition to compensatory damages, together with pre-judgment and post-judgment interest, as permitted by law, Plaintiff's attorney's fees and the costs of this action, and the imposition of a constructive trust on all of Defendant DeVito's income arising from or relating to the Work, including, but not limited to, income arising from the licensing or assignment of rights therein for *Jersey Boys*.

## COUNT VI

### [Constructive Fraud]

(Against Defendant DeVito)

120.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 119 hereinabove, as if fully set forth in this Paragraph 120

121.    The special and confidential relationship between Mr. Woodard and Defendant DeVito, and between Plaintiff and Defendant DeVito, as aforesaid, gave rise, *inter alia*, to a duty to disclose, such that non-disclosure is constructive fraud, and becomes the equivalent of a fraudulent concealment, even in the absence of fraudulent intent, where it misleads the one reposing confidence in the other to his prejudice, and/or gains advantage to the person at fault.

122.     Defendant DeVito's failures to speak and disclose to Plaintiff: (a) that Defendant DeVito had registered the copyrights in the Work in his own name; (b) that Defendant DeVito had issued an "exclusive license" or assignment to Defendants Valli and Gaudio, covering certain rights in and to the Work; (c) that Defendant DeVito was to obtain, and actually obtained, royalties and/or other compensation as a result of said license or assignment, which were required to be shared with Plaintiff in accordance with her co-ownership of the Work, and the parties' December 1, 1988 agreement; (d) that *Jersey Boys* was adapted from the Work, which had been referenced and used extensively in connection therewith; (e) that the "exclusive license" conveyed by Defendant DeVito to Defendants Valli and Gaudio had been further licensed and/or assigned to, *inter alia*, Defendants Brickman, Elice, DSHT, Dodger Theatricals, Jersey Boys Broadway, and JB Viva Vegas, all of whom were profiting from derivative works based upon the Work; (f) that Defendant DeVito and/or his attorney, Jay Julien, had been receiving weekly and monthly statements concerning Defendant DeVito's royalties and/or profits from the licensing of the Work; (g) that Defendant DeVito had worked, was working, or is working with another writer, to prepare an autobiography that is derivative of the Work; and, (h) that Peter C. Bennett, counsel to the Four Seasons Partnership, sent a demand letter to Defendant DeVito, through his attorney Jay Julien, indicating that Defendant DeVito was prohibited from publishing an autobiography, due to provisions in his separation agreement with the Four Seasons, all of which provided gains and advantages to Defendant DeVito to the detriment of Mr. Woodard and Plaintiff, constitute constructive fraud.  Moreover, Mr. Woodard and Plaintiff justifiably relied on Defendant DeVito's silence, in view of the parties' special and confidential relationship, and took no steps to enforce their co-ownership and contractual rights against him (believing, erroneously, that same had not been violated or breached); to demand an accounting of profits therefrom (believing, erroneously, that no profits had been obtained), or to pursue actions against the remaining Defendants herein, for their infringing activities (unaware that there was any connection between *Jersey Boys* and the Work).

123.     As a direct and proximate result of Defendant DeVito's aforesaid conduct, Plaintiff has sustained substantial economic losses, including past and future compensation, and other economic benefits, such as those which may have flowed from timely publication of the Work.

Plaintiff has also sustained loss of financial stability and future security, all to Plaintiff's detriment and damage, in amounts not yet fully ascertained.

124.    Plaintiff seeks Judgment against Defendant DeVito for damages resulting from his acts of constructive fraud, together with pre-judgment and post-judgment interest as provided by law, Plaintiff's attorney's fees and the costs of this action, and the imposition of a constructive trust on all of Defendant DeVito's income arising from or relating to the Work, including, but not limited to, income arising from the licensing or assignment of rights therein for *Jersey Boys*.

## COUNT VII

### [Fraud and Fraudulent Concealment]

(Against Defendant DeVito)

125.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 124 hereinabove, as if fully set forth in this Paragraph 125.

126.    On or about January 19, 1991, Defendant DeVito falsely, and fraudulently, with the intent to deceive and defraud Plaintiff, sent a five-year, pre-paid, Catholic Mass Card thereto, in apparent "sympathy" for Mr. Woodard's terminal illness, just eight days after registering the Work's copyrights in Defendant DeVito's own name, to provide false assurances to Mr. Woodard and Plaintiff that the parties' special, confidential relationship remained intact, and that Defendant DeVito cared about Mr. Woodard and Plaintiff, as he took the first step in his fraudulent scheme to deprive them of their rights in and to the Work, and of the opportunity to realize profits therefrom. *Exhibit 15*, at p. 2.

127.    On September 21, 2005, Defendant DeVito falsely, and fraudulently, with the intent to deceive and defraud Plaintiff, represented to Plaintiff and Mrs. Ceen, in a message transmitted through Charles Alexander on September 22, 2005, that Defendant DeVito "loved Rex [Woodard]," and "would [help] in any way he could" with Plaintiff's efforts to publish the Work. *Exhibit 20*, at p. 2.

128.    On September 22, 2005, Defendant DeVito falsely, and fraudulently, with the intent to deceive and defraud Plaintiff, represented to Plaintiff, through a conversation with Mrs. Ceen, that Defendant DeVito remained interested in publishing the Work with Plaintiff, but wished to update

-53-

the Work, had lost his copy, and needed another, when in fact, Defendant DeVito intended to delay and obstruct Plaintiff's ongoing efforts to publish the Work, and made such false statements to keep Plaintiff at bay, prior to the debut of *Jersey Boys* on Broadway.

129.    On November 2, 2005, Defendant falsely, and fraudulently, with the intent to deceive and defraud Plaintiff, represented to Plaintiff, through Mrs. Ceen, using his attorney, Jay Julien, as an instrumentality of deceit, that the Work was "not saleable," and could not be published in its present form, when in fact, Defendant DeVito had already licensed or transferred significant exclusive rights in the Work in exchange for substantial consideration.  These statements were also designed to keep Plaintiff at bay for a lengthy, indeterminate period, as *Jersey Boys* was prepared for its official Broadway debut four days later, and, to deprive Plaintiff of the opportunity to realize profits from said derivative work.

130.    The foregoing representations were false in fact, and known to be false by Defendant DeVito at the time they were so made.

131.    Mr. Woodard and Plaintiff relied upon Defendant DeVito's foregoing false representations, and were thereby induced to maintain their confidence and trust in Defendant DeVito; to refrain from enforcing their co-ownership, contractual, equitable, and statutory rights against him (believing that same had not been violated or breached); to refrain from demanding an accounting of profits obtained by Defendant DeVito from the Work (believing that no such profits had been obtained); to refrain from pursuing actions against the remaining Defendants herein, for their infringing activities (unaware that there was any connection between *Jersey Boys* and the Work); and, to refrain from further efforts to publish the Work (believing that Defendant DeVito was reviewing the Work with the intention of updating it for publication).

132.    Due to the parties' special and confidential relationship, described, *inter alia*, at Paragraphs 114 and 115 hereof,  Defendant DeVito owed a duty to Mr. Woodard and Plaintiff, who he knew, or should reasonably have known, reposed their confidence in him, to speak, and to disclose material facts peculiarly within his knowledge, and not within their fair and reasonable reach.

133.    Between 1991 and 2008, as detailed hereinabove, and evidenced by the *Exhibits*

hereto, Defendant DeVito breached his duty to disclose, and concealed material facts from Mr. Woodard and/or Plaintiff, namely: (a) that Defendant DeVito had registered the copyrights in the Work in his own name; (b) that Defendant DeVito had issued an exclusive license or assignment to Defendants Valli and Gaudio, covering certain rights in and to the Work; (c) that Defendant DeVito was to obtain, and actually obtained, royalties and/or other compensation as a result of said license or assignment, which were required to be shared with Plaintiff in accordance with her co-ownership of the Work, and the parties' December 1, 1988 agreement; (d) that *Jersey Boys* was adapted from the Work, which had been referenced and used extensively in connection therewith; (e)  that the license granted by Defendant DeVito to Defendants Valli and Gaudio had been further licensed and/or assigned to, *inter alia*, Defendants Brickman, Elice, DSHT, Dodger Theatricals, and Jersey Boys Broadway, all of whom were profiting from derivative works based upon the Work; (f) that Defendant DeVito and/or his attorney, Jay Julien, had been receiving weekly and monthly statements concerning Defendant DeVito's royalties and/or profits from the licensing of the Work; (g) that Defendant DeVito had worked, was working, or is working with another writer, to prepare an autobiography that is derivative of the Work; and, (h) that Peter C. Bennett, counsel to the Four Seasons Partnership, sent a demand letter to Defendant DeVito, through his attorney Jay Julien, indicating that Defendant DeVito was prohibited from publishing an autobiography, due to provisions in his separation agreement with the Four Seasons.

134.    Mr. Woodard and Plaintiff justifiably relied on Defendant DeVito's silence, in view of the parties' special and confidential relationship, and refrained from taking steps to enforce their co-ownership and contractual rights against him (believing, erroneously, that same had not been violated or breached); from demanding an accounting of profits from Defendant DeVito (believing, erroneously, that no profits had been obtained), or from pursuing actions against the remaining Defendants herein, for their infringing activities (unaware that there was any connection between *Jersey Boys* and the Work).

135.    As a direct and proximate result of Defendant DeVito's aforesaid conduct, Plaintiff has sustained substantial economic losses, including past and future compensation, and other economic benefits, such as those which may have flowed from timely publication of the Work.

Plaintiff has also sustained loss of financial stability, peace of mind and future security and has suffered embarrassment, humiliation, mental and emotional distress and discomfort, all to Plaintiff's detriment and damage, in amounts not yet fully ascertained.

136.   In acting as described above, Defendant DeVito acted oppressively, maliciously, fraudulently, and outrageously towards Plaintiff, with conscious disregard for Plaintiff's known rights, and with the intention of causing unjust and cruel hardship to Plaintiff.  Moreover, in acting in a deliberate, cold, callous, and intentional manner, Defendant DeVito intended to injure, and injured Plaintiff, and Plaintiff requests the assessment of exemplary and/or punitive damages against Defendant DeVito, in an amount sufficient to punish and make an example of him, in addition to compensatory damages, pre-judgment and post-judgment interest, as permitted by law, Plaintiff's attorney's fees and the costs of this action, and the imposition of a constructive trust on all of Defendant DeVito's income arising from or relating to the Work, including, but not limited to, income arising from the licensing or assignment of rights therein for *Jersey Boys*.

## COUNT VIII

### [Conversion]

(Against Defendant DeVito)

137.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 136 hereinabove, as if fully set forth in this Paragraph 137.

