**EXHIBIT 31**

**[FOUNDATIONAL AGREEMENTS FOR *JERSEY BOYS*]**



Dodgers Theatricals, Ltd..

New York, New York  10036
Attn: Mr. Michael David

Robert Gaudio
c/o Peter C. Bennett, Esq.

Beverly Hills, CA 90210

Frankie Valli
c/o Peter C. Bennett, Esq.

Beverly Hills, CA 90210

Marshall Brickman
c/o International Creative Management

New York, NY 10019
Attn: Sam Cohn

Rick Elice
c/o International Creative Management

New York, NY 10019
Attn: Sam Cohn

Dated as of May 1, 2004

Re: "Jersey Boys"/The Four Seasons Musical

Dear Bob and Frankie, Marshall and Rick:

    This letter, when signed by Robert Gaudio and Frankie Valli ("**Owner**"), and  Marshall Brickman and Rick Elice (jointly, "**Bookwriter**") on the one hand, and Dodger Stage Holding Theatricals, Inc. ( "**Producer**"), on the other hand, will set forth the basic terms and conditions of the agreement between Owner and Bookwriter (sometimes collectively referred to as "**Author**") and Producer regarding the right to develop  and produce  a live stage dramatico-musical play (the "**Play**") based on the name and history of the singing group "The Four Seasons" (the "**Group**") and the life stories of the members of the Group (subject to the last sentence of this paragraph) and featuring the Compositions.  The "**Compositions**" are hereby defined as certain compositions written by the Group, mutually agreed by the parties hereto to be used in the Play, and actually used in the Play.  For the avoidance of doubt, the Compositions do not include songs that are written by persons other than Bob Gaudio or Bob Crewe, or songs the publishing of which is controlled by third parties (hereafter referred to as "**Non-Owned Compositions**").  Owner acknowledges that Producer shall have the right to use all of the Compositions listed in *Schedule A*, attached, although their specific use in the Play shall be

227867/10/JPB/8082/0000/05/19/05

Corbello v. DeVito, et al.
Exhibit 31 -- 00002

subject to Owner's approval. The rights in and to the name "The Four Seasons," in and to the life stories of the members of the Group and in and to the story of the Group are hereinafter referred to as the **"Underlying Rights."** The rights in and to the Compositions are hereinafter referred to as the **"Composition Rights."** All rights in the Compositions and the book of the Play not specifically granted herein are hereby reserved by Owner and Bookwriter as their interests may appear. Producer shall be solely responsible for securing (and paying for) any Non-Owned Compositions it elects to use in the Play (subject to Owner's approval rights with respect to the selection of Non-Owned Compositions as set forth herein). For the avoidance of doubt, Frankie Valli and Bob Gaudio are granting rights to their life stories only through the year 1980 (with a single exception made for the final scene at the Rock and Roll Hall of Fame).

1. **Option.**

(a) Producer agrees to pay Owner on execution of this Agreement the sums of (i) Fifteen Thousand Dollars ($15,000) for the Underlying Rights and (ii) Six Thousand Dollars ($6,000) for the Composition Rights, which payments shall be deemed a non-refundable advance against any and all advances and/or royalties payable to Owner in connection with the Play. Equivalent amounts (i.e., Twenty One Thousand Dollars ($21,000) in the aggregate) shall be payable on the first anniversary of the execution of this Agreement, but in no event later than May 1, 2005.

Upon payment of the aforementioned sums, Owner shall grant Producer an initial exclusive option for a period of two (2) years commencing upon delivery of the Completed Play (as defined in Section 2.03 of the Approved Production Contract for Musical Plays of the Dramatists Guild, Inc. (the "APC"), but in no event to commence later than one (1) year following the date hereof, (unless the delivery of a Completed Play is delayed by Owner), to produce and present the Play. The initial option period may be extended for one (1) additional year upon payment of additional advances of Fifteen Thousand Dollars ($15,000) for the Underlying Rights and Six Thousand Dollars ($6,000) for the Composition Rights, which payments must be made not later than on the expiration of the initial option period. The parties acknowledge and agree that as of May 1, 2004, the Producer has been furnished with a Completed Play.

(b) Producer agrees to pay to Bookwriter within seven days after the execution of this Agreement the sum of Twenty Four Thousand Dollars ($24,000), which shall be deemed a non-refundable advance against any and all advances and/or royalties payable to Bookwriter in connection with the Play.

(c) Producer shall have the right to arrange for readings, staged readings, developmental productions, workshops and/or limited runs in regional or not-for-profit theaters of the Play during the option period, as it may be extended, subject to reasonable and customary compensation to Owner.

(d) Producer shall exercise the option by presenting one (1) first-class paid public performance of the Play prior to the end of the option period on Broadway or the West End (the **"Commercial Production"**), as it may be extended. Upon the official press opening of the Play in a Broadway or West End theater, Producer shall acquire all commercial production rights in and to the Play, including, but not limited to, first-class, second-class, touring, sit-down and so-

227867/10/JPB/8082/0000/05/19/05
Doc#: NY5: 95399_9

2

Z.

Corbello v. DeVito, et al.
Exhibit 31 -- 00003

called bus-and-truck production rights, in the United States, its territories and possessions, including Puerto Rico, and Canada (the "**Territory**"). In addition, if Producer opens a first-class production on Broadway or the West End and Producer is not simultaneously presenting any other performances of the Play in New York City, Producer shall acquire the sole and exclusive rights to produce one or more Off-Broadway Performances (as defined in Section 9.02(a) of the APC) of the Play during the time that Producer continues to have rights to present the Play hereunder.

2.     **Advances.** Producer agrees to pay Owner advance payments equal to two-thirds (2/3) of the Advance Payments set forth in Article III of the APC for the Composition Rights, plus one-third (1/3) of said Advance Payments for the Underlying Rights, and to pay Bookwriter advance payments equal to one-third (1/3) of said Advance Payments.

3.     **Royalty payments.** For each company produced by Producer, Producer agrees to pay Owner a royalty of one and one-half percent (1.5%) of the gross weekly box office receipts ("**GWBOR**") for the Underlying Rights (the "**Underlying Rights Royalty**") and a royalty of three percent (3%) of GWBOR for the Composition Rights (the "**Music Royalty**"), increasing, upon 125% recoupment of the production expenses ("**Recoupment**"), to an Underlying Rights Royalty equal to two percent (2%) of GWBOR and a Music Royalty equal to four percent (4%) of GWBOR. For each company produced by Producer, Producer agrees to pay Bookwriter a royalty of one and one-half percent (1.5%) of GWBOR for the Book (the "**Bookwriter Royalty**") increasing, upon 125% Recoupment, to two percent (2%) of GWBOR Notwithstanding the foregoing, in no event shall the Underlying Rights Royalty be less than the royalty paid to the Bookwriter, , and in no event shall the Music Royalty be less than twice the Bookwriter Royalty. Producer further agrees that if Owner agrees to assign a share (the "**Assigned Share**") of the Underlying Rights Royalty to any of the Third Parties (as defined in Paragraph 4 hereof) to acquire the rights in their life stories for the Play pursuant to Paragraph 4 hereof, Producer shall pay Owner an additional royalty (the "**Additional Royalty**") equal to the Assigned Share, but in no event shall the Additional Royalty, regardless of the amount of the Assigned Share, exceed one-half of one percent (0.5%). Owner represents that it has agreed to pay to the Third Parties a royalty of one-half percent (0.5%). As used herein, the "**Aggregate Authors**" share of proceeds from the Play shall refer to the proceeds payable to Bookwriter on account of the Book and to Owner on account of the Composition and Underlying Rights and the Additional Royalty.

It is understood that Producer shall have the option to pay Owner on the basis of a so-called "royalty pool," calculated on the basis of a four (4) week royalty cycle and pro rata with the other royalty participants based on the royalty participants' post-125%-Recoupment share of GWBOR (it being understood that the 0.5% Additional Royalty will not increase on Recoupment or any time thereafter). The terms of the royalty pool are attached hereto as *Exhibit A*. The foregoing notwithstanding, under no circumstances shall Owner's royalty be diluted or reduced by virtue of Producer's election to include Non-Owned Compositions in the Play. Owner agrees to use all reasonable efforts to assist Producer in acquiring any in connection with the Non-Owned Compositions the Author deems advisable for its production of the Play.

4.     **Other Participants.** Owner represents that it owns and controls the rights in and to the name "The Four Seasons," the individual life stories of Frankie Valli and Robert Gaudio, and the story of the Group itself, except for the rights in and to the life stories of Nick Macioci and Tom

Corbello v. DeVito, et al.
Exhibit 31 -- 00004

DeVito (the "**Third Parties**"). Owner agrees that it shall enter into separate agreements with the Third Parties, in substantially the form attached hereto as **Exhibit A**, pursuant to which Owner shall acquire all necessary rights (the "**Third Party Rights**") from the Third Parties to allow Producer to exercise all of the rights in and to the Play granted herein, including, but not limited to, all live stage production rights and all Subsidiary Rights granted to Producer herein, and Owner agrees to assign to Producer, for no additional consideration, the Third Party Rights. Owner agrees to defend, indemnify and hold harmless Producer, its directors, officers, employees, agents, licensees, successors and assigns against any and all losses, costs, expenses (including reasonable attorneys' fees and disbursements), damages or recoveries arising out of any claims or causes of action brought by any of the Third Parties against Producer in connection with the Play arising from Owner's failure to secure rights from the Third Parties. Owner, the Bookwriter and the Third Parties shall hereinafter be referred to collectively as Author.

Owner represents that Bob Crewe ("Crewe"), one of the writers of the Compositions, has no rights in the Play Compositions that would affect the rights granted to Producer hereunder, and that Owner has secured all such necessary Composition rights from Crewe. Owner agrees to defend, indemnify and hold harmless Producer, its directors, officers, employees, agents, licensees, successors and assigns against any and all losses, costs, expenses (including reasonable attorneys' fees and disbursements), damages or recoveries arising out of any claims or causes of action brought by Bob Crewe against Producer in connection with the Play arising from Owner's failure to secure Composition rights from Bob Crewe. The foregoing notwithstanding, it is acknowledged and agreed that Crewe is not a member of the Group and that Owner has not acquired, nor shall Owner be required to acquire, so-called life-story rights from him. If Producer elects to use Crewe's name and life story in the Play (without fictionalizing such elements), Producer shall be required to obtain such rights directly from Crewe. Owner agrees to use reasonable efforts to assist Producer in acquiring any rights from Crewe the Producer deems advisable for its production of the Play.

5.    [Intentionally deleted]

6.    **Merger/Holdback.** If the Play runs for six months or more in a Broadway or West End theater, or for three hundred twenty (320) consecutive performances in a continuous run (subject to reasonable and customary lay-offs between cities), including performances on a first-class tour preceding or following a Broadway or West End production, there will be an exclusive merger of all live stage musical rights in the life stories of Valli, Gaudio, Macioci and DeVito, solely as they relate to their involvement with the Group, with the Play.

If the Play runs for three (3) months or more in a Broadway or West End theater in a continuous run, there will be a non-exclusive merger of all life live stage musical rights in the life stories of Valli, Gaudio, Macioci and DeVito with the Play, and Owner agrees not to grant to any third party the live stage musical rights in the life stories of the members of the Group for one (1) year following the expiration of Producer's production rights in the Play in the Territory.

Owner agrees that for so long as Producer retains production rights in the Play, it shall not license the rights in more than four (4) of the Compositions at one time for use in another live stage dramatico-musical play. The foregoing shall in no way be read to limit the number of live stage dramatico-musical plays to which Owner may license the rights to four (4) or less of the Compositions. In addition, nothing herein shall be read to limit Owner's right to perform,

4

Corbello v. DeVito, et al.
Exhibit 31 -- 00005

any of the Compositions in a musical revue or as background or incidental music in a live stage dramatico-musical production, or to use the name of the Group, their names or the name of the Compositions in connection with a musical revue.

