**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DONNA CORBELLO,                    )
                                   )
            Plaintiff,             )
                                   )         2:08-cv-00867-RCJ-PAL
      vs.                          )
                                   )
THOMAS GAETANO DEVITO et al.,      )         **ORDER**
                                   )
            Defendants.            )
_____)

        This case arises out of alleged copyright infringement and the failure of a joint copyright owner to account for royalties.  Plaintiff Donna Corbello is the widow and heir of Rex Woodard, who assisted Defendant Thomas Gaetano "Tommy" DeVito in writing his unpublished autobiography.  Plaintiff alleges that DeVito and others wrongfully appropriated the unpublished autobiography Woodard wrote in order to develop the screenplay for *Jersey Boys*, a hit Broadway musical based on the band *The Four Seasons* that has played in the United States, Canada, England, and Australia, grossing many millions of dollars.  Corbello has sued several companies and individuals, including the individual members of *The Four Seasons*.  Defendants Frankie Valli, Robert Gaudio, DSHT, Inc., Dodger Theatricals, Ltd., and Jersey Boys Broadway Limited Partnership have moved for summary judgment against the thirteenth and fourteenth causes of action of the Third Amended Complaint ("TAC").  These five Defendants are the only Defendants against whom the thirteenth and fourteenth causes of action are brought.  Plaintiff's

response includes her own Motion for Summary Judgment (ECF No. 600) as to the twelfth,

thirteenth, and fourteenth causes of action.

I.      FACTS AND PROCEDURAL HISTORY

    A.      The Work

        Rex Woodard was an attorney, author, and avid *Four Seasons* fan who finally met

Defendant and founding *Four Seasons* member Tommy DeVito for an interview on December 9,

1981 as a result of the publicity generated from an article Woodard had written about the band in

*Goldmine* magazine earlier that year that focused on the years between the band's breakup in

1970 and its reconstitution in 1975. (*See* Third Am. Compl. ¶¶ 26–29, Mar. 18, 2011, ECF No.

457).  On December 23, 1981, Woodard interviewed DeVito's brother Nick DeVito, and on

January 8, 1982 he interviewed Nick Massi, another founding member of the *Four Seasons*. (*Id.*

¶ 29).  The result of these three interviews was a second article published in *Goldmine* in June of

1982 that focused on the band's earliest incarnation, *The Four Lovers*. (*Id.*).

        Woodard kept in touch with DeVito and founding *Four Seasons* member Frankie Valli

throughout the 1980s, and in November of 1988 Woodard flew to Las Vegas, Nevada for a series

of interviews with DeVito (the "1988 Interviews"). (*See id.* ¶ 31–32).  During the 1988

Interviews, DeVito revealed to Woodard that he and Massi had spent several years engaged in

criminal enterprises and in prison, and that they had retained "underworld contacts" throughout

the band's era of popularity. (*See id.* ¶ 32).  Because this revelation was in stark contrast to the

clean-cut image of the band presented in the popular media, Woodard realized the journalistic

value of the story, and in fact DeVito offered Woodard the opportunity to write his authorized

biography with full credit and an equal share in any profits. (*See id.*).

        Woodard returned to Beaumont, Texas to begin writing DeVito's authorized biography

(the "Work"), which has never yet been published. (*See id.*).  On December 1, 1988, Woodard

sent DeVito a letter (the "Letter Agreement") memorializing their previous verbal

understandings concerning the Work. (*Id.* ¶ 33).  DeVito singed the Letter Agreement beneath the word "APPROVED" and mailed it back to Woodard. (*See id.*; Letter Agreement, Dec. 1, 1988, ECF No. 457-11).  The Letter Agreement reads in full:

December 1, 1988

Mr. Tommy DeVito
[street address]
Las Vegas, Nevada [zip code]

Dear Tommy:

     I am making progress on the taped interviews we did.  You suggested that I prepare a written memorandum of our arrangement for future reference.  I will do so by this letter.

     I agreed to write your authorized biography based on the recorded interviews you gave me, plus any other relevant information which would benefit the book.  You and I will be shown as co-authors, with you receiving first billing.  I will do all of the actual writing, but you will have absolute and exclusive control over the final text of this book.

     We have further agreed that we will share equally in any profits arising from this book, whether they be in the form of royalties, advances, adaptations fees, or whatever.  This agreement will be binding upon our heirs, both as to obligations and benefits, in the event one or both of us should die.

     If this letter accurately sets forth our agreement as you understand it, sign the enclosed photocopy where indicated and return it to me in the enclosed self-addressed, stamped envelope.  Keep this original letter in your own file.

     Thank you for asking me to work with you on this project.  I look forward to working with you over the next several months.

Sincerely,<br>[signed] Rex Woodard<br>Rex Woodard

RW/ml
Enclosures

APPROVED:

[signed] Tommy DeVito
TOMMY DEVITO

(Letter Agreement).  Over the next two years, Woodard used the 1988 Interviews and all of his

other knowledge about the band to create the Work, including information obtained directly from his past interviews with band members, information from public sources such as newspaper articles, magazine articles, and album linings, Freedom of Information Act requests filed with law enforcement agencies, and questionnaires he sent to DeVito. (Third Am. Compl. ¶ 34). Woodard compiled all of this information into the Work, resulting in a first-person, narrative-style biography told from DeVito's perspective. (*See id.*).  Woodard remained in close contact with DeVito throughout his creation of the Work and sent DeVito each chapter for approval and editing as they were completed. (*Id.* ¶ 35).

### B.   Woodard's and DeVito's Publication Attempts

As the Work neared completion in late 1990, Woodard and DeVito attempted to find a publisher and even provided an outline of the Work to actor Joe Pesci to explore the possibility of adaptation to a screenplay. (*See id.* ¶ 36).  Plaintiff provides a copy of what she claims is the cover sheet to a January 1991 version of the Work, reading:

UNTITLED
TOMMY DEVITO/FOUR SEASONS
BIOGRAPHY

. . . .

TOMMY DEVITO
REX WOODARD
©, January, 1991

(*See* Work Cover Page, Jan. 1991, ECF No. 457-15).  Though he never smoked, Woodard had been diagnosed with lung cancer in 1989, and his condition seriously worsened by late 1990. (*Id.* ¶ 39).  By February or March of 1991, he was bedridden, and he died on May 25, 1991 at age forty-one. (*Id.* ¶ 40).  Woodard had hoped that income generated from the Work would support his wife and children. (*Id.* ¶ 41).

