1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

7

## DISTRICT OF NEVADA

8

| | | |
|---|---|---|
| DONNA CORBELLO, | ) | |
| Plaintiff, | ) ) ) | 2:08-cv-00867-RCJ-PAL |
| vs. | ) ) | |
| THOMAS GAETANO DEVITO et al., | ) ) | **ORDER** |
| Defendants. | ) ) | |
| _____ | ) | |

9
10
11
12
13

14       This case arises out of alleged copyright infringement.  Plaintiff Donna Corbello is the

15   widow and heir of Rex Woodard, who assisted Defendant Thomas Gaetano "Tommy" DeVito in

16   writing his unpublished autobiography (the "Work").  Plaintiff alleges that DeVito and others

17   wrongfully appropriated the Work to develop the screenplay for *Jersey Boys*, a hit musical based

18   on the band *The Four Seasons* that has played in the United States, Canada, England, and

19   Australia.  Corbello has sued several companies and individuals, including several members of

20   *The Four Seasons*, for copyright infringement, and has sued DeVito on several state law causes

21   of action.  The Court has ruled that DeVito and Plaintiff were 50% joint owners of the Work,

22   that DeVito had granted Defendants Frankie Valli and Robert "Bob" Gaudio a selectively

23   exclusive license to exploit the Work, i.e., a license that was exclusive as against DeVito but

24   nonexclusive as against Plaintiff, and that Valli and Gaudio had in turn granted a nonexclusive

25   sublicense to Defendant DSHT, Inc.  The Court made no rulings as to any further licenses.  The

Court also ruled that only DeVito was potentially liable for a direct accounting.  Pending before the Court are eight motions for summary judgment.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    The Work

Rex Woodard was an attorney, author, and avid *Four Seasons* fan who finally met Defendant and founding *Four Seasons* member Tommy DeVito for an interview on December 9, 1981 as a result of the publicity generated from an article Woodard had written about the band in *Godmine* magazine earlier that year (the "1981 Article") that focused on the years between the band's breakup in 1970 and reconstitution in 1975. (*See* Third Am. Compl. ¶¶ 26–29, Mar. 18, 2011, ECF No. 457).  On December 23, 1981, Woodard interviewed Tommy's brother Nick DeVito, and on January 8, 1982 he interviewed Nick Massi, another founding member of *The Four Seasons*. (*Id.* ¶ 29).  The result of these three interviews was a second article published in *Goldmine* in June of 1982 (the "1982 Article"), which focused on the band's earliest incarnation, *The Four Lovers*. (*Id.*).

Woodard kept in touch with DeVito and founding *Four Seasons* member Frankie Valli throughout the 1980s, and in November of 1988 Woodard flew to Las Vegas, Nevada for a series of interviews (the "1988 Interviews") with DeVito that sewed the seeds of the present litigation. (*See id.* ¶ 31–32).  During these interviews, DeVito explained to Woodard that except for Valli and final *Four Seasons* founding member Robert "Bob" Gaudio, the members of the band (DeVito and Massi) had spent several years engaged in criminal enterprises and in prison and retained "underworld contacts" throughout the band's era of popularity. (*See id.* ¶ 32).  Because this revelation was in stark contrast to the clean-cut image of the band presented in the popular media, Woodard realized the journalistic value of the story, and DeVito offered Woodard the opportunity to write his authorized biography with full credit and an equal share in any profits. (*See id.*).

Woodard returned to Beaumont, Texas to begin writing DeVito's authorized biography (the "Work"), which has never been published. (*See id.*).  On December 1, 1988, Woodard sent DeVito a letter (the "Letter Agreement") memorializing their previous verbal understandings concerning creation of the Work. (*Id.* ¶ 33).  DeVito signed the Letter Agreement beneath the word "APPROVED" and mailed it back to Woodard. (*See id.*; Letter Agreement, Dec. 1, 1988, ECF No. 457-11).  The Letter Agreement reads in full:

December 1, 1988

Mr. Tommy DeVito
[street address]
Las Vegas, Nevada [zip code]

Dear Tommy:

I am making progress on the taped interviews we did.  You suggested that I prepare a written memorandum of our arrangement for future reference. I will do so by this letter.

I agreed to write your authorized biography based on the recorded interviews you gave me, plus any other relevant information which would benefit the book. You and I will be shown as co-authors, with you receiving first billing.  I will do all of the actual writing, but you will have absolute and exclusive control over the final text of this book.

We have further agreed that we will share equally in any profits arising from this book, whether they be in the form of royalties, advances, adaptations fees, or whatever.  This agreement will be binding upon our heirs, both as to obligations and benefits, in the event one or both of us should die.

If this letter accurately sets forth our agreement as you understand it, sign the enclosed photocopy where indicated and return it to me in the enclosed self-addressed, stamped envelope.  Keep this original letter in your own file.

Thank you for asking me to work with you on this project.  I look forward to working with you over the next several months.

Sincerely,
[signed] Rex Woodard
Rex Woodard

RW/ml
Enclosures

APPROVED:

[signed] Tommy DeVito
TOMMY DEVITO

(Letter Agreement).  Over the next two years, Woodard used the 1988 Interviews and all of his other knowledge about the band to create the Work, including his past interviews with band members, newspaper articles, magazine articles, album linings, Freedom of Information Act requests he filed with law enforcement agencies, and questionnaires he sent to DeVito. (Third Am. Compl. ¶ 34).  Woodard compiled all of this information into the Work, resulting in a first-person, narrative-style biography told from DeVito's perspective. (*See id.*).  Woodard remained in close contact with DeVito throughout his creation of the Work and sent DeVito each chapter for approval and editing as they were completed. (*Id.* ¶ 35).

## B.    Woodard's and DeVito's Publication Attempts

As the Work neared completion in late 1990, Woodard and DeVito attempted to find a publisher and even provided an outline of the Work to actor Joe Pesci to explore adaptation to a screenplay. (*See id.* ¶ 36).  Plaintiff provides a copy of what she claims is a cover sheet to a January 1991 version of the Work, which reads in full:

UNTITLED
TOMMY DEVITO/FOUR SEASONS
BIOGRAPHY

. . . .

TOMMY DEVITO
REX WOODARD
©, January, 1991

(*See* January 1991 Work Cover Page, ECF No. 457-15).

Though he never smoked, Woodard had been diagnosed with lung cancer in 1989, and his condition had begun seriously to worsen by late 1990. (*Id.* ¶ 39).  By February or March of 1991, he was bedridden, and he died on May 25, 1991 at age forty-one. (*Id.* ¶ 40).  Woodard had hoped that income generated from the Work would support his wife and children. (*Id.* ¶ 41).

///

### C.      Plaintiff's and Ceen's Publication Attempts

In accordance with Woodard's wishes, Plaintiff and Woodard's sister Cindy Ceen continued to seek publication after Woodard's death independently of DeVito; however, public interest in *The Four Seasons* had waned, making it difficult to find a publisher. (*Id.* ¶ 42).  Ceen determined in September 2005 to contact DeVito for his assistance in getting the Work published. (*See id.*).  Ceen first contacted a prominent member of an Internet *Four Seasons* fan group named Charles Alexander to facilitate contact with DeVito. (*See id.* ¶ 43).  Alexander responded to Ceen on September 22, 2005 that he had met with DeVito the previous day, had told DeVito of Ceen's desire to publish the Work, and that DeVito had agreed to help. (*See id.*).  Ceen called DeVito the same day (using a telephone number provided by Alexander), and DeVito indicated that he wanted to update the Work with post-1990 events and restore some "obscene" language Woodard had omitted. (*Id.*).  DeVito also claimed he had lost his copy of the Work and asked Ceen for a replacement, which she mailed to DeVito the next day, along with a letter memorializing their telephone conversation and informing DeVito that Plaintiff was considering self-publishing the Work if a traditional publisher could not be found. (*Id.*).  Neither Plaintiff nor Ceen heard from DeVito again. (*Id.* ¶ 44).  DeVito's attorney Jay Julien left Ceen a voice mail message on November 2, 2005, and Ceen returned his call the next day, during which conversation Julien told Ceen that he had spoken with DeVito regarding the Work and concluded that it was "not saleable." (*Id.*).  Ceen was surprised by this conclusion, because the play *Jersey Boys* was scheduled to open on Broadway a few days later. (*Id.*).  Julien did not disclose that the Work had been used or exploited in any way or that rights in the Work had been licensed or assigned. (*Id.*).

### D.      *Jersey Boys* **and Plaintiff's Discovery of the Alleged Infringements**

By late 2006, *Jersey Boys* had become a Broadway hit, earning four Tony Awards. (*Id.* ¶ 45).  Plaintiff had not seen the show, but she and Ceen estimated that the show's success

1  would revive interest in the band and make publication of the Work viable. (*Id.*). Plaintiff and

2  Ceen engaged counsel to confirm the registration of Woodard's and DeVito's copyright in the

3  Work, to register the copyright if not yet registered, and to contact Julien to see if DeVito had

4  changed his mind about joint publication of the Work in light of *Jersey Boys*'s success. (*Id.*). A

5  January 3, 2007 search of the U.S. Copyright Office's online records indicated no registration of

6  the Work to Woodard but showed that on January 11, 1991 (four months before Woodard's

7  death) DeVito had registered a literary work entitled *Tommy DeVito - Then and Now*, Reg. No.