138.   Beginning in the summer of 2004, continuing through to the present, and, upon information and belief, on at least a weekly basis since October 2005, Defendant DeVito has converted, to his own use, numerous royalty payments and/or other compensation attributable to the use, licensing, and/or assignment of the Work, or exclusive rights therein, which were due, owed, and properly belonged to Plaintiff, by virtue of her status as co-owner of the Work, and pursuant to the parties' December 1, 1988 agreement, in amounts not yet fully ascertained.

139.   Said conversions by Defendant DeVito of Plaintiff's rightful share of royalties and/or profits were intentional, facilitated by, and accomplished through Defendant DeVito's foregoing acts of fraud and fraudulent concealment, notwithstanding the existence of a special and confidential relationship.

140.     In acting as above described, Defendant DeVito acted oppressively, maliciously, fraudulently, and outrageously towards Plaintiff, with conscious disregard for Plaintiff's known rights, and with the intention of causing unjust and cruel hardship to Plaintiff.  Moreover, in so acting in a deliberate, cold, callous, and intentional manner, Defendant DeVito intended to injure, and injured Plaintiff, and Plaintiff requests the assessment of exemplary and/or punitive damages against Defendant DeVito, in an amount sufficient to punish and make an example of him, in addition to compensatory damages, pre-judgment and post-judgment interest, as permitted by law, Plaintiff's attorney's fees and the costs of this action, and the imposition of a constructive trust on all of Defendant DeVito's income arising from or relating to the Work, including, but not limited to, income arising from the licensing or assignment of rights therein for *Jersey Boys*.

## COUNT IX

### [Copyright Infringement under the Laws of the United Kingdom]

(Against Defendant DeVito)

141.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 140 hereinabove, as if fully set forth in this Paragraph 141.

142.     This is an action for copyright infringement under s 16(2) of the U.K. *Copyright, Designs and Patents Act 1988*, as amended ("CDPA 1988"), arising from, *inter alia*, Defendant DeVito's authorization of infringing acts in the United Kingdom.

143.     Copyright infringement constitutes a transitory cause of action, and may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.

144.     The *Berne Convention for the Protection of Literary and Artistic Works*, to which the United States and the United Kingdom are signatories, provides that works authored by citizens of signatory states must be accorded at least the same copyright protection in other signatory states as such states accord to works authored by their own citizens, and the United Kingdom accords such "national treatment" to U.S. authors, pursuant to, *inter alia*, Section 154(2) CDPA 1988, and Statutory Instrument 1989, No. 157, *The Copyright (International Conventions)(Amendment) Order 1989.*  Thus, at the time the Work was completed, the copyrights therein were protected under U.K. law, without registration or any further formalities.

145.    The Work is a work of "joint authorship" under s 10 (1) CDPA 1988, in that, *inter alia*, it was produced by the collaboration of Mr. Woodard and Defendant DeVito; both Mr. Woodard and Defendant DeVito made integral contributions thereto, which could not be removed without fundamentally altering the whole; and, the parties worked together with a common design or aim, and shared responsibility for the form of expression contained therein.

146.    Whereas, the copyrights in a work vest initially with the author(s), under s 11(1) CDPA 1988, all copyrights in the Work vested initially with Mr. Woodard and Defendant DeVito, as joint authors, and they were co-owners thereof, each having an indivisible fifty (50%) percent interest therein.

147.    Whereas, copyright is transmissible by testamentary disposition or operation of law, under s 90(1) CDPA 1988, Plaintiff inherited Mr. Woodard's interest in the Work upon his death, and became co-owner of all copyrights therein with Defendant DeVito.

148.    Section 173(2) CDPA 1988 provides that the consent of all owners of a copyrighted work is required to license the work.

149.    One copyright co-owner may sue another co-owner for acts done without his license, under s 16(2) CDPA 1988, and merely accounting to a co-owner for profits is insufficient to escape liability for copyright infringement in such circumstances.

150.    Pursuant to s 16(2) and s 173(2) CDPA 1988, copyright in a work is infringed by a person who, without the license of all copyright owners does, or authorizes another to do, directly, or indirectly, any of the acts restricted by the copyright, including, *inter alia*, copying the work; issuing copies to the public in the European Economic Area (EEA) for the first time; communicating the work to the public by electronic transmission; performing the work in public; renting or lending the work to the public; and, making an adaptation of the work, as set forth in s 16(1) CDPA 1988, and, pursuant to s 21(2) CDPA 1988, doing any of these acts in relation to an adaptation is also a restricted act.

151.    *Jersey Boys* is an adaptation of the Work, under s 21(3) CDPA 1988, as it is a conversion of the Work into a dramatic work.

152.    Defendant DeVito has infringed Plaintiff's copyrights in the Work, under s 16(2)

CDPA 1988, by entering into an agreement with Defendants Valli and Gaudio authorizing said Defendants, and/or their licensees or assignees, to adapt the Work for *Jersey Boys;* to perform this adaptation worldwide, including in the U.K., to arrange for and promote performances therein; to broadcast excerpts from this adaptation by electronic transmissions therein; and, to otherwise deal with restricted rights in the Work therein, all in the absence of Plaintiff's express consent.

153.     Plaintiff is entitled to a permanent injunction against Defendant DeVito, for his acts of U.K. copyright infringement, under s 96(2) CDPA 1988.

154.     Plaintiff is also entitled to damages from Defendant DeVito, or an accounting of profits, for his acts of U.K. copyright infringement, under s 96(2) CDPA 1988, in amounts to be determined at trial, including additional (enhanced) damages, such as lost profits, other damages appropriate to the actual prejudice suffered by Plaintiff as a result of Defendant DeVito's infringing acts, and damages for the moral prejudice caused to Plaintiff by the infringement, under s 97(2) CDPA 1988, and Regulation 3 of the Intellectual Property (Enforcement etc.) Regulations 2006 (SI 2006/1028), due, *inter alia*, to the flagrancy of Defendant DeVito's conduct in authorizing others to use, adapt, and perform adaptations of the Work in the U.K., and the direct benefits obtained by Defendant DeVito thereby, in the form of ongoing profits, all in the absence of Plaintiff's consent, and with knowing disregard for her co-ownership of the Work.

## COUNT X

### [Copyright Infringement under the Laws of Canada]

(Against Defendant DeVito)

155.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 154 hereinabove, as if fully set forth in this Paragraph 155.

156.     This is an action for copyright infringement under Section 27(1) of the Canadian *Copyright Act* R.S.C. 1985, c. C-42 ("the Act"), arising from, *inter alia*, Defendant DeVito's authorization of infringing acts in Canada.

157.     Copyright infringement constitutes a transitory cause of action, and may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.

158.     The *Berne Convention for the Protection of Literary and Artistic Works*, to which the

United States and Canada are signatories, provides that works authored by citizens of signatory states must be accorded at least the same copyright protection in other signatory states as such states accord works authored by their own citizens, and Canada accords such "national treatment" to U.S. authors, pursuant to, *inter alia*, Section 5(1) of the Act.  Thus, at the time the Work was completed, the copyrights therein were protected under Canadian law, without registration or any further formalities.

159.    The Work is a work of "joint authorship" under Section 2 of the Act, in that, *inter alia*, it was produced by the collaboration of Mr. Woodard and Defendant DeVito; both Mr. Woodard and Defendant DeVito made substantial, original, and integral contributions thereto, which could not be removed without fundamentally altering the whole; and, the parties worked together with a common design or aim, and shared responsibility for the form of expression contained therein.

160.    Whereas, the copyrights in a work vest initially with the author(s), under Section 13 of the Act, all copyrights in the Work vested initially with Mr. Woodard and Defendant DeVito, as joint authors, and they were co-owners thereof, with each holding an indivisible fifty (50%) percent ownership interest therein.

161.    Whereas, copyright is transmissible by testamentary disposition,  pursuant to, *inter alia*, Section 14(1) of the Act, Plaintiff inherited Mr. Woodard's interest in the Work upon his death, and became co-owner of the copyrights therein, with Defendant DeVito.

162.    Pursuant to, *inter alia*, Sections 3(1) and 27(1) of the Act, the consent of all owners of a copyrighted work is required to license the work, or to exercise any of the rights of a copyright owner under Section 3(1) of the Act, and one copyright co-owner may sue another co-owner for acts done without his license, under Section 27(1) of the Act.

163.    Pursuant to, *inter alia*, Sections 3(1)(a) -(i) and 27(1) and (5) of the Act, copyright in a work is infringed by a person who, without license from all copyright owners does, or authorizes another to: publish an unpublished work or any substantial part thereof; copy the work; convert the work into a dramatic work, by way of performance in public or otherwise;  reproduce, adapt and publicly present the work as a cinematographic work; communicate the work to the public by telecommunication; or, permit a theater or other place of entertainment to be used for the

performance in public of a work.

164.    Defendant DeVito has infringed Plaintiff's copyrights in the Work, under Section 27(1) of the Act, by entering into an agreement with Defendants Valli and Gaudio authorizing said Defendants, and/or their licensees or assignees, to copy and adapt the Work for *Jersey Boys;* to perform this derivative work worldwide, including in Canada; to arrange for and promote performances in theaters therein; to broadcast excerpts from this adaptation by electronic transmissions therein; and, to otherwise deal with rights in the Work reserved exclusively to copyright owners under Section 3(1) of the Act, all in the absence of Plaintiff's express consent.

165.    Plaintiff is entitled to a permanent injunction against Defendant DeVito, for his acts of copyright infringement under Canadian law, pursuant to Section 34(1) of the Act.

166.    Plaintiff is also entitled to damages from Defendant DeVito, for his acts of Canadian copyright infringement, in an amount to be determined at trial, under Sections 34(1) and 35 of the Act, together with such part of Defendant DeVito's profits from such infringements as the Court considers just, which were not taken into account in calculating such damages.

## COUNT XI

### [Copyright Infringement under the Laws of Australia]

(Against Defendant DeVito)

167.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 166 hereinabove, as if fully set forth in this Paragraph 167.

168.    This is an action for copyright infringement under Sections 115(1), 36, and 39 of the Australian *Copyright Act 1968* (Cth) ("the 1968 Act"), arising from, *inter alia*, Defendant DeVito's authorization of infringing acts in Australia.

169.    Copyright infringement constitutes a transitory cause of action, and may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.

170.    The *Berne Convention for the Protection of Literary and Artistic Works*, to which the United States and Australia are signatories, provides that works authored by citizens of signatory states must be accorded at least the same copyright protection in other signatory states as such states accord works authored by their own citizens, and Australia accords such "national treatment" to U.S.

authors, pursuant to, *inter alia*, Section 184 of the 1968 Act, and Section 4, *Copyright (International Protection) Regulations 1969*. Thus, at the time the Work was completed, the copyrights therein were protected under Australian law, without registration or any further formalities.

171.     The Work is a work of "joint authorship" under s 10(1) of the 1968 Act, in that, *inter alia*, it was produced by the collaboration of Mr. Woodard and Defendant DeVito; both Mr. Woodard and Defendant DeVito made substantial, original, and integral contributions thereto, and invested skill and labor therein; and, the contributions of each are merged with and inseparable from those of the other therein.