7.    **Additional Territories.** Upon the first first-class official press opening of the Play in a Broadway or West End theater, Producer shall acquire all rights in the Additional Territories (as defined in Section 9.03 of the APC) set forth in the APC and on such terms and conditions as set forth in the APC.
In addition,

(a)    and provided that Producer has Vested in the Territory, which for purposes of this Paragraph shall require an Official Press Opening on Broadway or in the West End, Owner, to the extent of its interest herein, hereby grants to Producer, and agrees to cause the Third Parties to grant Producer, the sole and exclusive option to produce the Play alone or in association with or under lease or license to other producer(s) in any language in performances which are the Supplemental Territory equivalents of First Class Performances in the Territory in one or more of the following ten (10) "**Supplemental Foreign Territories**":

(i)    Japan

(ii)    Far East (China, Hong Kong, Taiwan, Korea, Indonesia, Singapore, Cambodia, Vietnam, Malaysia, Thailand, and the Philippines)

(iii)    German Speaking Territory (Germany, Austria, Switzerland, Liechtenstein)

(iv)    Scandinavia (Finland, Sweden, Norway, Denmark)

(v)    Belgium/Netherlands/Luxembourg/France

(vi)    Spain/Portugal/Italy/Andorra

(vii)    Israel

(viii)    South Africa

(ix)    Latin America (Mexico, Belize, Costa Rica, Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Panama, Argentina, Bolivia, Brazil, Chile, Colombia, Dominican Republic, Ecuador, French Guyana, Guyana, Paraguay, Peru, Uruguay, Venezuela)

(x)    Eastern Europe (Albania, Bulgaria, Czech Republic, Greece, Turkey, Hungary, Poland, Romania, Russia and the countries formerly contained in the U.S.S.R. and the former Yugoslavia and their successors).

(b)    The foregoing options shall be exercised if at all by Producer by payment by Producer to Owner and Bookwriter of the amount set forth in Paragraph 7(d) below with respect to each Supplemental Foreign Territory, which amount shall in each instance constitute a non-

5

Corbello v. DeVito, et al.
Exhibit 31 -- 00006

refundable advance against royalties payable to Owner and Bookwriter with respect to performances of the Play in such Supplemental Foreign Territory and shall be paid not later than on the following schedule:

> Thirty percent (30%) of such amount at the conclusion of six (6) months following the Official Press Opening of the Play in New York City or the West End of London, whichever is earlier (the "Opening");

> Thirty percent (30%) of such amount at the conclusion of nine (9) months following the Opening;

> Forty percent (40%) of such amount at the conclusion of twelve (12) months following the Opening.

Notwithstanding the foregoing schedule of payments, the entire amount shall be payable not later than the date of the first paid public performance of the first production in the Supplemental Foreign Territory to which the payments apply, or, if Producer or any affiliate, employee or agent of Producer has received (or received credit for) payments which would cover two hundred percent (200%) of the amounts owed to Owner and Bookwriter, promptly after receipt of such funds. Producer shall notify Owner and Bookwriter in writing concerning receipt of third-party advances promptly after receipt.

(c)     Payment of any advance shall not obligate Producer to make the remaining payments, it being understood however that Producer's rights in respect of any applicable Supplemental Foreign Territory shall automatically terminate on Producer's failure to pay any advance amounts for such Supplemental Foreign Territory as provided.

(d)     The advances are as follows:

|       |                                      |           |
|-------|--------------------------------------|-----------|
| (i)   | Japan                                | $150,000  |
| (ii)  | Far East                             | $50,000   |
| (iii) | German Speaking Territory            | $125,000  |
| (iv)  | Scandinavia                          | $25,000   |
| (v)   | Belgium/Netherlands/Luxembourg/France | $25,000   |
| (vi)  | Spain/Portugal/Italy/Andorra         | $10,000   |
| (vii) | Israel                               | $5,500    |
| (viii)| South Africa                         | $5,500    |
| (ix)  | Latin America                        | $15,000   |
| (x)   | Eastern Europe                       | $15,000   |

Payments to Owner and Bookwriter pursuant to this Paragraph 7 shall be allocated among them pro rata on the basis of their respective pre-125%-Recoupment share of GWBOR payable for the book, music and lyrics of the Play for the initial first-class production of the Play; provided that for purposes of calculating Owner's share, the Additional Royalty shall not be considered part of Owner's compensation.

(e)     Notwithstanding the foregoing, in the event that Producer receives (and/or any amount is credited to, or paid on behalf of, Producer or any affiliate of Producer, and/or any

Corbello v. DeVito, et al.
Exhibit 31 -- 00007

consideration is otherwise granted to or on behalf of Producer) from any Supplemental Foreign Territory an advance against its license fee in an amount greater than two hundred percent (200%) of the foregoing advance payable to Owner and Bookwriter with respect to that Supplemental Foreign Territory, Producer shall promptly following receipt pay to Owner and Bookwriter (or credit to Owner and Bookwriter, in the event and to the extent that such 50% is unavailable for payment) as an additional advance fifty percent (50%) of the excess over such two hundred percent (200%).

(f)      Unless Producer presents the first paid public performance of the Play in a Supplemental Foreign Territory within three (3) years of the official press opening of the Play on Broadway or in the West End, whichever is earlier, Producer's exclusive rights to present the Play in such Supplemental Foreign Territory shall automatically terminate, except that if Producer has presented at least three separate companies of the Play anywhere in the world within said 36-month period, Producer shall have the right to extend (for an added consecutive period of eighteen (18) months) its exclusive rights in any additional Supplemental Foreign Territories in which Producer has not yet presented the Play by paying to Owner and Bookwriter, prior to the expiration of said three-year period, as an additional non-returnable advance against royalties, an amount equal to twice (200%) of the advance set forth in Paragraph 7(d) for each such Supplemental Foreign Territory in which Producer desires to extend its rights.

(g)      If a production produced or co-produced by Producer in any Supplemental Foreign Territory hereunder has run at least twenty-one (21) paid public performances, subsequent productions within such Supplemental Foreign Territory (which are the Supplemental Foreign Territory equivalents of First or Second Class productions in the Territory) presented after the expiration of Producer's rights to present the Play in such Supplemental Foreign Territory shall be deemed to be Revival Performances pursuant to Section 11.01(g) of the APC, except that Producer's participation period shall be thirty (30) years instead of forty (40) years.

(h)      The royalty payable to Aggregate Author for performances of the Play in each Supplemental Foreign Territory shall be eight and one half percent (8.5%) of GWBOR if foreign royalties are owed to the Third Parties and eight percent (8% )if not, said royalty not shared with Producer or translator or any third party (except, of course, the Third Parties and any agent(s) of Owner and Bookwriter), except as Owner and Bookwriter may elect. Where Producer leases or licenses the Play but does not produce or co-produce the Play (i.e., Producer has no substantial voice in the management of the production or financial contribution to the production), the following shall apply:

1.      If that portion of the license fee to the Producer which is calculated as a percentage of GWBOR exceeds three percent (3%), then any excess over the eleven and one-half percent (11.5%) payable to Owner, Bookwriter and Producer in the aggregate (i.e., eight and one-half percent (8.5%) to Owner and Bookwriter, three percent (3%) to Producer) shall be shared between Owner, Bookwriter and the Producer in a 8.5:3 ratio with respect to the first 1.5% over eleven and one-half percent (11.5%), and equally thereafter (i.e., one-half to Owner and Bookwriter and one-half to Producer).

2.      Nothing shall preclude Producer from negotiating a percentage of profits for the Producer as part of a license fee, provided that any such profit

Corbello v. DeVito, et al.
Exhibit 31 -- 00008

participation in excess of ten percent (10%) of the profits shall be divided as follows: forty percent (40%) to Aggregate Author, sixty percent (60%) to the Producer. Producer shall furnish to Owner copies of agreements, accountings and statements relating to any such profit participation promptly following receipt by Producer.

(i)     Owner shall have approval over any licensee, assignee, or lessee in connection with any production which Producer does not produce or co-produce. For purposes of this Paragraph 7(i), a production produced or co-produced by Producer shall mean a production in which the Producer (or another entity in which either Producer or Stage Holdings or any of their principals or companies controlled by any of their principals is a principal) has a material interest involving material risk of loss on the production. If Owner has not granted its written approval with respect to any co-production, Producer shall provide Owner notice of Producer's investment and risk of loss in such co-production together with that documentation bearing thereon. In connection with Owner's approval rights pursuant to the first sentence of this Paragraph 7(i), Owner shall be deemed to have approved the following: Toho, TV Asahi, Densu; Howard Panter, Stoll Moss, Cameron Macintosh, Andre Psasynski, Kitchen-Cole, Paul Gregg; Stella, Rudy Klausnitzer; John Frost, Adelaide Performing Arts Center; Rob Brookman; RUG.

(j)     The advances paid with respect to each Supplemental Foreign Territory shall be recoupable from the first dollar of royalties otherwise paid to Owner and Bookwriter with respect to such Supplemental Foreign Territory.

(k)     The contract between Producer and the Supplemental Foreign Territory producer or manager shall require the Play to be produced in the manner and on all of the terms provided herein governing approvals, rights to attend final callbacks, rehearsals, previews and the official opening (provided that Producer shall not be required to provide more than two round-trip business-class tickets for each Author per production) and billing, with respect to productions in the Supplemental Foreign Territory. In addition, whenever any or all of the Authors are required by Producer to travel (or elect to travel pursuant to the foregoing sentence) in a Supplemental Foreign Territory in connection with a production of the Play produced hereunder, they shall be entitled, for not more than fourteen (14) days for any such Supplemental Foreign Territory (seven [7] days in the event the director of the initial first class production of the Play is also the director of the Play in the applicable Supplemental Foreign Territory), to first-class hotel accommodations and a per diem equal to Seventy-Five Dollars ($75). Each Author shall receive full and complete copies of all contracts relating to productions in the Supplemental Foreign Territory promptly following execution thereof. If a contract has not been executed prior to the first rehearsal, Producer shall furnish each Author with the most recent draft.

(l)     Owner and the Bookwriter shall have approval of all translators and translations, and as well as meaningful consultation in connection with the content of all agreements with translators. Owner and the Bookwriter, as their interests may appear, shall own the copyright in all translations of the book of the Play. The owner(s) of the lyrics of the Compositions shall own the copyright in all translations of the lyrics owned by them as their sole property without obligation to any translator, except for obligations to make payments to translators consistent with industry standards if Owner and Bookwriter wish to use the translations.

Corbello v. DeVito, et al.
Exhibit 31 -- 00009

Notwithstanding the foregoing, in connection with the exploitation of the rights in the Additional Territories or the Supplemental Foreign Territories, Owner shall receive, in addition to its compensation as authors of the Play, additional compensation equal to one third (1/3) of the advance (but not the royalty) payable to Owner and Bookwriter as authors in consideration of the Underlying Rights.

**8.    Subsidiary rights.** Upon merger, Owner shall share pro rata, on the basis of its pre-Recoupment share of GWBOR (including the Underlying Rights Royalty but excluding the Additional Royalty) any and all proceeds (the "Subsidiary Rights Proceeds") derived from the disposition or other exploitation of those rights in the Play set forth in Articles IX and XI of the APC, including, without limitation, "Subsidiary Rights" (as defined in Section 11.01 of the APC), performances in the Additional Territories (as defined in Section 9.03 of the APC), foreign participation (as set forth in Section 11.03(a) of the APC) and audio-visual sequels (as set forth in Section 11.03(f) of the APC), and any and all exploitations of the Play in all media in perpetuity throughout the world.