### C.   Plaintiff's and Ceen's Publication Attempts

In accordance with Woodard's wishes, Plaintiff and Woodard's sister Cindy Ceen

continued to seek publication after Woodard's death independently of DeVito; however, public

interest in *The Four Seasons* had waned, making it difficult to find an interested publisher. (*Id.*

¶ 42).  Ceen determined in September 2005 to contact DeVito for his assistance in finding a

publisher. (*See id.*).  Ceen first contacted a prominent member of an Internet *Four Seasons* fan

group named Charles Alexander to facilitate contact with DeVito, whom she apparently did not

personally know. (*See id.* ¶ 43).  Alexander responded to Ceen on September 22, 2005 that he

had met with DeVito the previous day and told DeVito of Ceen's desire to publish the Work, and

that DeVito had agreed to help. (*See id.*).  Ceen called DeVito the same day (using a telephone

number provided by Alexander), and DeVito indicated that he wanted to update the Work with

post-1990 events and restore some "obscene" language Woodard had omitted. (*Id.*).  DeVito also

claimed he had lost his copy of the Work and asked Ceen for a replacement, which she mailed to

DeVito the next day, along with a letter memorializing their telephone conversation and

informing DeVito that Plaintiff was considering self-publishing the Work if a traditional

publisher could not be found. (*Id.*).  Neither Plaintiff nor Ceen heard from DeVito again. (*Id.*

¶ 44).  DeVito's attorney Jay Julien left Ceen a voice mail message on November 2, 2005, and

Ceen returned his call the next day, during which conversation Julien told Ceen that he had

spoken with DeVito regarding the Work and concluded that it was "not saleable." (*Id.*).  Ceen

was surprised by this conclusion, because the play *Jersey Boys* was scheduled to open on

Broadway a few days later. (*Id.*).  Julien did not disclose that the Work had been used or

exploited in any way or that rights in the Work had been licensed or transferred. (*Id.*).

### D.    *Jersey Boys* and Plaintiff's Discovery of the Alleged Infringements

By late 2006, *Jersey Boys* had become a Broadway hit, earning four Tony Awards.

(*Id.* ¶ 45).  Plaintiff had not seen the show, but she and Ceen estimated that the show's success

would revive interest in the band and make publication of the Work viable. (*Id.*).  Plaintiff and

Ceen engaged counsel to confirm the registration of Woodard's and DeVito's copyright in the

Work, to register the copyright if it had not yet been registered, and to contact Julien to see if DeVito had changed his mind about joint publication of the Work in light of *Jersey Boys*'s success. (*Id.*). A January 3, 2007 search of the U.S. Copyright Office's online records indicated no registration of the Work to Woodard but that on January 11, 1991 (four months before Woodard's death) DeVito had registered a literary work entitled *Tommy DeVito - Then and Now*, Reg. No. Txu 454 118 (the "DeVito Work"). (*Id.* ¶ 46). Plaintiff's counsel ordered a copy of the registration and discovered that DeVito had registered the DeVito Work in his own name only, claiming that the DeVito Work was unpublished and that he wrote it in its entirety in 1990. (*Id.* ¶ 47). Plaintiff's counsel ordered a copy of the DeVito Work itself and discovered that the DeVito Work was identical to the Work, and in fact appeared to be a photocopy of the manuscript typed by Woodard's secretary Myrtle Locke, with two exceptions. (*Id.* ¶¶ 48–49). First, the original cover page from the January 1991 version of the Work had been replaced with a cover page in a different font and font size, reading:

TXu 454 118

. . . .

Tommy DeVito - Then and Now
by
Tommy DeVito

(*See id.* ¶ 49; DeVito Work Cover Page, ECF No. 457-23). Second, the first page of Chapter 41 (page 264 of the Work) was missing. (*See* Third Am. Compl. ¶ 49). Plaintiff concluded in light of the Letter Agreement and her dealings with DeVito and Julien after Woodard's death that DeVito had registered the Work without credit to Woodard or disclosure to Woodard or his heirs. (*Id.* ¶ 50).

Plaintiff also soon discovered that the writers of (and several actors in) *Jersey Boys* had access to the Work and that DeVito had received royalties or other profits from *Jersey Boys*, and she concluded that the Work had "inspired the form, structure, and content of the musical . . . ."

1   (*See id.* ¶ 51).  As support for this conclusion, Plaintiff notes that Defendant Des McAnuff, the

2   director of *Jersey Boys*, was quoted in a July 8, 2006 report in *Backstage* magazine as stating

3   that Defendants Marshall Brickman and Eric Elice had relied in part on "an unpublished

4   autobiography by DeVito" in creating the libretto for the musical. (*See id.* ¶ 52).  The source

5   apparently does not indicate whether the libretto served as the script, a program for audiences, or

6   something else. (*See id.*).  Plaintiff notes that Christian Hoff, the first actor to play DeVito in

7   *Jersey Boys*, stated in what appears to be an online interview that he was provided with a

8   synopsis of the Work for his audition and a full copy for background research. (*See id.*).[1]

9   Plaintiff also saw public reports of DeVito's financial profits from the musical. (*See id.*).

10  Plaintiff also notes an exchange on a *Jersey Boys* podcast website indicating that one fan had

11  reported to another that the musical was based on DeVito's unpublished biography. (*See id.*).

12  ### E.    Pre-Litigation Negotiations

13          On June 13, 2007, Plaintiff's counsel wrote Julien by email and overnight courier

14  demanding that DeVito execute an application for supplementary registration with the U.S.

15  Copyright Office to add Woodard as a coauthor and co-claimant of the Work and demanding an

16  accounting of profits in accordance with the Letter Agreement. (*Id.* ¶ 53).  Counsel conferred

17  with one another by email and telephone between June and October of 2007, and Julien admitted

18  at one point that DeVito had provided a copy of the Work "to *Jersey Boys*" and expressed

19  interest in the possibility of a joint copyright infringement action against "*Jersey Boys*," but later

20  decided that Plaintiff's only recourse was a suit against DeVito because he had authorized use of

21  the Work. (*Id.* ¶ 54).  Although DeVito initially considered filing a supplemental registration of

22  the Work to credit Woodard, he later refused, claiming that he in fact was the sole author and

23

24          [1]Plaintiff also cites to a Wikipedia entry for support that the Work served as a basis for
        the musical, but this is poor evidence, as any person on Earth (or with a communications link to
25  Earth from outer space, for that matter) can edit a Wikipedia article, including Plaintiff herself.
        (*See id.*).

1    that Woodard had been a mere scribe. (*Id.*).

2    On July 2, 2007, Plaintiff filed her own supplementary application with the U.S.

3    Copyright Office to add Woodard as a coauthor and co-claimant of the Work, but the office

4    rejected the application because DeVito, the original claimant, had not signed it. (*Id.* ¶ 55).  The

5    office could not under 17 U.S.C. § 201(a) permit a non-author, non-claimant as to an original

6    registration (known in copyright parlance as a "basic registration") to supplement the original

7    application, but such a person could apply to register her own work, in which case the office

8    would consider the new claim to be adverse to the existing claim if the claims purported to

9    register the same work exclusively to different claimants. (*See* Copyright Office Letter, June 16,

10   2008, ECF No. 457-27, at 7).  However, the Copyright Office Review Board granted Plaintiff's

11   appeal based on a closer examination of regulations and practices, determining that her

12   supplemental registration could be accepted, and that a certificate of registration would be issued

13   after processing. (*See* Copyright Office Letter, Mar. 27, 2009, ECF No. 457-28).  The amended

14   certificate, Reg. No. Txu1 372-636, lists Woodard and DeVito as coauthors of the entire text of

15   the Work and as co-claimants thereto. (*See* Certificate of Registration TXu1 372-636, July 3,

16   2007, ECF No. 457-29).[2]