8  Txu 454 118 (the "DeVito Work"). (*Id.* ¶ 46). Plaintiff's counsel ordered a copy of the

9  registration and discovered that DeVito had registered the DeVito work in his own name only,

10 claiming that the work was unpublished and that he wrote it in its entirety in 1990. (*Id.* ¶ 47).

11 Plaintiff's counsel ordered a copy of the DeVito Work itself and discovered that the DeVito

12 Work was identical to the Work, and in fact appeared to be a photocopy of the manuscript typed

13 by Woodard's secretary Myrtle Locke, with two exceptions. (*Id.* ¶¶ 48–49). First, the original

14 cover page from the January 1991 version of the Work had been replaced with a cover page in a

15 different font and font size, reading:

16                                                                        TXu 454 118

17          . . . .

18                                    Tommy DeVito - Then and Now
                                                   by
19                                          Tommy DeVito

20 (*Id.* ¶ 49; *see* DeVito Work Cover Page, ECF No. 457-23). Second, the first page of Chapter 41

21 (page 264 of the Work) was missing. (*See* Third Am. Compl. ¶ 49). Plaintiff concluded in light

22 of the Letter Agreement and her dealings with DeVito and his counsel after Woodard's death

23 that DeVito had registered the Work without credit to Woodard or disclosure to Woodard or his

24 heirs. (*Id.* ¶ 50).

25          Plaintiff also soon discovered that the writers of and several actors in *Jersey Boys* had

access to the Work and that DeVito had received royalties or other profits from *Jersey Boys*, and she concluded that the Work had "inspired the form, structure, and content of the musical . . . ." (*See id.* ¶ 51).  As support for this conclusion, Plaintiff notes that Defendant Des McAnuff, the director of *Jersey Boys*, was quoted in a July 8, 2006 report in *Backstage* magazine as stating that Defendants Marshall Brickman and Eric Elice had relied in part on "an unpublished autobiography by DeVito" in creating the libretto. (*See id.* ¶ 52).  The source apparently does not indicate whether the libretto served as the script, a program for audiences, or something else. (*See id.*).  Plaintiff notes that Christian Hoff, the first actor to play DeVito in *Jersey Boys*, stated in what appears to be an online interview that he was provided with a synopsis of the Work for his audition and a full copy for background research. (*See id.*).  Plaintiff also cites to a Wikipedia entry for support that the Work served as a basis for the musical. (*See id.*).  Plaintiff also notes an exchange on a *Jersey Boys* podcast website indicating that one fan had reported to another that the musical was based on DeVito's unpublished biography. (*See id.*).  Plaintiff also saw public reports of DeVito's financial profits from the musical. (*See id.*).

### E.    Pre-Litigation Negotiations

On June 13, 2007, Plaintiff's counsel wrote Julien by email and overnight courier demanding that DeVito execute an application for supplementary registration with the U.S. Copyright Office to add Woodard as a coauthor and co-claimant of the Work and demanding an accounting of profits in accordance with the Letter Agreement. (*Id.* ¶ 53).  Counsel conferred with one another by email and telephone between June and October 2007, and Julien admitted at one point that DeVito had provided a copy of the Work "to *Jersey Boys*" and expressed interest in the possibility of a joint copyright infringement action against "*Jersey Boys*," but later decided that Plaintiff's only recourse was a suit against DeVito because he had authorized *Jersey Boys*'s use of the Work. (*Id.* ¶ 54).  Although DeVito initially considered filing a supplemental registration of the Work to credit Woodard, he later refused, claiming that he in fact was the sole

1    author and that Woodard had been a mere scribe. (*Id.*).

2        On July 2, 2007, Plaintiff filed her own supplementary application with the U.S.

3    Copyright Office to add Woodard as a coauthor and co-claimant of the Work, but the office

4    rejected the application because DeVito, the original claimant, had not signed it. (*Id.* ¶ 55).  The

5    office could not under 17 U.S.C. § 201(a) permit a non-author, non-claimant as to an original

6    registration, i.e., a "basic registration," to supplement the basic application, but such a person

7    could apply to register her own work, in which case the office would consider the new claim to

8    be adverse to the existing claim if the claims purported to register the same work exclusively to

9    different claimants. (*See* Copyright Office Letter, June 16, 2008, ECF No. 457-27, at 7).

10   However, the Copyright Office Review Board granted Plaintiff's appeal based on a closer

11   examination of regulations and practices, determining that her supplemental registration could be

12   accepted, and that a certificate of registration would be issued after processing. (*See* Copyright

13   Office Letter, Mar. 27, 2009, ECF No. 457-28).  The amended certificate, Reg. No. Txu1 372-

14   636, lists Woodard and DeVito as coauthors of the entire text of the Work and co-claimants

15   thereto. (*See* Certificate of Registration TXu1 372-636, July 3, 2007, ECF No. 457-29).[1]

16   _____

17       [1]Plaintiff alleges that her 2007 supplemental registration "was not cross-indexed" with
     DeVito's original 1991 registration because DeVito had not signed his 1991 application. (*See*

18   *id.*).  She alleges that as a result, she cannot establish clear title in the Work. (*See id.*).  But
     Plaintiff does not explain how DeVito could have obtained his basic registration without signing

19   his application, and in fact she adduces a copy of DeVito's signed 1991 application. (*See* Form
     TX, Reg. No. Txu 454 118, July 11, 1991, ECF No. 457-22 (signed by DeVito on July 7, 2011)).

20   This form appears to function as both an application (with the applicant's signature at the bottom
     of page 2) and a certificate of registration (once approved by the office at the top of page 1). (*See*

21   *id.*).  Nor does it make sense that the office did not cross-reference Plaintiff's 2007 supplemental
     application with DeVito's 1991 basic application, particularly as her 2007 application was a

22   supplement to the 1991 registration and the certificate the office eventually issued specifically
     identifies the 1991 basic registration both by registration number and DeVito's name.

23       The applicable regulation, which Plaintiff cites, clarifies her complaint.  Although her
     supplemental registration identifies DeVito's basic registration, because no basic registrant

24   (DeVito) signed the supplemental registration, the office could not annotate DeVito's basic
     registration with the fact of Plaintiff's supplemental registration, *see* 37 C.F.R. § 201(b)(1) n.1,

25   so a person finding only DeVito's basic registration would not be aware of Plaintiff's
     supplemental registration.  Even though the supplemental registration of Woodard's and his

Thereafter, further indication of the connection between *Jersey Boys* and the Work emerged through public sources such as public interviews of certain Defendants. (*See* Third Am. Compl. ¶ 56).  Plaintiff alleges that the evidence that the musical was an adaptation of the Work means that *Jersey Boys* is a "derivative work" of the Work under 17 U.S.C. § 101. (*See id.* ¶ 57). Plaintiff recounts the similarities between *Jersey Boys* and the Work. (*See id.*).

## F.     The "Cover-up"

DeVito and Julien then took steps to conceal the fact that DeVito had exploited the Work to create and profit from *Jersey Boys*. (*See id.* ¶ 58).  First, DeVito withdrew his quotes from Charles Alexander's forward to the upcoming *Jersey Boys* book, because the use of those quotations would have linked the book, and hence the musical, to the Work. (*See id.*).  Second, DeVito reported in an interview that he had never shown the Work to anyone except Brickman, Elice, and McAnuff, the writers and director of *Jersey Boys*. (*Id.*).  Third, DeVito "dismantled" his website <www.tommydevito.com> to remove reference to "his SMASH HIT *Jersey Boys*." (*Id.*).  Fourth, he stated in an interview that he had dictated the Work to a lawyer and that the book was not to be published yet. (*Id.*).  At this point, Plaintiff instituted the present lawsuit.

*///*

---

heirs' rights in the Work is sufficient to give constructive notice under the statute, it is only sufficient if a "reasonable search" would reveal Woodard's rights in the Work, and it is theoretically possible that a search might reveal only DeVito's registration, so that the failure to annotate DeVito's basic registration with the fact of Plaintiff's supplemental registration is problematic. *See* 17 U.S.C. § 205(c)(1).  Plaintiff's fear is practically unfounded, however, because the supplemental registration includes the title of the DeVito Work as it appears on the basic registration itself, as well as the basic registration number, (*see* Certificate of Registration TXu1 372-636), so a reasonable search could not fail to reveal the supplemental registration, and the world is therefore on constructive notice of the supplemental registration as a matter of law regardless of the "one-way" cross-reference, *see* § 205(c).  Plaintiff may not challenge DeVito's basic registration directly with the office, because the cancellation procedures do not appear to contemplate adjudication of a non-claimant's complaints over improper registration, *see* 37 C.F.R. § 201.7, but a federal court may refer such a dispute to the Registrar of Copyrights for administrative adjudication under the primary jurisdiction doctrine while retaining jurisdiction, if necessary, *see Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 781–82 (9th Cir. 2002).