172.     Whereas, the copyrights in a work vest initially with the author(s), under Section 35(2) of the 1968 Act, all copyrights in the Work vested initially with Mr. Woodard and Defendant DeVito, as joint authors, and they were co-owners thereof, with each holding an indivisible fifty (50%) percent ownership interest therein, as a tenant-in-common.

173.     Whereas, copyright in an unpublished work is transmissible by testamentary disposition,  pursuant to s 198 of the 1968 Act, Plaintiff inherited Mr. Woodard's interest in the Work upon his death, and became co-owner of the copyrights therein, with Defendant DeVito.

174.     Pursuant to, *inter alia*, s 36 of the 1968 Act, the consent of all owners of a copyrighted work is required to license the work, or to exercise any of the rights of a copyright owner under s 31(1) of the 1968 Act, and one copyright co-owner may sue another co-owner for acts done without his license, under Sections 36 and 39 of the 1968 Act.

175.     Pursuant to s 36 , s 39, s 31, and/or s 101 of the 1968 Act, copyright in a work is infringed by a person who, without the license of all copyright owners does, or authorizes another to do, any of the acts comprised in the copyright, including, *inter alia*, reproducing the work in "material form" (which encompasses adaptations of the work, under Sections 10(1) and 21(2) of the 1968 Act); publishing the work; performing the work in public; communicating the work to the public; making an adaptation of the work; doing or authorizing any of the foregoing acts in relation to an adaptation of the work; and, in the case of indirect infringement, permitting a place of public entertainment to be used for the public performance of a work.

176.     *Jersey Boys* is an adaptation of the Work, under s 10(1) of the 1968 Act, as, *inter alia*,

1    it is a dramatization of the Work.

2          177.    Defendant DeVito has infringed Plaintiff's copyrights in the Work, directly, and

3    indirectly, under Sections 36, 39, and/or 101 of the 1968 Act, by, *inter alia*, entering into an

4    agreement with Defendants Valli and Gaudio authorizing said Defendants, and/or their licensees or

5    assignees, to copy and adapt the Work for *Jersey Boys;* to perform this adaptation worldwide,

6    including in Australia; to arrange for and promote performances of this adaptation of the Work in

7    places of public entertainment therein; to communicate excerpts from this adaptation by electronic

8    transmissions therein; and, to otherwise deal with rights in the Work reserved exclusively to

9    copyright owners under Section 31(1) of the 1968 Act, all in the absence of Plaintiff's consent,

10   notwithstanding Defendant DeVito's full awareness of Plaintiff's co-ownership of the copyright in

11   the Work.

12         178.    Plaintiff is entitled to a permanent injunction against Defendant DeVito, for his acts

13   of direct and indirect copyright infringement under Australian law, pursuant to, *inter alia*, Section

14   115(2) of the 1968 Act.

15         179.    Plaintiff is also entitled to damages from Defendant DeVito, or an accounting of

16   profits, for his acts of Australian copyright infringement, under s 115(2) of the 1968 Act, in amounts

17   to be determined at trial, and additional (exemplary or punitive) damages, under s 115(4) of the 1968

18   Act, due, *inter alia*, to the flagrancy of Defendant DeVito's conduct in authorizing others to use,

19   adapt, and perform adaptations of the Work in Australia in utter disregard for Plaintiff's co-

20   ownership thereof; the direct benefits obtained by Defendant DeVito thereby, in the form of ongoing

21   profits; and, the need to deter similar future acts of copyright infringement thereby.

22                                        <u>**COUNT XII**</u>

23   **[Declarations of Invalidity, Non-Exclusivity, and/or Non-Transferability of "Exclusive**

24                **License" and Invalidity of Subsequent Licenses/Assignments]**

25   (Against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway)

26         180.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 179

27   hereinabove, as if fully set forth in this Paragraph 180.

28         181.    Defendant DeVito, as a co-owner of the Work, lacked the power, authority, and/or

requisite ownership interest to unilaterally issue an exclusive license to Defendants Valli and Gaudio thereunder, and accordingly, the "exclusive license" Defendant DeVito granted thereto, on or about August 13, 1999, was *void ab initio*, under 17 U.S.C. §§ 201(a) and (d)(2), insofar as it purported to cover the Work, or any of the rights, privileges, benefits, or protections accorded to an owner of copyrights therein, under, *inter alia*, 17 U.S.C. §§ 106, 501(b), 502, 503, 504, and 505.

182.    Alternatively, whereas, Defendant DeVito, as a co-owner of the Work, lacked the power, authority and/or requisite ownership interest to unilaterally issue an exclusive license to Defendants Valli and Gaudio thereunder, the "exclusive license" Defendant DeVito granted thereto, on or about August 13, 1999, must be construed as a non-exclusive license, which Defendants Valli and Gaudio could not lawfully license, sublicense, or assign, under 17 U.S.C. § 201(d)(2), in the absence of Plaintiff's express consent.

183.    As a result of the invalidity of the aforesaid "exclusive license" from Defendant DeVito, as set forth in Paragraph 181 hereof, Defendants Valli and Gaudio had, acquired, have, and possess, no right, power, license, or other authority to use, reference, and/or adapt the Work; to reproduce the Work or distribute copies thereof; to prepare derivative works based upon the Work; to perform the Work or adaptations thereof; to authorize others to prepare derivative works based upon the Work; to license, sublicense, lease, or otherwise permit third parties to use, exercise, or exploit any of the copyrights in the Work; or to exercise, or authorize the exercise of, any right in the Work reserved to copyright owners under 17 U.S.C. §§ 106 and 201(d).

184.    Alternatively, as a result of the non-exclusive nature of the aforesaid "exclusive license" from Defendant DeVito, as set forth in Paragraph 182 hereof, Defendants Valli and Gaudio had, acquired, have, and possess, no right, power, license, or other authority to authorize others to prepare derivative works based upon the Work; to license, sublicense, lease, or otherwise permit third parties to use, exercise, or exploit any of the copyrights in the Work; or to authorize the exercise of any other rights in the Work reserved to copyright owners under 17 U.S.C. §§ 106 and 201(d).

185.    As a result of the invalidity or non-exclusivity of the aforesaid "exclusive license" from Defendant DeVito to Defendants Valli and Gaudio, the subsequent purported transfer of these

rights by Defendants Valli and Gaudio to Defendants DSHT and/or Dodger Theatricals, in the May 1, 2004 agreement between these parties, and any purported license or transfer of these rights to Defendants Brickman and Elice, Jersey Boys Broadway, and any other person, were void, *ab initio*, with no force or effect, and conveyed no rights relating to or arising from the Work.

186.    In this Circuit, a co-owner of a copyrighted work may <u>assign</u> his own exclusive rights in the work, in whole or part, under 17 U.S.C. § 201(d)(1), but unless he assigns all of his rights in the work, the transferee is entitled, with respect to the rights assigned, only to the "protections and remedies" accorded by the Copyright Act, and not to the "rights and benefits" conferred thereby, and accordingly, may not further license, sublicense, or assign those rights, under 17 U.S.C. § 201(d)(2). Thus, in the alternative, under FED. R. CIV. P. 8(d)(2)-(3), Defendant DeVito's foregoing "exclusive license" to Defendants Valli and Gaudio constituted an assignment of Defendant DeVito's entire share in the exclusive rights to prepare derivative works based upon the Work in the media of, *inter alia*, theater, film, and television, making Defendants Valli and Gaudio co-owners of said rights with Plaintiff, with Plaintiff holding a fifty (50%) percent ownership interest therein, and Defendants Valli and Gaudio holding a fifty (50%) percent ownership interest; but, because the assignment encompassed less than Defendant DeVito's entire share of all exclusive rights in the Work, the rights acquired by Defendants Valli and Gaudio thereunder may not be further licensed, sublicensed, leased, or transferred thereby, absent Plaintiff's consent, under 17 U.S.C. § 201(d)(2). Consequently, the further transfer of these rights by Defendants Valli and Gaudio to Defendants DSHT and/or Dodger Theatricals, in the May 1, 2004 agreement between these parties and Defendants Brickman and Elice, was void, *ab initio*, with no force or effect, and neither licensed nor conveyed any rights relating to or arising from the Work. Similarly, the subsequent transfer of these rights by Defendant Dodger Theatricals to Defendant Jersey Boys Broadway, was void, *ab initio*, with no force or effect, and neither licensed nor conveyed any rights relating to or arising from the Work.

187.    Plaintiff seeks a Declaratory Judgment against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, pursuant to 28 U.S.C. § 2201, decreeing that: (a) that the "exclusive license" encompassing the Work which Defendant DeVito granted to Defendants Valli and Gaudio, on or about August 13, 1999, was void, *ab initio*, under 17 U.S.C. §§ 201(a) and

(d)(2); or, (b) was a limited, nonexclusive license, which Defendants Valli and Gaudio could not further license, lease, assign, or otherwise transfer or convey, in the absence of Plaintiff's consent, under 17 U.S.C. § 201(d)(2); (c) that all subsequent non-exclusive licenses, exclusive licenses, assignments, leases, and/or transfers of said rights by Defendants Valli and Gaudio were void and invalid under 17 U.S.C. § 201(d)(2), including, but not limited to, the licenses and/or assignments granted by Defendants Valli and Gaudio to Defendants Brickman, Elice, McAnuff, DSHT, and/or Dodger Theatricals, and the subsequent transfer from Dodger Theatricals to Jersey Boys Broadway; and, (d) that Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway have no rights to use, reference, and/or adapt the Work; to reproduce the Work or distribute copies thereof; to prepare derivative works based upon the Work; to perform the Work or adaptations thereof; to license, sublicense, lease, or otherwise permit third parties to use, exercise, or exploit any of the copyrights in the Work; or to exercise, or authorize the exercise of, any other right in the Work reserved to copyright owners under 17 U.S.C. §§ 106 and 201(d).