(a)    Author (Owner and Bookwriter) shall own and control the Play with respect to all rights subject to the rights expressly granted to Producer in this Agreement.  Provided Producer presents the Play on Broadway, including an official opening performance and at least ten (10) performances thereafter, the Producer shall receive from the Author the percentage of the net proceeds, (regardless of when paid, and less agency commissions) to the Aggregate Author specified hereinbelow from any disposition made before the time periods specified hereinbelow after the final performance of the Producer's last production of the Play hereunder in the U.S. and Canada of any of the following rights in the Play:  worldwide audio-visual rights in the Play (i.e., motion picture, television, video cassette, video disk, CD-ROM, DVD, CDI and other "interactive" media, and all other kinds of visual and audio-visual productions in connection with the Play, whether now existing or developed in the future, and regardless of the method or mode of reproduction, projection, transmission, exhibition or delivery used, and including any soundtrack records and all other rights which may be included as allied rights in any transactions of the Author relating directly or indirectly to disposition of audio-visual rights); audio and audio-visual recordings of the Play of any nature; all stage performances of the Play of any nature (except those produced by or under license from the Producer), including, foreign language performances, condensed and tabloid versions, so-called concert tour versions of the Play; operetta or grand opera performances; stock, amateur and regional theatre performances; commercial use products/merchandise rights directly tied to the Play (except those exploited by or under license from the Producer); and radio rights.  Net proceeds shall mean gross proceeds less Representative's commission, if any, not exceeding ten (10%) percent, except twenty (20%) percent with respect to amateur rights.  For the avoidance of doubt, Subsidiary Rights include only exploitations of rights derived from the Play (i.e., inclusive of the book and structure of the Play) and do not include other projects based on the life story of the Group or featuring the music of the Group.  The foregoing notwithstanding, the following shall prevail:

(b)    In any Supplemental Foreign Territory where Producer has not produced the Play and vested for subsidiary rights participation pursuant to the next sentence, the time period applicable to dispositions of foreign stage production rights shall be seven years instead of ten years participation shall be limited to 25% of Author's net proceeds.  In connection with Supplemental Foreign Territory where Producer has produced the Play for not less than 21 paid public performances including an official opening and no more than eight previews, Producer's

*9*

Corbello v. DeVito, et al.
Exhibit 31 -- 00010

participation in foreign stage rights in the Supplemental Foreign Territory shall be for the period (following the last performance in such Supplemental Foreign Territory) and at the percentage level that would have governed in the Territory, for the same level of vesting.

(c)    The time period applicable to dispositions of subsidiary rights other than foreign stage rights shall be eighteen (18) years with reducing participation as follows:  years 1-10, 40%; years 11-12, 35%; years 13-14, 30%; years 15-16, 25%; years 17-18, 20%; and thereafter, no further participation.

(d)    At Producer's request Author shall furnish to Producer copies of all contracts relating to any of the foregoing rights in which Producer is entitled to share.  Monies to which Producer is entitled hereunder shall be sent by Author to Producer immediately following receipt and collection by Author.  All payments to Producer shall be accompanied by copies of all statements furnished to Author.  Author agrees to keep and maintain true and accurate books and records of account in connection with the licensing, disposition, or other exploitation of rights in the Play and to retain all such records for a period of not less than two (2) years from the date Producer receives payment and related statements.  Producer or its designee shall have the right at any time during regular business hours upon thirty (30) days prior notice to examine, inspect and audit such books and records and other material pertaining to the exploitation of the Play by the Author and the payments to the Producer hereunder, and to make copies and extracts thereof at Producer's expense.

(e)    If any person constituting Aggregate Author renders services with respect to any audio-visual production based on the Play, Producer's right to share shall not apply to such person's compensation for such services, provided that such compensation is not unreasonable in relation to the amount paid for the rights to the Play in which Producer is entitled to share, and in relation to the fair market value for such services, taking into account said person's stature in the motion picture or television industry, as appropriate, and provided further that the such compensation shall not be designed to avoid paying Producer's share set forth above.  In connection with any audio-visual production based on the Play, no additional synchronization rights payments shall be owing in connection with the use of any of the Compositions.

(f)    Notwithstanding anything contained herein, neither Producer, Bookwriter nor any third party shall be entitled to receive any percentage or share of any moneys or proceeds derived by any of the parties constituting Owner or any other person from the publication, mechanical reproduction, synchronization and small-performing rights of the separate music and lyrics contained in the Play, or any rights in or to such separate music and lyrics as are customarily granted to music publishers or from any use of whatsoever kind and nature of the separate musical compositions in the Play for motion picture (except as set forth in Paragraph 10 hereof), radio and television purposes or otherwise (except when used as part of a performance or reproduction, in whole or in part, of the Play), all of which the parties constituting Owner, as their interests may appear, shall be entitled to receive and retain, without accounting for or paying any share thereof to Producer, Bookwriter or any third party and the copyrights and all renewals and extensions thereof shall be in the name of and solely for the benefit of the parties constituting Owner.  Reference to separate numbers, separate music and lyrics, separate musical compositions or separate synchronization of music and lyrics shall be deemed to refer to the use of the music and lyrics contained in the Play, apart from any other portion of the Play (such as, but not limited to, the book, staging, sets and costumes).

227867/10/JPB/8082/0000/05/19/05
Doc#: NYS: 95399_9

10

*JO*

Corbello v. DeVito, et al.
Exhibit 31 -- 00011

(g)     Notwithstanding anything contained herein, in the event and to the extent that Author has not received the return of 125% of the Deferred Amounts (as defined in Exhibit A attached hereto) from net profits as provided in Exhibit A, then any unreturned Deferred Amounts shall be deductible from 25% of the Subsidiary Rights income owed to Producer hereunder, after the Financing Entity of the production company entitled to receive Subsidiary Rights proceeds (the "Mother Company") has recouped 110% of its production costs.

(h)     The parties agree in advance that amounts equal to seven and one-half percent (7.5%) of 100% of Subsidiary Rights proceeds payable to Aggregate Author, or such other share as the parties may hereafter agree to, may be payable to Des McAnuff (the "McAnuff Share"), provided he is the director of the Play as of its opening on Broadway. The McAnuff Share shall be deducted "off the top" prior to the division of proceeds between Aggregate Author and Producer. Any further payment obligations to Mr. McAnuff other than those set forth in the preceding sentence must be mutually approved by the parties.

9.     **Merchandising.**  Owner hereby grants to Producer the exclusive rights to create, manufacture and sell Commercial Use Products (as defined in Section 11.01(c) of the APC) based on the Play upon the terms set forth in Section 11.05 of the APC. Owner and Bookwriter will collectively receive a share of proceeds derived therefrom in accordance with Section 11.05 of the APC, except that credit card commissions shall be deductible as well as taxes in determining gross retail sales. Owner shall have the right to approve the type of Commercial Use Products created, manufactured and sold hereunder, provided that the following are pre-approved: caps, tee-shirts, sweatshirts, jackets, bathrobes, mugs, key rings, buttons, posters, matches, jewelry, bags backpacks, wallets, pens, pencils, ceramic tiles, towels, souvenir books, coasters and magnets.

Nothing hereinabove shall be deemed to give Producer the right to use the photographs or likenesses of Owner or other members of the Group in connection with Commercial Use Products without that party's prior approval. However, Producer shall have the right to use the name "The Four Seasons" in connection with Commercial Use Products, provided that Producer agrees to include the trademark registration notice ("®") as reasonably instructed by Owner. The foregoing notwithstanding, Owner reserves the right to sell in the venue Four Seasons merchandise not specifically tied to the Play ("Seasons Merch"), subject only to (i) Owner reaching an agreement on terms with the venue and a suitable accounting mechanism being devised and (ii) the parties determining, in good faith, that the sale of merchandise will not unreasonably dilute or undermine Producer's ability to sell show-related merchandise. Without limiting the foregoing, Producer may reasonably withhold its consent for sale of particular items of Seasons Merch containing three (3) or more of the same songs that appear on the cast album for the Play.

10.     **Motion picture and allied rights.**

(a)     Provided that Producer vests in the Territory, Producer will have a right of first negotiation for a period of sixty (60) days whenever Owner wishes to dispose of the motion picture, television or allied rights (the "Film Rights") in the story of the Group. If Producer and Owner fail to enter into an agreement within the negotiating period, Owner will have the right to negotiate with third parties, provided that if Owner wishes to enter into an agreement with any

Corbello v. DeVito, et al.
Exhibit 31 -- 00012

such third party on the same terms or on terms less favorable to it than the Producer's last best offer in writing, Owner will offer the Film Rights to Producer on the same terms as Owner was prepared to accept from said third party.  If Owner enters into an agreement with a third party, Producer will have no further right of first negotiation with respect to subsequent motion pictures.

(b)     Upon Vesting by Producer, if Owner disposes of the Film Rights for a motion picture based on the story of the Group (the "Film"), and if the Film either (i) has the same or substantially the same title as the Play or (ii) includes no less than one-third (33-1/3%) of the songs in the Play, then Producer will participate in Owner's proceeds from the Film as per the APC.

(c)     If Owner enters into an agreement to dispose of the Film Rights in the Play within three (3) years from the close of the production of the Play on Broadway or the West End, whichever is later, but neither of the other two conditions set forth in subsection (b) hereof are met, Producer will receive the following share of Owner's proceeds from the disposition of the rights in the story of the Group:

(i)     If Producer shall have Vested but the Play closes on Broadway after playing fewer than six (6) months of performances, five percent (5%);

(ii)    If the Play runs for six (6) months or more on Broadway but closes after fewer than twelve (12) months of performances, ten percent (10%); and

(iii)   If the Play runs for twelve (12) months or more on Broadway, fifteen percent (15%).

11.    **Cast album.**  Producer has the right to negotiate the dispositions of the rights in the Cast Album (as defined in Section 8.17 of the APC), subject to Owner's approval of the record company and the terms of the agreement with the record company, such approval not to be unreasonably withheld.  Robert Gaudio shall have the right to produce the Cast Album, on such terms and conditions as are customary for the producer of a cast album of Mr. Gaudio's stature. Owner agrees to approve reduced mechanical royalties typical for cast albums.  Producer may negotiate with record producer for a fund for "non-traditional advertising" which may be recouped as if it were an advance, subject to Author's approval, not to be unreasonably withheld.

12.    **Credit.**

(a)     The billing of Owner and Bookwriter shall be substantially as follows:

Corbello v. DeVito, et al.
Exhibit 31 -- 00013

[Producer]
presents
**JERSEY BOYS**

Book by                                    Music and Lyrics by
Marshall Brickman and Rick Elice          Bob Gaudio & Bob Crewe

Based on the Life Story of
Frankie Valli and The Four Seasons

The size of the billing given to Owner and Bookwriter shall not in any event be less than 50% of the type size used for the title of the Play (other than artwork titles) or stars billed above the title, whichever is larger. Owner and Bookwriter shall receive billing in all programs, advertising and publicity issued by or under the control of Producer, except for so-called "ABC" ads (except Sunday "ABC" ads), congratulatory ads and announcements of an award to anyone other than Owner or Bookwriter, and ads of a quarter page or less in which only the title of the Play, stars billed above the title, the name of the theater, "critics' quotes" and/or ticket price scales appear.

(b)     No billing shall appear in a type larger or more prominent than the billing to Owner and Bookwriter except for the title of the Play and stars billed above the title. In addition, only stars, the director, the choreographer, and Producer may receive billing as large and as prominent as Owner and Bookwriter. In advertisements using billing boxes, size and prominence of billing shall be measured by reference to the title of the Play in the billing box. In addition, Producer shall have the right to utilize so-called "movie billing" (or "run-on" billing) in lieu of a billing box.

(c)     Each of the parties constituting Owner and Bookwriter shall be afforded a biography in the "Who's Who" section of the program for the Play, the content of which shall be subject to their prior approval and the length of which shall be subject to reasonable space limitations.

(d)     Owner will have the right to require that a "Discography" of all chart records performed by Frankie Valli and/or The Four Seasons be included in all programs for the Play. In addition, in connection with souvenir programs, Owner will also have the right to require that additional information be included, with the specific content of such information is to be determined and to be subject to Producer's reasonable approval. Producer approves a photograph of the Four Seasons display at the Rock and Roll Hall of Fame and a "Did You Know" page in the program containing information Owner reasonably believes necessary to answer some questions not addressed in the Play concerning the life story of Frankie Valli and the Four Seasons and certain individuals involved, directly or indirectly, in their careers.

(e)     No casual or inadvertent failure to comply with the provisions of this Paragraph 12 shall be deemed a breach of this Agreement, unless such failure can, but shall not, be rectified promptly upon notice by Owner or Bookwriter.