17   _____

18   [2]At this point in the TAC, Plaintiff alleges that her 2007 supplemental registration "was not cross-indexed" with DeVito's original 1991 registration because DeVito had not signed his

19   1991 application. (*See id.*).  She alleges that as a result, she cannot establish clear title in the Work. (*See id.*).  But Plaintiff does not explain how DeVito could have obtained his basic

20   registration without signing his application, and in fact she adduces a copy of DeVito's signed 1991 application. (*See* Form TX, Reg. No. Txu 454 118, July 11, 1991, ECF No. 457-22 (signed

21   by DeVito on July 7, 2011)).  This form appears to function as both an application (with the applicant's signature at the bottom of page 2) and a certificate of registration (once approved by

22   the office at the top of page 1). (*See id.*).  Nor does it make sense that the office did not cross-reference Plaintiff's 2007 supplemental application with DeVito's 1991 basic application,

23   particularly as her 2007 application was a supplement to the 1991 registration and the certificate the office eventually issued specifically identifies the 1991 basic registration both by registration

24   number and DeVito's name.  The applicable regulation, which Plaintiff cites, clarifies her complaint.  Although her supplemental registration identifies DeVito's basic registration,

25   because no basic registrant (DeVito) signed the supplemental registration, the office could not annotate DeVito's basic registration with the fact of the supplemental registration, *see* 37 C.F.R.

1   Thereafter, further indication of the connection between *Jersey Boys* and the Work

2   emerged through public sources, such as public interviews of certain Defendants. (*See* Third Am.

3   Compl. ¶ 56).  Plaintiff alleges that the evidence that the musical was an adaptation of the Work

4   means that *Jersey Boys* is a "derivative work" of the Work under 17 U.S.C. § 101. (*See id.* ¶ 57).

5   Plaintiff recounts several similarities between the musical and the Work. (*See id.*).

6   **F.      The "Cover-up"**

7   DeVito and Julien then took steps to conceal the fact that DeVito had exploited the Work

8   to create and profit from *Jersey Boys*. (*See id.* ¶ 58).  First, DeVito withdrew his quotes from

9   Charles Alexander's forward to the upcoming *Jersey Boys* book, because the use of those

10  quotations would have linked the book, and hence the musical, to the Work. (*See id.*).  Second,

11  DeVito reported in an interview that he had never shown the Work to anyone except Brickman,

12  Elice, and McAnuff. (*Id.*).  Third, DeVito altered his website <www.tommydevito.com> to

13  remove the reference to "his SMASH HIT *Jersey Boys*." (*Id.*).  Fourth, DeVito stated in an

14  interview that he had dictated the Work to a lawyer and that the book was not to be published

15  yet. (*Id.*).

16

17  § 201(b)(1) n.1, so a person finding only DeVito's basic registration would not be aware of
    Plaintiff's supplemental registration.  Even though the supplemental registration of Woodard's

18  and his heirs' rights in the Work is sufficient to give constructive notice under the statute, it is
    only sufficient if a "reasonable search" would reveal Woodard's rights in the Work, and it is

19  theoretically possible that a search might reveal only DeVito's registration, so that the failure to
    annotate DeVito's basic registration with the fact of Plaintiff's supplemental registration is

20  problematic. *See* 17 U.S.C. § 205(c)(1).  Plaintiff's fear is practically unfounded, however,
    because the supplemental registration includes the title of the DeVito Work as it appears on the

21  basic registration itself, as well as the basic registration number, (*see* Certificate of Registration
    TXu1 372-636), so a reasonable search could not fail to reveal the supplemental registration, and

22  the world is therefore on constructive notice of the supplemental registration as a matter of law
    regardless of the "one-way" cross-reference, *see* § 205(c).  Plaintiff may not challenge DeVito's

23  basic registration directly with the office, because the cancellation procedures do not appear to
    contemplate adjudication of a non-claimant's complaints over improper registration, *see* 37

24  C.F.R. § 201.7, but a federal court may refer such a dispute to the Registrar of Copyrights for
    administrative adjudication under the primary jurisdiction doctrine while retaining jurisdiction, if

25  necessary, *see Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 781–82
    (9th Cir. 2002).

### G.    DeVito's Licensing of the Work

Certain documents made public during Valli's divorce proceedings in July 2008 revealed that DeVito had granted Valli and Gaudio an exclusive, irrevocable, perpetual, worldwide, assignable license (the "Valli/Gaudio License") freely to use and adapt certain "Materials," including his "biographies," for the purpose of creating a musical based on the life and music of *The Four Seasons*. (*Id.* ¶ 59).  The Valli/Gaudio License included the right to "ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised versions, merchandise, and/or other works . . . in all media now existing or later devised." (*Id.*).  The Valli/Gaudio License waived any claim of copyright infringement by DeVito, provided that DeVito would be entitled to 20% of any royalties Valli and Gaudio obtained through exploitation of the Materials, and provided that Massi would be entitled to 5% of any such royalties. (*See id.*).  Plaintiff suspects that Valli and Gaudio further licensed the Materials, which included the Work, to one or more unknown authors in 1999 for adaptation into an early version of *Jersey Boys* called *Walk Like a Man*. (*See id.*).  When the original producer rejected *Walk Like a Man*, Valli and Gaudio fired its authors, permitted their agreement with the original producer to lapse, and further licensed the Materials to Brickman and Elice (the "Brickman/Elice Sublicense"), who used the Materials to write *Jersey Boys*. (*See id.*).  Plaintiff implies that Valli's and Gaudio's informal joint ventures related to their exploitation of the Materials constitutes a general partnership as a matter of law, which partnership Plaintiff refers to as "The Four Seasons Partnership." (*See id.* ¶ 4–5).

### H.    *Jersey Boys*

The *Jersey Boys* foundational production agreement (the "*Jersey Boys* Agreement") is dated May 1, 2004. (*See id.* ¶ 61; *Jersey Boys* Agreement 1, May 1, 2004, ECF No. 457-34, at 2). The *Jersey Boys* Agreement lists five parties: Valli and Gaudio as "Owner," Brickman and Elice as "Bookwriter," and Dodger Stage Holding Theatricals, Inc. (now known as DSHT) as

1  "Producer." (*See Jersey Boys* Agreement 1).  The copies of the signature page of the *Jersey Boys*

2  Agreement attached to the TAC include signatures by all of these parties except Brickman, and

3  DSHT's signature is typewritten, without the handwritten signature of any natural person as an

4  agent of DSHT. (*See id.* at 24, ECF No. 457-34, at 25–26).  The signatures are not dated. (*See*

5  *id.*).  The *Jersey Boys* Agreement is comprehensive and appears to govern the worldwide

6  exploitation of *Jersey Boys*. (*See generally id.*).  The details of the twenty-three-page agreement

7  need not be recounted here but will be noted where relevant to the determination of claims.  The

8  *Jersey Boys* Agreement includes a schedule and two exhibits as attachments, all of which the

9  base agreement identifies.  Schedule A is a table of musical compositions to be used in the

10  musical along with details of authorship and copyright ownership.  Exhibit A is the Valli/Gaudio

11  License.  Exhibit B is a list of "payment instructions" consisting of addresses for mailing

12  payments to the signatories and other beneficiaries.