### G.      DeVito's Licensing of the Work

Certain documents made public during Valli's divorce proceedings in July 2008 revealed that DeVito had granted Valli and Gaudio an exclusive, irrevocable, perpetual, worldwide, assignable license (the "Valli/Gaudio License") freely to use and adapt certain "Materials," including his "biographies," for the purpose of creating a musical based on the "life and music" of *The Four Seasons*. (*Id.* ¶ 59).  The Valli/Gaudio License included the right to "ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised versions, merchandise, and/or other works . . . in all media now existing or later devised." (*Id.*).  The Valli/Gaudio License waived any claim of copyright infringement by DeVito, provided that DeVito would be entitled to 20% of any royalties Valli and Gaudio obtained through exploitation of the Materials, and provided that Massi would be entitled to 5% of any such royalties. (*See id.*).  Plaintiff suspects that Valli and Gaudio further licensed the Materials, which included the Work, to one or more unknown authors in 1999 for adaptation into an early version of *Jersey Boys* called *Walk Like a Man*. (*See id.*).  When the original producer rejected *Walk Like a Man*, Valli and Gaudio fired its authors, permitted their agreement with the original producer to lapse, and further licensed the Materials to Brickman and Elice, who used them to write *Jersey Boys*. (*See id.*).  Plaintiff implies that Valli's and Gaudio's informal joint ventures related to their exploitation of the Materials constitutes a general partnership as a matter of law that Plaintiff refers to as "The Four Seasons Partnership." (*See id.* ¶ 4–5).

### H.      *Jersey Boys*

The *Jersey Boys* foundational production agreement (the "*Jersey Boys* Agreement") is dated May 1, 2004. (*See id.* ¶ 61; *Jersey Boys* Agreement 1, May 1, 2004, ECF No. 457-34, at 2). The *Jersey Boys* Agreement lists five parties: Valli and Gaudio as "Owner," Brickman and Elice as "Bookwriter," and Dodger Stage Holding Theatricals, Inc. (now known as DSHT, Inc.) as "Producer." (*See Jersey Boys* Agreement 1).  The copies of the signature page of the *Jersey Boys*

Agreement attached to the Third Amended Complaint ("TAC") include signatures by all of these parties except Brickman, and DSHT's signature is typewritten, without the handwritten signature of any natural person as an agent of DSHT. (*See id.* at 24, ECF No. 457-34, at 25–26).  The signatures are not dated. (*See id.*).  The *Jersey Boys* Agreement is comprehensive and appears to govern the worldwide exploitation of *Jersey Boys*. (*See generally id.*).  The details of the twenty-three-page agreement need not be recounted here, but will be noted where relevant to the determination of claims.  The *Jersey Boys* Agreement includes a schedule and two exhibits as attachments, all of which the base agreement identifies.  Schedule A is a table of musical compositions to be used in the musical along with details of authorship and copyright ownership. Exhibit A is the Valli/Gaudio License.  Exhibit B is a list of "payment instructions" consisting of addresses for mailing payments to the signatories and other beneficiaries.

Plaintiff believes that DSHT further assigned or licensed its rights under the *Jersey Boys* Agreement to Defendant Dodger Theatricals, Ltd., which is the primary producer of *Jersey Boys* on Broadway, tours throughout the United States, and in London, U.K. (*See* Third Am. Compl. ¶ 62).  Plaintiff believes that DSHT and/or Dodger Theatricals further licensed their rights to others and eventually assigned them to Defendant Jersey Boys Broadway, which in turn licensed them to several parties, including Defendants JB Viva Vegas and Jersey Boys Records. (*See id.*). Plaintiff alleges that *Jersey Boys* has earned gross revenues of approximately $300 million per year and believes she is entitled to at least $6.5 million. (*See id.* ¶ 70).

## I.    The Present Lawsuit

In December 2007, Plaintiff sued DeVito in the U.S. District Court for the Eastern District of Texas on three causes of action: (1) declaratory judgment; (2) equitable accounting; and (3) breach of contract.  That court transferred the case to this District in 2008 pursuant to 28 U.S.C. § 1404(a), without deciding whether it had personal jurisdiction over DeVito, and it denied Plaintiff's motion to reconsider.  The TAC, filed in March 2011, lists fourteen Defendants

and twenty causes of action: (1) declaratory judgment (DeVito); (2) equitable accounting (DeVito); (3) breach of contract (DeVito); (4) unjust enrichment (DeVito); (5) breach of the covenant of good faith and fair dealing (DeVito); (6) constructive fraud (DeVito); (7) fraud (DeVito); (8) conversion (DeVito); (9) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (DeVito); (10) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (DeVito); (11) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (DeVito); (12)–(13) declaratory judgment (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (14) equitable accounting (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, in the alternative) (15) copyright infringement under 17 U.S.C. § 501(a) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey Boys Records); (16) vicarious copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home); (17) contributory copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records); (18) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (19) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); and (20) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway).

## II.  LEGAL STANDARDS

### A.  Summary Judgment

A court must grant summary judgment when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *See Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if

there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *See*

*id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at
> trial, it must come forward with evidence which would entitle it to a directed verdict
> if the evidence went uncontroverted at trial.  In such a case, the moving party has the
> initial burden of establishing the absence of a genuine issue of fact on each issue
> material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)

(citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears

the burden of proving the claim or defense, the moving party can meet its burden in two ways:

(1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2)

by demonstrating that the nonmoving party failed to make a showing sufficient to establish an

element essential to that party's case on which that party will bear the burden of proof at trial.

*See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden,

summary judgment must be denied and the court need not consider the nonmoving party's

evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

     If the moving party meets its initial burden, the burden then shifts to the opposing party

to establish a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing

party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### B.    Personal Jurisdiction

A defendant may move to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2).  Jurisdiction exists if: (1) provided for by law; and (2) the exercise of jurisdiction comports with due process. *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1207 (9th Cir. 1980).  When no federal statute governs personal jurisdiction, a federal court applies the law of the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).  Where a forum state has a "long-arm" statute or rule providing its courts jurisdiction to the full extent of the Due Process Clause of the Fourteenth Amendment, such as Nevada does, *see Arbella Mut. Ins. Co. v. Eighth Judicial Dist. Court*, 134 P.3d 710, 712 (Nev. 2006) (citing Nev. Rev. Stat. § 14.065), a court need only apply federal due process standards to determine personal jurisdiction, *see Boschetto*, 539 F.3d at 1015.

Nevada's long-arm rule restricts extra-territorial jurisdiction to the limits of both the U.S. and Nevada Constitutions. *See* Nev. Rev. Stat. § 14.065(1).  However, Nevada's due process clause is textually identical to the federal clause in relevant respects, *see* Nev. Const. art. 1, § 8(5), and the Nevada Supreme Court reads the state clause coextensively with the federal clause, *see, e.g.*, *Wyman v. State*, 217 P.3d 572, 578 (Nev. 2009).  Until 1868, when the

Fourteenth Amendment was adopted, the Due Process Clause of the Fifth Amendment did not apply to the states. *See Barron v. City of Baltimore*, 32 U.S. 243, 250–51 (1833) (Marshall, C.J.). The Declaration of Rights that comprises Article I of the Nevada Constitution, which was adopted in 1864, was included only to impose the same restrictions upon the State of Nevada that were already imposed against the federal government under the Bill of Rights, and the Nevada Supreme Court has therefore not interpreted the protections of the Declaration of Rights to exceed the scope of their federal counterparts. Michael W. Bowers, *The Sagebrush State* 43–44 (3rd ed., Univ. Nev. Press 2006); Michael W. Bowers, *The Nevada State Constitution* 24 (1993). During the Nevada Constitutional Convention in 1864, the Due Process Clause of Article I was not debated, although several other provisions of Article I, and even Section 8, were heavily debated. *See generally* Andrew J. Marsh, Official Report of the Debates and Proceedings of the Constitutional Convention of the State of Nevada (Frank Eastman pr., 1866), *available at* http://books.google.com.

There are two categories of personal jurisdiction: general jurisdiction and specific jurisdiction. General jurisdiction exists over a defendant who has "substantial" or "continuous and systematic" contacts with the forum state such that the assertion of personal jurisdiction over him is constitutionally fair even where the claims are unrelated to those contacts. *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)). A state court has general jurisdiction over the state's own residents, for example. *See, e.g.*, *Planning Grp. of Scottsdale, L.L.C. v. Lake Mathews Mineral Props., Ltd.*, 246 P.3d 343, 346 ¶ 13 (Ariz. 2011) (citing *Milliken v. Meyer*, 311 U.S. 457, 462 (1940)).

Even where there is no general jurisdiction over a defendant, specific jurisdiction exists when there are sufficient minimal contacts with the forum such that the assertion of personal jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)

(quoting *Milliken*, 311 U.S. at 463).  The standard has been restated using different language. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("[I]t is essential in each case that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (citing *Int'l Shoe Co.*, 326 U.S. at 319) (emphasis added)); *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.  Rather, it is that the defendant's conduct and connection with the forum State are such that he should *reasonably anticipate being haled into court there*." (citing *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 97–98 (1978)) (emphasis added)).  From these cases and others, the Ninth Circuit has developed a three-part test for specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

> The plaintiff bears the burden on the first two prongs.  If the plaintiff establishes both prongs one and two, the defendant must come forward with a "compelling case" that the exercise of jurisdiction would not be reasonable.  But if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed.

*Id.* (citations omitted).  The third prong is itself a seven-factor balancing test, under which a court considers:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective

relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007) (quoting *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 107, 1112 (9th Cir. 2004)).