188.    Alternatively, under FED. R. CIV. P. 8(d)(2)-(3), Plaintiff seeks a Declaratory Judgment against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, pursuant to 28 U.S.C. § 2201, decreeing that: (a) that the "exclusive license" encompassing the Work which Defendant DeVito granted to Defendants Valli and Gaudio, on or about August 13, 1999, constituted an assignment of Defendant DeVito's share in the exclusive rights to prepare derivative works based upon the Work in the media of, *inter alia*, theater, film, and television, resulting in the indivisible co-ownership of these rights by Plaintiff (50%) and Defendants Valli and Gaudio (50%), under 17 U.S.C. §§ 201(a) and (d)(2); (b) that notwithstanding this "assignment," which encompassed less than all of Defendant DeVito's rights in the Work, that Defendants Valli and Gaudio were and remain prohibited from further licensing, sublicensing, leasing, or transferring the rights thereby obtained, under 17 U.S.C. § 201(d)(2); (c) that all subsequent non-exclusive licenses, exclusive licenses, assignments, leases, and/or transfers of said rights by Defendants Valli and Gaudio were and remain void and invalid under 17 U.S.C. § 201(d)(2), including, but not limited to, the licenses and/or assignments granted by Defendants Valli and Gaudio to Defendants Brickman, Elice, McAnuff, DSHT, and/or Dodger Theatricals; (d) that the subsequent assignment or transfer

of said rights from Defendant Dodger Theatricals to Defendant Jersey Boys Broadway, was and remains void and invalid under 17 U.S.C. § 201(d)(2); and, (e) that Defendants DSHT, Dodger Theatricals, and Jersey Boys Broadway have no rights to use, reference, and/or adapt the Work; to reproduce the Work or distribute copies thereof; to prepare derivative works based upon the Work; to perform the Work or adaptations thereof; to authorize others to prepare derivative works based upon the Work; to license, sublicense, lease, or otherwise permit third parties to use, exercise, or exploit any of the copyrights in the Work; or to exercise, or authorize the exercise of, any right in the Work reserved to copyright owners under 17 U.S.C. §§ 106 and 201(d).

## COUNT XIII

**[Alternative Declaration that "Exclusive License" from Defendant DeVito to Defendants Valli and Gaudio Constituted a Transferable Assignment of Exclusive Rights]**

(Against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, in the Alternative, Under FED. R. CIV. P. 8(d)(2)-(3))

189.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 188 hereinabove, as if fully set forth in this Paragraph 189.

190.    In the alternative to Counts XII, XV, XVI, and XVII hereof, under Fed. R. Civ. P. 8(d)(2)-(3), and pursuant to the allegations of Paragraphs 17(h), 20(c) and (f), 21, and 64 hereof, Defendant DeVito's August 13, 1999 grant of exclusive rights to Defendants Valli and Gaudio effected an assignment of his entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants Valli and Gaudio (50%), under 17 U.S.C. §§ 201(a) and (d)(2), which said Defendants could further assign, under 17 U.S.C. § 201(d)(1)-(2).

191.    In the alternative to Counts XII, XV, XVI, and XVII hereof, under Fed. R. Civ. P. 8(d)(2)-(3), and pursuant to the allegations of Paragraphs 17(h), 20(c) and (f), 21, 64, and 190 hereof, Defendants Valli's and Gaudio's May 1, 2004 transfer of the exclusive rights in the Work obtained from Defendant DeVito, to Defendants DSHT and/or Dodger Theatricals, was effective, and constituted an assignment of Valli's and Gaudio's entire share in the exclusive right to prepare

derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants DSHT and/or Dodger Theatricals (50%), under 17 U.S.C. §§ 201(a) and (d).

192.   In the alternative to Counts XII, XV, XVI, and XVII hereof, under Fed. R. Civ. P. 8(d)(2)-(3), and pursuant to the allegations of Paragraphs 17(h), 20(c) and (f), 21, 64, and 190 hereof, Defendant Dodger Theatricals' subsequent transfer of the exclusive rights in the Work obtained from Defendants Valli, Gaudio, and/or DSHT, to Defendant Jersey Boys Broadway was effective, and constituted an assignment of Dodger Theatricals' entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendant Jersey Boys Broadway (50%), under 17 U.S.C. §§ 201(a) and (d).

193.   Plaintiff seeks a Declaratory Judgment against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, pursuant to 28 U.S.C. § 2201, decreeing: (a) that the "exclusive license" encompassing the Work which Defendant DeVito granted to Defendants Valli and Gaudio, on or about August 13, 1999, effected an assignment of his entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants Valli and Gaudio (50%), under 17 U.S.C. §§ 201(a) and (d)(2); and, (b) that Defendants Valli's and Gaudio's May 1, 2004 transfer of the exclusive rights in the Work obtained from Defendant DeVito as aforesaid, to Defendants DSHT and/or Dodger Theatricals, constituted an assignment of Valli's and Gaudio's entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants DSHT and/or Dodger Theatricals (50%), under 17 U.S.C. §§ 201(a) and (d); and, (c) that Defendant Dodger Theatricals' subsequent transfer of the exclusive rights in the Work obtained from Defendants Valli, Gaudio, and/or DSHT, to Defendant Jersey Boys Broadway was effective, and constituted an assignment of Dodger Theatricals' entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-

ownership of these rights by Plaintiff (50%) and Defendant Jersey Boys Broadway (50%), under 17 U.S.C. §§ 201(a) and (d).

## COUNT XIV

### [Equitable Accounting]

(Against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway,

in the Alternative, Under FED. R. CIV. P. 8(d)(2)-(3))

194.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 193 hereinabove, as if fully set forth in this Paragraph 194.

195.    Co-owners of a copyrighted work are akin to tenants-in-common, with each co-owner having an undivided, independent right to use the work, subject to a duty to account for profits to the other co-owner(s).

196.    As a result of Defendant DeVito's transfer of his entire share of certain of his exclusive rights in the Work to Defendants Valli and Gaudio, under the "exclusive license" executed on or about August 13, 1999, Defendants Valli and Gaudio became co-owners of these rights with Plaintiff, under 17 U.S.C. §§ 201(a) and (d), with Defendants Valli and Gaudio holding an indivisible fifty (50%) percent ownership interest therein, and Plaintiff holding the remaining fifty (50%) percent ownership interest therein.

197.    As a result of Defendants Valli's and Gaudio's May 1, 2004 transfer of certain of the exclusive rights in the Work obtained from Defendant DeVito as aforesaid, to Defendants DSHT and/or Dodger Theatricals – namely, all live stage musical rights in and to the Work as used, referenced, and/or adapted for *Jersey Boys*, Defendants DSHT and/or Dodger Theatricals became co-owners of these rights with Plaintiff, under 17 U.S.C. §§ 201(a) and (d), with Defendants DSHT and/or Dodger Theatricals holding an indivisible fifty (50%) percent ownership share therein, and Plaintiff holding the remaining indivisible fifty (50%) percent ownership interest therein.

198.    As a result of Defendant Dodger Theatricals' subsequent transfer of the exclusive rights in the Work obtained from Defendants Valli and Gaudio and/or DSHT as aforesaid, to Defendant Jersey Boys Broadway, Defendant Jersey Boys Broadway became a co-owner of these rights with Plaintiff, under 17 U.S.C. §§ 201(a) and (d), with Defendant Jersey Boys Broadway

holding an indivisible fifty (50%) percent ownership share therein, and Plaintiff holding the remaining indivisible fifty (50%) percent ownership interest therein.

199.    As co-owner of the aforesaid rights in the Work transferred to Defendants Valli and Gaudio, Plaintiff has a right to an accounting from Defendants Valli and Gaudio, of any and all profits obtained as a result of their exercise of said rights, and the use and benefit of the Work, and to payment of her fifty (50%) percent *pro rata* share of same.

200.    As co-owner of the aforesaid rights in the Work transferred by Defendants Valli and Gaudio to Defendants DSHT and/or Dodger Theatricals, Plaintiff has a right to an accounting from Defendants DSHT and/or Dodger Theatricals, of any and all profits obtained as a result of their exercise of said rights, and the use and benefit of the Work, and to payment of her fifty (50%) percent *pro rata* share of same.

201.    As co-owner of the aforesaid rights in the Work transferred by Defendant Dodger Theatricals to Defendant Jersey Boys Broadway, Plaintiff has a right to an accounting from Defendant Jersey Boys Broadway, of any and all profits obtained as a result of its exercise of said rights, and the use and benefit of the Work, and to payment of her fifty (50%) percent *pro rata* share of same.

202.    The duties of Defendants Valli and Gaudio, Defendants DSHT and/or Dodger Theatricals, and Defendant Jersey Boys Broadway to account to Plaintiff, as aforesaid, includes, but is not limited to, a duty to account for profits obtained, derived, or resulting from: (a) the use and/or adaptation of the Work for *Jersey Boys* and collateral products by same; and, (b) the use and/or adaptation of the Work by any other person or entity acting under a license, sublicense, lease and/or transfer of rights under the Work issued formally or informally by said Defendants thereto.

203.    Plaintiff has demanded that Defendants Valli and Gaudio, DSHT and Dodger Theatricals, and Jersey Boys Broadway, account for profits arising directly or indirectly from their use, exploitation, and/or exercise of rights assigned by Defendant DeVito or his successors relating to the Work, but said Defendants have failed and refused, and continue to fail and refuse, to render accountings or pay Plaintiff her share of said profits.

204.    The precise nature and extent of Defendant Valli's, Gaudio's, DSHT's, Dodger

Theatricals', and Jersey Boys Broadway's income attributable to the rights originally conveyed by Defendant DeVito, and/or attributable to the use and benefit of the Work, are unknown to Plaintiff at the present time, and said profits cannot be determined without an accounting of said Defendants' transactions relating to *Jersey Boys*, the *Jersey Boys Book*, the *Jersey Boys Cast Recording*, which includes portions of the *libretto*, and the motion picture version of *Jersey Boys* which is planned. Moreover, the facts and accounts presented are so complex that investigations concerning said Defendants' accounts are necessary to effect justice between the parties, and establish the value of Plaintiff's interests.

205.    Plaintiff seeks an Order from this Court that Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway render accountings to Plaintiff of the amounts owed, as well as a Judgment against said Defendants, for sums to be determined in the accounting, with prejudgment and post-judgment interest, as allowed by law.

## COUNT XV

### [Copyright Infringement]

(Against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals,
Jersey Boys Broadway, JB Viva Vegas, and Jersey Boys Records)

206.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 205 hereinabove, as if fully set forth in this Paragraph 206.

207.    The Work contains large amounts of material that is wholly original to Mr. Woodard and Defendant DeVito, and constitutes copyrightable subject matter under the laws of the United States.  As co-author of the joint Work, Mr. Woodard held an indivisible fifty (50%) percent share therein, including an equal share in any material which may have originated from Defendant DeVito, and Mr. Woodard's entire ownership interest passed to Plaintiff upon his death.

208.    U.S. Copyright Reg. No. Txu 454 118 for the Work, dated January 11, 1991, and shown in *Exhibit 21* hereof, has been and is being held by Defendant DeVito in constructive trust for Plaintiff, as co-owner, and Plaintiff is entitled to the rights, benefits, protections, and remedies accorded by the Copyright Act thereunder. Said registration issued years before the infringing conduct complained of herein, and the prerequisites and formalities of 17 U.S.C. § 411 have been

satisfied.  Whereas, Plaintiff is a legal and/or beneficial owner of the copyrights embodied in U.S. Reg. No. Txu 454 118, she has standing to bring this action for copyright infringement against the above-named Defendants under 17 U.S.C. § 501(b).