13.     **Approvals.** Owner shall have the right to approve the Bookwriter, the book of the Play, in connection with any developmental production (and Owner acknowledges that it has approved

*13*

Corbello v. DeVito, et al.
Exhibit 31 -- 00014

the book used in the La Jolla Production for the purposes of the La Jolla Production (and thereafter, in connection with the initial commercial production), and the director, choreographer, designers, principal cast members, orchestrator, arranger and musical director of the Play, and any replacements of the foregoing, as well as the selection of Compositions and Non-Owned Compositions. Marshall Brickman and Rick Elice are hereby pre-approved as the Bookwriter, and Des McAnuff is approved as director. Author's approvals shall be exercised by majority vote, with each of the parties constituting Owner having one vote and the Bookwriter having one vote (regardless of whether one or more parties constitute the Bookwriter). Notwithstanding the foregoing, no changes in the book of the Play shall be made without Bookwriter's approval (provided it is understood that the book in any event must be approved by the Owner, on whose lives the book is based).

14. ~~Dramatists Guild approval not required. Notwithstanding the references to, or incorporation of, certain specific provisions of the APC, neither this letter nor any future formal production contract entered into by and among the parties hereto and the Bookwriter shall require submission to or certification by The Dramatists Guild, Inc.~~

15.    **Net profits.**

(a)    As additional consideration to Owner for the rights granted hereunder, Owner shall receive three percent (3%) of one hundred percent (100%) of all net profits of the limited partnership or other entity formed to produce any production of the Play hereunder (the "**Financing Entity**") after such production has recouped one hundred twenty-five percent (125%) of its production costs.

(b)    Except as set forth in subparagraphs (c), (d), (e) and (f) below, net profits shall be defined as in the Financing Entity agreement used in connection with the financing of the initial production of the Play hereunder, provided that no deductions shall be made from other net profits participants prior to calculating Owner's share thereof. A copy of the final Financing Entity agreement will be furnished to Owner at the time it is submitted to prospective investors. Payments pursuant to this paragraph shall be made at the same time or times as payments made to the investors in the Financing Entity. Copies of all statements to which such investors are entitled shall be sent to Owner at the same time such statements are sent to investors.

(c)    Producer shall notify Owner in writing at such times, if ever, as an entity is formed to produce an additional company of the Play other than the Mother Company (as defined in Paragraph 8(g) above), and each party constituting Owner shall have the right to elect to receive a net profit participation with respect to such additional company on the same terms as set forth in Paragraph 15(a) above. In the event that any such party exercises such right with respect to any additional company, the income which flows to the Mother Company from such additional company will be excluded in calculating such party's net profit participation in the Mother Company (i.e. Owner will not "double-dip"), provided that such income will be included for the purpose of determining recoupment and 125% recoupment for the Mother Company. A party constituting Owner shall exercise such right, if at all, by written notice to Producer not later than the first day of rehearsals of the additional company. If with respect to any party constituting Owner, Producer has not so received notice with respect to any additional company, such party shall be deemed not to have exercised its right with respect thereto. Producer agrees to inform Owner of any license fee and royalty received by the Mother Company in connection

*14*

Corbello v. DeVito, et al.
Exhibit 31 -- 00015

with any such additional company, provided that Producer's inadvertent failure to so inform Owner shall not be deemed a breach of this Agreement.

(d)     Income to Producer from Subsidiary Rights shall be included for the purposes of determining recoupment and 125% recoupment for the initial first-class company of the Play.

(e)     Notwithstanding any right Producer may have with respect to its investors to accumulate profits of any company for the formation of an additional company, such accumulated profits shall be included for the purposes of determining recoupment and 125% recoupment as well as for the purpose of calculating Owner's profit participation with respect to such company.

(f)     <u>Intentionally deleted</u>.

(g)     Once the Financing Entity has recouped two hundred percent (200%) of the production expenses incurred in connection with the Play, Owner shall thereafter be entitled to receive an amount equal to six percent (6%) of one hundred percent (100%) of the net profits earned by the Financing Entity.

(h)     Notwithstanding the foregoing, the profit participation contained herein shall apply only to the Mother Company and any other company where Producer utilizes a royalty pool, with the right to amortize production costs.

16.     **Right to invest.**

(a)     Provided Owner invests an equal proportion of Producer's enhancement funding toward the initial developmental production of the Play (currently anticipated to be presented at La Jolla Playhouse and referred to herein as the **"LJP Production"**), Owner will have the option to invest or introduce to Producer third parties who wish to invest up to an aggregate of one-third (1/3) of the total capitalization of the Mother Company of the Play subject to subparagraph (f) below.  Owner hereby commits to contribute its one-third (1/3) share the capitalization of the JERSEY BOYS LJP LLC of funding to enhance the LJP Production, and shall remit said share to Producer on signing this Agreement.  Producer represents that the capitalization of the JERSEY BOYS LJP LLC is $900,000.00, and that accordingly, Owner's share will be $300,000. Owner further shall have the right to invest in additional productions of the Play produced or co-produced by Producer (or under Producer's lease, license, management control) on a *pro rata* basis based on the aggregate amount Producer is contributing to such production, all on the same terms set forth herein with respect to each such production of the Play produced or co-produced by Producer, and on regular investor terms with respect to each such additional production of the Play licensed to an unrelated third party.

(b)     All of Owner's financing for the Mother Company shall be received by Producer on a schedule mutually agreed by the parties.  Owner may agree to authorize the immediate use of its contribution, without waiving right of refund, provided the parties reach a mutual agreement with respect to Producer's use of such funds. Owner agrees to provide up to one third (1/3) of the financing of the Mother Company.  Initially this shall figure shall be based on the minimum capitalization of the Mother Company (currently $7,000,000), and if Producer elects to raise the maximum capitalization (currently $7,750,000) then Owner shall have the right to

15

Corbello v. DeVito, et al.
Exhibit 31 -- 00016

contribute one third (1/3) of the difference, if any, between the minimum capitalization and the actual capitalization at the time same is determined. Notwithstanding anything to the contrary which may be contained in the foregoing, Owner's retroactive contribution of $300,000 referred to in subparagraph 16(a) above shall be made on complete execution of this Agreement and may be expended immediately by Producer for legitimate pre-production purposes.

(c)     If Owner shall have arranged for investments totaling twenty percent (20%) or more of the total capitalization, Owner will receive a share of the adjusted net profits payable to Producer equal to one-half (1/2) of its share of the adjusted net profits payable out of the total share payable to all investors. By way of example, if Owner raises twenty percent (20%) of the total capitalization, and all of the investors in the Play are entitled to receive fifty percent (50%) of the adjusted net profits of the Play, then Owner will be entitled to receive out of Producer's share of adjusted net profits five percent (5%) of the adjusted net profits and Owner and the investors will receive a total of ten percent (10%) of the adjusted net profits out of the total fifty percent (50%) of adjusted net profits payable to all of the investors in the Play. As an additional example, if Owner raises thirty percent (30%) of the total capitalization, and all of the investors in the Play are entitled to receive fifty percent (50%) of the adjusted net profits of the Play, then Owner will be entitled to receive out of Producer's share of adjusted net profits seven and one-half percent (7.5%) of the adjusted net profits and Owner and the investors will receive a total of fifteen percent (15%) of the adjusted net profits out of the total fifty percent (50%) of adjusted net profits payable to all of the investors in the Play. For purposes of this paragraph, only money contributed by investors not customarily involved in theatrical productions will be credited to Owner.

(d)     It is expected that the producer's management royalty will be equal to three percent (3%) of GWBOR, payable in a royalty pool on a pro rata basis with all royalty pool participants, and that such three percent will be allocated as follows: to Producer, two percent (2%) of GWBOR, and to investors, one percent (1%) of GWBOR (the "Investor Royalty"). If Owner shall have contributed or arranged for investments totaling twenty percent (20%) or more of the total capitalization, Owner will participate in the Investor Royalty in the same proportion as those investments contributed or arranged by Owner bear to the total capitalization.

(e)     In addition, Owner will be treated on a most-favored nations basis in all respects with any investor contributing a share of financing equal to or less than Owner.

(f)     Regardless of whether Owner elects to raise up to one-third (1/3) of the total capitalization of the initial commercial production of the Play as set forth in subparagraph (a) above, if Owner (either itself or through one or more investors of Owner, for the purposes of this paragraph) elects to contribute toward the enhancement of the LJP Production (which Owner shall have the right to do with respect to up to one-third (1/3) of Producer's aggregate enhancement obligations, and which may be done retroactively): (i) Owner shall have the right to contribute an amount toward the initial commercial production of the Play in the same proportion as Owner's enhancement contribution bears to Producer's overall enhancement obligations; and (ii) with respect to the monies contributed toward the initial commercial production as provided for in (i) above, Owner shall receive one producer "point" for every four investor "points" to which Owner is entitled by virtue of Owner's investment (i.e., a "one-for-four" deal), on a most favored nations basis in all respects with any third party contributing the same or lesser amount toward the enhancement of the LJP Production and/or the initial commercial production of the

16

Corbello v. DeVito, et al.
Exhibit 31 -- 00017

**Play.** By way of illustration, if Producer's aggregate enhancement obligation for the LJP Production is $ 900,000 and Owner elects to contribute $45,000 (i.e., 5%) of said enhancement obligation, then Owner shall have the right to contribute 5% of the total capitalization of the commercial production, for which Owner will receive the greater of a "one-for-four" deal or the deal offered any third party who similarly invests in the initial commercial production. For the avoidance of doubt, to the extent subparagraph (c) above is applicable and more favorable to Owner than this subparagraph (f), then subparagraph (c) shall control with respect to Owner's share of the producer points.

(g)     Provided Owner causes at least 25% of the total capitalization of the Mother Company to be contributed, the parties agree to negotiate in good faith an appropriate producer or associate producer credit for Owner and/or its investors.

**17.    Travel and expenses.** Owner shall have the right to attend all rehearsals, previews and the official press opening of any sit-down production in major U.S. metropolitan cities (e.g., New York, Los Angeles, Chicago) and the first presentation of any first-class tour. Producer agrees that whenever either or both of the Owner are required by Producer to travel (or elect to travel pursuant to the foregoing sentence) more than one hundred (100) miles from their respective residences in connection with the Play, they shall be entitled, to business class air transportation (first-class if not available) and a per diem equal to Five Hundred Dollars ( $500). Alternatively, the parties may agree on a monthly stipend to be negotiated in good faith. The foregoing notwithstanding, in connection with the La Jolla Production, Owner and Bookwriter shall receive transportation and accommodations in accordance with their separately negotiation agreement with La Jolla.

**18.    Representations and Warranties.**

(a)     Owner's Representations. Owner jointly and severally represents to Producer, Bookwriter, and their respective licensees and assigns, that (i) Owner has obtained or will obtain, not later than on commencement of rehearsals of the first company of the Play, all rights in the Compositions necessary to allow Producer to exercise all the rights in and to the Play granted herein, including, but not limited to, all live stage production rights and all Subsidiary Rights granted herein, and the material comprising the Compositions is or will be wholly original with Owner and has not been or will not be copied in whole or in part from any other work, except to the extent it is based on or taken from material in the public domain or on material which Owner has acquired the right to use; (ii) the material contained in the Compositions and any other material contributed by Owner to the Play does not and will not violate, conflict with or infringe upon any rights whatsoever of any person, firm, corporation or entity; (iii) to the best of Owner's knowledge, there is no claim or legal proceeding currently alleging that any element which Owner has contributed or will contribute to the Play or any use thereof, violates, conflicts with or infringes upon the rights of any person, firm, corporation or entity; (iv) Owner has the sole and exclusive right to enter into this Agreement and to grant the rights in the Play herein granted to Producer; and (v) Owner has not disposed of or otherwise exercised any rights in the Compositions or any other material contributed by Owner to the Play, or authorized their exercise by any person, firm or corporation in a way that would in any way conflict with the exercise of any of the rights granted to Producer hereunder, and shall not during the term of this Agreement dispose of, exercise or authorize any person, firm or corporation to exercise any

Corbello v. DeVito, et al.
Exhibit 31 -- 00018

rights therein which would in any way conflict with the exercise of any of the rights granted to Producer hereunder.