13      Plaintiff believes that DSHT further transferred or licensed its rights under the *Jersey*

14  *Boys* Agreement to Defendant Dodger Theatricals, Ltd., which is the primary producer of *Jersey*

15  *Boys* on Broadway, tours throughout the United States, and in London, U.K. (*See* Third Am.

16  Compl. ¶ 62).  Plaintiff believes that DSHT and/or Dodger Theatricals further licensed their

17  rights to others and eventually licensed them to Defendant Jersey Boys Broadway, which in turn

18  licensed them to several parties, including Defendants JB Viva Vegas and Jersey Boys Records.

19  (*See id.*).  Plaintiff alleges that *Jersey Boys* has earned gross revenues of approximately $300

20  million per year and believes she is entitled to at least $6.5 million. (*See id.* ¶ 70).

21      **I.    The Present Lawsuit**

22      In December 2007, Plaintiff sued DeVito in the Eastern District of Texas on three causes

23  of action: (1) declaratory judgment; (2) equitable accounting; and (3) breach of contract.  That

24  court transferred the case to this District in 2008 pursuant to 28 U.S.C. § 1404(a).  The TAC,

25  filed in March 2011, lists fourteen Defendants and twenty causes of action: (1) declaratory

1  judgment (DeVito); (2) equitable accounting (DeVito); (3) breach of contract (DeVito); (4)

2  unjust enrichment (DeVito); (5) breach of the covenant of good faith and fair dealing (DeVito);

3  (6) constructive fraud (DeVito); (7) fraud (DeVito); (8) conversion (DeVito); (9) copyright

4  infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (DeVito);

5  (10) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (DeVito);

6  (11) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth)

7  (Austl.) (DeVito); (12)–(13) declaratory judgment (Valli, Gaudio, DSHT, Dodger Theatricals,

8  and Jersey Boys Broadway); (14) equitable accounting (Valli, Gaudio, DSHT, Dodger

9  Theatricals, and Jersey Boys Broadway, in the alternative) (15) copyright infringement under 17

10  U.S.C. § 501(a) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey

11  Boys Broadway, JB Viva Vegas, and Jersey Boys Records); (16) vicarious copyright

12  infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger

13  Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home); (17)

14  contributory copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice,

15  McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records);

16  (18) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988

17  (U.K.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys

18  Broadway); (19) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.)

19  (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys

20  Broadway); and (20) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of

21  1968 (Cth) (Austl.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and

22  Jersey Boys Broadway).

23       Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway (collectively,

24  "Defendants") have moved for defensive summary judgment on the thirteenth and fourteenth

25  causes of action.  Plaintiff has moved for offensive summary judgment on the twelfth, thirteenth,

1    and fourteenth causes of action.  The twelfth and thirteenth causes of action are for declaratory

2    judgment as to the validity and nature of the Valli/Gaudio License and the Brickman/Elice

3    Sublicense.  The fourteenth cause of action is for an equitable accounting by Defendants.[3]

4    **II.    LEGAL STANDARDS**

5            A court must grant summary judgment when "the movant shows that there is no genuine

6    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

7    Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson*

8    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if

9    there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

10   *id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

11   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

12   judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at
> trial, it must come forward with evidence which would entitle it to a directed verdict
> if the evidence went uncontroverted at trial.  In such a case, the moving party has the
> initial burden of establishing the absence of a genuine issue of fact on each issue
> material to its case.

16   *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)

17   (citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears

18   the burden of proving the claim or defense, the moving party can meet its burden in two ways:

19   (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2)

20   by demonstrating that the nonmoving party failed to make a showing sufficient to establish an

21   element essential to that party's case on which that party will bear the burden of proof at trial.

22   *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden,

23   summary judgment must be denied and the court need not consider the nonmoving party's

24

25            [3]The second cause of action, which is not currently at issue, is for an equitable accounting
     by DeVito.

1   evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

2          If the moving party meets its initial burden, the burden then shifts to the opposing party

3   to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

4   *Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing

5   party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

6   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

7   versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

8   626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment

9   by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v.*

10  *List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions

11  and allegations of the pleadings and set forth specific facts by producing competent evidence that

12  shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

13         At the summary judgment stage, a court's function is not to weigh the evidence and

14  determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

15  U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

16  to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely

17  colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

18  **III.    ANALYSIS**

19        **A.    Declaratory Judgment**

20         Only Plaintiff has requested summary judgment on the twelfth cause of action for a

21  declaration that DeVito as a joint owner of the Work lacked the authority to issue an exclusive

22  license to Valli and Gaudio, rendering the Valli/Gaudio License *void ab initio* as to the Work

23  under 17 U.S.C. §§ 201(a) and (2)(d).  Alternatively, Plaintiff requests a declaration that if the

24  license was effective, that it amounted to a nonexclusive license that Valli and Gaudio could not

25  further license or assign under § 201(d)(2) without Plaintiff's consent.  In the alternative yet

again, Plaintiff requests a declaration that the Valli/Gaudio License constituted not a license but

a transfer of DeVito's rights in the Work, but because DeVito did not assign all of his exclusive

rights in the Work, that Valli and Gaudio cannot further transfer the rights under § 201(d)(2)

without Plaintiff's consent.[4]   The Court denies summary judgment to Plaintiff on this cause of

action.  The Court finds that the Valli/Gaudio License was an exclusive license as against

DeVito, but a nonexclusive license as against Plaintiff, and that Valli and Gaudio were able to

further assign the license because of DeVito's explicit permission to do so.  The Court makes no

ruling as to the Brickman/Elice Sublicense.

     As to the thirteenth cause of action, on which both Plaintiff and Defendants have moved

for summary judgment, Plaintiff requests a declaration, in the alternative to the declarations

requested in the twelfth cause of action, that the Valli/Gaudio License was a transfer or license

of DeVito's rights in the Work that Valli and Gaudio could in fact further transfer or license

---

[4]With respect to assignments of rights in the Work, there is a great risk of equivocation of terms.  The words "assignment," "transfer," and "license" must be used consistently, lest the determination of rights turn into a Shakespearean comedy.  "Transfer" or "transfer of copyright" indicates the transfer of ownership in a copyright, whether in whole or in part, as is the case where there is joint ownership of a work, as here.  As a default, a transferor of copyright, like a grantor of real estate, retains nothing except the transferee's consideration therefor.  "License" indicates a right to use the copyright in some manner, but the licensor retains ownership.  This arrangement is something analogous to the lease of real property.  It is the word "assignment" that works the worst confusion.  Some use it to mean "transfer."  Some use it to mean "license" or "sublicense."  Some use it interchangeably to mean all three and other things besides.  To avoid confusion in the copyright context, the term is probably best restricted to mean a licensee's assignment of his license to a third-party (which is possible where the licensor has expressly permitted such an assignment).  In other words, the term "assignment" is best used to denote no transfer of copyright or new license, but the giving of an existing license from an existing licensee to a third party.  More specifically, where the existing licensee retains rights under the existing license, his further giving of rights is a "sublicense."  Where the existing licensee does not retain rights, his giving of the rights is an "assignment" of the existing license.  It is the use of the term "assignment" interchangeably with both "transfer" and "license" that creates all manner of confusion and in some cases even serves to obscure the distinction between a transfer and a license.