## III.   ANALYSIS

### A.   Jersey Boys Records Limited Partnership's Motion for Summary Judgment (ECF No. 605)

Jersey Boys Records Limited Partnership ("JB Records") argues that there is no personal jurisdiction over JB Records in Nevada and that Plaintiff has failed to state a claim of copyright infringement against JB Records.  Plaintiff implicates JB Records in the fifteenth through seventeenth causes of action for infringement, vicarious infringement, and contributory infringement, respectively.

"In order to succeed in a copyright infringement claim, a plaintiff must show that he or she owns the copyright and that defendant copied protected elements of the work." *Jada Toys, Inc. v. Mattel*, 518 F.3d 628, 636 (9th Cir. 2008) (internal quotation marks omitted).  The infringement statute defines an infringer as "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602 . . . ." 17 U.S.C. § 501(a).  Exclusive rights under § 106 include reproduction of sound recordings, preparation of derivative works, distribution of copies of the work, and public performances, displays, or digital audio transmission of the work. *See id.* § 106(1)–(6).  Use of a copyright "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright," but "fair use." *Id.* § 107.  The infringement alleged in this case does not fall into any of these protected categories of use.  Sections 108 through 122 include additional limitations on exclusive rights, none of which appear to apply in the present case, except perhaps § 114, which limits exclusive rights in sound recordings. *See id.* §§ 108–22.

The terms "contributory infringement" and "vicarious infringement" do not appear in the infringement statute, but the courts have permitted plaintiffs to proceed on these theories of relief.  The seminal case for both theories was *Gershwin Publishing Corp. v. Columbia Artists Management*, 443 F.2d 1159 (2d Cir. 1971).  First,

> one may be liable for copyright infringement even though he has not himself performed the protected composition.  For example, a person who has promoted or induced the infringing acts of the performer has been held jointly and severally liable as a 'vicarious' infringer, even though he has no actual knowledge that copyright monopoly is being impaired.

*Id.* at 1161–62 (footnote omitted).  "[T]o succeed in imposing vicarious liability, a plaintiff must establish that the defendant exercises the requisite control over the direct infringer and that the defendant derives a direct financial benefit from the direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 729 (9th Cir. 2007).  "[O]ne 'infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.'" *Id.* (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).  Second, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Publishing Corp.*, 443 F.2d at 1162 (footnote omitted).  An example of contributory infringement is the knowing provision of facilities to sell infringing materials by a flea market operator. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996).  In summary, vicarious infringement requires control over the infringer with respect to the infringing activity and a direct financial benefit therefrom, but not knowledge that the activity infringes any copyright, whereas contributory infringement requires knowing solicitation or support of infringing activity.

As to personal jurisdiction, JB Records notes that it is a New York limited partnership with its principal place of business in New York and that it does not have any real property, offices, or employees in Nevada.  Assuming this is true, there is no general jurisdiction over JB Records in Nevada, but it appears that Plaintiff's claims arise out of JB Records's conduct in this

1   state.  The Cast Album is sold at the performances of *Jersey Boys* in Las Vegas, and Plaintiff

2   alleges JB Records receives royalties from these sales.  The allegation that the Cast Album

3   infringes the Work therefore is sufficient to provide specific jurisdiction over JB Records in

4   Nevada.  JB Records also notes that it produced the Cast Album but that Rhino Entertainment

5   Co. manufactured, distributed, and sold the CDs.  Plaintiff alleges not only direct infringement,

6   but also contributory infringement, apparently based upon the theory that JB Records's

7   production of the CDs contributed to the infringement of the Work by others because the

8   production of the Cast Album was a part of the promotion for the musical.  By producing the

9   record, the theory goes, JB Records infringed the copyright directly or at least contributed to its

10  infringement by those who manufactured, distributed, and sold it.  The Court finds that the

11  allegations in the TAC are sufficient to satisfy the first two prongs of the personal jurisdiction

12  test over JB Records, and that requiring JB Records to defend in Nevada would not be

13  unreasonable.

14          However, the Court will grant summary judgment to JB Records on the merits.  First,

15  Plaintiff makes no sufficient allegation that JB Records had the legal right or ability to prevent

16  other parties from infringing, either through an employment relationship or otherwise, so there is

17  no vicarious infringement by JB Records.  Plaintiffs's allegation that "[all Defendants] each had

18  the right and ability to control the acts of other infringers herein," (*see* Third Am. Compl. ¶ 233),

19  is precisely the kind of bare-bones recitation of a cause of action that does not withstand scrutiny

20  under the *Twombly-Iqbal* plausibility standard, much less under a motion for summary judgment.

21          Second, Plaintiff does not sufficiently allege that JB records was aware of any

22  infringement of the Work, so it cannot be liable for contributory infringement, which requires

23  knowledge.  Plaintiff alleges that all Defendants had "access to" the Work but simply lumps all

24  Defendants in together with this allegation.  There is no plausible allegation that JB Records

25  knew of any infringement of the Work.  Plaintiff alleges in conclusory fashion that Michael S.

David, a principal of Dodger Theatricals, which is in turn a general partner of JB Records, "was

Page 19 of  40

1   aware, or should reasonably have been aware, that Defendant DeVito was not the sole author of

2   the Work . . . ." (*See id.* ¶ 239).  This is too attenuated to impute knowledge of infringement to

3   JB Records.

4        Third, Defendant is entitled to summary judgment on the clams of direct infringement,

5   because the Cast Album is simply not substantially similar to the Work.  For this reason, also,

6   there cannot be contributory or vicarious infringement due to the actions of the manufacturers

7   and distributors of the Cast Album, because those parties' actions do not infringe the Work.  A

8   copyright infringement plaintiff must prove both intrinsic and extrinsic substantial similarity.

9   *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010) (citing *Shaw v. Lindheim*,

10  919 F.2d 1353, 1356 (9th Cir. 1990)).  "On a motion for summary judgment, [a court applies]

11  only the extrinsic test.  The intrinsic test is left to the trier of fact.  If the [plaintiff] fail[s] to

12  satisfy the extrinsic test, [he] cannot survive a motion for summary judgment." *Id.* (citations

13  omitted).

14       The extrinsic test is an objective test based on specific expressive elements:
    the test focuses on articulable similarities between the plot, themes, dialogue, mood,

15      setting, pace, characters, and sequence of events in two works.  A court must take
    care to inquire only whether the protect[able] elements, standing alone, are

16      substantially similar.  Copyright law only protects expression of ideas, not the ideas
    themselves.  Familiar stock scenes and themes that are staples of literature are not

17      protected.  Scenes-a-faire, or situations and incidents that flow necessarily or
    naturally from a basic plot premise, cannot sustain a finding of infringement.

18      Historical facts are also unprotected by copyright law.

19       Under the "inverse ratio" rule, if a defendant had access to a copyrighted
    work, the plaintiff may show infringement based on a lesser degree of similarity

20      between the copyrighted work and the allegedly infringing work.

21  *Id.* at 624–25 (citations and internal quotation marks omitted; alterations in original).

22       Plaintiff alleges that the Cast Album infringes the Work directly because it "captures the

23  presentational style and straightforward street tone/mood that is found in Jersey Boys and the

24  Work." (Third Am. Compl. ¶¶ 14, 16, 70, 96, 204, 218, 224, 240).  The magistrate judge

25  correctly noted that this was insufficient to state a claim of infringement and compelled Plaintiff

    to comply with Brickman's interrogatory requesting Plaintiff to identify any points of substantial

1   similarity between the Cast Album and the Work.  Plaintiff responded only by claiming that

2   "The line adapted from the Work's, 'A little surprise' for Frankie, at page 46, is present in 'The

3   Early Years: A Scrapbook' cut on the Jersey Boys Cast Album."  In the present motion, JB

4   Records notes again that Plaintiff's only allegations of infringement as to the Cast Album is that

5   the word "surprise" is used in both the Work and the Cast Album in connection with Tommy

6   DeVito's "set[ting] up a little surprise" by having Frankie Valli sing with DeVito's band in a

7   small club, and that the few minutes of spoken dialogue at the beginning of the Cast

8   Album—which consists mainly of *Four Seasons* songs to which Plaintiff does not claim any

9   copyright ownership—infringed the "presentational style" and "mood/tone" of the Work.

10       JB Records is correct that the Cast Album is not substantially similar to the Work under

11   the extrinsic test.  The Cast Album consists mainly of *Four Seasons* songs, plus a few minutes of

12   dialogue.  The Work is a 274-page autobiography.  The similarity between the two, even

13   assuming for the sake of argument that the "surprise" comment standing alone is protectable

14   material, is negligible.  The "surprise" sequence is a brief comment on a historical event.  The

15   presentational style of the Cast Album is that of the biography of a popular music group, but

16   apart from the "surprise" line, Plaintiff does not allege that the Cast Album presents anything

17   other than historical facts and *Four Seasons* works.  In response, Plaintiff argues that JB Records

18   has not complied with jurisdiction-related discovery requests.  The Court therefore grants the

19   motion in part.  There is personal jurisdiction over JB Records, but the Cast Album is not

20   substantially similar to the Work.