209.  Plaintiff also has standing to bring this action for copyright infringement against the above-named Defendants under 17 U.S.C. § 411(a)-(b), by virtue of *Supplementary Registration* No. Txu1 372 636, issued on July 3, 2007, and shown in *Exhibit 26B* hereof, which supplements U.S. Reg. No. Txu 454 118 to include Mr. Woodard's claims of authorship and ownership.

210.  *Jersey Boys* is a derivative work based upon the Work, under 17 U.S.C. § 101, as it is a dramatization, fictionalization, abridgment, condensation, or other recasting, transformation, or adaptation of the Work, and the various drafts, treatments, and outlines for *Jersey Boys* which preceded the finalized versions of the script, exhibit extensive intermediate copying.

211.  Each of the above-named Defendants, and/or their principals, had extensive access to the Work, over a period spanning at least several years, and, pursuant to the inverse ratio rule in this Circuit, less similarity between the Work and *Jersey Boys* is required to establish "copying" than would be required if said Defendants had less access to the Work.

212.  *Jersey Boys* is substantially similar to the Work, extrinsically and intrinsically.

213.  *Jersey Boys* includes passages copied *verbatim* from the Work, and passages closely paraphrased from the Work, and the selection, sequencing, and ordering of the events portrayed in *Jersey Boys* were appropriated from the Work.

214.  Plaintiff has not authorized any of the above-named Defendants to prepare derivative works based upon the Work; to otherwise appropriate material from the Work for any purpose, or authorize others to do so; to reproduce the Work; to perform the Work, or to distribute copies thereof.

215.  The "exclusive license" granted by Defendant DeVito to Defendants Valli and Gaudio, on or about August 13, 1999, was invalid under 17 U.S.C. § 201(a) and (d)(2), as set forth hereinabove, and conveyed no rights to Defendants Valli and Gaudio, or constituted only a non-exclusive license, with no rights to further transfer, lease, license, or sublicense same.

216.  Alternatively, the "exclusive license" granted by Defendant DeVito to Defendants

Valli and Gaudio constituted an assignment of certain of Defendant DeVito's exclusive rights in the Work, under 17 U.S.C. § 201(d)(1), but did not permit the further licensing, sublicensing, leasing and/or transfer of said rights by Defendants Valli and Gaudio to any third party, under 17 U.S.C. § 201(d)(2).

217.    Defendants Valli and Gaudio have infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a), by their exercise of exclusive rights in the Work which are reserved to copyright owners under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and Defendant DeVito, as co-owners thereof, namely: (a) the authorization of others, including Defendants Brickman, Elice, McAnuff, DSHT, and Dodger Theatricals, to prepare derivative works based upon the Work, including, but not limited to, the *Jersey Boys libretto* and production, the *Jersey Boys Cast Recording*, and the *Jersey Boys Book*, in violation of Plaintiff's rights under 17 U.S.C. § 106(2); (b) the authorization of others, including Defendants Brickman, Elice, and McAnuff, to reproduce and distribute copies of the Work, in violation of Plaintiff's rights under 17 U.S.C. §§ 106(1) and 106(3); and, (c) the authorization of others, including Defendants DSHT and Dodger Theatricals, to perform portions of the Work, and/or derivative works based thereon, in violation of Plaintiff's rights under 17 U.S.C. § 106(4), and said Defendants are jointly and severally liable for these infringements.

218.    Defendants Brickman and Elice have infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a), by, *inter alia*: (a) their preparation of derivative works based upon the Work, namely, various versions of the *Jersey Boys libretto*, in violation of Plaintiff's rights under 17 U.S.C. § 106(2); (b) their copying from the Work for said *libretto*, including intermediate copying in drafts, outlines, and treatments therefor, in violation of Plaintiff's rights under 17 U.S.C. §§ 106(1); (c) their reproduction and distribution of copies of the Work, in violation of Plaintiff's rights under 17 U.S.C. §§ 106(1) and 106(3); and, (d) their authorization of others to use their infringing material in, inter alia, the *Jersey Boys Cast Recording* and *Jersey Boys Book*, in violation of Plaintiff's rights under 17 U.S.C. 106(2), and said Defendants are jointly and severally liable for these infringements.

219.    Defendant McAnuff has infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a) by, *inter alia*: (a) his copying from the Work and preparation of derivative works based

upon it, in concert with Defendants Brickman and Elice and in violation of Plaintiff's rights, under 17 U.S.C. § 106(1) and (2), and (b) his reproduction and/or distribution of copies of the Work, in violation of Plaintiff's rights under 17 U.S.C. §§ 106(1) and/or 106(3).

220.   Defendant DSHT has infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a), by its unlawful exercise of exclusive rights therein which are reserved to copyright owners under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and Defendant DeVito as co-owners thereof, namely: (a) the authorization of others, including Defendants Brickman, Elice, McAnuff, and Dodger Theatricals, to prepare derivative works based upon the Work, including, but not limited to, the *Jersey Boys libretto* and production, the *Jersey Boys Cast Recording*, and the *Jersey Boys Book*, in violation of Plaintiff's rights under 17 U.S.C. § 106(2); (b) the authorization of others, including Defendants Brickman, Elice, and McAnuff, to reproduce and distribute copies of the Work, in violation of Plaintiff's rights under 17 U.S.C. §§ 106(1) and 106(3); and, (c) the performance of, and/or authorization of others, including Defendants Dodger Theatricals, to produce and perform, portions of the Work, and derivative works based thereon, in violation of Plaintiff's rights under 17 U.S.C. § 106(4).

221.   Defendant Dodger Theatricals has infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a), by its unlawful exercise of exclusive rights therein which are reserved to copyright owners under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and Defendant DeVito, as co-owners, namely: (a) the authorization of others, including Defendants Brickman, Elice, and McAnuff, to copy from, and prepare derivative works based upon the Work, including, but not limited to, the various versions of the *Jersey Boys libretto* and production, the *Jersey Boys Cast Recording*, and the *Jersey Boys Book*, in violation of Plaintiff's rights under 17 U.S.C. § 106(1) and (2); (b) the authorization of others, including Defendants Brickman, Elice, and McAnuff, to reproduce and distribute copies of the Work, in violation of Plaintiff's rights under 17 U.S.C. §§ 106(1) and 106(3); (c) the performance of, and/or authorization of others, to produce and perform, portions of the Work, and derivative works based thereon, in violation of Plaintiff's rights under 17 U.S.C. § 106(4); and, (d) the assignment of rights, to Defendant Jersey Boys Broadway, to engage in each of the foregoing unlawful activities, without authority to do so, in violation of, *inter alia*, 17

U.S.C. §§ 106(1)-(4) and 201.

222.    Defendant Jersey Boys Broadway has infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a), by its unlawful exercise of exclusive rights therein which are reserved to copyright owners under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and Defendant DeVito, as co-owners, namely: (a) the authorization of others, including Defendants Brickman, Elice, and McAnuff, to copy from, and prepare derivative works based upon the Work, including, but not limited to, various versions of the *Jersey Boys libretto* and production, the *Jersey Boys Cast Recording*, and the *Jersey Boys Book*, in violation of Plaintiff's rights under 17 U.S.C. § 106(1) and (2); (b) the authorization of others, including Defendants Brickman, Elice, and McAnuff, to reproduce and distribute copies of the Work, in violation of Plaintiff's rights under 17 U.S.C. §§ 106(1) and 106(3); and, (c) the performance of, and/or authorization of others, including Defendant JB Viva Vegas, to produce and perform, portions of the Work, and derivative works based thereon, in violation of Plaintiff's rights under 17 U.S.C. § 106(4).

223.    Defendant JB Viva Vegas has infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a), by its unlawful exercise of exclusive rights therein which are reserved to copyright owners under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and Defendant DeVito as co-owners, namely, the production and performance of, and/or authorization of others to perform publicly, portions of the Work, and a derivative work based thereon, in violation of Plaintiff's rights under 17 U.S.C. § 106(4).

224.    Defendant Jersey Boys Records has infringed Plaintiff's copyrights in the Work, under 17 U.S.C. § 501(a), by its unlawful exercise of exclusive rights therein which are reserved to copyright owners under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and Defendant DeVito as co-owners, namely, the authorization of others to include material copied or adapted from the Work in violation of 17 U.S.C. §§ 106(1)-(2), for the *Jersey Boys Cast Recording*.

225.    Defendants' foregoing unlawful activities were willful, and committed with the intent to commercially exploit the Work, in which they have no legal or proprietary rights.

226.    If Defendants' foregoing activities continue, Plaintiff will suffer irreparable harm of a continuing nature for which there is no plain, speedy or adequate remedy at law, and Defendants'

1   acts of copyright infringement will continue unless they are enjoined from further committing such

2   wrongful acts.

3        227.    By reason of the foregoing willful infringements of copyright, Plaintiff has sustained

4   injury, loss, and damage to her ownership rights, and Defendants have unlawfully, unfairly and

5   wrongfully derived, and will continue to derive, income from these infringing acts, and are being

6   unjustly enriched by these infringements.

7        228.    Plaintiff has been damaged by said Defendants' acts in an amount not yet ascertained

8   but to be proven at trial.

9        229.    Defendants' aforesaid infringing acts have been performed with knowledge of

10  Plaintiff's copyrights and were performed intentionally and willfully.

11       230.    Plaintiff is entitled to injunctive relief against Defendants Valli, Gaudio, Brickman,

12  Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey

13  Boys Records, for their acts of infringement, as provided in 17 U.S.C. § 502; namely to preliminary

14  and permanent injunctions preventing Defendants, their officers, partners, agents, servants,

15  employees, and attorneys, and all those acting in concert or participation therewith, from directly or

16  indirectly copying and distributing the Work; preparing derivative works based upon or adapted from

17  the Work; performing the Work, in whole or in part, performing derivative works based upon the

18  Work, and/or authorizing third parties to engage in such activities.

19       231.    Plaintiff is further entitled to recover from Defendants Valli, Gaudio, Brickman,

20  Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey

21  Boys Records, Plaintiff's actual damages and any additional profits of these infringers, under 17

22  U.S.C. § 504(b); to statutory damages in lieu of actual damages, under 17 U.S.C. § 504(c); to

23  enhanced damages for Defendants' willful infringements, under 17 U.S.C. § 504(d); and, to

24  Plaintiff's attorney fees and the costs of this action, under 17 U.S.C. § 505. Plaintiff also is entitled

25  to an Order allowing for the impoundment and destruction of any and all infringing articles, under

26  17 U.S.C. § 503.

27                              **COUNT XVI**

28                      **[Vicarious Copyright Infringement]**

(Against Defendants Valli, Gaudio, McAnuff, David, DSHT, Dodger Theatricals,

Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home)

232.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 231 hereinabove, as if fully set forth in this Paragraph 232.