Without limiting the foregoing, Owner represents that it owns and controls, or that it will be able to secure by license, the rights in each of the Compositions identified as Owner's responsibility on *Schedule A*. For the avoidance of doubt, Owner shall not be responsible for acquiring rights to (or paying for) Non-Owned Compositions.

(b)     Owner's Indemnity.  Each of the parties constituting Owner jointly and severally agrees to indemnify and hold harmless Producer, the Bookwriter and their respective licensees and assigns (the "**Indemnified Parties**") from and against any claims, demands, suits, costs, expenses (including reasonable attorney's fees and disbursements), damages or losses suffered or incurred by the Indemnified Parties or any of them by reason of the breach of any of Owner's representations and warranties contained in this Agreement.

(c)     Producer's Indemnity.  Producer agrees to indemnify and hold harmless each of the parties constituting Owner, and their respective licensees and assigns, from and against any claims, demands, suits, costs, expenses (including reasonable attorney's fees and disbursements), damages or losses suffered or incurred by them or any of them by reason of its production of the Play, except if by reason, in whole or in part, of the breach by Owner, or any of them, of any of their representations, warranties, agreements or covenants contained herein.  The foregoing indemnity obligation shall include, without limitation, third party claims arising from depictions of individuals in the Play who are not members of The Four Seasons or from fabrications, fictionalizations and/or embellishments in the Play.

(d)     Notwithstanding the foregoing, Producer shall include each of the parties constituting Owner as an additional named insured in Producer's general liability and errors and omission insurance policies for the production of the Play.

(e)     The indemnifying party hereunder shall be notified in writing by the indemnified party of the existence of any claim, demand or suit which, if sustained, would give rise to liability on the part of the indemnifying party hereunder promptly after the indemnified party has knowledge of such claim, demand or suit.  The indemnifying party shall have the option to designate counsel to defend any such claim, demand or suit, and except as provided below, it is understood that the indemnifying party shall be responsible for the fees of such counsel designated by him and, except as provided below, control such defense.  The indemnified parties shall cooperate in the defense of any such claim, demand or suit and any or all of them may participate in the defense of any such claim, demand or suit with counsel of their own choosing (if such party does not approve counsel designated by the indemnifying party) at his or their own expense, it being understood that the indemnifying party shall not be responsible for the payment of any fees of such counsel.  No indemnified party shall take any action to compromise or settle any such claim, demand or suit unless consented to in writing by the indemnifying party.

## 18A.   Bookwriter's Representations and Warranties.

(a)     Bookwriter's Representations.  Bookwriter  jointly and severally represents to Producer and Owner, and their respective licensees and assigns, that, except to the extent based on the life stories of Owner or the Third Parties, the Compositions, or material in the public

227867/10/JPB/8082/0000/05/19/05
Doc#: NY5: 95399_9

18

18

Corbello v. DeVito, et al.
Exhibit 31 -- 00019

domain or otherwise furnished to them by Owner, the Book will be original with Bookwriter and does not and will not violate, conflict with or infringe upon any rights whatsoever of any person, firm, corporation or entity; Bookwriter has the sole and exclusive right to enter into this Agreement and to grant the rights in the Play herein granted to Producer; and Bookwriter has not disposed of or otherwise exercised any rights in the Book or any other material contributed by Bookwriter to the Play, or authorized their exercise by any person, firm or corporation in a way that would in any way conflict with the exercise of any of the rights granted to Producer hereunder, and shall not during the term of this Agreement dispose of, exercise or authorize any person, firm or corporation to exercise any rights therein which would in any way conflict with the exercise of any of the rights granted to Producer hereunder.

(b)     Bookwriter's Indemnity.  Each of the parties constituting Bookwriter jointly and severally agrees to indemnify and hold harmless Producer, the Owner and their respective licensees and assigns (the "Indemnified Parties") from and against any claims, demands, suits, costs, expenses (including reasonable attorney's fees and disbursements), damages or losses suffered or incurred by the Indemnified Parties or any of them by reason of the breach of any of Bookwriter's representations and warranties contained in this Agreement.

(c)     Producer's Indemnity.  Producer agrees to indemnify and hold harmless each of the parties constituting Bookwriter, and their respective licensees and assigns, from and against any claims, demands, suits, costs, expenses (including reasonable attorney's fees and disbursements), damages or losses suffered or incurred by them or any of them by reason of its production of the Play, except if by reason, in whole or in part, of the breach by Bookwriter, or any of them, of any of their representations, warranties, agreements or covenants contained herein.

(d)     Notwithstanding the foregoing, Producer shall include each of the parties constituting Bookwriter as an additional named insured in Producer's general liability and errors and omission insurance policies for the production of the Play.

(e)     The indemnifying party hereunder shall be notified in writing by the indemnified party of the existence of any claim, demand or suit which, if sustained, would give rise to liability on the part of the indemnifying party hereunder promptly after the indemnified party has knowledge of such claim, demand or suit.  The indemnifying party shall have the option to designate counsel to defend any such claim, demand or suit, and except as provided below, it is understood that the indemnifying party shall be responsible for the fees of such counsel designated by him and, except as provided below, control such defense.  The indemnified parties shall cooperate in the defense of any such claim, demand or suit and any or all of them may participate in the defense of any such claim, demand or suit with counsel of their own choosing (if such party does not approve counsel designated by the indemnifying party) at his or their own expense, it being understood that the indemnifying party shall not be responsible for the payment of any fees of such counsel.  No indemnified party shall take any action to compromise or settle any such claim, demand or suit unless consented to in writing by the indemnifying party.

19.     **House Seats.**  For each regular evening and matinee performance of the Play, Producer shall reserve for purchase by each of the parties constituting Owner and the Bookwriter, or their designees, two (2) pairs of adjoining house seats within the center section of the orchestra, rows 3-12 (except for benefits, theater party and subscription performances where substantially the

Corbello v. DeVito, et al.
Exhibit 31 -- 00020

entire orchestra is sold out and the invitation periods for the Antoinette Perry and/or Olivier awards, for which Producer shall reserve for each of the parties constituting Owner and Bookwriter one (1) such pair of house seats). In addition, Producer shall reserve for purchase by each of the parties constituting Owner and Bookwriter three (3) additional pairs of house seats, with a total of sixteen (16) invitations for the post-performance party, for the Official Press Opening of the Play on Broadway. Producer further agrees to accommodate any additional requests for house seats made by Owner or Bookwriter from Producer's available pool of house seats. The tickets set aside hereunder shall be set aside and made available for purchase at regular box office prices by such person until forty-eight (48) hours prior to each scheduled performance. Each of the parties constituting Owner and Bookwriter agrees to keep records sufficient to enable Producer and comply with the regulations of the New York State Attorney General and other applicable local regulations with respect to house seats.

20.   **Stage Manager's Script.**  Prior to the final close of the Play hereunder, or prior to two months after the New York opening, whichever is the earlier, Producer shall deliver to Owner, as said person's property, one copy of a neat and legible up-to-date stage manager's script of the Play as produced on the New York stage (it being understood that the delivery of such script does not constitute any statement of position by Producer with respect to the use of the script).

21.   **Orchestrations.**  Producer shall in the first instance furnish all necessary orchestral scores, conductor's scores, orchestra parts and vocal parts of the Songs ("**Orchestrations**") at Producer's own expense. Subject to the provisions of the following sentence, the Producer shall be the sole and exclusive owner of the physical Orchestrations (as distinguished from the copyrights therein) and the Producer may, subject to Owner's copyrights in such Orchestrations, sell, license, assign, rent or otherwise dispose of such Orchestrations and retain any sums received therefrom. Notwithstanding the foregoing, if Owner elects to own the Orchestrations, then Owner shall deliver written notice to the Producer to such effect and the following provisions shall apply:

(a)   The Orchestrations shall belong to Owner immediately upon delivery to Producer, subject to payment by Owner of any obligations to the creators of the orchestrations and the copyists, in connection with uses other than productions and cast albums produced or licensed by Producer. To the extent that such obligations exceed union minimums or the rates charged by the orchestrator in the past, such over scale obligations shall be subject to Owner's prior approval, not to be unreasonably withheld. Such Orchestrations may be used by Owner at any time after the close of the initial commercial production of the Play, whether or not the deductions or payments referred to in this Paragraph have been completed.

(b)   Owner shall have the right to contract for the publication of the Orchestrations or any part thereof, without prejudice to the right of Producer to arrange for separate payment to Producer by the music publisher.

(c)   Producer may deduct from the Music Royalty otherwise payable to Owner hereunder, Five Hundred Dollars ($500) in the aggregate in each week of performances of each company of the Play hereunder until a sum equal to fifty percent (50%) of Producer's actual expenditure for the Orchestrations shall have been recovered by Producer.

Corbello v. DeVito, et al.
Exhibit 31 -- 00021

(d)     Owner may at its option pay outright to Producer at any time a sum equal to fifty percent (50%) of Producer's expenditures for such Orchestrations or such remaining balance thereof as may then be unpaid.

**22.     Radio and Television Exploitation; Documentary.**

(a)     The Producer shall have the right to authorize one or more radio and/or television presentations of excerpts from the Play (each such presentation not to exceed ten (10) minutes in total, and provided no more than ninety (90) seconds of any Musical Composition shall be used in connection with each such presentation) for the sole purpose of exploiting and publicizing the production of the Play; provided, however, that the Producer shall receive no compensation or profit (other than reimbursement for out-of-pocket expenses), directly or indirectly, for authorizing any such radio or television presentations.  The foregoing shall be subject to any contractual music restrictions of which Author makes Producer aware.

(b)     Notwithstanding anything to the contrary contained in this Agreement, Author hereby grants to Producer the perpetual right to use, and to allow others to use, each Author's name, approved photograph and approved likeness and portions of the Play in connection with one documentary or promotional filmed or taped production about the development of the Play or the making of the cast album (the **"Documentary"**) intended by Producer to enhance interest in the Play, provided that the portions of the Play used in the Documentary do not exceed in the aggregate fifteen (15) minutes, provided, however, that the Producer shall receive no compensation or profit (other than reimbursement for out-of-pocket expenses), directly or indirectly, for authorizing any such Documentary.  Producer's rights in connection with the Documentary shall be in addition to Producer's right to arrange for an opening night special similar to opening night specials in connection with other Broadway shows. It is specifically understood and agreed that the foregoing provisions shall not be deemed to limit Producer's right to permit news, film or similar crews to film opening night or other production activities for review and/or publicity purposes, or otherwise to publicize and promote the Play, without any payment obligation to Author.

**23.     Use of Author's Name and Likeness.**

Owner grants to Producer the right to use the  name[s], photographs and likenesses of Owner and the Third Parties and the Group in connection with the promotion of the Play, any photographs and likenesses to be subject to Owner's approval.

Bookwriter grants to Producer the right to use the name[s], photographs and likenesses of Bookwriter in connection with the promotion of the Play, any photographs and likenesses to be subject to Bookwriter's approval, such approval not to be unreasonably withheld.

**24.     Duration of Rights.**  Following presentation of the Commercial Production in the Territory, and the initial production in any Additional or Supplemental Foreign Territory, Producer's rights to produce the Play shall continue in such Territory or Foreign Territory so long as Producer present the Play without a hiatus of four months or more with no performances, extendable to up to twelve months by payment of $500.00 as an additional non-returnable advance against royalties for each additional month over four.

Corbello v. DeVito, et al.
Exhibit 31 -- 00022

25.   **Agency.**  Payment information instructions are attached hereto as *Exhibit B*.

26.   **LJP Production.**   Author agrees that a developmental production may be presented at the La Jolla Playhouse, which shall separately contract with Author consistent with its customary practice.

27.   **Miscellaneous.**

(a)   The Producer shall have no obligation to produce or present the Play hereunder.