     Under 17 U.S.C. § 101, exclusive licenses, but not nonexclusive licenses, fall under the definition of a transfer.  This would seem to indicate that an exclusive licensee whose license is from fewer than all joint owners is essentially a joint owner himself (within the usufructory and temporal scope of his license).  But the *Sybersound* court ruled that such a licensee has no standing to sue for infringement, so he cannot be a joint owner, because it cannot be that a person could have a property right yet lack standing to sue for its violation.  Such a person has only a contract right enforceable against his licensor.

under § 201(d)(1)–(2), and which they did further transfer or license to DSHT and/or Dodger Theatricals via the *Jersey Boys* Agreement, and which Dodger Theatricals thereafter further transferred or licensed to Jersey Boys Broadway. Plaintiff also requests a declaration that she owns 50% of the Work with whoever owns the remaining 50%. The Court grants summary judgment to Plaintiff on this cause of action in part and denies summary judgment to Defendants. The Valli/Gaudio License was a license that Valli and Gaudio could further assign because of DeVito's explicit permission to do so in the Valli/Gaudio License, and Valli and Gaudio did in fact further assign their license to DSHT via the *Jersey Boys* Agreement, but it is not clear whether there was any further assignment. Plaintiff continues to own 50% of the Work, with DeVito owning the other 50%. The Court will explain these findings further herein.

As a preliminary matter, the Court must determine whether the Work was in fact a joint work between DeVito and Woodard. This area of the law is not entirely clear. A leading copyright treatise includes a long discussion of recent developments. *See* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.07 (Matthew Bender & Co., Inc. 2011). To be considered a coauthor, a person must make more than a *de minimis* contribution to a work. *Id.* § 6.07[A][1]. If all DeVito did was contribute non-copyrightable historical facts, and Woodard supplied the entire quantum of copyrightable, creative material, it may be the case that DeVito is not a coauthor of the Work at all. If the Work were Woodard's alone under the law of copyright, the Letter Agreement would still constitute an assignment of 50% of Woodard's rights to receive profits from the Work, i.e., a partial assignment of royalties, but it would not appear to constitute a partial transfer of copyright. (*See* Letter Agreement ("I [Woodard] will do all of the actual writing, but you [DeVito] will have absolute and exclusive control over the final text of this book. We have further agreed that we will share equally in any profits arising from this book, whether they be in the form of royalties, advances, adaptations fees, or whatever.")). "[C]ontrol over the final text" may or may not have included creative editing as a factual matter. If DeVito had more than a *de minimis* role in creating the Work, then he is a coauthor. If he

exercised his editing powers only to decide which facts should or should not be included in the book, it is possible he does not qualify as a coauthor.

Even if a putative coauthor's contributions would not be separately copyrightable, if the putative coauthor makes a more than *de minimis* contribution to the resulting work, and the resulting work is copyrightable, then the putative coauthor is in fact a coauthor of the resulting work, otherwise the odd situation could result where there are *no* legal authors of a collaborative work that itself is clearly copyrightable. *See* 1 Nimmer & Nimmer, *supra*, § 6.07[A][3][a]–[c] (citing *Gaiman v. McFarlane*, 360 F.3d 644, 658–59 (7th Cir. 2004) (Posner, J.)). In fact, Judge Posner in *Gaiman* posited an example very similar to that presented here:

> Here is a typical case from academe. One professor has brilliant ideas but can't write; another is an excellent writer, but his ideas are commonplace. So they collaborate on an academic article, one contributing the ideas, which are not copyrightable, and the other the prose envelope, and unlike the situation in the superficially similar case of *Balkin v. Wilson*, 863 F. Supp. 523 (W.D. Mich. 1994), they sign as coauthors. Their intent to be the joint owners of the copyright in the article would be plain, and that should be enough to constitute them joint authors within the meaning of 17 U.S.C. § 201(a).

*Gaiman v. McFarlane*, 360 F.3d at 659. Courts to interpret this case, however, read it as an exception that a putative coauthor whose contributions are not separately copyrightable is in fact a coauthor of the resulting copyrightable work, but only in those cases where *no* putative coauthor's contributions are separately copyrightable, such that the resulting copyrightable work would be orphaned in the absence of the exception. *See, e.g.*, *Gaylord v. United States*, 595 F.3d 1364, 1377 n.4 (Fed. Cir. 2010).

Plaintiff appears to admit that DeVito was closely involved in editing the book. (*See* Third Am. Compl. ¶ 35 ("DeVito would contact Mr. Woodard to discuss any desired changes, *sometimes marking changes to the text in pen* and sometimes simply requesting that particular facts be added or removed.") (emphasis added)). It appears that the Work was in fact a joint work because of DeVito's non-*de minimis* creative edits. The Court will therefore proceed to determine the legal effect of the Valli/Gaudio License and the *Jersey Boys* Agreement.

1    Partial ownership of joint works can be transferred or licensed, but the joint nature of the

2    work limits the legal effect of such transfers and licenses. *See* 1 Nimmer & Nimmer, *supra*,

3    § 6.09–6.11.  Despite the use of the word "joint," the nature of joint ownership in copyright is

4    analogous to a tenancy-in-common in real property, not a joint tenancy, i.e., unless otherwise

5    agreed by contract, a deceased joint owner's rights in a work pass to his heirs or legatees, not to

6    the other joint owners. *Id.* § 6.09 (citing *Silverman v. Sunrise Pictures Corp.*, 273 F. 909 (2d Cir.

7    1921); *Edward B. Marks Corp. v. Wonnell*, 61 F. Supp. 722 (S.D.N.Y. 1945)).  Because a person

8    cannot legally infringe his own copyright, a joint owner cannot be liable for infringement to

9    another joint owner, and he may exploit the joint work without consent of the other joint

10    owner(s). *Id.* § 6.10 [A][1][a] (citing *Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984)).  However, a

11    person who retains only beneficial ownership in a copyright and not legal ownership, for

12    example by signing away his ownership in exchange for a portion of royalties, will be liable for

13    infringement if he then exploits the work without permission of the legal owner(s). *Id.* § 6.10

14    [A][1][b] (citing 17 U.S.C. § 501(b)).

15    Like a sole owner, a joint owner may retain his ownership while granting licenses to third

16    parties. *Id.* § 6.10 [A][2][a] (citing *Meredith v. Smith*, 145 F.2d 620 (9th Cir. 1944)).  When a

17    joint owner grants a nonexclusive license, the licensee obtains the right to exploit the work

18    according to the license but has no right to prevent the licensor or other joint owners from further

19    exploiting the work directly or licensing additional third parties to exploit it. *Id.* § 6.10 [A][2][b].