21       **B.    Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger
               Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, and Getting Home, Inc.'s Motion
22             for Partial Summary Judgment (ECF No. 613)**

23       Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Ltd., JB Viva

24   Vegas L.P., and Getting Home, Inc. (collectively, "Movants") argue that the statute of

25   limitations bars Plaintiff's copyright infringement claim against them as to "drafts or other non-

final script materials" and that Movants need not account to Plaintiff for profits generated from

Page 21 of  40

1    such materials.  Movants note that the TAC is the first version of the Complaint to allege that

2    drafts, treatments, and outlines of *Jersey Boys*, which Movants refer to as "non-final script

3    materials," infringed the Work.

4         First, Plaintiff may have an accounting as a remedy under 17 U.S.C. § 504 to the extent

5    any Movant is ultimately found liable for infringement, though there is no separate action for an

6    accounting except against a joint owner.  Second, Plaintiff does not appear to (and could not)

7    allege that the pre-production drafts in-and-of-themselves constituted independently actionable

8    infringements.  She properly alleges that the performance of *Jersey Boys* and distribution of

9    other finished materials for sale to the public constituted infringement, but she would not be

10   aggrieved if all she alleged was that certain Defendants crafted a play out of the Work and

11   privately performed it for their own entertainment.  Plaintiff's identification of the pre-

12   production materials in the TAC is not in support of any new and separate cause of action.  The

13   pre-production materials would presumably be part of her proof of the existing infringement

14   claim.  That is, they are relevant to proving infringement via the final production, because draft

15   scripts and treatments may prove a connection between the Work and *Jersey Boys*.  But the

16   inclusion of allegations concerning the pre-production materials do not constitute a new and

17   separate cause of action.  The fifteenth claim for copyright infringement in the TAC is the same

18   as that in the Second Amended Complaint, and it is brought against the same eight Defendants.

19   The only difference is that the TAC includes some additional language further explaining why

20   and how Plaintiff believes *Jersey Boys* infringes the Work, i.e., because it is based on the Work

21   and also "the various drafts, treatments, and outlines for *Jersey Boys* which preceded the

22   finalized versions of the script . . . ." (Third Am. Compl. ¶ 210).

23        Movants' argument is of the form: (1) the plaintiff's complaint alleged a tort by the

24   defendant against the plaintiff; (2) after the statute of limitations ran, the plaintiff amended the

25   complaint to further allege the instrumentality of the tort; (3) therefore, the court should grant the

     defendant summary judgment as against any claim involving the use of the newly alleged

instrumentality.  It is as if a party were to ask a court to grant summary judgment as against any injuries arising out of an alleged battery with a baseball bat because the plaintiff had, after the statute of limitations for battery had run, amended the complaint to add the allegation that the defendant used a baseball bat to the existing allegations that the defendant had struck the plaintiff.  Plaintiff has simply added no theory of relief but has merely added language indicating the particular instrumentality by which the Plaintiff believes the infringement came about, which details were not before and are not now essential to the sufficiency of the infringement allegations.  The Court therefore denies the motion for summary judgment.

Insofar as Movants fear Plaintiff will seek damages from the jury based purely on the private, non-commercial creation of the pre-production materials themselves, apart from the claim that *Jersey Boys* itself infringed the Work, the Court assures Movants that such a theory will not go to the jury.  Such private, noncommercial activity in-and-of-itself is fair use. *See* 17 U.S.C. § 107; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448–50 (1984) (holding that private, noncommercial copying of protected works is fair use).  But Plaintiff does not allege that, and the pre-production materials could be important evidence for showing that the final product infringes the Work.  In any case, Movants are protected from infringement claims by their license. *See infra.*

### C.    David's Motion for Summary Judgment (ECF No. 622)

David argues that there is no personal jurisdiction over him in Nevada.  Plaintiff alleges that David is a New York citizen who is a principal, officer, and shareholder of Dodger Theatricals, Ltd., and that he was an officer and/or shareholder of DSHT in 2004 when DSHT agreed to produce *Jersey Boys* in La Jolla, California. (*See* Third Am. Compl. ¶ 9).  Plaintiff alleges that David is a signatory to various licensing agreements concerning *Jersey Boys*.  She also alleges that David "organiz[ed]" Jersey Boys Broadway LP, JB Records, Dodger Theatricals, Ltd., DSHT, and JB Viva Vegas, LP. (*See id.* ¶ 240).

David argues that because the alleged organization did not occur in Nevada, and because

1    he has no personal contacts with Nevada, but only happens to be an officer and/or limited partner

2    of several organizations that have done business in Nevada, there is no personal jurisdiction over

3    him personally in Nevada.

4         Plaintiff has sufficiently shown that David purposely availed himself of the right to do

5    business in Nevada and purposely directed his allegedly infringing activities toward Nevada.

6    David admitted at his deposition that he owned 50% of Dodger Theatricals, that Dodger

7    Theatricals's primary activity was the supervision of *Jersey Boys* productions, that Dodger

8    Theatricals receives income from those productions in the form of fees and royalties, and that

9    David receives a small salary from Dodger Theatricals. (*See* David Dep. 14, 18–19, June 30,

10   2011, ECF No. 672-6).  He also admitted to being "in charge" of Dodger Theatricals, though he

11   delegated control. (*See id.* 22:11–18).  He later clarified, "I'm the president of a company that

12   produced Jersey Boys and as president, I oversee those 24 people." (*Id.* 26:19–21).  Nor is it

13   unreasonable to expect David to defend in Nevada where his half-owned production company

14   does regular business.  The Court denies the motion.

15        **D.    Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger**
             **Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, Getting Home, Inc.'s, Jersey Boys**
16           **Broadway LP's, and Skunk, Inc.'s Motion for Summary Judgment (ECF No.**
             **626)**
17
          Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Ltd., JB Viva
18
     Vegas L.P., Getting Home, Inc., Jersey Boys Broadway LP, and Skunk, Inc. (collectively,
19
     "Movants") argue that *Jersey Boys* simply does not infringe the Work, because the Work is a
20
     historical work with only "thin" protection under U.S. copyright law.  The Court denies this
21
     motion as moot, because it grants these Movants' separate motion for summary judgment that
22
     they acted within the scope of valid licenses and sublicenses.
23
          **E.    Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger**
24              **Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, Getting Home, Inc.'s, Jersey Boys**
                **Broadway LP's, and Skunk, Inc.'s Motion for Summary Judgment (ECF No.**
25              **632)**

          Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Ltd., JB Viva

1   Vegas L.P., Getting Home, Inc., Jersey Boys Broadway LP, and Skunk, Inc. (collectively,

2   "Movants") argue that the claims for copyright infringement under foreign law should be

3   summarily adjudicated in favor of Movants for the same reasons noted in Part IV.D, *supra*,

4   because regardless of whether the Court uses the law of the United States, the United Kingdom,

5   Canada, or Australia, the choice-of-law analysis will result in the application of the substantive

6   copyright law of the United States.

7        In diversity cases, choice-of-law issues are considered substantive for the purposes of

8   *Erie*, and a federal court therefore applies the choice-of-law rules used by the courts of the state

9   in which it is located. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1944) (citing

10  *Erie R.R. v. Thompkins*, 304 U.S. 64 (1938)). The same is true in federal question cases when

11  the choice-of-law issue concerns a state law claim brought pursuant to a federal court's

12  supplemental jurisdiction. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151,

13  1164 (9th Cir. 1996). But when the underlying cause of action at issue is federal, a federal court

14  applies federal common law choice-of-law rules. *Schoenberg v. Exportadora de Sal, S.A. de*

15  *C.V.*, 930 F.2d 777, 782 (9th Cir. 1991).

16       Plaintiff filed the present case in the U.S. District Court for the Eastern District of Texas,

17  invoking jurisdiction under both 28 U.S.C. §§ 1331 and 1332(a). (*See* Compl. ¶ 4, Dec. 26, 2007,

18  ECF No. 36-5). The present issue is copyright infringement under federal law, so federal

19  common law choice-of-law rules apply.

20       "Federal common law follows the approach of the Restatement (Second) of Conflict of

21  Laws (1969)." *Schoenberg*, 930 F.2d at 782 (citing *Harris v. Polskie Linie Lotnicze*, 820 F.2d

22  1000, 1003–04 (9th Cir. 1987)). The Second Restatement states a "general principal" for tort

23  claims:

24       (1) The rights and liabilities of the parties with respect to an issue in tort are
         determined by the local law of the state which, with respect to that issue, has the
25       most significant relationship to the occurrence and the parties under the principles
         stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971).  The principles stated in § 6 are:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Id.* § 6(2)(a)–(g).  Finally, the Second Restatement adopts the rule of dépeçage, under which each issue arising under a single claim may receive its own choice-of-law analysis. *See id.* § 145(1) (applying the analysis to "issue[s]").  This may be the only practical difference between the state and federal choice-of-law rules in the present case, because the Nevada Supreme Court also employs §§ 145 and 6 in tort actions but appears not to have enforced the dépeçage concept. *See Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark*, 134 P.3d 111, 116–19 (Nev. 2006) (deciding the choice-of-law question by cause of action, not by issue, though the question does not appear to have been directly litigated); *see also Lucarelli ex rel. Taylor Estate v. DVA Renal Healthcare Inc.*, No. 08-0406, 2008 WL 5586615, at *3 (W.D. La. Oct. 24, 2008) (noting that the Nevada Supreme Court in *General Motors* had applied the analysis to the "cause of action" as a whole and no other authority from Nevada indicated an issue-by-issue approach).