233.    Defendants Valli, Gaudio, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home, each had the right and ability to control the acts of other infringers herein, and received direct financial benefit from the infringements, as shown, *inter alia*, in the documents included in *Exhibit 31* hereof.  Accordingly, said Defendants are liable to Plaintiff for vicarious copyright infringement.

234.    As a direct and proximate result of said Defendants' vicarious copyright infringement, Plaintiff has suffered, and will continue to suffer, monetary damage and irreparable harm.

235.    Plaintiff is entitled to injunctive relief against Defendants Valli, Gaudio, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home, for their vicarious copyright infringements as provided in 17 U.S.C. § 502, namely, to preliminary and permanent injunctions preventing said Defendants, their officers, agents, servants, employees, attorneys, and all those acting in concert or participation therewith, from directly or indirectly copying and distributing the Work; preparing derivative works based upon or adapted from the Work; performing the Work, in whole or in part; performing derivative works based upon the Work, and/or authorizing third parties to engage in such activities.

236.    Plaintiff is further entitled to recover from Defendants Valli, Gaudio, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home, Plaintiff's actual damages, plus any profits resulting from the infringements, under 17 U.S.C. § 504(b); statutory damages in lieu of actual damages, if Plaintiff so elects, under 17 U.S.C. § 504(c); and, to Plaintiff's attorneys' fees and the costs of this action under 17 U.S.C. § 505.  Finally, Plaintiff is entitled to an Order allowing for the impoundment and destruction of any and all infringing articles under 17 U.S.C. § 503.

## COUNT XVII

### [Contributory Copyright Infringement]

(Against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT,

Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records)

237.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 236 hereinabove, as if fully set forth in this Paragraph 237.

238.    Defendants Valli, Gaudio, Brickman, Elice, and McAnuff were aware, and/or should reasonably have been aware, that Defendant DeVito, whom they well know, was not the sole author of the Work, or the sole owner of the copyrights therein, and upon information and belief, said Defendants were also aware of Mr. Woodard's primary authorship of the Work.

239.    Defendant David, the dominant principal of Defendant Dodger Theatricals, which is the general partner of Defendants Jersey Boys Broadway and Jersey Boys Records, and an officer and director of DSHT, when the contracts for the La Jolla, California production of *Jersey Boys* were signed, was also aware that Defendant DeVito was not the sole author of the Work; was aware, or should reasonably have been aware, that Defendant DeVito was not the sole owner of the copyrights therein; and upon information and belief, was aware of Mr. Woodard's primary authorship of the Work.

240.    Notwithstanding the above-named Defendants' knowledge of the infringing activities complained of herein, each induced, caused, or materially contributed to the infringing conduct of others, and are therefore liable to Plaintiff as contributory copyright infringers. Defendants Valli and Gaudio, through their unlawful "authorizations," licenses, and/or assignments, contributed to the infringements of Defendants Brickman, Elice, McAnuff, DSHT, and Dodger Theatricals, and their sublicensees and/or transferees. Defendants Brickman and Elice, through their drafting of the infringing *Jersey Boys libretto* and intermediate copying from the Work for the drafts and/or treatments which secured a director and producers, materially contributed to, and/or induced, acts of infringement by Defendants Valli, Gaudio, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, JB Viva Vegas, and third parties, including the publishers of the *Jersey Boys Book*, and those involved with the *Jersey Boys Cast Recording*  Defendant McAnuff induced, caused, and/or materially contributed to the infringing acts of Defendants Brickman and Elice, and thereby the remaining Defendants, by encouraging their intermediate copying, and the

transformation of the original *libretto* for *Jersey Boys* into one that was adapted even more heavily from the Work.  Defendant David, the driving force behind Defendants Dodger Theatricals, DSHT (during periods relevant hereto), Jersey Boys Broadway, Jersey Boys Records, and JB Viva Vegas, caused, induced, and/or materially contributed to the acts of infringement by these Defendants, and others, by, *inter alia*, organizing these companies for the purpose of engaging in infringing activities.  And, Defendants DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records, caused, induced, and/or materially-contributed to the infringements of Defendants Brickman, Elice, McAnuff, and others, including third parties, by, *inter alia*, launching productions of *Jersey Boys* throughout the U.S., and abroad, and authorizing and distributing the infringing *Jersey Boys Cast Recording*.

241.    Defendants' foregoing activities were willful, and committed with the intent to commercially exploit the Work, in which they have no legal or proprietary rights.

242.    If Defendants' foregoing activities continue, Plaintiff will suffer irreparable harm of a continuing nature for which there is no plain, speedy or adequate remedy at law, and Defendants' acts of copyright infringement will continue unless they are enjoined from further committing such wrongful acts.

243.    By reason of the foregoing willful acts of contributory infringement, Plaintiff has sustained injury, loss, and damage to her ownership rights, and Defendants have unlawfully, unfairly and wrongfully derived, and will continue to derive, income from these infringing acts, and are being unjustly enriched thereby.

244.    Plaintiff has been damaged by said Defendants' acts in an amount not yet ascertained but to be proven at trial.

245.    Plaintiff is entitled to injunctive relief against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records, for their acts of contributory infringement, as provided in 17 U.S.C. § 502; namely to preliminary and permanent injunctions preventing said Defendants, their officers, agents, servants, employees, and attorneys, and all those acting in concert or participation therewith, from directly or indirectly copying and distributing the Work; preparing derivative works based upon or adapted from

the Work; performing the Work, in whole or part, or performing derivative works based upon the Work; and/or authorizing third parties to engage in such activities.

246.   Plaintiff is further entitled to recover from Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records, Plaintiff's actual damages and any profits resulting from the infringements, under 17 U.S.C. § 504(b); statutory damages in lieu of actual damages, under 17 U.S.C. § 504(c); enhanced damages for the willfulness of said Defendants' infringements, under 17 U.S.C. § 504(d); and, Plaintiff's attorneys' fees and the costs of this action, under 17 U.S.C. § 505.  Finally, Plaintiff is entitled to an Order allowing for the impoundment and destruction of any and all infringing articles, under 17 U.S.C. § 503.

## COUNT XVIII

### [Copyright Infringement under the Laws of the United Kingdom]

(Against Defendants Valli, Gaudio, Brickman, Elice, McAnuff,

DSHT, Dodger Theatricals, and Jersey Boys Broadway)

247.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 246 hereinabove, as if fully set forth in this Paragraph 247.

248.   This is an action for copyright infringement under s 16(2) of the U.K. *Copyright, Designs and Patents Act 1988*, as amended ("CDPA 1988"), arising from, *inter alia*, the authorization and/or execution by Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and/or Jersey Boys Broadway of infringing acts in the United Kingdom.

249.   Copyright infringement constitutes a transitory cause of action, and may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.

250.   The *Berne Convention for the Protection of Literary and Artistic Works*, to which the United States and the United Kingdom are signatories, provides that works authored by citizens of signatory states must be accorded at least the same copyright protection in other signatory states as such states accord works authored by their own citizens, and the United Kingdom accords such "national treatment" to U.S. authors, pursuant to, *inter alia*, Section 154(2) CDPA 1988, and Statutory Instrument 1989, No. 157, *The Copyright (International Conventions) (Amendment) Order*

*1989.* Thus, at the time the Work was completed, the copyrights therein were protected under U.K. law, without registration or any further formalities.

251.   The Work is a work of "joint authorship" under s 10 (1) CDPA 1988, in that, *inter alia*, it was produced by the collaboration of Mr. Woodard and Defendant DeVito; both Mr. Woodard and Defendant DeVito made integral contributions thereto, which could not be removed without fundamentally altering the whole; and, the parties worked together with a common design or aim, and shared responsibility for the form of expression contained therein.

252.   Whereas, the copyrights in a work vest initially with the author(s), under s 11(1) CDPA 1988, all copyrights in the Work vested initially with Mr. Woodard and Defendant DeVito, as joint authors, and they were co-owners thereof, each having an indivisible fifty (50%) percent interest therein.

253.   Whereas, copyright is transmissible by testamentary disposition or operation of law, under s 90(1) CDPA 1988, Plaintiff inherited Mr. Woodard's interest in the Work upon his death, and became co-owner of all copyrights therein with Defendant DeVito.

254.   Section 173(2) CDPA 1988 provides that the consent of all owners of a copyrighted work is required to license a work, or otherwise authorize any of the acts restricted to copyright owners therein.

255.   Pursuant to s 16(2) and s 173(2) CDPA 1988, copyright in a work is infringed by a person who, without the license of all copyright owners does, or authorizes another to do, directly, or indirectly, any of the acts restricted by the copyright, including, *inter alia*, copying the work; issuing copies to the public in the European Economic Area (EEA) for the first time; communicating the work to the public by electronic transmission; performing the work in public; renting or lending the work to the public; and, making an adaptation of the work, as set forth in s 16(1) CDPA 1988, and, pursuant to s 21(2) CDPA 1988, doing any of these acts in relation to an adaptation is also a restricted act.

256.   *Jersey Boys* is an adaptation of the Work, under s 21(3) CDPA 1988, as it is a conversion of the Work into a dramatic work.

257.   Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals,

and Jersey Boys Broadway have infringed Plaintiff's copyrights in the Work, under s 16(2) CDPA 1988, by entering into agreements among themselves and others, authorizing themselves and others to copy from and adapt the Work for *Jersey Boys;* copying and adapting the Work for *Jersey Boys*; staging and performing this adaptation worldwide, including in the United Kingdom, and arranging for and promoting performances in public theaters and/or other entertainment establishments therein; broadcasting excerpts from said adaptation by electronic transmissions therein; and, otherwise dealing with restricted rights in the Work therein, all in the absence of Plaintiff's consent.

258.   Plaintiff is entitled to a permanent injunction against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, for their acts of U.K. copyright infringement, under s 96(2) CDPA 1988.

259.   Plaintiff is also entitled to damages from Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, or an accounting of profits therefrom, for their acts of U.K. copyright infringement, under s 96(2) CDPA 1988, in amounts to be determined at trial, including additional (enhanced) damages, such as lost profits, other damages appropriate to the actual prejudice suffered by Plaintiff as a result of said Defendants' infringing acts, and damages for the moral prejudice caused to Plaintiff by their infringements, under s 97(2) CDPA 1988, and Regulation 3 of the Intellectual Property (Enforcement etc.) Regulations 2006 (SI 2006/1028), due, *inter alia*, to the flagrancy of their conduct in adapting, performing, and authorizing others to use, adapt, and perform adaptations of the Work in the U.K., and due to the direct benefits obtained by said Defendants thereby, in the form of ongoing profits, in the absence of Plaintiff's consent, and with knowing disregard for her co-ownership of the Work.