(b)   Provided that twenty-one (21) paid public performances (including up to ten previews) of the Play are presented by the Producer hereunder, Author shall contractually require that Producer shall receive clear and prominent credit in connection with all stage productions of the Play; in all publications of the Play (including acting editions and trade editions and anthologies), on the presentation page; and (subject to best efforts only on the part of the Author) on all positive prints of all audio-visual productions based on the Play (including but not limited to motion picture and television versions) of the Play.  With respect to stage productions of the Play, Producer's credit shall appear on the title page of all programs, and also in all advertising and publicity wherever and whenever full production credits appear, in a type size not less than 20% of the type size used for the non-artwork title of the Play.  Producer's credit shall be substantially as follows: "Original Broadway [*or other description, if appropriate*] Stage Production by Producer [*or Producer's designee*]".

(c)   If the Producer shall be prevented from exercising any option hereunder, or if any production hereunder shall be postponed or interrupted, due to epidemic, fire, action of the elements, strikes, labor disputes or  disturbances, governmental order, court order, act of God, public enemy, wars (whether or not declared), riots, civil commotion, illness of stars or director, or any other cause beyond the Producer's control, whether of a similar or dissimilar nature, such prevention or interruption shall not be deemed as a breach of this Agreement or a cause for forfeiture of the Producer's rights hereunder, and all time periods hereunder shall be extended for the duration of the force majeure provided the duration of the force majeure event(s) shall not exceed one (1) month in any one instance or three (3) months in the aggregate.

(d)   Prior to the initial Commercial Production hereunder, no assignment of this Agreement by Producer shall be effective without the consent of the Author, not to be unreasonably withheld, except to a partnership or limited liability company in which either the Producer or an entity controlled by Producer or any of its constituents or their principals is a general partner or managing member.   Thereafter, Producer may license or assign its rights hereunder to a licensee or assignee who assumes in writing Producer's obligations hereunder relevant to the licensed or assigned rights. Upon assumption by any such assignee or licensee of the Producer's obligations hereunder and delivery of a copy of such assumption to Author, Producer shall be relieved of all further obligation to Author hereunder in connection with such license or assignment if Author has approved such license; otherwise Producer shall remain secondarily liable.

(e)   Each Author shall have the right to inspect and copy Producer's books and records with respect to the payments due Author hereunder on reasonable advance notice to the Producer.

Corbello v. DeVito, et al.
Exhibit 31 -- 00023

(f)     All notices to any party hereunder shall be in writing and shall be deemed given and received when personally delivered, or two business days after being mailed by registered or certified mail, RRR, or upon delivery by an overnight delivery service, or on date of written confirmation of fax or e-mail transmission.  Notices shall be addressed to such party's address as given above or to such other address as the party may hereafter specify by notice duly given. Courtesy copies of all notices to Producer shall be sent to Nan Bases, Esq., 316 West 22nd Street, New York, NY 10011, with an additional courtesy copy by fax to 212/989-3357; courtesy copies of all notices to Owner shall be sent to Franklin, Weinrib, Rudell & Vassallo, P.C., 488 Madison Avenue, New York, New York 10022, Attn: Jason P. Baruch, Esq.; and courtesy copies of all notices to Bookwriter  shall be sent to  International Creative Management, Inc., 40 West 57th Street,  New York, New York 10019,  Attn: Maarten Kooij, Esq.

(g)     Any controversy or claim arising out of, or relating to this Agreement, or any alleged breach thereof, shall be settled by arbitration before a single arbitrator in New York, New York, in accordance with the rules then obtaining of the American Arbitration Association and judgment upon the award rendered by the arbitrator may be entered in the highest court of the forum, state or federal, having jurisdiction thereof. In connection with the enforcement of any arbitration award, each of the parties hereby consents and submits to the jurisdiction of the State and Federal courts located in the County of New York and consents to the venue thereof, and consents to service of process by registered or certified mail at the address to which notices are to be given and agrees that such service shall be deemed effective as if personal service had been made within New York State, New York County.

(h)     This Agreement shall not constitute the parties as partners or create a joint venture or fiduciary relationship between them, and neither party shall be deemed to be the representative or agent of the other.  This Agreement is made in the State of New York, and shall be governed by, and construed in accordance with, the laws of that State applicable to contracts made and entirely performed therein.  This Agreement supersedes all prior agreements between the parties with respect to the subject matter hereof, constitutes the entire agreement, and shall not be changed or terminated except in a writing signed by the parties.  No waiver shall be deemed a continuing waiver.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, heirs, executors, administrators, successors and permitted assigns.  No party shall be deemed to have breached any of the provisions hereof, or to have forfeited rights hereunder for failure to make any payment, unless and until the other party has sent written notice to said party specifying said party's failure, and such failure is not corrected or rectified within fifteen (15) days after receipt of notice from the other party. Paragraph headings are used herein for convenience only and shall not be referred to in the interpretation of this Agreement.  Use of any gender herein shall be deemed to refer to any other where appropriate from the context. This Agreement may be signed in counterparts and by fax.

23

Corbello v. DeVito, et al.
Exhibit 31 -- 00024

\*          \*          \*

If the foregoing correctly states our understanding, please countersign below where indicated.

Sincerely,

DODGER THEATRICALS, LTD.

_____

By: Michael David
Its: President

AGREED TO AND ACCEPTED:

_____
Robert Gaudio

_____
Frankie Valli

_____
Marshall Brickman

_____
Rick Elice

Corbello v. DeVito, et al.
Exhibit 31 -- 00025

If the foregoing correctly states our understanding, please countersign below where indicated.

Sincerely,

DODGER THEATRICALS, LTD.

By: Michael David
Its: President

AGREED TO AND ACCEPTED:

_____
Robert Gaudio

_____
Frankie Valli

_____
Marshall Brickman

_____
Rick Elice

227867/10/JPB/8082/0000/05/19/05                    24
Docs NY: 95398_9

25

Corbello v. DeVito, et al.
Exhibit 31 -- 00026

## Schedule A
## "JERSEY BOYS" MUSICAL COMPOSITION MASTER LIST

| Song Title (Alphabetical Order) | Writer(s) | Scope of Use | Ownership Interests (Payment Details) | Contracting Party(ies) | Pro Rata/ Flat Fee | Comments |
|---|---|---|---|---|---|---|
| *An Angel Cried* | Bob Gaudio | less than 25% of song with music/lyrics | Seasons Four Music 75% Hancock Trust (c/o EMI) 12.5% Dan Crewe (c/o EMI) 12.5% | Seasons Four Music Hancock Trust Dan Crewe | *Pro Rata* | Payments to The Hancock Trust and Dan Crew are both c/o EMI. |
| *Beggin'* | Bob Gaudio Peggy Furina | about 75% with music/lyrics, then additional portion with music only | EMI Longitude 50% Seasons Four Music 50% | EMI Seasons Four Music | *Pro Rata* | |
| *Big Girls Don't Cry* | Bob Crewe Bob Gaudio | about 50% with music/lyrics | MPL Commun. | MPL | *Pro Rata* | |
| *Big Man in Town* | Bob Gaudio | one full use, then additional music only | EMI Longitude 25% Gavadima Music 75% | EMI Gavadima | *Pro Rata* | |
| *Bye Bye Baby* | Bob Crewe Bob Gaudio | one full use, then additional music only | EMI Longitude 50% Seasons Four Music 50% | EMI Seasons Four Music | *Pro Rata* | |
| *Can't Take My Eyes Off of You* | Bob Crewe Bob Gaudio | one full use, then additional music only | EMI Longitude 50% Seasons Four Music 50% | EMI Seasons Four Music | *Pro Rata* | |
| *C'mon Marianne* | L Russell Brown Ray Bloodworth | about 25% of song with music/lyrics, then additional music only | EMI Longitude 75% Season Four Music 25% | EMI Seasons Four Music | *Pro Rata* | |
| *Ces Soirees-La (French version of "Oh What a Night")* | Bob Gaudio Judy Parker Yannick & Eddy Marnay (Zolo/Bacri) | about 25% of song with music/lyrics, and additional full use | EMI/Jobete Music 100% (for LJP only, then 50% to Seasons Music, 50% to Jobete) | EMI | Flat Fee | As of 1/1/05, Seasons Music has 50% interest. Not a *Pro Rata* tune for the La Jolla production - status may change for commercial production |
| *Cry For Me* | Bob Gaudio | one full use, then portion with music only | Seasons Four Music 75% Hancock Trust (c/o EMI) 12.5% Dan Crewe (c/o EMI) 12.5% | Seasons Four Music Hancock Trust Dan Crewe | *Pro Rata* | Payments to The Hancock Trust and Dan Crew are both c/o EMI. |

26

Corbello v. DeVito, et al.
Exhibit 31 -- 00027

| Song Title (Alphabetical Order) | Writer(s) | Scope of Use | Ownership Interests (Payment Details) | Contracting Party(ies) | Pro Rata/ Flat Fee | Comments |
|---|---|---|---|---|---|---|
| *My Boyfriend's Back* | Robert Feldman Gerald Goldstein Richard Gottehrer | about 50% with music/lyrics | EMI Blackwood Music | EMI | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition |
| *My Eyes Adored You* | Bob Crewe Kenny Nolan | about 75% with music/lyrics, then additional music only | EMI Longitude | EMI | *Pro Rata* | We agreed to add this to the *Pro Rata* list |
| *My Mother's Eyes* | Abel Baer L. Wolf Gilbert | about 75% of song with music/lyrics | EMI Feist Catalog 50% Songwriters Guild 50% | EMI Songwriters Guild | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition |
| *Oh What A Night (December, 1963)* | Bob Gaudio Judy Parker | about 25% of music with lyrics/music and additional full use | EMI/Jobete Music 100% (for LJP only, then 50% to Seasons Music, 50% to Jobete) | EMI | *Pro Rata* | As of 1/1/05, Seasons Music has 50% interest. English language only. *Ces Soirees-La* covered under Flat Fee license |
| *Opus 17 - (Don't You Worry 'bout Me)* | Sandy Linzer Denny Randell | one full use, then additional portion with music only | EMI/Screen Gems 75% Seasons Four Music 25% | EMI Seasons Four Music | *Pro Rata* | |
| *Rag Doll* | Bob Crewe Bob Gaudio | full use w/music/lyrics, then additional use with music only | EMI Longitude 50% Gavadima Music 50% | EMI Gavadima Music | *Pro Rata* | |
| *(Who Wears) Short Shorts* | Bob Gaudio Bill Dalton Tom Austin Bill Crandall | less than 25% of song with music/lyrics | EMI Longitude 75% New Seasons Music 25% | EMI New Seasons Music | *Pro Rata* | |
| *Sherry* | Bob Gaudio | about 75% of song with music/lyrics, then additional music | MPL Commun. | MPL | *Pro Rata* | |
| *Silhouettes* | Bob Crewe Frank Slay | about 50% with music/lyrics, then about 4 bars repeated music only | Arc (Regent) | Arc (Regent) | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition. |
| *Stay* | Maurice Williams | one full use, then some with music only | MPL Commun. 50% Cheerio Corp. 50% | MPL Cheerio | Flat Fee | This was originally listed as a *Pro Rata* song but should be a Flat Fee song. The Four Seasons have no interest in this composition. |