20    When a joint owner grants an exclusive license, however, the licensor loses the right (while the

21    license is in effect) to exploit the work directly or even to license the work to additional third

22    parties. *Id.* § 6.10 [A][2][c].  Yet the exclusivity of a license granted by a joint owner does not

23    apply against the other joint owners, who, having done nothing to alienate their own rights, may

24    continue to exploit or further license the work. *See id.* § 6.10 [A][2][d] (citing *Davis v. Blige*,

25    505 F.3d 90, 100 (2d Cir. 2007)).  In fact, the Ninth Circuit has ruled that a joint owner's

exclusive licensee has the status of a nonexclusive licensee for the purposes of standing to sue

1   for infringement. *See id.* (citing *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir.

2   2008)).  *Sybersound* stands for the proposition that any attempt by a joint owner to grant an

3   exclusive license without the consent of all other joint owners results in the grant of a

4   nonexclusive license as a matter of law, at least for the purposes of standing to sue for

5   infringement. *See id.* at 1146 (citing *Oddo*, 743 F.2d at 633) ("[U]nless all the other co-owners of

6   the copyright joined in granting an exclusive right to [the plaintiff], [the licensor], acting solely

7   as a co-owner of the copyright, could grant only a nonexclusive license to [the plaintiff] because

8   [the licensor] may not limit the other co-owners' independent rights to exploit the copyright.").

9   This case has caused a considerable amount of consternation, and Nimmer disagrees with the

10  result, *see* 1 Nimmer & Nimmer, *supra*, § 6.10 [A][2][d], but it is now the law in this Circuit.

11  Joint owners may agree by contract that none of them shall independently license a work, *id.* §

12  6.10 [C], but there appears to be no such provision in the Letter Agreement between DeVito and

13  Woodard.

14          At oral argument, Plaintiff was adamant that *Sybersound* stood only for the limited

15  procedural proposition that an exclusive licensee who had his license from fewer than all the

16  joint owners of a work stood in the position of a nonexclusive licensee for the purposes of

17  standing to sue third parties for infringement, i.e., he could not sue for infringement, whereas an

18  exclusive licensee who had his license from all joint owners (or from a sole owner) could.

19  Plaintiff strongly rejected that *Sybersound* stood for the proposition that an attempt by fewer than

20  all joint owners of a work to grant an exclusive license resulted in a nonexclusive license *per se*.

21  Plaintiff accused the *Sybersound* court of erring due to its equivocation with respect to different

22  meanings of the word "exclusive."  Plaintiff argues that in *Fleischer Studios, Inc. v. A.V.E.L.A.,*

23  *Inc.*, the Ninth Circuit noted that *Sybersound* must be understood as a procedural case only.

24  *See* 654 F.3d 958 (9th Cir. 2011).  But *Fleischer* mentions *Sybersound* only briefly, and for a

25  proposition irrelevant to the effect of the attempted grant of an exclusive license by fewer than

all joint owners. *See* 654 F.3d at 964.

1    The *Sybersound* decision can, in any case, be squared with the ability of a joint owner to

2 grant an exclusive license if we simply untangle what we mean by "exclusive." In the context of

3 intellectual property, the difference between "exclusive" and "nonexclusive" licenses concerns

4 the continuing ability of the grantor to use or further license to others the licensed property

5 during the period the license is in effect. An "exclusive" license is "[a] license that gives the

6 licensee the sole right to perform the licensed act . . . and that prohibits the licensor from

7 performing the licensed act and from granting the right to anyone else . . . ." *Black's Law*

8 *Dictionary* 1003 (9th ed. 2009). A "nonexclusive" license does not impose this limitation on the

9 licensor. A joint owner of a work may consistent with *Sybersound* grant a license that is

10 exclusive *as against him*, i.e., he may no longer exploit or further license the work. But such a

11 licensee cannot prevent the other joint owner(s) from using or further licensing the work. In a

12 sense, then, such a license is both exclusive and nonexclusive. *See* 1 Nimmer & Nimmer, *supra*,

13 § 6.10[A][2][c]–[d] (explaining that an exclusive license from fewer than all joint owners is

14 exclusive as against the licensor, but not as against the other joint owners). By analogy, one

15 tenant-in-common as to a parcel of land may lease the land without the consent of the other

16 tenants-in-common, but he is liable to account to the other tenants for the rents, and even if the

17 first tenant promises his lessee that he will vacate the land during the lease, the first tenant and

18 his lessee cannot via this separate agreement prevent the other tenants from going onto their own

19 land. This is likely what the *Sybersound* court meant when it said that a joint owner cannot

20 without consent of the other joint owner(s) grant an "exclusive license," i.e., a license that is

21 exclusive *as against all joint owners*, but by attempting to do so, a joint owner grants whatever

22 "nonexclusive" license he in fact has the power to grant, i.e., a license that is not exclusive as

23 against all joint owners, but which is exclusive as against the licensor. Plaintiff's criticisms

24 would be justified if *Sybersound* meant that a joint owner could not grant a license that was

25 exclusive even as against himself, or that the very fact of joint ownership prevented even all joint

owners in cooperation from granting an exclusive license. *Sybersound* does not appear to stand

1   for either of these propositions, but only points out in the copyright context the unremarkable

2   and familiar principle that where there is joint ownership of property in a system where each

3   owner has the ability to license its use, one joint owner cannot do so to the detriment of another

4   joint owner's ability to use or license the property.  Surely the Ninth Circuit will clarify that it

5   meant something like this if given the chance, and perhaps it will have the chance in the present

6   case.  In any case, this Court is confident that the *Sybersound* court is guilty at most of imprecise

7   syntax or some minor equivocation, as opposed to outright copyright-law heresy.  As to

8   Nimmer's insistence that a nominal exclusive licensee who holds his license from fewer than all

9   joint owners should have standing to sue for infringement, *see id.* § 6.10[A][2][d], the issue

10  simply does not present itself in this case.  There do not yet appear to be any counter-, third-

11  party-, or cross-claims by any licensee of the Work.  The only infringement claims are brought

12  by Plaintiff, who no party seems to contest is a 50% owner of the Work, and not a licensee.  The

13  Court expresses no opinion on Nimmer's policy-based criticism that *Sybersound*'s rejection of

14  the ability of a selectively exclusive licensee[5] to sue for copyright infringement unreasonably

15  hinders the ability to enforce a copyright.

16          The Valli/Gaudio License was either a selectively exclusive license[6] or a transfer of

17  DeVito's ownership of the Work, but in no case was it an exclusive license as against Plaintiff.

18  The Court finds that the Valli/Gaudio License was not a "transfer of copyright ownership" under

19  17 U.S.C. § 101 but was a selectively exclusive license, i.e., it was exclusive as against DeVito,

20  but nonexclusive as against Plaintiff.  The Court is perhaps coining a new term here, but it is not

21  creating any new doctrine.  Nimmer explicitly recognizes and discusses the phenomenon this

22  term describes when jointly owned works are separately licensed by fewer than all joint owners.

23  *See id.* § 6.10[A][2][c]–[d].

24

25          [5]*See infra*, note 6.

        [6]The license was exclusive as against DeVito, the licensor, but nonexclusive as against
Plaintiff. *See* 1 Nimmer & Nimmer, *supra*, § 6.10[A][2][c]–[d].