In *Itar-Tass Russian News Agency v. Russian Kurier*, the Second Circuit rejected Prof. Nimmer's interpretation of the Berne Convention that the substantive law for an infringement

claim should necessarily be the law of the nation where the infringement occurred as opposed to the law of the nation of which the author is a citizen or where the work was first published, i.e., the "national treatment principle." *See* 153 F.3d 82, 89 (2d Cir. 1998).  The Second Circuit interpreted the Berne Convention differently, to require only "that if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors." *Id.* (citing Berne Convention Art. 5(1) (Paris text 1971), reprinted in 3 William F. Patry, *Copyright Law and Practice* 2013 (1994)).  In other words, in the Second Circuit's view, the national treatment principle as expressed in the Berne Convention is an anti-discrimination principle, not a choice-of-law principle. *See id.* at 89 n.8. The court noted that the federal statute provided no choice-of-law rule, so it would have to apply federal common law choice-of-law rules. *See id.* at 90.  The Court then found that because a copyright constituted property, the contacts of that property itself was most important as to issues of ownership, and the substantive law of Russia would therefore apply, because the works at issue had been created by Russian nationals and first published in Russia. *See id.*  The court then noted that the principle of *lex loci delicti*—under which the substantive law of the place of occurrence of a tort controls—applies in the copyright infringement context. *See id.* at 91 (citing *Lauritzen v. Larsen*, 345 U.S. 571, 583 (1953)).  The court therefore ruled that U.S. law governed infringement issues because that was where the infringement allegedly occurred. *See id.*

Movants urge the Court to adopt the *Itar-Tass* approach, and the Court will do so.  The application of *Itar-Tass* in this case results in the application of U.S. law as to copyright ownership issues, because it is not disputed that the Work was created in the United States.  The present motion is a motion against allegations of overseas infringement, however, and *Itar-Tass* therefore counsels in favor of applying foreign copyright law to infringement issues. Movants argue that the foreign infringement claims will be controlled by the antecedent ownership issues resolved under U.S. law.  That is, once the Court determines that Movants had

1    valid licences under U.S. law, the foreign infringement claims will be implausible.  The Court

2    agrees.

3        The *Itar-Tass* court did not face the precise issue presented here, but a similar one.  It

4    found that under Russian law only the journalists who wrote the newspaper articles, not the

5    newspaper company, owned the copyright in the text—although the newspaper company owned

6    any copyright in the arrangement of those articles on its pages to the extent such a thing could be

7    copyrighted—and therefore the newspapers had no standing to sue for infringement via

8    reprinting of the text under U.S. law. *See id.* at 84.  The precise question presented here is

9    whether the validity of a copyright license is more akin to ownership or infringement for the

10   purposes of an infringement action.  The answer to this question is critical, because in the U.S. a

11   license obtained from fewer than all joint owners protects a licensee from an infringement action,

12   i.e., such a license is valid, but in the Commonwealth countries, such a license appears to be a

13   nullity, though the Court has only referred to Nimmer thus far and has not yet performed any

14   significant research on the Commonwealth law.  Does the fact that a license granted by fewer

15   than all joint owners is valid under U.S. law necessarily obviate a clearly applicable foreign

16   action for infringement where the foreign jurisdiction would not recognize the license?  The

17   Court believes the better answer is "yes."  It is true that under this rule a licensee will be able to

18   perform works in a jurisdiction where he would not be able to perform them had he obtained his

19   license there.  But this is the same result reached under *Itar-Tass* with respect to the ownership

20   issue.  Under the reasoning of that case, a person who is an owner of copyright under the law

21   where he becomes a joint owner may perform the disputed act with impunity even in

22   jurisdictions where his ownership would not be recognized had he purported to obtain it in that

23   jurisdiction.  In short, for the purposes of an infringement action, licensing is more akin to

24   ownership than infringement.  Just as a tenancies and profits à prendre are property interests,

25   though they are only possessory and usufructory interests, respectively, a license in copyright is

     an analogous usufructory interest in intellectual property.  The determination of such a property

interest is properly determined under the law of the place where the interest arose. Here, that place is the United States. And once one has been declared to be a licensee under the law of the appropriate jurisdiction, the issue is settled, and the person is a licensee for the purposes of an infringement action under the law of any other jurisdiction. Because Movants had valid licenses or sublicenses to exploit the Work under U.S. law, *see infra*, the foreign infringement claims fail. The Court therefore grants the motion for summary judgment.

### F. Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, and Getting Home, Inc.'s Motion for Partial Summary Judgment (ECF No. 635)

Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Ltd., JB Viva Vegas L.P., and Getting Home, Inc. (collectively, "Movants") move for summary judgment against counts fifteen through seventeen for copyright infringement, vicarious copyright infringement, and contributory copyright infringement, respectively, based upon their valid license from DeVito, which license granted Valli and Gaudio the ability to assign or sublicense the Materials. If Movants can show they operated within the Valli/Gaudio License and subsequent sublicenses as permitted via the Valli/Gaudio License, they will be entitled to summary judgment against the fifteenth through seventeenth claims.

Valli and Gaudio are entitled to summary judgment against the infringement claims. The Court has already ruled that the Valli/Gaudio License permitted Valli and Gaudio to exploit the Materials identified therein, including the Work, and permitted Valli and Gaudio to further sublicense the Materials. The Court also ruled that the *Jersey Boys* Agreement was such a sublicense to DSHT (including Brickman and Elice) from Valli and Gaudio. These three Defendants therefore also cannot be held liable for infringement. The remaining Defendants are McAnuff, Dodger Theatricals, JB Viva Vegas L.P., and Getting Home.

Plaintiff alleges that McAnuff's infringement arose out of his direction of *Jersey Boys*, "along with Defendants Brickman and Elice, by authorization of Defendants Gaudio and Valli, under the [*Jersey Boys* Agreement] issued by Defendant DeVito . . . ." (Third Am. Compl. ¶ 8).

1   In other words, according to Plaintiff's own allegations, McAnuff's direction of *Jersey Boys* was

2   pursuant to DSHT's sublicense from Valli and Gaudio (the *Jersey Boys* Agreement), pursuant in

3   turn to Valli's and Gaudio's license from DeVito (the Valli/Gaduio License), both of which the

4   Court has ruled were valid.  McAnuff therefore cannot have infringed the Work in his capacity

5   as the director of *Jersey Boys*.  Plaintiff does not allege that McAnuff engaged in any "rogue"

6   exploitation of the Work unconnected to his efforts with *Jersey Boys* and uncovered by DSHT's

7   sublicense.

8          Plaintiff alleges that Dodger Theatricals is a signatory to the *Jersey Boys* Agreement

9   under which it produced *Jersey Boys* along with DSHT. (*See id.* ¶ 11).  Like McAnuff, Dodger

10  Theatricals also cannot have infringed the Work via its efforts with *Jersey Boys*, and Plaintiff

11  does not allege any "rogue" activity outside the scope of the *Jersey Boys* Agreement by Dodger

12  Theatricals either.  The same reasoning applies to JB Viva Vegas L.P., which Plaintiff alleges is

13  implicated as a general partner of Dodger Theatricals and which serves "as a clearinghouse for

14  revenues generated by the musical in Las Vegas, Nevada." (*Id.* ¶ 13).  Again, if this Defendant's

15  only actions were in cooperation with licensees or sublicensees of the Work, and it is not

16  accused of any activity outside the scope of that license, it cannot have infringed the Work.

17  Finally, Plaintiff alleges that Getting Home is a "loan-out" company through which Elice

18  provided some of his services as a writer of *Jersey Boys* and which is also a signatory to an

19  agreement concerning the Cast Album. (*See id.* ¶ 16).  This Defendant is not accused of any

20  activity outside the scope of the *Jersey Boys* Agreement.  Elice was permitted under that

21  sublicense to write the screenplay and other items for *Jersey Boys*.  And the Court has held on

22  the merits, *supra*, that the Cast Album does not infringe the Work.  Movants are therefore correct

23  that their alleged infringing activity falls within the scope of valid licenses and sublicenses, and

24  they are entitled to summary judgment on the fifteenth through seventeenth causes of action.

25         Plaintiff responds that the Valli/Gaudio License terminated under its terms before

    Movants exploited the Work via *Jersey Boys*.  The relevant portion of the Valli/Gaudio License

reads:

> In consideration of the foregoing payments, you grant to us the exclusive right to use and incorporate the Materials in one or more theatrical productions, and any and all ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised versions, merchandise and/or other works . . . . You hereby consent to any such use and agree that the Works may be exploited throughout the world in all media now existing and later devised, and you further acknowledge that you shall not receive any compensation for the use of the Materials or in connection with any of the Works other than the compensation expressly set forth herein. *The rights granted by you to us hereunder shall continue in perpetuity if the rights in the Play have merged with each other pursuant to the production contract between us and the initial commercial producer. If the rights of the initial commercial producer lapse prior to merger, and we enter into a production contract with another commercial producer within two (2) years following such lapse of rights, our rights hereunder shall continue only for the duration of such subsequent producer's rights, and in perpetuity if merger has occurred pursuant to our production contract with such subsequent producer.*

> . . . .

> The rights granted to us herein are irrevocable and not subject to rescission or injunction under any circumstances.