## COUNT XIX

### [Copyright Infringement under the Laws of Canada]

(Against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT,

Dodger Theatricals, and Jersey Boys Broadway)

260.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 259 hereinabove, as if fully set forth in this Paragraph 260.

261.   This is an action for copyright infringement under Section 27(1) of the Canadian

*Copyright Act* R.S.C. 1985, c. C-42 ("the Act"), arising from, *inter alia*, the authorization and/or execution. by Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals and/or Jersey Boys Broadway, of infringing acts in Canada.

262.    Copyright infringement constitutes a transitory cause of action, and may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.

263.    The *Berne Convention for the Protection of Literary and Artistic Works*, to which the United States and Canada are signatories, provides that works authored by citizens of signatory states must be accorded at least the same copyright protection in other signatory states as such states accord works authored by their own citizens, and Canada accords such "national treatment" to U.S. authors, pursuant to, *inter alia*, Section 5(1) of the Act.  Thus, at the time the Work was completed, the copyrights therein were protected under Canadian law, without registration or any further formalities.

264.    The Work is a work of "joint authorship" under Section 2 of the Act, in that, *inter alia*, it was produced by the collaboration of Mr. Woodard and Defendant DeVito; both Mr. Woodard and Defendant DeVito made substantial, original, and integral contributions thereto, which could not be removed without fundamentally altering the whole; and, the parties worked together with a common design or aim, and shared responsibility for the form of expression contained therein.

265.    Whereas, the copyrights in a work vest initially with the author(s), under Section 13 of the Act, all copyrights in the Work vested initially with Mr. Woodard and Defendant DeVito, as joint authors, and they were co-owners thereof, with each holding an indivisible fifty (50%) percent ownership interest therein.

266.    Whereas, copyright is transmissible by testamentary disposition,  pursuant to, *inter alia*, Section 14(1) of the Act, Plaintiff inherited Mr. Woodard's interest in the Work upon his death, and became co-owner of the copyrights therein, with Defendant DeVito.

267.    Pursuant to, *inter alia*, Sections 3(1) and 27(1) of the Act, the consent of all owners of a copyrighted work is required to license the work, or to exercise any of the rights of a copyright owner under Section 3(1) of the Act, and one copyright co-owner may sue any person, including his co-owner, and a purported licensee thereof, for acts done without his license, under Section 27(1)

of the Act.

268.   Pursuant to, *inter alia*, Sections 3(1)(a) -(I) and 27(1) and (5) of the Act, copyright in a work is infringed by a person who, without license from all copyright owners does, or authorizes another to: publish an unpublished work or any substantial part thereof; copy the work; convert the work into a dramatic work, by way of performance in public or otherwise;  reproduce, adapt and publicly present the work as a cinematographic work; communicate the work to the public by telecommunication; or, permit a theater or other place of entertainment to be used for the performance in public of a work.

269.   Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, have infringed Plaintiff's copyrights in the Work, under Section 27(1) of the Act, by, *inter alia*, entering into agreements among themselves and with others, authorizing themselves and/or others to copy from and adapt the Work for *Jersey Boys;* to stage and perform this derivative work worldwide, including in Canada; to arrange for and promote performances of this adaptation in theaters in Canada; to broadcast excerpts from this adaptation by electronic transmissions therein; and, to otherwise deal with rights in the Work reserved exclusively to copyright owners under Section 3(1) of the Act, all in the absence of Plaintiff's consent.

270.   Plaintiff is entitled to a permanent injunction against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, for their acts of copyright infringement under Canadian law, pursuant to Section 34(1) of the Act.

271.   Plaintiff is also entitled to damages from Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, for their acts of Canadian copyright infringement, in an amount to be determined at trial, under Sections 34(1) and 35 of the Act, together with such part of said Defendants' profits from such infringements as the Court considers just, which were not taken into account in calculating such damages.

## COUNT XX

### [Copyright Infringement under the Laws of Australia]

(Against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT,

Dodger Theatricals, and Jersey Boys Broadway)

272.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 271 hereinabove, as if fully set forth in this Paragraph 272.

273.   This is an action for copyright infringement under Sections 115(1), 36, and 39 of the Australian *Copyright Act 1968 (Cth)* ("the 1968 Act"), arising from, *inter alia*, the authorization and/or execution. by Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and/or Jersey Boys Broadway, of infringing acts in Australia.

274.   Copyright infringement constitutes a transitory cause of action, and may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.

275.   The *Berne Convention for the Protection of Literary and Artistic Works*, to which the United States and Australia are signatories, provides that works authored by citizens of signatory states must be accorded at least the same copyright protection in other signatory states as such states accord works authored by their own citizens, and Australia accords such "national treatment" to U.S. authors, pursuant to, *inter alia*, Section 184 of the 1968 Act, and Section 4, *Copyright (International Protection) Regulations 1969*.  Thus, at the time the Work was completed, the copyrights therein were protected under Australian law, without registration or any further formalities.

276.   The Work is a work of "joint authorship" under s 10(1) of the 1968 Act, in that, *inter alia*, it was produced by the collaboration of Mr. Woodard and Defendant DeVito; both Mr. Woodard and Defendant DeVito made substantial, original, and integral contributions thereto, and invested skill and labor therein; and, the contributions of each are merged with and inseparable from those of the other therein.

277.   Whereas, the copyrights in a work vest initially with the author(s), under Section 35(2) of the 1968 Act, all copyrights in the Work vested initially with Mr. Woodard and Defendant DeVito, as joint authors, and they were co-owners thereof, with each holding an indivisible fifty (50%) percent ownership interest therein, as a tenant-in-common.

278.   Whereas, copyright in an unpublished work is transmissible by testamentary disposition,  pursuant to s 198 of the 1968 Act, Plaintiff inherited Mr. Woodard's interest in the Work upon his death, and became co-owner of the copyrights therein, with Defendant DeVito.

279.   Pursuant to, *inter alia*, s 36 of the 1968 Act, the consent of all owners of a

-85-

copyrighted work is required to license the work, or to exercise any of the rights of a copyright owner under s 31(1) of the 1968 Act, and Plaintiff has not provided her consent to the use or exercise of any rights in the Work in Australia by Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, or Dodger Theatricals, or any purported lessee, licensee, sublicensee, or assignee thereof.

280.    Pursuant to s 36 , s 39, s 31, and/or s 101 of the 1968 Act, copyright in a work is infringed by a person who, without the license of all copyright owners does, or authorizes another to do, any of the acts comprised in the copyright, including, *inter alia*, reproducing the work in "material form" (which encompasses adaptations of the work, under Sections 10(1) and 21(2) of the 1968 Act); publishing the work; performing the work in public; communicating the work to the public; making an adaptation of the work; doing or authorizing any of the foregoing acts in relation to an adaptation of the work; and, in the case of indirect infringement, permitting a place of public entertainment to be used for the public performance of a work.

281.    *Jersey Boys* is an adaptation of the Work, under s 10(1) of the 1968 Act, as, *inter alia*, it is a dramatization of the Work.

282.    Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, have infringed Plaintiff's copyrights in the Work, directly, and indirectly, under Sections 36, 39, and/or 101 of the 1968 Act, by, *inter alia*, entering into agreements among themselves and with others, authorizing themselves and/or others to copy from and adapt the Work for *Jersey Boys*; to perform this adaptation worldwide, including in Australia; to arrange for and promote performances of this adaptation of the Work in places of public entertainment therein; to communicate excerpts from this adaptation by electronic transmissions therein; and, to otherwise deal with rights in the Work reserved exclusively to copyright owners under Section 31(1) of the 1968 Act, all in the absence of Plaintiff's consent, and, notwithstanding their awareness of Plaintiff's co-ownership of the copyright in the Work.

283.    Plaintiff is entitled to a permanent injunction against Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, for their acts of direct and indirect copyright infringement under Australian law, pursuant to, *inter alia*, Section 115(2) of the 1968 Act.

284.    Plaintiff is also entitled to damages from Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway, or an accounting of profits therefrom, for their acts of Australian copyright infringement, under s 115(2) of the 1968 Act, in amounts to be determined at trial, along with additional (exemplary or punitive) damages, under s 115(4) of the 1968 Act, due, *inter alia*, to the flagrancy of said Defendants' conduct in using, adapting, and performing adaptations of the Work in Australia, and in authorizing others to do so, in utter disregard for Plaintiff's co-ownership of the copyright therein; the direct benefits obtained by said Defendants thereby, in the form of ongoing profits; and, the need to deter similar future acts of copyright infringement thereby.

**WHEREFORE**, Plaintiff demands:

A.    That the Court enter a Declaratory Judgment in favor of Plaintiff, and against Defendant DeVito, decreeing as follows:

1.    That the Work is a "joint work" under 17 U.S.C. § 101;

2.    That Mr. Woodard was a co-author of the Work, and co-owner thereof, under 17 U.S.C. § 201(a);

3.    That Mr. Woodard was a qualified copyright claimant with respect to the Work, under 37 C.F.R. § 202.3(a)(3), when the Work was first fixed in a tangible medium of expression;

4.    That U.S. Reg. No. Txu 454 118 has been held in constructive trust by Defendant DeVito, and must be supplemented, by Defendant DeVito or the Copyright Office, to reflect Mr. Woodard's status as a co-author, co-owner, and copyright co-claimant;

5.    That Plaintiff is an "author's widow" with respect to the Work, under 17 U.S.C. § 101;

6.    That Plaintiff inherited Mr. Woodard's ownership interest in the Work upon his death under 17 U.S.C. § 201(d)(1), and is a co-owner thereof with Defendant DeVito, holding an indivisible fifty (50%) percent ownership interest therein;

7.    That Plaintiff is eligible and entitled to record, with the United States Copyright Office, her status as heir and successor to Mr. Woodard's interests in the Work, under 17

1   U.S.C. § 205;

2          8.      That Plaintiff may publish and otherwise exploit the Work, independently of
3   Defendant DeVito, and enjoy, exercise, and enforce all other rights, benefits, and causes of action
4   accorded to copyright owners with respect thereto;

5          9.      That the "exclusive license" granted by Defendant DeVito to Defendants Valli
6   and Gaudio, in or around August 1999, was *void ab initio*, with no legal effect; or, alternatively,

7          10.     That the "exclusive license" granted by Defendant DeVito to Defendants Valli
8   and Gaudio constituted an assignment of rights to said Defendants under 17 U.S.C. § 201(d)(2),
9   making them co-owners with Plaintiff thereof, holding collectively, a fifty (50%) percent interest
10  therein, but with no rights to further sublicense, assign, or otherwise transfer same, under 17 U.S.C.
11  § 201(d)(2);

12         B.      That the Court order Defendant DeVito to render an accounting to Plaintiff of the
13  amounts owed under the parties' December 1, 1988 letter agreement and by virtue of their status as
14  copyright co-owners;

15         C.      That Judgment be entered against Defendant DeVito for a sum to be determined in
16  the accounting, together with prejudgment and post-judgment interest, as provided by law;