Corbello v. DeVito, et al.
Exhibit 31 -- 00028

| Song Title (Alphabetical Order) | Writer(s) | Scope of Use | Ownership Interests (Payment Details) | Contracting Party(ies) | Pro Rata/ Flat Fee | Comments |
|---|---|---|---|---|---|---|
| *Dawn (Go Away)* | Bob Gaudio Sandy Linzer | one full use | EMI Longitude 50% Seasons Four Music 50% | EMI Seasons Four Music | *Pro Rata* | |
| *Earth Angel* | Jess Belvin Curtis Williams Gaynel Hodge | about 25% with music/lyrics, then some with music only | Embassy Music Corp. | Embassy Music Corp. | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition |
| *Everybody Knows My Name* | Bob Crewe Bob Gaudio | only *lyrics* from song are recited | EMI Longitude 50% Seasons Four Music 50% | EMI Seasons Four Music | *Pro Rata* | |
| *Fallen Angel* | Guy Fletcher Doug Flett | one full use with music/lyrics | Chrysalis Music | Chrysalis Music | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition |
| *I Can't Give You Anything But Love* | Dorothy Fields Jim McHugh | 32-bar refrain, then additional portion of music only | EMI April Music 50% Songwriters Guild 50% | EMI Songwriters Guild | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition |
| *I Go Ape* | Bob Crewe Frank Slay | about 50% of song with music/lyrics | MPL Commun. | MPL | *Pro Rata* | *Pro rata* OK for LJP. May need to be Flat Fee for commercial productions. |
| *I'm In The Mood For Love* | Dorothy Fields Jim McHugh | about 25% of song with music/lyrics | Famous Music | Famous Music | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition |
| *I Still Care* | Bob Gaudio | less than 25% of song with music/lyrics | Seasons Four Music 75% Hancock Trust (c/o EMI) 12.5% Dan Crewe (c/o EMI) 12.5% | Seasons Four Music Hancock Trust Dan Crewe | *Pro Rata* | Payments to The Hancock Trust and Dan Crew are both c/o EMI. Neither an EMI nor MPL composition, but *Pro Rata* per agreement |
| *Let's Hang On (To What We've Got)* | Bob Crewe Denny Randell Sandy Linzer | one full use, then additional portion with music only | EMI Screen Gems 75% Seasons Four Music 25% | EMI Seasons Four Music | *Pro Rata* | |
| *Moody's Mood For Love* | James Moody (w/lyrics by Eddie Jefferson) | about 25% of song with music/lyrics | Famous Music | Famous Music | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition |

Corbello v. DeVito, et al.
Exhibit 31 -- 00029

| Song Title (Alphabetical Order) | Writer(s) | Scope of Use | Ownership Interests (Payment Details) | Contracting Party(ies) | Pro Rata/ Flat Fee | Comments |
|---|---|---|---|---|---|---|
| *Sunday Kind of Love* | Barbara Belle Anita Leonard Stan Rhodes Louis Prima | about 75% of song with lyrics/music, then some with music only | Universal/MCA | Universal/MCA | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition. |
| *Trance* | Bob Gaudio | about 25% of song with music/lyrics, then some music only | Seasons Four Music 75% Hancock Trust (c/o EMI) 12.5% Dan Crewe (c/o EMI) 12.5% | Seasons Four Music Hancock Trust Dan Crewe | *Pro Rata* | Payments to The Hancock Trust and Dan Crew are both c/o EMI, but EMI has no interest in this composition. It should be *removed from EMI license*. [*Confirm no interest by Tomorrow Tunes*] |
| *Walk Like a Man* | Bob Crewe Bob Gaudio | one full use, then additional portion with music only | MPL Commun. [*or Gavadima?*] | MPL | *Pro Rata* | [*Need confirmation that this song is MPL and not 100% Gavadima*] |
| *Who Loves You* | Bob Gaudio Judy Parker | one full use, then additional portion with music only | EMI/Jobete Music 100% (for LJP only, then 50% to Seasons Music, 50% to Jobete) | EMI | *Pro Rata* | As of 1/1/05, Seasons Music has 50% interest. |
| *Working My Way Back To You* | Sandy Linzer Denny Randell | one full use with music/lyrics | EMI/Screen Gems 75% Seasons Four Music 25% | EMI Seasons Four Music | *Pro Rata* | |
| *You're the Apple of My Eye* | Otis Blackwell | about 75% of song with lyrics/music | EMI Unart Catalog | EMI | Flat Fee | The Four Seasons are not responsible for clearing and/or paying for this composition. |

**Flat Fee** compositions = 12
*Pro Rata* compositions = 23

Corbello v. DeVito, et al.
Exhibit 31 -- 00030

**Exhibit A**

**Royalty-Related Definitions;**
**Contingent Amortization**

1.   **Definitions.**

(a)   "**Gross Weekly Box Office Receipts**" shall mean all sums received by Producer from all ticket sales to the Play, allocable to performances given in such week, less the following deductions: (i) all applicable Federal and other admission taxes and similar taxes which may be now or hereafter imposed upon admissions; (ii) any fees or commissions paid in connection with theater parties, group sales, or benefits, credit card organizations such as American Express, telephone sales, and automated ticket distribution or remote box offices; (iii) any amounts equivalent to the former five (5%) percent New York City Amusement Tax, the net proceeds of which are actually paid over to pension or welfare funds of the various theatrical unions; (iv) amounts received for Actor's Fund benefit performances which are actually paid over to the Actors' Fund; (v) so-called or "restoration" or "facilities" fees, however denominated, provided such fees are reasonable, customary and identified on the face of the ticket; (vi) rent and occupancy tax; (vii) booking fees; and in the British Isles, Australia and New Zealand, also V.A.T., entertainment taxes, and library discounts, if any.

(b)   "**Cumulative Operating Profits**" shall mean the difference between Gross Weekly Box Office Receipts and Running Expenses for the same Accounting Period.

(c)   "**Running Expenses**" shall mean all expenses, charges and disbursements of whatsoever kind actually incurred or accrued as running expenses of the Play, including but not limited to, royalties of royalty recipients who are not percentage royalty participants, theatre rental, costs and expenses, compensation and salaries of general manager, company manager, stage manager, conductor, orchestrator, musicians, arrangers, business manager, theatre party representatives, production associates, production assistants, production supervisor, cast, any non-percentage payments to any workshop or regional theatre in which the Play shall have been presented and Actors' Equity Association, if it is entitled to any weekly payments other than percentage payments by reason of any Developmental Production of the Play, stagehands, weekly office expense charges of the Producer (not to exceed $1,500 per week, regardless of the total cash office charge actually paid to Producer), cash office charge to the general manager, transportation charges, office facilities, insurance, legal and auditing/ accounting/bookkeeping expenses directly attributable to the Play, advertising, publicity, marketing and promotion expenses (including the right to engage an advertising agency at the usual commission and to contract for additional payments for merchandising, exploitation, sale promotion and publicity of the Play), rentals of equipment and props from parties including Producer (on an arms-length basis consistent with rentals charged by third parties), television commercials subsequent to the initial television commercial, other extraordinary advertising expense, miscellaneous supplies, all taxes of whatsoever kind or nature other than income taxes, and all other reasonable expenses (other than Production Expenses) incurred in connection with the business of the limited partnership or other entity formed to produce the particular company of the Play. No item of running expense may be amortized over a period greater than 15 weeks and in all events such amortization shall be in equal weekly amounts. No item shall be charged as both a Production Expense and a Running Expense or Other Expense. Any items supplied by Producer or related or affiliated companies or persons shall be at rates or prices customary in the industry.

227867/10/JPB/8082/0000/05/19/05

*30*

Corbello v. DeVito, et al.
Exhibit 31 -- 00031

(d)   **"Production Expenses"** shall mean the total expenses, charges and disbursements of whatsoever kind or nature incurred by the limited partnership or other entity formed to produce the particular company of the Play in connection with the production preliminary to the official opening night of the particular production, including but not limited to, fees of authors, conceivers, designers, directors, choreographers, orchestrators, arrangers, musical supervisors, general manager, production assistants, and costs of sets, curtains, drapes, costumes, physical properties (purchased and/or rented), insurance premiums, audition, casting and rehearsal charges and expense, transportation charges and expenses incurred in connection therewith, office fees, reasonable legal and auditing expenses, advance publicity and advertising (including the production of television and radio commercials), costs of out-of-town or Developmental Productions, theater costs and expenses, taxes of whatsoever kind or nature, expenses for replacement or substitutions of any of the foregoing items, and any and all other expenses in accordance with good theatrical practice usually included in the term Production Expenses. Any items supplied by Producer or related or affiliated companies or persons shall be at rates or prices customary in the industry. No Production Expense shall also be deemed a Running Expense or Other Expense.

(e)   **"Other Expenses"** shall mean all reasonable expenses, whatsoever kind or nature, other than Production Expenses and Weekly Operating (i.e., Running) Expenses (and whether or not similar or dissimilar thereto) incurred in connection with or by reason of the operation of the limited partnership or other entity formed to produce the particular company of the Play including, without limitation, monies paid or payable in connection with claims for plagiarism, libel, negligence, and other claims of a similar or dissimilar nature. No Other Expense shall also be deemed a Running Expense or Production Expense.

(f)   **"Company Share"** shall mean the gross weekly box office receipts (whether in the form of fixed fees or in the form of guarantees plus a percentage) derived by the Producer from said company share engagement (which shall include the share, royalty or fee payable to the Producer and any sums paid directly to a star or stars or any other person, firm or entity to which payments ordinarily would be the responsibility of the Producer) from such performances after the deduction therefrom of (i) deductions permitted under sub-paragraph (a) hereof and (ii) customary third party booking fees charged by any tour booking agents, provided, however, that the royalty computation of this sub-paragraph (g) shall be applicable only if all other percentage royalty participants' royalties (other than star(s) and theatre) and the Producer's management fee are computed on the same basis.

2.   **Royalty Formula**.   Producer shall have the right to pay Aggregate Author's royalty on the basis of an operating profits formula in connection with first class productions of the Play in the Territory and West End as follows:

(a)   Aggregate Author's share of the Net Operating Profits (as defined below) shall be 20% rising to 22.5% on recoupment of 110% of production costs, further rising to 25% on recoupment of 150% of production costs exclusive of bonds, deposits and other recoverables. Recoupment and multiples thereof (**"recoupment points"**) shall be computed separately for each company of the Play.

Corbello v. DeVito, et al.
Exhibit 31 -- 00032

(b)     Net Operating Profits shall be computed on the basis of four-week Accounting Periods (extendable to six weeks for the final accounting period of the run). Increases at recoupment points shall take effect in the Accounting Period immediately following the Accounting Period in which the recoupment point occurred.

(c)     Aggregate Author shall receive the following Minimum Weekly Guarantee ("MWG"), prorated for weeks with fewer than eight performances, as an advance against Aggregate Author's share of Net Operating Profits for the Accounting Period: (i) for sit-down productions in theaters with a maximum gross potential of less than $1,000,000, a MWG of $8,500 rising to $10,000 at 110% recoupment, except,; (ii) for sit-down productions in theaters with a maximum gross potential of $1,000,000 or greater, a MWG of $10,625 increasing to $12,500 at 110% recoupment (i.e., a 25% increase); and (iii) where the royalty is calculated on a Company Share basis, a MWG of $20,000 increasing to $25,000 on recoupment. If Producer wishes to amortize production costs when using an Aggregate Author's royalty pool based on company share, the foregoing Minimum Weekly Guarantees shall be re-negotiated in good faith.

(d)     Provided all other royalty participants similarly agree, Aggregate Author's royalty shall be capped as follows: (i) Prior to recoupment of 110% of Production Expenses, a cap of 115% of the royalty which Aggregate Author would have received but for the royalty formula; (ii) following 110% recoupment and until 125% recoupment, a cap of 130% of the royalty which Aggregate Author would have received but for the royalty formula; and (iii) following 125% recoupment, there shall be no caps.

(e)     The Minimum Weekly Guarantee shall be payable within seven (7) days of the applicable week. The difference, if any, between Author's share of the Net Operating Profits for the Accounting Period and the aggregate Minimum Weekly Guarantee payments paid in such Accounting Period shall be paid to Author not later than twenty-one (21) days following the end of the Accounting Period, accompanied by reasonable explanatory statements (in any event, Author shall be entitled to the same statements as are sent to investors and any other royalty participant). There shall be no cross-collateralization between Accounting Periods.

3.     **Contingent Amortization**

(a)     A Prima Facie Amortization Amount shall be determined, equal to 1% of the capitalization of the Broadway or other sit-down production per performance week, and for first class/bus and truck companies in the Territory, 2% of the capitalization of the production per performance week.

(b)     For every dollar of Cumulative Operating Profits earned in an Accounting Period over the Prima Facie Amortization Amount, half, or $.50, shall be used to reduce the Prima Facie Amortization Amount in that Accounting Period. The reduced Prima Facie Amortization Amount shall be referred to as the Actual Amortization Amount.