A joint owner may also transfer his partial ownership of a work altogether. *See* 17 U.S.C. § 201(d)(1) ("The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession."). In such a case, the transferee stands in the shoes of the transferor with respect to rights of further exploitation, transfer, and license. *See* 1 Nimmer & Nimmer, *supra*, § 6.11. A transfer of copyright ownership need not use the words "transfer" or "assign" but must indicate an intent to effect an outright transfer of the copyright. *See Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) ("No magic words must be included in a document to satisfy § 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright."); *Urantia Found. v. Maaherra*, 114 F.3d 955, 960 (9th Cir. 1997) ("Even though the precise words 'assign' or 'transfer' do not appear in the trust instrument, the members of the Contact Commission demonstrated their intent to transfer the common law copyright in the Papers to the Foundation both through the language of the trust instrument itself, and by delivery of the printing plates to the Foundation. The trust instrument provided that the trustees of the Foundation were 'to retain absolute and unconditional control of all plates and other media for the printing and reproduction of the Urantia Book and any translation thereof . . . .'"). If the Valli/Gaudio License in fact constituted such a transfer, then Plaintiff would now be a joint owner of the Work with Valli and Gaudio, assuming no further transfers, though DeVito would still potentially be liable to share royalties with Plaintiff under the Letter Agreement as a matter of contract law.

The Court finds that the Valli/Gaudio License is at best ambiguous as to the intent to transfer copyright. The document does not use words of "transfer," but rather gives an "exclusive right to use," indicating a license. More importantly, the document does not sufficiently identify the Work, which is necessary to effect the transfer of copyright in the Work. The Valli/Gaudio License constitutes Exhibit A to the *Jersey Boys* Agreement. (*See* Valli/Gaudio License, ECF No. 457-34, at 38). The copy Plaintiff adduces was signed on

1    an unspecified date by Gaudio, Macioli (Massi), and DeVito, but not by Valli. (*See id.*).  The

2    Valli/Gaudio License is in the form of a letter from Valli and Gaudio to DeVito and Massi in

3    which Valli and Gaudio indicate their intent to develop a musical based on the life and music of

4    *The Four Seasons* and wish to use "your creative contributions, biographies, events in your life,

5    names and likenesses (the 'Materials')". (*See id.* 1).  Valli and Gaudio propose that "in

6    consideration for our right to use such Materials," DeVito and Massi shall be entitled to certain

7    royalties. (*See id.* 1–2).  The letter further explains:

8            In consideration of the foregoing payments, you grant to us the exclusive
         right to use and incorporate the Materials in one or more theatrical productions, and
9        any and all ancillary and subsidiary exploitations thereof including, without
         limitation, cast albums, motion picture and televised versions, merchandise and/or
10       other works . . . . You hereby consent to any such use and agree that the Works may
         be exploited throughout the world in all media now existing and later devised, and
11       you further acknowledge that you shall not receive any compensation for the use of
         the Materials or in connection with any of the Works other than the compensation
12       expressly set forth herein.  The rights granted by you to us hereunder shall continue
         in perpetuity if the rights in the Play have merged with each other pursuant to the
13       production contract between us and the initial commercial producer.  If the rights of
         the initial commercial producer lapse prior to merger, and we enter into a production
14       contract with another commercial producer within two (2) years following such lapse
         of rights, our rights hereunder shall continue only for the duration of such subsequent
15       producer's rights, and in perpetuity if merger has occurred pursuant to our
         production contract with such subsequent producer.

16            . . . .

17            The rights granted to us herein are irrevocable and not subject to rescission
18       or injunction under any circumstances.

19   (*Id.* 2–4).  The all-important question is whether the above-quoted language indicates an intent to

20   transfer copyright ownership, or merely to grant a license.  On their face, the first two sentences

21   of the passage indicate an attempt to grant an exclusive license.  The third and fourth sentences

22   complicate the analysis.  They indicate that the license becomes perpetual if and when "the rights

23   in the Play have merged with each other pursuant to the production contract between us and the

24   initial commercial producer [or a later producer]."  There seems to be no dispute that there was a

25   later production contract.  Finally, the rights are irrevocable.  Still, the Work is nowhere

     identified except insofar as it is included under the umbrella of "biographies."  The Court finds

that the Work is not sufficiently identified in the Valli/Gaudio License to show a transfer of

copyright.  Any ambiguity must be resolved in favor of Defendants.  Valli and Gaudio attest that

at the time they entered into the Valli/Gaudio License, they were not even specifically aware of

the existence of the Work, which, insofar as the agreement is ambiguous, is good parol evidence

that there was no intent to transfer copyright in the Work. (*See* Valli Decl. ¶ 11, June 24, 2011,

ECF No. 548-5; Gaudio Decl. ¶ 12, June 22, 2011, ECF No. 548-6).  Valli and Gaudio both

declare that they never saw a copy of the Work until Plaintiff's counsel showed them a copy

during their depositions in the summer of 2011.

As to exploitation of the Work overseas, the Valli/Gaudio License appears to be a nullity,

because it is in fact a license and not a transfer of copyright ownership. *See id.* § 6.10 [D] (citing

*Powell v. Head*, 12 Ch. D. 686 (1879) (U.K.); *Cescinsky v. George Routledge & Sons, Ltd.*, 2

K.B. 325 (1916) (U.K.); *Massie & Renwick, Ltd. v. Underwriters' Survey Bureau, Ltd.*, 1 D.L.R.

625 (1940) (Can.)) ("[I]n foreign jurisdictions, a license will not be valid unless all joint owners

are party to it.").

The Court rejects Defendants arguments that they could only become joint owners with

Plaintiff as to the entire Work (or some stick in the bundle of rights pertaining to the Work) if

DeVito were able to grant a fully exclusive license in the Work (or an exclusive license in some

stick in the bundle of rights pertaining to the Work), as opposed to a selectively exclusive

license.  Defendants fail to note the distinction between the grant of an exclusive license

(whether fully or selectively exclusive) and the transfer of copyright.  Defendants' argument

relies on the incorrect premise that the grant of an exclusive license and the transfer of copyright

are synonymous.  They are not. *See* 1 Nimmer & Nimmer, *supra*, §§ 6.10–6.11.  Defendants are

correct that DeVito could not as a joint owner grant an exclusive license against other joint

owners without their concurrence, and that such an attempt results in a selectively exclusive

license, which under *Sybersound* is nonexclusive for the purposes of standing to sue for

infringement.  However, they ignore the possibility that the Valli/Gaudio License was in fact a

Page 24 of  28

1    transfer of copyright, which is different from the grant of an exclusive license.  The Court finds

2    that it was not a transfer of copyright as a matter of fact, but the possibility that it could have

3    been so exists as a matter of law.