(Valli/Gaudio License 2–4, ECF No. 457-34, at 38 (emphasis added)).  Plaintiff argues that Valli and Gaudio entered into a production agreement with the initial producer, Metropolitan, in September 1999, but that the agreement lapsed without a merger on December 10, 2002, and that Valli and Gaudio did not enter into the *Jersey Boys* Agreement until October 27, 2005, over two years later.

As an initial matter, it is not clear what the parties meant here by "merger."  The case law uses the term "merger" in the copyright context to describe the principle that when the expression of an idea is inseparable from the idea itself, the expression of the idea cannot be protected by copyright because one cannot copyright an idea under 17 U.S.C. § 102(b). *See CDN Inc. v. Kapes*, 197 F.3d 1256, 1261 (9th Cir. 1999).  This is the definition of "merger" given in the copyright law "nutshell." *See* Mary LaFrance, *Copyright Law in a Nutshell* § 2.5 (Thomson/West 2008), at 32–36 ("Courts invoke merger when there are so few ways to express a particular idea that protecting one such expression would make it difficult for others to express the same idea. . . . The more utilitarian the expression, the more likely it is that merger will

apply.  Merger often applies to recipes, simple instructions, contest rules, and simple legal or

business forms.").  It is extremely unlikely this is what the parties meant by "merger," because it

is practically impossible that anything fairly characterized as a dramatic musical play could ever

fall on the "idea" side of the "idea/expression" line. *See id.* at 1262 (noting that even something

as mundane and uninteresting as a wholesale price guide can in some cases fall on the

protectable "expression" side of that line).  Also, it would make no sense to provide that the

sublicense would become perpetual as soon as there was no need for any license at all due to the

production having been crafted into a set of expressions consisting of purely uncopyrightable

ideas.

The term "merger" has also been used to describe the phenomenon whereby intangible

intellectual property rights "merge" with tangible property, thereby making it possible to convert

intellectual property under state law where only an infringement action would have lied before

such a merger. *See, e.g.*, *WesternGeco v. Ion Geophysical Corp.*, No. 09-cv-1827, 2009 WL

3497123 at *3 (S.D. Tex. Oct. 28, 2009).  This cannot be what the parties meant, because the

*Jersey Boys* Agreement does not contemplate the merger of ideas into a tangible form, but rather

a presentation.  The agreement also covers the potential production of play-related paraphernalia,

but this is ancillary to the point of the agreement, which was the production of dramatic musical

performances.

The courts have also used the term "merger" to describe a doctrine that Congress

overruled via its new definition of a joint work under the Copyright Act of 1976. *See Batiste v.*

*Island Records Inc.*, 179 F.3d 217, 222 & n.7 (5th Cir. 1999) (citing 17 U.S.C. § 101).  Under

that now-overruled "Twelfth Street Rag" doctrine, a transferee of a partial interest in a joint work

could add elements to the existing joint work, thereby creating a new joint work and

extinguishing the previous joint ownership interests. *Id.* at 222 n.7 (citing *Shapiro, Bernstein &*

*Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, *modified on reh'g*, 223 F.2d 252 (2d Cir. 1955)).  If

this is what the parties meant by "merger"—and it may have been— the clause could be

1   interpreted to apply the former Twelfth Street Rag doctrine as a trigger for automatic extension

2   of the license.

3          But even assuming for the sake of argument that merger meant something distinct that

4   never occurred, the Valli/Gaudio License did not terminate.  Under the "merger" clause, even if

5   merger did not occur with the initial producer, Valli's and Gaudio's rights were to continue for

6   the duration of the subsequent producer's rights under a sublicense if Valli and Gaudio granted

7   such a sublicense within two years of the lapse of the initial producer's rights, and in perpetuity

8   if merger first occurred pursuant to the sublicense to the subsequent producer. (*See id.*).

9   Therefore, so long as Valli and Gaudio gave DSHT the sublicense, i.e., entered into the *Jersey*

10  *Boys* Agreement, within two years of the lapse of Metropolitan's rights, the Valli/Gaudio

11  License would continue for the duration of DSHT's rights under the *Jersey Boys* Agreement

12  even if merger never occurred.  Valli and Gaudio entered into the *Jersey Boys* Agreement with

13  the subsequent producer, DSHT, on an unknown date. (*See Jersey Boys* Agreement, May 1,

14  2004, ECF No. 457-34).  The signatures on that document are not dated, though the document is

15  dated May 1, 2004, (*see id.*), which is within two years after Metropolitan's rights expired on

16  December 10, 2002 according to Plaintiff's conclusion of the date Metropolitan's rights lapsed.

17  (*See* Pl.'s Separate Statement of Facts ¶ 13, Nov. 28, 2011, ECF No. 720).

18         However, even if the Court assumes that the *Jersey Boys* Agreement was not executed

19  until more than two years after the initial production agreement with Metropolitan lapsed,[2] the

20  license thereunder remained in effect for two reasons: (1) the parties' course of conduct; (2) and

21  the failure of DeVito to terminate the Valli/Gaudio License under the governing statutes.

22         First, DeVito clearly acquiesced in the continued validity of the Valli/Gaudio License by

23  continually accepting royalties thereunder.  Second, the "merger" clause provides for the

24  automatic extension of rights to Valli and Gaudio upon certain conditions.  But this contractual

25  _____

          [2]Plaintiff provides evidence indicating that the first signatory to the *Jersey Boys*
    Agreement was Gaudio in May 2005.

provision extending the term of the license under certain conditions inures to the benefit of Valli

and Gaudio. It did not and could not remove statutory requirements for termination that

independently restrict DeVito for the benefit of his licensees. For example, an exclusive license

may be terminated only by giving certain written notice before termination of the rights. *See* 17

U.S.C. § 203(a)(4). Even assuming that the "merger" clause in the Valli/Gaudio License itself

was sufficient—and it likely was not, because the notice must comply with the format as given in

regulations promulgated by the Register of Copyrights and must be served within a particular

time window, *see id.*—"[a] copy of the notice [must] be recorded in the Copyright Office before

the effective date of termination, as a condition to its taking effect," *id.* § 203(a)(4)(A), and

Plaintiff does not allege that DeVito ever filed the Valli/Gaudio License or any other notice of

termination with the Copyright Office.

Plaintiff also argues that Valli and Gaudio could not sublicense their rights because their

license was not exclusive. But the Court has already ruled that the Valli/Gaudio License was

exclusive, and that DeVito gave them the explicit ability to sublicense their rights thereunder,

though Valli and Gaudio stand in the shoes of nonexclusive licensees for the purposes of their

standing to sue for infringement. *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137,

1146 (9th Cir. 2008). The Court therefore grants the motion.

G. **Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, Jersey Boys Broadway LP's, JB Records's, Skunk, Inc.'s, and Getting Home, Inc.'s Motion for Partial Summary Judgment (ECF No. 638)**

Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Ltd., JB Viva

Vegas L.P., Jersey Boys Broadway LP, JB Records, Skunk, Inc., and Getting Home, Inc.

(collectively, "Movants") argue that any copyright infringement claim arising out of the

2004–2005 La Jolla, California production (the "La Jolla Production") of *Jersey Boys* is barred

by the statute of limitations. Movants note that the La Jolla Production closed on January 16,

2005, that Plaintiff did not sue Movants via the First Amended Complaint until August 12, 2008,

1   and that the statute of limitations for copyright infringement is three years. *See* 17 U.S.C. § 507.

2       The question is whether Plaintiff discovered, or with due diligence should have

3   discovered, the La Jolla Production's infringement on or before August 13, 2005. *See Polar Bear*

4   *Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004) ("§ 507(b) permits damages

5   occurring outside of the three-year window, so long as the copyright owner did not

6   discover—and reasonably could not have discovered—the infringement before the

7   commencement of the three-year limitation period.").

8       Movants argue that Plaintiff "most certainly knew of the La Jolla production's existence,

9   and its end, long before she commenced this action."  But Plaintiff alleges that she first contacted

10  DeVito in an attempt to publish the Work in September 2005 and that *Jersey Boys* first opened in

11  November 2005. (*See* Third Am. Compl. ¶¶ 41–44).  She also alleges she first learned of the

12  infringement in January 2007. (*See id.* ¶¶ 45–51).  Movants point only to Plaintiff's admission at

13  her deposition that she knew of the La Jolla Production's existence, not that she knew of the

14  alleged infringement therein, and Plaintiff stated that she did not recall when she learned of the

15  La Jolla Production. (*See* Corbello Dep. 212–13, June 14, 2011, ECF No. 648-1).  It cannot be

16  said that Plaintiff need have traveled from Texas to California to view the La Jolla Production to

17  have acted reasonably under the discovery rule.  Movants have not satisfied their initial burden

18  on summary judgment.  Movants are entitled to summary judgment on the relevant claims for

19  other reasons, but the Court will deny the present motion.

20      **H.    Plaintiff's Motion for Partial Summary Judgment (ECF No. 641)**

21      Plaintiff asks the Court to grant her offensive summary judgment on the first cause of

22  action for declaratory judgment against DeVito concerning joint authorship of the Work.

23  Plaintiff requests three declarations: (1) that the Work is a joint work under 17 U.S.C. § 101; (2)

24  that Woodard was a co-author and hence a co-owner; and (3) that U.S. Copyright Reg. No. TXu

25  454 118, i.e., the DeVito Work, obtained by DeVito in his name only, was secured and has been

held in part in constructive trust for Woodard, and subsequently for his heir, Plaintiff.  The Court

1  grants the motion.