17         D.      That Plaintiff be awarded direct damages, and foreseeable consequential damages,
18  in amounts to be determined through discovery, or at trial, resulting from Defendant DeVito's
19  breaches of contract, together with prejudgment and post-judgment interest, as provided by law;

20         E.      That Judgment be entered against Defendant DeVito for damages resulting from his
21  unjust enrichment, in an amount to be determined at trial, together with pre-judgment and post-
22  judgment interest, attorneys' fees, and the costs of this action;

23         F.      That a constructive trust be imposed on all of Defendant DeVito's income arising from
24  or relating to the Work, including, but not limited to, income arising from the licensing or assignment
25  of rights therein for *Jersey Boys*;

26         G.      That exemplary and/or punitive damages be assessed against Defendant DeVito,
27  pursuant to, *inter alia*, NEV. REV. STAT. § 42.001, in amounts to be determined at trial, for his breach
28  of the implied covenant of good faith and fair dealing in the performance of contractual obligations

in the presence of a special and confidential relationship, and his acts of fraud, fraudulent concealment, and fraudulent conversion;

H.   That the Court enter a Declaratory Judgment in favor of Plaintiff, and against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, decreeing as follows:

1.   That the "exclusive license" encompassing the Work which Defendant DeVito granted to Defendants Valli and Gaudio, on or about August 13, 1999, was void and invalid under 17 U.S.C. §§ 201(a) and (d)(2);

2.   That all subsequent non-exclusive licenses, exclusive licenses, assignments, leases, and/or transfers of said rights by Defendants Valli and Gaudio were void and invalid under 17 U.S.C. § 201(d)(2), including, but not limited to, the licenses and/or assignments granted by Defendants Valli and Gaudio to Defendants Brickman, Elice, McAnuff, DSHT, and/or Dodger Theatricals, and the subsequent assignment from Defendant Dodger Theatricals to Defendant Jersey Boys Broadway; and,

3.   That Defendants Valli, Gaudio, DSHT Dodger Theatricals, and Jersey Boys Broadway have no rights to use, reference, and/or adapt the Work; to reproduce the Work or distribute copies thereof; to prepare derivative works based upon the Work; to perform the Work or adaptations thereof; to authorize others to prepare derivative works based upon the Work; to license, sublicense, lease, or otherwise permit third parties to use, exercise, or exploit any of the copyrights in the Work; or to exercise, or authorize the exercise of, any right in the Work reserved to copyright owners under 17 U.S.C. §§ 106 and 201(d);

I.   That, in the alternative, the Court enter a Declaratory Judgment in favor of Plaintiff, and against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, decreeing as follows:

1.   That the "exclusive license" encompassing the Work which Defendant DeVito granted to Defendants Valli and Gaudio, on or about August 13, 1999, constituted an assignment of Defendant DeVito's share in the exclusive rights to prepare derivative works based upon the Work in the media of, *inter alia*, theater, film, and television, resulting in the indivisible co-ownership of

these rights by Plaintiff (50%) and Defendants Valli and Gaudio (50%), under 17 U.S.C. §§ 201(a) and (d)(2);

2.      That, notwithstanding this "assignment," Defendants Valli and Gaudio were and remain prohibited from further licensing, sublicensing, leasing, or transferring the rights thereby obtained, under 17 U.S.C. § 201(d)(2);

3.      That all subsequent non-exclusive licenses, exclusive licenses, assignments, leases, and/or transfers of said rights by Defendants Valli and Gaudio were and remain void and invalid under 17 U.S.C. § 201(d)(2), including, but not limited to, the licenses and/or assignments granted by Defendants Valli and Gaudio to Defendants Brickman, Elice, McAnuff, DSHT, and/or Dodger Theatricals, and the subsequent assignment by Defendant Dodger Theatricals to Defendant Jersey Boys Broadway; and,

4.      That Defendants DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, have no rights to use, reference, and/or adapt the Work; to reproduce the Work or distribute copies thereof; to prepare derivative works based upon the Work; to perform the Work or adaptations thereof; to authorize others to prepare derivative works based upon the Work; to license, sublicense, lease, or otherwise permit third parties to use, exercise, or exploit any of the copyrights in the Work; or to exercise, or authorize the exercise of, any right in the Work reserved to copyright owners under 17 U.S.C. §§ 106 and 201(d);

J.      That, in the alternative, the Court enter a Declaratory Judgment in favor of Plaintiff, and against Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, decreeing as follows:

1.      That the "exclusive license" encompassing the Work which Defendant DeVito granted to Defendants Valli and Gaudio, on or about August 13, 1999, effected an assignment of his entire share in the exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants Valli and Gaudio (50%), under 17 U.S.C. §§ 201(a) and (d)(2);

2.      That Defendants Valli's and Gaudio's May 1, 2004 transfer of the exclusive rights in the Work obtained from Defendant DeVito as aforesaid, to Defendants DSHT and/or Dodger

1  Theatricals, constituted an assignment of Valli's and Gaudio's entire share in the exclusive right to

2  prepare derivative works based upon the Work, in the fields of, *inter alia*, theater, film, and television,

3  resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and Defendants DSHT

4  and/or Dodger Theatricals (50%), under 17 U.S.C. §§ 201(a) and (d); and,

5          3.    That Defendant Dodger Theatricals' subsequent transfer of the exclusive rights

6  in the Work obtained from Defendants Valli, Gaudio, and/or DSHT, to Defendant Jersey Boys

7  Broadway was effective, and constituted an assignment of Dodger Theatricals' entire share in the

8  exclusive right to prepare derivative works based upon the Work, in the fields of, *inter alia*, theater,

9  film, and television, resulting in an indivisible co-ownership of these rights by Plaintiff (50%) and

10  Defendant Jersey Boys Broadway (50%), under 17 U.S.C. §§ 201(a) and (d);

11          K.    That the Court order Defendants Valli and Gaudio to render an accounting to Plaintiff

12  of all profits obtained from their use and exploitation of the Work, to the extent that Defendant

13  DeVito's August 13, 1999 "exclusive license" thereto is determined to constitute an assignment;

14          L.    That the Court order Defendants DSHT, Dodger Theatricals, and Jersey Boys

15  Broadway, to render accountings to Plaintiff of all profits obtained from their use and exploitation

16  of the Work, to the extent that Defendant DeVito's August 13, 1999 "exclusive license" to

17  Defendants Valli and Gaudio is determined to constitute an assignment of rights, which may be

18  further transferred or assigned;

19          M.    That Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger

20  Theatricals, Jersey Boys Broadway, JB Viva Vegas, Jersey Boys Records, Skunk, Getting Home,

21  their officers, agents, servants, affiliates, employees, attorneys and representatives, related companies,

22  and all those in privity or acting in concert therewith, be forthwith preliminarily and/or permanently

23  enjoined and restrained, from directly or indirectly infringing Plaintiff's copyrights in the Work in

24  any manner, including by copying, reproducing, and/or imitating the Work; distributing copies of the

25  Work; preparing and/or publishing derivative works based upon the Work; performing the Work, in

26  whole or in part; performing derivative works based upon the Work, and/or authorizing third parties

27  to engage in such activities; and, preliminarily and permanently enjoined from continuing the

28  ongoing, nationwide and foreign productions of the musical production, *Jersey Boys*, and the

distribution and sale of the *Jersey Boys Cast Recording* and *Jersey Boys Book*, until such time as all infringing material has been removed;

N.     That Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, Jersey Boys Records, Skunk, and Getting Home be required to account for all gains, profits and advantages derived from, or caused by, each of their direct infringements, willful infringements, vicarious infringements, and/or contributory infringements of Plaintiff's copyrights in the Work, and pay to Plaintiff such damages as Plaintiff has sustained in consequence of each infringement thereof, plus any additional profits resulting from the infringements, under 17 U.S.C. § 504(b), or such other damages as to this Court may appear proper within the provisions of the Copyright Law, including statutory damages in lieu of actual damages, if elected by Plaintiff under 17 U.S.C. § 504(c), and enhanced damages for Defendants' willful infringements, under 17 U.S.C. § 504(d);

O.     That Defendants Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey Boys Records be required to pay Plaintiff's attorneys' fees and the costs of this action under 17 U.S.C. § 505;

P.     That Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, Jersey Boys Records, Skunk, and Getting Home, be ordered to deliver up on oath, for impoundment and destruction, any and all infringing articles, under 17 U.S.C. § 503, including but not limited to scripts, manuscripts, drafts, books, records, compact discs, and other items which include material taken or adapted from the Work;

Q.     That the Court impose a constructive trust on all gains and profits realized by Defendants Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, Jersey Boys Records, Skunk, and Getting Home, as a direct or indirect result of their acts of infringement, including, but not limited to, gains and profits realized from performances of *Jersey Boys* throughout the United States and abroad; and,

R.     That the Court provide Plaintiff with such other and further relief as the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED:

DONNA CORBELLO, PLAINTIFF

February 16, 2011                    By :    /s/ Gregory H. Guillot
                                     Gregory H. Guillot
                                     John L. Krieger
                                     George L. Paul
                                     Robert H. McKirgan

                                     Her Attorneys

1

### CERTIFICATE OF SERVICE

2     I, Gregory H. Guillot, do hereby certify that a true and correct copy of the foregoing document was served, by CM/ECF on this 18th day of March, 2011, upon each of the following:

3

4     Daniel M. Mayeda
      LEOPOLD, PETRICH & SMITH, P.C.
      2049 Century Park East, Suite 3110
5     Los Angeles, California 90067-3274

6     David S. Korzenik
      MILLER KORZENIK SOMMERS LLP
7     488 Madison Avenue, Suite1120
      New York, New York 10022-5702

8
      Samuel S. Lionel
9     Todd Kennedy
      LIONEL, SAWYER & COLLINS
10    300 So. 4t Street # 1700
      Las Vegas, Nevada 89101

11
      Attorneys for Defendants, Frankie Valli, Robert J. Gaudio,
12    Marshall Brickman, Eric S. Elice, Des McAnuff,
      DSHT, Inc., and Dodger Theatricals, Ltd.

13
      L. Bradley Hancock
14    Christopher B. Payne
      Greenberg Traurig, LLP
15    1000 Louisiana, Suite 1800
      Houston, TX 77002

16
      Booker T. Evans, Jr.
17    Greenberg Traurig LLP
      2375 East Camelback Road, Suite 700
18    Phoenix, AZ 85016

19    Alma Chao
      Greenberg Traurig, LLP
20    3773 Howard Hughes Parkway
      Suite 500 North
21    Las Vegas, NY 89169

22    Attorneys for Defendant,
      Thomas Gaetano DeVito

23
                                        /s/ Gregory H. Guillot
24      _____
                                         Gregory H. Guillot

25

26

27

28
                                    -94-