The following examples illustrate the operation the Amortization Factor. For simplicity, the Accounting Period in each example is assumed to be one week and the Prima Facie Amortization Amount to be $60,000.

227867/10/JPB/8082/0000/05/19/05
Doc#: NYS: 95399_9

31

32

Corbello v. DeVito, et al.
Exhibit 31 -- 00033

Example #1:   Assume that the pre-Amortization Factor Operating Profits (i.e., Cumulative Operating Profits before implementation of the Amortization Factor) for Accounting Period #1 is $75,000. The difference between said amount and $60,000 is $15,000; half of said $15,000 is added back to said $15,000, with the result that the Post-Amortization Operating Profits on which Cumulative Operating Profits-based royalties are based is $22,500 ($15,000 + $7,500), and the Actual Amortization Amount for the Accounting Period is $52,500.

Example #2:  Assume that the Pre-Amortization Factor Operating Profits for Accounting Period #2 is $120,000. The difference between said amount and $60,000 is $60,000; half of said $60,000 is added back to said $60,000, with the result that the Post-Amortization Operating Profits on which Cumulative Operating Profits-based royalties are based is $90,000 ($60,000 +$30,000) and the Actual Amortization Amount for the Accounting Period is $30,000.

Example #3:  Assume that the Pre-Amortization Factor Operating Profits for Accounting Period #3 is $150,000. The difference between said amount and $60,000 is $90,000; half of said $90,000, or $45,000 is added back to said $90,000, with the result that the Post-Amortization Operating Profits on which Cumulative Operating Profits-based royalties are based is $135,000 ($90,000 + $45,000) and the Actual Amortization Amount for the Accounting Period is $15,000.

Example #4:  Assume that the Pre-Amortization Factor Operating Profits for Accounting Period #4 is $180,000. The difference between said amount and $60,000 is $120,000; half of said $120,000, or $60,000 is added back to said $120,000, with the result that the Post-Amortization Operating Profits on which Cumulative Operating Profits-based royalties are based is $180,000 ($120,000 + $60,000) and the Actual Amortization Amount for the Accounting Period is zero.

Example #5:  Assume that the Pre-Amortization Factor Operating Profits for Accounting Period #4 is $10,000. Since said sum is less than the Prima Facie Amortization Amount of $60,000, the entire $10,000 is dedicated to amortization, and the Actual Amortization Amount for the Accounting Period is $10,000.

(c)     After the Financing Entity has paid back its investors and earned Net Profits equal to its capitalization, 10% of the Net Profits earned thereafter shall be assigned to the royalty recipients whose shares of Cumulative Operating Profits have been reduced by operation of this Contingent Amortization formula (the "affected royalty recipients"), pro rata in accordance with such reductions, until such time as such royalty recipients shall have earned back such reductions in their shares of Cumulative Operating Profits which resulted from the implementation of this Contingent Amortization formula (the "Deferred Amounts") plus an additional 25% of the Deferred Amounts. Thereafter, such royalty participants shall share pro rata in 3% of the Net Profits in perpetuity.

(d)     If and to the extent Aggregate Author has not received a 125% return of the Deferred Amounts from Net Profits as provided for in subparagraph (c) above, the Aggregate Author shall be entitled to recoup 125% of the Deferred Amounts from 25% of the Producer's

Corbello v. DeVito, et al.
Exhibit 31 -- 00034

share of Subsidiary Rights income after the Financing Entity has recouped 110% of its production costs, as set forth in Paragraph 8(g) of the Agreement.

        (e)    The foregoing amortization formula shall not be applicable with respect to the share of the royalty payable to EMI Publishing, which the parties acknowledge has not agreed to participate in the amortization or "claw-back" mechanism.

Corbello v. DeVito, et al.
Exhibit 31 -- 00035

# EXHIBIT B

## PAYMENT INSTRUCTIONS

### Owner payments (and Gavadima Music, Seasons Four Music and New Seasons Music payments):

Four Seasons Partnership
c/o Peter Bennett, Esq.

Beverly Hills, California  90210

with a copy to:

Franklin, Weinrib, Rudell & Vassallo, P.C.

New York, New York 10022
Attn: Jason Baruch, Esq.

### Bookwriter (Marshall Brickman) Payments:

International Creative Management,  Inc.
  a/a/f Marshall Brickman

New York, New York 10019
Attn: Sam Cohn

with a copy to:

Marshall Brickman

New York, New York 10023

### Bookwriter (Eric S. Elice) Payments:

International Creative Management,  Inc.
  a/a/f Eric S. Elice

New York, New York 10019
Attn: Sam Cohn

with a copy to:

Eric S. Elice

New York, New York 10024

### EMI Payments:

New York, New York 10104
Attn: Barbara Adams

### MPL Communications Payments:

New York, New York 10019
Attn: Peter Silvestri

### Hancock Trust d/b/a Heart's Delight Music Payments:

227867/10/JPB/8082/0000/05/19/05
Doc#: NYS: 95399_9

34

*35*

Corbello v. DeVito, et al.
Exhibit 31 -- 00036

c/o Manatt, Phelps & Phillips

Los Angeles, CA  90064

**Dan Crewe Payments:**
c/o Manatt, Phelps & Phillips

Los Angeles, CA  90064

**Nicholas Maccioci Payments:**
c/o Jay Julien, Esq.

New York, New York  10036

with a copy to:

West Orange, New Jersey 07052

**Thomas Devito Payments:**
c/o Jay Julien, Esq.

New York, New York  10036

with a copy to:

c/o J.R. Reilly

Henderson, Nevada 89014

227867/10/JPB/8082/0000/05/19/05
Doc#: NY5: 95399_9

35

36

Corbello v. DeVito, et al.
Exhibit 31 -- 00037

EXECUTED

## EXHIBIT A

Robert Gaudio and Frankie Valli
c/o Peter C. Bennett, Esq.

Beverly Hills, California 90210


Dated as of _____, 1999


Mr. Nicholas Macioci
~~~~~~~~~~~~~~~
West Orange, New Jersey 07052

Mr. Thomas Devito
c/o J.R. Reilly
~~~~~~~~~~~~~~~
Henderson, Nevada 89014

Re: "The Four Seasons"

Dear Nicky and Tommy:

For One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

We are presently contemplating entering into an agreement which would authorize the creation of a musical stage play based on the life and music of "The Four Seasons" (the "Play"). In connection with the Play, the authors of the play may wish to use or incorporate certain aspects of your life related to The Four Seasons including, by way of example, your creative contributions, biographies, events in your life, names and likenesses (the "Materials"). In consideration of our right to use such Materials, as more fully set forth below, you shall be entitled to the following:

(a) One-fourth (i.e., 25%) of the royalty actually paid specifically for the underlying rights as a whole ("Your Royalty Share"), subject to the same waivers, deferrals and royalty pool calculations as are applicable to us in our capacity as underlying rights holders, provided we shall not enter into an agreement for the underlying rights in which the royalty allocated to underlying rights is less than one-third the aggregate royalty allocated to the book, music and lyrics of the Play without your approval. By way of example only, if 6% of the gross weekly box office receipts ("GWBOR") is paid for

160244/7/JPB/5082/0000/06/15/99

37

Corbello v. DeVito, et al.
Exhibit 31 -- 00038

the book, music and lyrics of the Play, the underlying rights shall receive no less than 2% thereof, and you shall be entitled to receive 0.5% thereof. By way of further example, if the book, music and lyrics are allocated 15.6% of weekly operating profits in a royalty pool, the underlying rights shall be allocated no less than 5.2% thereof, and you shall be entitled to receive 1.3% thereof. Your Royalty Share shall be divided between you as follows: 80% to Thomas Devito and 20% to Nicholas Macioci. You will further be entitled to one-fourth of the subsidiary rights income payable to us in our capacity as underlying rights holder, which amount shall be divided between you in the same ratio as applicable to the royalty, provided we shall not enter into an agreement in which the author's share of subsidiary rights allocated to underlying rights is less than one-fourth the entire author's share without your approval.  By way of example only, if the author's share of stock and amateur advances is $600,000 (net of agency fees and commissions), underlying rights shall receive no less than $150,000 thereof, and you shall be entitled to receive $37,500 thereof.  You shall not be entitled to share in subsidiary rights income derived from the Play or in royalties paid or received for any purpose other than in connection with the underlying rights (such as royalties which may be paid for writing services, or for music or lyrics);

(b) One-fourth (i.e., 25%) of the advance actually paid specifically for the underlying rights, to be divided equally between you.  By way of example only, if a $30,000 advance is paid for the underlying rights, you shall receive $3,750 each.  You shall not be entitled to share in monies paid or received for any purpose other than the underlying rights;

(c) $10,000 of the advance actually paid specifically for underlying rights, such advance to be paid entirely to Nicholas Macioci.

In consideration of the foregoing payments, you grant to us the exclusive right to use and incorporate the Materials in one or more theatrical productions, and any and all ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised versions, merchandise and/or other works (collectively, "Works").  We shall further have the right to use the Materials in the advertising, publicity and promotion of the Works.  You hereby consent to any such use

160244/7/TPB/8082/0000/06/15/99

- 2 -

Corbello v. DeVito, et al.
Exhibit 31 -- 00039

and agree that the Works may be exploited throughout the world in all media now existing or later devised, and you further acknowledge that you will not receive any compensation for the use of the Materials or in connection with any of the Works other than the compensation expressly set forth herein.  The rights granted by you to us hereunder shall continue in perpetuity if the rights in the Play have merged with each other pursuant to the production contract between us and the initial commercial producer. If the rights of the initial commercial producer lapse prior to merger, and we enter into a production contract with another commercial producer within two (2) years following such lapse of rights, our rights hereunder shall continue only for the duration of such subsequent producer's rights, and in perpetuity if merger has occurred pursuant to our production contract with such subsequent producer.

Without limitation of the foregoing, we shall have the right, but not the obligation, to use the Materials in any manner which we see fit including, without limitation: to depict you or create or develop a character or characters based on you either in whole or in part; to dramatize and/or fictionalize events and incidents in your life and the manner in which you are depicted; to use, change, adapt or elect not to use the Materials as we may determine; and to make any other changes to the Materials and the Works as we may, in our sole discretion, deem appropriate.

You waive any right to inspect or approve the Works or any use of the Materials in connection therewith. You further waive any claim in connection with the Materials or Works including, but not limited to, any claim that the Works libel, slander or defame you or violate any right of privacy, publicity, confidentiality, copyright or other personal or property right.

In addition to the foregoing, the bookwriters of the Play, or their designees, agree to interview you, and you agree to make yourselves available for such interviews by the bookwriters, or their designees, as they may reasonably request.

The rights granted to us herein are irrevocable, and not subject to rescission or injunction under any circumstances. In the event of a breach by us, your sole remedy shall be an action at law for damages actually

160244/7/JPB/8082/0000/06/15/99

- 3 -

39

Corbello v. DeVito, et al.
Exhibit 31 -- 00040

Jul-01-99 04:20P GAUDIO/PARKER.

suffered; in no event shall you have the right to seek
injunctive relief or to enjoin or restrain or otherwise
interfere with the exploitation, production, distribution
or exhibition of the Play or the Works.

We shall have the unrestricted right to assign
this agreement in whole or in part. This agreement shall
inure to our benefit and the benefit of our licensees,
successors, designees and assigns. It shall be binding
upon you, your heirs, executors, administrators,
representatives and assigns and shall be governed by the
laws of the State of New York.

This agreement is intended to expand and not
limited the rights granted to us pursuant to previous
agreements between the parties. You acknowledge there are
no assurances that the Play will be produced or that any
royalties, subsidiary rights income or other monies will be
received by us and paid to you. You further acknowledge
that, other than as expressly set forth herein, no promises
have been made to you, nor have you relied on any prior
representations in entering into this agreement.

If the foregoing is acceptable, please countersign
this letter where indicated.

very truly yours,

Frankie Valli

Bob Gaudio

AGREED AND ACCEPTED:

Nicholas Macioci

Thomas Davito

16024477/TPB/3082/0000/0601.FY99

- 4 -

Corbello v. DeVito, et al.
Exhibit 31 -- 00041