4    Next, Plaintiff asks the Court to declare that Valli and Gaudio further licensed the Work

5    to DSHT and/or Dodger Theatricals via the *Jersey Boys* Agreement, and that Dodger Theatricals

6    thereafter either directly, or after further assignment or sublicense by DSHT, further assigned or

7    sublicensed it to Jersey Boys Broadway.  The *Jersey Boys* Agreement was between "Owner"

8    Valli and Gaudo, "Bookwriter" Elice and Brickman, and "Producer" DSHT. (*See Jersey Boys*

9    Agreement 1).  The rights to the name *The Four Seasons* and the life stories of the members of

10   the band, as well as the history of the band, are referred to as the "Underlying Rights." (*See id.*

11   2).  The rights to songs written by the band to be used in the musical are referred to as the

12   "Composition Rights." (*See id.*).  The *Jersey Boys* Agreement the contains several paragraphs of

13   complex assignments of rights and royalties provisions. (*See id.* 2–4).  Pages seven and eight of

14   the *Jersey Boys* Agreement contain indications of a license to Producer DSHT. (*See id.* 7

15   ("Owner shall have approval over any license, assignee, or lessee in connection with any

16   production which Producer does not produce or co-produce."); *see id.* 8 ("Owner and the

17   Bookwriter, as their interests may appear, shall own the copyright in all translations of the book

18   of the Play.")).  Page nine contains additional indication of license. (*See id.* 9 ("Author (Owner

19   and Bookwriter) shall own and control the Play with respect to all rights subject to the rights

20   expressly granted to Producer in this Agreement.")).  Page twenty-one makes clear that the

21   duration of the license is not perpetual. (*See id.* 21 ¶ 24).

22   In summary, the Valli/Gaudio License was not a transfer of copyright from DeVito to

23   Valli and Gaudio, because although the instrument purported to give exclusive rights in the

24   Materials irrevocably and perpetually, it did not sufficiently identify the Work to transfer

25   DeVito's 50% ownership of copyright in the Work to Valli and Gaudio.  At best, the instrument

is ambiguous with respect to intent to transfer copyright, and the parol evidence indicates that

1  there was no intent to transfer copyright, particularly as Valli and Gaudio appear not to have

2  known specifically about the Work itself at the time they entered into the Valli/Gaudio License

3  with DeVito.  The intent of the parties to the Valli/Gaudio License was to create an exclusive

4  license in the Materials, which included the Work under the general category of "biographies."

5  The Valli/Gaudio License therefore constituted a selectively exclusive license.  It was in part an

6  exclusive license and in part a nonexclusive license as to exploitation within the United States,

7  and in foreign jurisdictions it was no license at all.  It was an exclusive license except insofar as

8  it must be nonexclusive as a matter of law.  That is, it was exclusive as to the Materials identified

9  therein, and it was even exclusive as to the Work, but only as against DeVito.  Next, although the

10 Valli/Gaudio License does not display a clear intent to transfer the copyright to the Work, the

11 definition of the Materials in the Valli/Gaudio License includes "biographies," and it is therefore

12 broad enough to include the Work under its broad grant of a license.  The fact that Valli and

13 Gaudio were not specifically aware of the Work—an important piece of parol evidence as to the

14 intent to transfer copyright—is not relevant to whether the Valli/Gaudio License encompassed

15 the Work for the purposes of licensing.  The license was purposely written in broad terms and

16 was meant to encompass any and all of DeVito's writings concerning certain portions of his life.

17 The license to exploit the Work, however, must be nonexclusive as against Plaintiff, because

18 DeVito was not its sole owner.  Finally, under the Copyright Act of 1976, as under the Copyright

19 Act of 1909, Valli and Gaudio were unable to further assign their license or to sublicense the

20 Work without the express consent of their licensor, DeVito. *See Gardner v. Nike, Inc.*, 279 F.3d

21 774, 780 (9th Cir. 2002).  The Valli/Gaudio License included express permission from DeVito to

22 assign or sublicense the license. (*See* Valli/Gaudio License 4 ("We [Valli and Gaudio] shall have

23 the unrestricted right to assign this agreement in whole or in part.")).  The *Jersey Boys*

24 Agreement appears to have constituted a nonexclusive sublicense to DSHT.  It is not clear based

25 on the evidence adduced at this stage whether any further purported licenses were granted by

1    DSHT.[7]

2        **B.    Equitable Accounting (Fourteenth Cause of Action)**

3        Both Plaintiff and Defendants have moved for summary judgment on this cause of action.

4    "[A] joint owner is under a duty to account to the other joint owners of the work for a ratable

5    share of the profits realized from his use of the work." 1 Nimmer & Nimmer, *supra*, § 6.12 [A]

6    (citing *Oddo*, 743 F.2d 630).  Such profits are held in constructive trust by the first joint owner

7    for the benefit of the other joint owners, which requires an accounting. *Id.* (citing *Oddo*, 743

8    F.2d 630).  The rule is justified to the degree the first joint owner has exploited the work,

9    because the value of the work to the other joint owners is thereby "depleted" for future

10   exploitation. *See id.*  A joint owner is also accountable to the other joint owners for their share of

11   profits from his separate licensing of a joint work. *Id.* § 6.12 [B].  The "depletion" rationale

12   applies especially strongly in licensing cases, because the licensor need not even risk his own

13   capital to realize profits from the licensee's exploitation of the joint work. *See id.*

14       Here, DeVito has a duty to account to Plaintiff for her ratable share of profits from his

15   licensing of the Work to Valli and Gaudio. *See id.* § 6.12 [C][1]–[2].[8]  As half owner of the

16   Work, Plaintiff is presumably entitled to half of the total consideration DeVito received for the

17   Valli/Gaudio License that is attributable to the Work.  There remains a question of fact what

18   percentage of DeVito's royalties under the license is attributable to the Work and what

19   percentage is attributable to other works or assistance DeVito provided under the license.  For

20   example, if it is determined at trial that 50% of the royalties DeVito received are attributable to

21   the Work (with the remaining 50% attributable to other pieces of the Materials he provided),

22

23        [7]Plaintiff alleges further licensing "on information and belief" but attaches no copies of
24   further licenses of transfers of copyright.  Further discovery may reveal such licenses, whether
     written or verbal.  It is nearly inconceivable that DSHT did not further license the Materials,
25   which included the Work, to Jersey Boys Broadway and other production companies.

         [8]Neither Plaintiff nor DeVito has moved for summary judgment on the second cause of
     action for an equitable accounting by DeVito.

then DeVito will be liable to Plaintiff for 25% of the total royalties he received under the Valli/Gaudio License.  In any case, he is liable to account for his royalties under the license.

Valli and Gaudio themselves, as well as DSHT and any other further licensees or sublicensees, do not owe Plaintiff a direct accounting, because a joint owner's licensee's duties are limited to the licensee's contractual duties under the license. *See* 1 Nimmer & Nimmer, *supra*, § 6.12[B] (citing, *inter alia*, *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 523 (9th Cir. 1990)).  The Court therefore grants summary judgment to Defendants on the fourteenth cause of action and denies summary judgment to Plaintiff.  The second cause of action for an accounting by DeVito remains viable.

## CONCLUSION

IT IS HEREBY ORDERED that the Motions for Summary Judgment (ECF Nos. 548, 600) are GRANTED in part and DENIED in part.  The Court denies summary judgment to Plaintiff on the twelfth cause of action.  The Court grants summary judgment to Plaintiff in part on the thirteenth cause of action and denies summary judgment to Defendants.  The Court grants summary judgment to Defendants on the fourteenth cause of action and denies summary judgment to Plaintiff.

IT IS SO ORDERED.

Dated this 26th day of October, 2011.

_____
ROBERT C. JONES
United States District Judge