2      The Court has already essentially made the first two declarations via its last summary

3  judgment order, wherein it ruled that the Work was in fact a joint work between DeVito and

4  Woodard, the only question being whether DeVito was himself a co-author.  In short, the Letter

5  Agreement is the "best objective manifestation of a shared intent." *See Aalmuhammed v. Lee*,

6  202 F.3d 1227, 1235 (9th Cir. 2000).  In order to grant the third request, the Court must be

7  convinced that there is no genuine issue of material fact that the DeVito Work is the same as the

8  Work.[3]  If it is, the Court may declare that DeVito has owned and does own a 50% joint interest

9  in the DeVito Work copyright but has held and does hold the remaining 50% joint interest in the

10  DeVito Work copyright in constructive trust for Woodard and Plaintiff, in succession.

11     A constructive trust in intellectual property is permitted as a remedy governed by state

12  law. *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 909 (9th Cir. 2010).  In *Mattel*, the

13  constructive trust potentially arose because of a provision in an employment agreement assigning

14  certain ideas of the employee to the employer, and California law governed the creation of the

15  constructive trust. *See id.*  Here, the constructive trust potentially arises because of the law of the

16  joint ownership of copyright, and Nevada law governs the creation of the constructive trust.

17
> A constructive trust will arise whenever the circumstances under which property was
> acquired makes it inequitable that it should be retained by him who holds the legal
18
> title, as against another, provided some confidential relationship exists between the
> two and provided the raising of the trust is necessary to prevent a failure of justice.
19

20  *Schmidt v. Merriweather*, 418 P.2d 991, 993 (Nev. 1966).

21     The relationship between Woodard and DeVito was sufficiently confidential, as

22  evidenced by the Letter Agreement, to invoke this remedy.  The remaining question is whether

23  the DeVito Work is the same as the Work.  Plaintiff provides a copy of the Work. (*See* Work,

24  Jan. 1991, ECF No. 636, at 2).  She has alleged that the Work and the DeVito Work are the same

25

---

[3]The Court assumes without deciding that Plaintiff is Woodard's heir.  No party appears to dispute this.

1  except that the title page of the DeVito Work is different and that the DeVito Work is missing

2  page 264. (*See* Third Am. Compl. ¶¶ 48–49). Plaintiff provides no copy of the DeVito Work, so

3  the Court cannot directly compare the two. However, DeVito admits in his response that the

4  DeVito Work, i.e., the product he registered with the U.S. Copyright Office as his sole work, was

5  in fact the Work. (*See* Resp. 10:16–11:22, Dec. 2, 2011, ECF No. 727). He makes this

6  admission in order to support his separate argument that the fact he registered the Work without

7  attribution to Woodard was because despite the Letter Agreement—which DeVito argues was

8  simply a royalties contract—he had no intent to create joint ownership. (*See id.*). In summary,

9  DeVito argues that he is the sole author of the Work because he had final creative control, that

10  the Letter Agreement is not dispositive as to the parties' intent to create joint ownership, and that

11  the fact he registered the Work without attribution to Woodard shows that DeVito lacked an

12  intent to create joint ownership.

13      The Court reaffirms its finding that the Work was a joint work between Woodard and

14  DeVito. The intent of the parties, as expressed through the Letter Agreement was clearly that

15  Woodard would "do all of the actual writing," and that DeVito would have veto power over the

16  final draft. All of the evidence supports this interpretation. DeVito admits as much in his

17  deposition, confirming Plaintiff's characterization of the situation, i.e., that Woodard made all

18  creative efforts in compiling and writing the Work and that DeVito mainly looked at what

19  Woodard had created and asked him to make minor edits. Although DeVito attempts to

20  characterize Woodard's contribution as that of a scribe and not an author, it is clear from a

21  comparison of the Work to the 1988 Interview transcripts Plaintiff adduces that Woodard was

22  more than a scribe. The 1988 Interviews are in question-and-answer format, not prose, as is the

23  Work. DeVito admitted at his deposition that the reason he needed Woodard (or someone) was

24  because he was not skilled enough to author the Work himself. He does not argue that his only

25  impairment was poor penmanship, arthritis in his hands, or the inability to work a typewriter. He

argues that his impairment was his lack of education. It is precisely the creative writing skill that

DeVito admits he did not have that Woodard provided.  It is not only works of fiction that are protectable by copyright.  Non-fiction works are also protected—not the historical facts themselves, but the creative presentation of those facts.  As the Court noted in the previous order, it is a close question whether DeVito would even be a joint author under the facts of this case in the absence of the Letter Agreement.  And Plaintiff adduces additional research materials not provided by DeVito during the 1988 Interviews but used by Woodard to assist in writing the Work, showing that he was more than just a scribe.

The Court therefore grants Plaintiff's motion and rules that: (1) the Work is a joint work under 17 U.S.C. § 101; (2) Woodard and DeVito were coauthors, and hence, Plaintiff is a co-owner as Woodard's heir; and (3) U.S. Copyright Reg. No. TXu 454 118, i.e., the DeVito Work, registered by DeVito in his name only, was secured and has been held in part in constructive trust for Woodard, and subsequently for his heir, Plaintiff.

## I.    Claims Disposition

| Claim | Short Title | Defendant(s) | Disposition |
|---|---|---|---|
| 1 | Declarations | DeVito | Adjudicated via this Order |
| 2 | Accounting | DeVito | Remains for Trial |
| 3 | Breach of Contract | DeVito | Remains for Trial |
| 4 | Unjust Enrichment | DeVito | Remains for Trial |
| 5 | Bad Faith | DeVito | Remains for Trial |
| 6 | Constructive Fraud | DeVito | Remains for Trial |
| 7 | Fraud/Concealment | DeVito | Remains for Trial |
| 8 | Conversion | DeVito | Remains for Trial |
| 9 | Infringement (UK) | DeVito | Remains for Trial |
| 10 | Infringement (Can.) | DeVito | Remains for Trial |
| 11 | Infringement (Austl.) | DeVito | Remains for Trial |
| 12 | Declarations | (Multiple) | Adjudicated via Order 661 |
| 13 | Declarations | (Multiple) | Adjudicated via Order 661 |
| 14 | Accounting | (Multiple) | Adjudicated via Order 661 |

| 15 | Infringement | (Multiple) | Adjudicated via this Order |
| 16 | Vicarious Inf. | (Multiple) | Adjudicated via this Order |
| 17 | Contributory Inf. | (Multiple) | Adjudicated via this Order |
| 18 | Infringement (UK) | (Multiple) | Adjudicated via this Order |
| 19 | Infringement (Can.) | (Multiple) | Adjudicated via this Order |
| 20 | Infringement (Austl.) | (Multiple) | Adjudicated via this Order |

The second through eleventh claims remain for trial, with DeVito and David as the remaining Defendants.[4]

## CONCLUSION

IT IS HEREBY ORDERED that Jersey Boys Records Limited Partnership's Motion for Summary Judgment (ECF No. 605) is GRANTED in part and DENIED it in part.  There is personal jurisdiction over JB Records in Nevada, but it is entitled to summary judgment on the merits.

IT IS FURTHER ORDERED that Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, and Getting Home, Inc.'s Motion for Partial Summary Judgment (ECF No. 613) is DENIED.

IT IS FURTHER ORDERED that  David's Motion for Summary Judgment (ECF No. 622) is DENIED.

IT IS FURTHER ORDERED that Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, Getting Home, Inc.'s, Jersey Boys Broadway LP's, and Skunk, Inc.'s Motion for Summary Judgment (ECF No. 626) is DENIED as moot.

IT IS FURTHER ORDERED that Valli's, Gaudio's, Brickman's, Elice's, McAnuff's,

---

[4]The Court denied summary judgment to Plaintiff on the twelfth cause of action for a declaration, and Defendants did not move for summary judgment on that cause of action.  But because that cause of action requested declarations on matters of law for the Court, and the Court ruled against Plaintiff, the claim has essentially been adjudicated such that a grant of summary judgment to Defendants on the twelfth cause of action would be a formality at this stage.

DSHT's, Dodger Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, Getting Home, Inc.'s, Jersey Boys Broadway LP's, and Skunk, Inc.'s Motion for Summary Judgment (ECF No. 632) is GRANTED.

IT IS FURTHER ORDERED that Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, and Getting Home, Inc.'s Motion for Partial Summary Judgment (ECF No. 635) is GRANTED.

IT IS FURTHER ORDERED that Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals, Ltd.'s, JB Viva Vegas L.P.'s, Jersey Boys Broadway LP's, JB Records's, Skunk, Inc.'s, and Getting Home, Inc.'s Motion for Partial Summary Judgment (ECF No. 638) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment (ECF No. 641) is GRANTED.

IT IS FURTHER ORDERED that the Motion to Continue Hearing (ECF No. 743) is DENIED.

IT IS FURTHER ORDERED that the Motion to Reconsider (ECF No. 744) is GRANTED.

IT IS FURTHER ORDERED that the Motion to Continue Trial (ECF No. 670) is GRANTED.

IT IS FURTHER ORDERED that the current trial date is VACATED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment as to all Defendants except DeVito and David.

IT IS SO ORDERED.

Dated this 31st day of January, 2012.

_____
ROBERT C. JONES
United States District Judge