1

2

3

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DONNA CORBELLO, | ) )  ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| THOMAS GAETANO DEVITO et al., | ) ) |
| Defendants. | ) ) ) |

2:08-cv-00867-RCJ-PAL

**ORDER**

Plaintiff Donna Corbello is the widow and heir of Rex Woodard, who assisted Defendant Thomas Gaetano "Tommy" DeVito in writing his unpublished autobiography (the "Work"). Plaintiff alleges that DeVito and others wrongfully appropriated the Work to develop the screenplay for *Jersey Boys*, a hit musical based on the band The Four Seasons that has played in the United States, Canada, England, and Australia.  Corbello has sued several companies and individuals for copyright infringement, and she has sued DeVito for an accounting and under several state law causes of action.  The Court granted summary judgment to certain Defendants and certified the order for immediate appeal.  The Court of Appeals reversed and remanded for further proceedings.  The Court now determines whether, and to what extent, Defendants are entitled to summary judgment on the infringement issue under the extrinsic test.

///

# I.   FACTS AND PROCEDURAL HISTORY

## A.   Factual Background

### 1.   The Work

Rex Woodard was an attorney, author, and avid Four Seasons fan who finally met Defendant and founding Four Seasons member Tommy DeVito for an interview on December 9, 1981 as a result of the publicity generated from an article Woodard had written about the band in *Goldmine* magazine earlier that year (the "1981 Article") that focused on the years between the band's breakup in 1970 and reconstitution in 1975. (*See* Third Am. Compl. ¶¶ 26–29, ECF No. 457).  On December 23, 1981, Woodard interviewed Tommy's brother Nick DeVito, and on January 8, 1982 he interviewed Nick Massi, another founding member of The Four Seasons. (*Id.* ¶ 29).  The result of these three interviews was a second article published in *Goldmine* in June of 1982 (the "1982 Article"), which focused on the band's earliest incarnation, The Four Lovers. (*Id.*).

Woodard kept in touch with DeVito and founding Four Seasons member Frankie Valli throughout the 1980s, and in November of 1988 Woodard flew to Las Vegas, Nevada for a series of interviews (the "1988 Interviews") with DeVito that sowed the seeds of the present litigation. (*See id.* ¶ 31–32).  During these interviews, DeVito explained to Woodard that except for Valli and final Four Seasons founding member Robert "Bob" Gaudio, the members of the band (DeVito and Massi) had spent several years engaged in criminal enterprises and in prison and retained "underworld contacts" throughout the band's era of popularity. (*See id.* ¶ 32).  Because this revelation was in stark contrast to the clean-cut image of the band presented in the popular media, Woodard realized the journalistic value of the story, and DeVito offered Woodard the

opportunity to write his authorized biography with full credit and an equal share in any profits. (*See id.*).

Woodard returned to Beaumont, Texas to begin writing DeVito's authorized biography (the "Work"), which has never been published. (*See id.*).  On December 1, 1988, Woodard sent DeVito a letter (the "Letter Agreement") memorializing their previous verbal understandings concerning creation of the Work. (*Id.* ¶ 33).  DeVito signed the Letter Agreement beneath the word "APPROVED" and mailed it back to Woodard. (*See id.*; Letter Agreement, Dec. 1, 1988, ECF No. 457-11).  The Letter Agreement reads in full:

December 1, 1988

Mr. Tommy DeVito
[street address]
Las Vegas, Nevada [zip code]

Dear Tommy:

I am making progress on the taped interviews we did.  You suggested that I prepare a written memorandum of our arrangement for future reference.  I will do so by this letter.

I agreed to write your authorized biography based on the recorded interviews you gave me, plus any other relevant information which would benefit the book.  You and I will be shown as co-authors, with you receiving first billing. I will do all of the actual writing, but you will have absolute and exclusive control over the final text of this book.

We have further agreed that we will share equally in any profits arising from this book, whether they be in the form of royalties, advances, adaptations fees, or whatever.  This agreement will be binding upon our heirs, both as to obligations and benefits, in the event one or both of us should die.

If this letter accurately sets forth our agreement as you understand it, sign the enclosed photocopy where indicated and return it to me in the enclosed self-addressed, stamped envelope.  Keep this original letter in your own file.

Thank you for asking me to work with you on this project.  I look forward to working with you over the next several months.

Sincerely,
[signed Rex Woodard]
Rex Woodard

RW/ml
Enclosures

APPROVED:
[signed Tommy DeVito]
TOMMY DEVITO

(Letter Agreement).  Over the next two years, Woodard used the 1988 Interviews and all of his

other knowledge about the band to create the Work, including his past interviews with band

members, newspaper articles, magazine articles, album linings, Freedom of Information Act

requests he filed with law enforcement agencies, and questionnaires he sent to DeVito. (Third

Am. Compl. ¶ 34).  Woodard compiled all of this information into the Work, resulting in a first-

person, narrative-style biography told from DeVito's perspective. (*See id.*).  Woodard remained

in close contact with DeVito throughout his creation of the Work and sent DeVito each chapter

for approval and editing as they were completed. (*Id.* ¶ 35).

    **2.**    **Woodard's and DeVito's Publication Attempts**

    As the Work neared completion in late 1990, Woodard and DeVito attempted to find a

publisher and even provided an outline of the Work to actor Joe Pesci to explore adaptation to a

screenplay. (*See id.* ¶ 36).  Plaintiff provides a copy of what she claims is a cover sheet to a

January 1991 version of the Work, which reads in full:

UNTITLED
TOMMY DEVITO/FOUR SEASONS
BIOGRAPHY

. . . .

TOMMY DEVITO
REX WOODARD
©, January, 1991

(*See* January 1991 Work Cover Page, ECF No. 457-15).

Though he never smoked, Woodard had been diagnosed with lung cancer in 1989, and his condition had begun seriously to worsen by late 1990. (*Id.* ¶ 39).  By February or March of 1991, he was bedridden, and he died on May 25, 1991 at age forty-one. (*Id.* ¶ 40).  Woodard had hoped that income generated from the Work would support his wife and children. (*Id.* ¶ 41).

### 3.      Plaintiff's and Ceen's Publication Attempts

In accordance with Woodard's wishes, Plaintiff and Woodard's sister Cindy Ceen continued to seek publication after Woodard's death independently of DeVito; however, public interest in The Four Seasons had waned, making it difficult to find a publisher. (*Id.* ¶ 42).  In September 2005, Ceen decided to contact DeVito for his assistance in publishing the Work. (*See id.*).  Ceen first contacted a prominent member of an Internet Four Seasons fan group named Charles Alexander to facilitate contact with DeVito. (*See id.* ¶ 43).  Alexander responded to Ceen on September 22, 2005 that he had met with DeVito the previous day, had told DeVito of Ceen's desire to publish the Work, and that DeVito had agreed to help. (*See id.*).  Ceen called DeVito the same day at a telephone number provided by Alexander, and DeVito indicated that he wanted to update the Work with post-1990 events and restore some "obscene" language Woodard had omitted. (*Id.*).  DeVito also claimed he had lost his copy of the Work and asked Ceen for a replacement, which she mailed to DeVito the next day, along with a letter memorializing their telephone conversation and informing DeVito that Plaintiff was considering self-publishing the Work if a traditional publisher could not be found. (*Id.*).  Neither Plaintiff nor Ceen heard from DeVito again. (*Id.* ¶ 44).  DeVito's attorney Jay Julien left Ceen a voice mail message on November 2, 2005, and Ceen returned his call the next day, during which conversation Julien told Ceen that he had spoken with DeVito regarding the Work and concluded that it was "not

saleable." (*Id.*).  Ceen was surprised by this conclusion, because the play *Jersey Boys* was scheduled to open on Broadway a few days later. (*Id.*).  Julien did not disclose that the Work had been used or exploited in any way or that rights in the Work had been licensed or assigned. (*Id.*).

### 4.    *Jersey Boys* and Plaintiff's Discovery of the Alleged Infringements

By late 2006, *Jersey Boys* had become a Broadway hit, earning four Tony Awards. (*Id.* ¶ 45).  Plaintiff had not seen the show, but she and Ceen estimated that the show's success would revive interest in the band and make publication of the Work viable. (*Id.*).  Plaintiff and Ceen engaged counsel to confirm the registration of Woodard's and DeVito's copyright in the Work, to register the copyright if not yet registered, and to contact Julien to see if DeVito had changed his mind about joint publication of the Work in light of *Jersey Boys*'s success. (*Id.*).  A January 3, 2007 search of the U.S. Copyright Office's online records indicated no registration of the Work to Woodard but showed that on January 11, 1991 (four months before Woodard's death) DeVito had registered a literary work entitled *Tommy DeVito - Then and Now*, Reg. No. Txu 454 118 (the "DeVito Work"). (*Id.* ¶ 46).  Plaintiff's counsel ordered a copy of the registration and discovered that DeVito had registered the DeVito Work in his own name only, claiming that the work was unpublished and that he wrote it in its entirety in 1990. (*Id.* ¶ 47).  Plaintiff's counsel ordered a copy of the DeVito Work itself and discovered that the DeVito Work was identical to the Work, and in fact appeared to be a photocopy of the manuscript typed by Woodard's secretary Myrtle Locke, with two exceptions. (*Id.* ¶¶ 48–49).  First, the original cover page from the January 1991 version of the Work had been replaced with a cover page in a different font and font size, reading:

TXu 454 118

. . . .

Tommy DeVito - Then and Now
by
Tommy DeVito

(*Id.* ¶ 49; *see* DeVito Work Cover Page, ECF No. 457-23).  Second, the first page of Chapter 41

(page 264 of the Work) was missing. (*See* Third Am. Compl. ¶ 49).  Plaintiff concluded in light

of the Letter Agreement and her dealings with DeVito and his counsel after Woodard's death

that DeVito had registered the Work without credit to Woodard or disclosure to Woodard or his

heirs. (*Id.* ¶ 50).

Plaintiff also soon discovered that the writers of and several actors in *Jersey Boys* had

access to the Work and that DeVito had received royalties or other profits from *Jersey Boys*, and

she concluded that the Work had "inspired the form, structure, and content of the musical . . . ."

(*See id.* ¶ 51).  As support for this conclusion, Plaintiff notes that Defendant Des McAnuff, the

director of *Jersey Boys*, was quoted in a July 8, 2006 report in Backstage magazine as stating that

Defendants Marshall Brickman and Eric Elice had relied in part on "an unpublished

autobiography by DeVito" in creating the libretto. (*See id.* ¶ 52).  Plaintiff notes that Christian

Hoff, the first actor to play DeVito in *Jersey Boys*, stated in what appears to be an online

interview that he was provided with a synopsis of the Work for his audition and a full copy for

background research. (*See id.*).  Plaintiff also cites to a Wikipedia entry for support that the Work

served as a basis for the musical. (*See id.*).  Plaintiff also notes an exchange on a *Jersey Boys*

podcast website indicating that one fan had reported to another that the musical was based on

DeVito's unpublished biography. (*See id.*).  Plaintiff also saw public reports of DeVito's

financial profits from the musical. (*See id.*).

///

///

1          **5.**          **Pre-Litigation Negotiations**

2          On June 13, 2007, Plaintiff's counsel wrote Julien by email and overnight courier

3   demanding that DeVito execute an application for supplementary registration with the U.S.

4   Copyright Office to add Woodard as a coauthor and co-claimant of the Work and demanding an

5   accounting of profits in accordance with the Letter Agreement. (*Id.* ¶ 53).  Counsel conferred

6   with one another by email and telephone between June and October 2007, and Julien admitted at

7   one point that DeVito had provided a copy of the Work "to Jersey Boys" and expressed interest

8   in the possibility of a joint copyright infringement action against "Jersey Boys," but later decided

9   that Plaintiff's only recourse was a suit against DeVito because he had authorized the use of the

10  Work. (*Id.* ¶ 54).  Although DeVito initially considered filing a supplemental registration of the

11  Work to credit Woodard, he later refused, claiming that he in fact was the sole author and that

12  Woodard had been a mere scribe. (*Id.*).

13          On July 2, 2007, Plaintiff filed her own supplementary application with the U.S.

14  Copyright Office to add Woodard as a coauthor and co-claimant of the Work, but the office

15  rejected the application because DeVito, the original claimant, had not signed it. (*Id.* ¶ 55).  The

16  office could not under 17 U.S.C. § 201(a) permit a non-author, non-claimant as to an original

17  registration, i.e., a "basic registration," to supplement the basic application, but such a person

18  could apply to register her own work, in which case the office would consider the new claim to

19  be adverse to the existing claim if the claims purported to register the same work exclusively to

20  different claimants. (*See* Copyright Office Letter, June 16, 2008, ECF No. 457-27, at 7).

21  However, the Copyright Office Review Board granted Plaintiff's appeal based on a closer

22  examination of regulations and practices, determining that her supplemental registration could be

23  accepted, and that a certificate of registration would be issued after processing. (*See* Copyright

24

Office Letter, Mar. 27, 2009, ECF No. 457-28). The amended certificate, Reg. No. Txu1 372-636, lists Woodard and DeVito as coauthors of the entire text of the Work and co-claimants thereto. (*See* Certificate of Registration TXu1 372-636, July 3, 2007, ECF No. 457-29).

Thereafter, further indication of the connection between *Jersey Boys* and the Work emerged through public sources such as public interviews of certain Defendants. (*See* Third Am. Compl. ¶ 56). Plaintiff alleges that the evidence that the musical was an adaptation of the Work means that *Jersey Boys* is a "derivative work" of the Work under 17 U.S.C. § 101. (*See id.* ¶ 57). Plaintiff recounts various similarities between Jersey Boys and the Work. (*See id.*).

## 6. The "Cover-Up"

DeVito and Julien then took steps to conceal the fact that DeVito had exploited the Work to create and profit from *Jersey Boys*. (*See id.* ¶ 58). First, DeVito withdrew his quotes from Charles Alexander's forward to the upcoming *Jersey Boys* book, because the use of those quotations would have linked the book, and hence the musical, to the Work. (*See id.*). Second, DeVito reported in an interview that he had never shown the Work to anyone except Brickman, Elice, and McAnuff, the writers and director of Jersey Boys. (*Id.*). Third, DeVito "dismantled" his website <www.tommydevito.com> to remove reference to "his SMASH HIT Jersey Boys." (*Id.*). Fourth, he stated in an interview that he had dictated the Work to a lawyer and that the book was not to be published yet. (*Id.*).

## 7. DeVito's Licensing of the Work

Certain documents made public during Valli's divorce proceedings in July 2008 revealed that DeVito had granted Valli and Gaudio an exclusive, irrevocable, perpetual, worldwide, assignable license (the "1999 Agreement") freely to use and adapt certain "Materials," including his "biographies," for the purpose of creating a musical based on the "life and music" of The

Four Seasons. (*Id.* ¶ 59).  The 1999 Agreement included the right to "ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised versions, merchandise, and/or other works . . . in all media now existing or later devised." (*Id.*).  The 1999 Agreement waived any claim of copyright infringement by DeVito, provided that DeVito would be entitled to 20% of any royalties Valli and Gaudio obtained through exploitation of the Materials, and provided that Massi would be entitled to 5% of any such royalties. (*See id.*).  Plaintiff suspects that Valli and Gaudio further licensed the Materials, which included the Work, to one or more unknown authors in 1999 for adaptation into an early version of *Jersey Boys* called Walk Like a Man. (*See id.*).  When the original producer rejected Walk Like a Man, Valli and Gaudio fired its authors, permitted their agreement with the original producer to lapse, and further licensed the Materials to Brickman and Elice, who used them to write Jersey Boys. (*See id.*).  Plaintiff implies that Valli's and Gaudio's joint ventures related to their exploitation of the Materials constitutes a general partnership as a matter of law that Plaintiff refers to as "The Four Seasons Partnership." (*See id.* ¶ 4–5).

### 8.     *Jersey Boys*

The *Jersey Boys* foundational production agreement (the "Jersey Boys Agreement") is dated May 1, 2004. (*See id.* ¶ 61; Jersey Boys Agreement 1, ECF No. 457-34, at 2).  The Jersey Boys Agreement lists five parties: Valli and Gaudio as "Owner," Brickman and Elice as "Bookwriter," and Dodger Stage Holding Theatricals, Inc. (now known as DSHT, Inc.) as "Producer." (*See* Jersey Boys Agreement 1).  The copies of the signature page of the Jersey Boys Agreement attached to the Third Amended Complaint ("TAC") include signatures by all of these parties except Brickman, and DSHT's signature is typewritten, without the handwritten signature of any natural person as an agent of DSHT. (*See id.* at 24, ECF No. 457-34, at 25–26).  The

signatures are not dated. (*See id.*).  The Jersey Boys Agreement is comprehensive and appears to govern the worldwide exploitation of *Jersey Boys*. (*See generally id.*).  The details of the twenty-three-page agreement need not be recounted here, but will be noted where relevant to the determination of claims.  The Jersey Boys Agreement includes a schedule and two exhibits as attachments, all of which the base agreement identifies.  Schedule A is a table of musical compositions to be used in the musical along with details of authorship and copyright ownership.  Exhibit A is the 1999 Agreement.  Exhibit B is a list of "payment instructions" consisting of addresses for mailing payments to the signatories and other beneficiaries.

Plaintiff believes that DSHT further assigned or licensed its rights under the Jersey Boys Agreement to Defendant Dodger Theatricals, Ltd., which is the primary producer of *Jersey Boys* on Broadway, tours throughout the United States, and in London, U.K. (*See* Third Am. Compl. ¶ 62).  Plaintiff believes that DSHT and/or Dodger Theatricals further licensed their rights to others and eventually assigned them to Defendant Jersey Boys Broadway Limited Partnership, which in turn licensed them to several parties, including Defendants JB Viva Vegas and Jersey Boys Records Limited Partnership. (*See id.*).  Plaintiff alleges that *Jersey Boys* has earned profits of approximately $150 million per year, with a life expectancy of at least ten years, and believes she is entitled to at least $6.5 million. (*See id.* ¶ 70).

### B.     Procedural History

### 1.     The Present Lawsuit

In December 2007, Plaintiff sued DeVito in the U.S. District Court for the Eastern District of Texas on three causes of action: (1) declaratory judgment; (2) equitable accounting; and (3) breach of contract.  That court transferred the case to this District in 2008 pursuant to 28 U.S.C. § 1404(a), without deciding whether it had personal jurisdiction over DeVito, and it

denied Plaintiff's motion to reconsider.  The TAC, filed in March 2011, lists fourteen Defendants and twenty causes of action: (1) declaratory judgment (DeVito); (2) equitable accounting (DeVito); (3) breach of contract (DeVito); (4) unjust enrichment (DeVito); (5) breach of the covenant of good faith and fair dealing (DeVito); (6) constructive fraud (DeVito); (7) fraud (DeVito); (8) conversion (DeVito); (9) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (DeVito); (10) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (DeVito); (11) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (DeVito); (12)–(13) declaratory judgment (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (14) equitable accounting (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, in the alternative) (15) copyright infringement under 17 U.S.C. § 501(a) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey Boys Records); (16) vicarious copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home); (17) contributory copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, Michael S. David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records); (18) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (19) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); and (20) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway).

2.        **The First Summary Judgment Order (No. 300)**

On March 31, 2010, the Court issued an order resolving ten pretrial motions as against the Second Amended Complaint ("SAC").  The Court denied DeVito's motion to dismiss, or in the alternative for summary judgment, finding that certain state law defenses were preempted by the Copyright Act and that in any case there was no evidence of an attorney–client relationship but only of a business relationship between DeVito and Woodard.  The Court also found that there remained genuine issues of material fact as to the eligibility of the Work or certain parts of it for copyright protection and as to what parts of the Work were used to create *Jersey Boys*.  The Court granted Corbello's cross motion for summary judgment as to DeVito's state law defenses but denied it as to infringement for the same reasons the Court denied DeVito's motion.

The Court denied Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals', and JB Viva Vegas, LP's (collectively, "New Defendants") motion to dismiss counts 15–17 for copyright infringement.  New Defendants argued that DeVito had waived and released any right to sue them and that they had an "implied nonexclusive license" from DeVito.  Finding no New York law to the contrary, the Court ruled in accordance with Ninth Circuit precedent that a failed attempt to grant an exclusive license could result in a nonexclusive license and that that was what happened in this case according to undisputed facts.  The Court denied the motion to dismiss, however, because it had been sufficiently alleged that New Defendants had sublicensed the work beyond the scope of their own license.

The Court denied Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals', and JB Viva Vegas, LP's other motion to dismiss counts 15–17 for copyright infringement.  Movants argued that the alleged similarities were unprotectable under copyright law, that many alleged similarities were not similarities, and that there was no "bodily appropriation" or "wholesale

appropriation" of the Work by the *Jersey Boys* script.  The Court found the claims to have been sufficiently alleged.

The Court denied Valli's, Gaudio's, DSHT's, and Dodger Theatricals' motion to dismiss counts 13–14 for declaratory judgment and an equitable accounting.  The Court denied the motion, finding that Corbello had sufficiently alleged in the alternative that DeVito had assigned his copyright in the Work via the 1999 Agreement such that movants could authorize others to use it but would owe Corbello, a joint owner, an accounting for any profits thereby obtained.

The Court denied three of Corbello's motions to strike and granted two of them in part, striking DeVito's affidavit as to certain purposes and ordering an exhibit to be placed under seal.

### 3.      The Second Summary Judgment Order (No. 661)

On October 27, 2011, the Court granted in part and denied in part two summary judgment motions.  Corbello and Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway filed cross motions for summary judgment as to counts 12–14 for declaratory judgment and an equitable accounting.  As to count 12 for a declaration that DeVito as a joint owner of the Work lacked the legal ability to grant Valli and Gaudio an exclusive license and that the 1999 Agreement was therefore either void, a nonexclusive license, or a transfer of DeVito's rights in the Work, the Court denied summary judgment, ruling that the 1999 Agreement was not a transfer but a license that was exclusive as against DeVito but nonexclusive as against Corbello.  As to count 13 for an alternative declaration that the 1999 Agreement permitted Valli and Gaudio to further transfer or license the Work, that they did transfer or license it to DSHT and/or Dodger Theatricals via the Jersey Boys Agreement, and that Dodger Theatricals thereafter transferred or licensed to Jersey Boys Broadway, the Court granted summary judgment to Plaintiff in part, ruling that the 1999 Agreement permitted further

assignment and that Valli and Gaudio had further assigned the rights in the Work to DSHT via the Jersey Boys Agreement, but that it was not clear whether there had been any further assignment.  The Court granted summary judgment to Defendants as to count 14 for an accounting because there had been no transfer of the Work and the relevant agreements included no duty to account.

### 4.      The Third Summary Judgment Order (No. 780)

On January 31, 2012, the Court adjudicated seven of the seventeen claims then remaining and entered judgment in favor of all Defendants except DeVito and David.  Jersey Boys Records had moved for summary judgment based on personal jurisdiction and failure to state a claim. The Court found that it had jurisdiction over Jersey Boys Records but granted the motion on the merits, ruling that Plaintiff had adduced no evidence that Jersey Boys Records had control over any other Defendant, that there was no allegation that Jersey Boys Records was aware of any infringement, so it could not be liable for contributory infringement, and that the album at issue did not pass the extrinsic test as to substantial similarity to the Work.  The Court denied two motions for summary judgment based on the statute of limitations.  The Court denied David's motion for summary judgment based on personal jurisdiction.  The Court denied a motion for summary judgment on the merits of the infringement issue (Motion No. 626) as moot because it granted another motion based on the Defendants' having licenses to use the Work.  The Court granted a motion for summary judgment as against the claims of infringement under foreign law, following the Second Circuit's persuasive ruling that the Berne Convention did not provide choice-of-law rules for copyright claims, and finding that U.S. law governed issues of copyright ownership and licensing in this case even if foreign law governed substantive infringement claims, and that the licenses under U.S. law protected Defendants from the foreign infringement

claims.  The Court granted Corbello's motion for summary judgment as to declarations that the Work was a joint work, that Woodard was a co-owner of the Work, and that DeVito held a 50% interest in the DeVito Work in constructive trust for Corbello, as successor-in-interest to Woodard.

### 5.    Further District Court Proceedings

At that point, claims 2–11 against DeVito remained for trial.  On July 9, 2012, the Court denied fees to Defendants, added David to the Judgment, and certified Order No. 780 and the current Order No. 809 for immediate appeal under Rule 54(b).

### 6.    The Appeal and Remand

Corbello appealed Orders 780 and 809.  On February 10, 2015, the Court of Appeals reversed, ruling that the 1999 Agreement was a transfer of ownership such that Valli and Gaudio became joint owners with Corbello in 1999, *Corbello v. DeVito*, 777 F.3d 1058, 1064 (9th Cir. 2015), and that although Valli and Gaudio could not be liable for infringement while they were joint owners, there remained a genuine issue of material fact whether the 1999 Agreement's reversionary clause had later been triggered such that Valli and Gaudio might be liable for infringement for their use of the Work thereafter, *id.* at 1066–67.  The Court of Appeals also ruled there remained a genuine issue of material fact as to whether DeVito granted Valli and Gaudio an implied nonexclusive license. *Id.* at 1067–68.

### 7.    The Present Order

The case will now proceed to trial, but the parties have requested that the Court first determine certain issues as a matter of law, i.e., whether certain parts of the Work are protected at all, whether certain parts of the Work are entitled to "thick" versus "thin" copyright protection, and whether Defendants are entitled to summary judgment on the infringement issue under the

extrinsic test.  As the Court has noted, it has already received all the briefing it requires on these issues in previous proceedings.  Furthermore, as the Court noted at a recent status conference, it intends to bifurcate the trial into infringement and damages phases, as the lengthy and complex determination of damages will be unnecessary if the jury finds no infringement.  Finally, if any Defendants are found to be liable for an accounting, the Court intends to hold accounting proceedings without a jury.

## II.    LEGAL STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an

element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

III.   **ANALYSIS**

A.   **Analytical Framework**

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  Defendants do not appear to dispute that Corbello is a joint owner of the Work.  They dispute whether they copied any protectable portions of the Work, whether they had access to the Work, and whether *Jersey Boys* is substantially similar to the Work.

Direct copying is sufficient but not necessary to establish the second element; it can also be established by showing that the defendant had access to the copyrighted work and that the accused work is substantially similar to the copyrighted work. *Id.* (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)).  Summary judgment is appropriate on a substantial similarity theory if no reasonable jury could find "substantial similarity of *ideas and expression*." *Id.* (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)) (emphasis added).  In other words, just as direct copying of unprotected parts of a work does not constitute infringement, *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 208 (9th Cir. 1989) (vacating a jury verdict and remanding for a new trial where the jury instructions permitted a finding of infringement based on the direct copying of unprotected material), access plus substantial similarity does not constitute infringement if the substantial similarity relates only to unprotected aspects of a work, *see Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 207–08 (9th Cir. 1988) (citing *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987)) ("To determine whether similarities result from unprotectable expression, analytic dissection of s*imilarities* may be performed.  If this demonstrates that all similarities in expression arise from use of common ideas, then no substantial similarity can be found.").

Although summary judgment on the substantial similarity issue is disfavored, it is permitted, and the Court of Appeals has frequently affirmed such rulings. *Funky Films*, 462 F.3d at 1076–77 (collecting cases).

"The substantial-similarity test contains an extrinsic and intrinsic component.  At summary judgment, courts apply only the extrinsic test; the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury." *Id.* at 1077 (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1360–61 (9th Cir. 1990)).

> For summary judgment, only the extrinsic test is important.  A plaintiff avoids summary judgment by satisfying the extrinsic test which makes similarity of the works a triable issue of fact.  In contrast, a plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests.

*Kouf*, 16 F.3d at 1045 (citations omitted).

> Extrinsic analysis is objective in nature.  [I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed.  The extrinsic test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works.  In applying the extrinsic test, this court compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.

> [P]rotectable expression includes the specific details of an author's rendering of ideas.  However, *scenes à faire*, which flow naturally from generic plot-lines, are not protectable.  We must take care to inquire only whether the *protectable elements, standing alone*, are substantially similar.  In so doing, we filter out and disregard the non-protectable elements in making [our] substantial similarity determination.

*Funky Films*, 462 F.3d at 1077 (citations and internal quotation marks omitted; alterations in original).  Scenes-a-faire are "situations and incidents that flow necessarily or naturally from a basic plot premise," and their copying does not constitute infringement. *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624–25 (9th Cir. 2010) (quoting *Cavalier v. Random House, Inc.*,

297 F.3d 815, 823 (9th Cir. 2002).  "Familiar stock scenes and themes that are staples of

literature are not protected." *Id.* at 624 (quoting *Cavalier*, 297 F.3d at 823).  Nor are historical

facts protected by copyright. *Id.* at 625 (citing *Narell v. Freeman*, 872 F.2d 907, 910–11 (9th Cir.

1989)).

The Court of Appeals recommends a three-step analysis: (1) the plaintiff must identify

similarities between the copyrighted work and the accused work; (2) of those similarities, the

district court must disregard any that are based on unprotectable material or authorized use; and

(3) the district court must determine the scope of protection ("thick" or "thin") to which the

remainder is entitled "as a whole" and instruct the jury accordingly for its subjective analysis

under the intrinsic test. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th

Cir. 1994).

Regular or "thick" protection is the norm, but when there are very few articulable,

concrete similarities based on protected aspects of a work and a limited number of ways in which

the underlying ideas could be expressed differently, or where the only protectable aspect of a

work is the "unique selection and arrangement" of otherwise unprotectable elements, a work is

entitled only to "thin" protection, where "virtually identical copying" is required to support a

finding of infringement. *See id.* at 1442, 1446; *see also Satava v. Lowry*, 323 F.3d 805, 812 (9th

Cir. 2003) (holding that an artist's copyright in his jellyfish sculptures was "thin" and therefore

protected only from virtually identical copying of his original contributions as to "the distinctive

curls of particular tendrils; the arrangement of certain hues; the unique shape of jellyfishes'

bells" because the shape of a jellyfish and the effects of the glass-in-glass medium were not

protectable).

Historical works are entitled to lesser protection than are works of fiction. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992) (citing *Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986) (citing *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966))) ("Works of fiction receive greater protection than works that have strong factual elements, such as historical or biographical works . . . ."); *see also Hoehling v. Univ. City Studios, Inc.*, 618 F.2d 972, 974 (2nd Cir. 1980) ("[T]he scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain.  [A]bsent wholesale usurpation of another's expression, claims of copyright infringement where works of history are at issue are rarely successful.").

> Biographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works . . . . This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution, e.g., so "that the world may not be deprived of improvements, or the progress of the arts be retarded."

*Maxtone–Graham*, 803 F.2d at 1263 (quoting *Rosemont Enters., Inc.*, 366 F.2d at 307 (quoting *Sayre v. Moore*, 105 Eng. Rep. 138, 139 (K.B. 1801))) (ruling that although the creation of a nonfiction work entails some creativity, where a work is essentially factual in nature, even verbatim quotation "within reason" is permitted).

In arguing that the Work is entitled only to "thin" protection, Defendants rely on *Narell v. Freeman*, 872 F.2d 907 (9th Cir. 1989), *Hoehling*, and two reported cases from the Southern District of New York.  In *Narell*, the author of a non-fiction book about the immigration of European Jews to California sued the author of a work of fiction who had admitted using the historical events depicted in the first work to write portions of her novel. *Id.* at 909.  The district

court granted summary judgment to the defendant based on, *inter alia*, a lack of substantial similarity. *Id.* The Court of Appeals affirmed, because "[Plaintiff's] copyright does not protect the facts and ideas [Defendant] took from [the copyrighted work]. Summary judgment is proper. [Defendant] did not copy substantial protected portions of [Plaintiff's] work." *Id.* at 915. In its analysis, the Court of Appeals noted:

> Copyright law protects only an author's expression. Facts and ideas within a work are not protected. Historical facts and theories may be copied, as long as the defendant does not bodily appropriate the expression of the plaintiff. [T]he scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain.

*Id.* at 910–11 (citations and internal quotation marks omitted; alteration in original). The defendant in that case "largely took unprotected factual information" from the plaintiff's work, such as reasons for the immigration, details of Adolph Sutro's journey, the character of San Francisco's streets, and the conduct of social and religious activities in the Jewish communities. *Id.* at 911. The defendant also copied eight specific phrases, such as "rekindle old memories," "staggering network," and "hordes of gold seekers," but the Court of Appeals ruled that such "ordinary phrases are not entitled to copyright protection" because they were "commonly-used expressions." *Id.* Still, a "sequence of creative expression" including an ordinary phrase can be protected. *See id.* (quoting *Salinger v. Random House*, 811 F.2d 90, 98 (2d Cir. 1987)).

**B.     Analysis**

**1.     Access and Substantial Similarity**

**a.     Access**

Corbello has produced enough evidence of Defendants' access to the Work to avoid summary judgment on the issue. She provides evidence that DeVito informed Brickman of the Work and offered to lend him a copy for limited purposes and a limited time and without

permission to show it to anyone or to copy any part of it. (*See* DeVito Dep. 354–62, May 11, 2011, ECF No. 748-1). She also provides evidence that despite DeVito's instructions to Brickman not to show the Work to anyone else or to copy it, Brickman emailed David and Elice on January 22, 2004 informing them of the Work and that he would soon have a copy of it. (*See* Brickman Email, Jan. 22, 2004, ECF No. 748-39). Brickman forwarded a copy of the email to McAnuff. (*See* McAnuff Email Reply, ECF No. 749-2). Even before Brickman had obtained the Work from DeVito, McAnuff had planned the early February 2004 meeting at which McAnuff, Elice, Brickman, and perhaps other writers constructed an outline for a play based upon the Work and marked up at least one of the two copies of the Work that Elice had made from Brickman's original copy from DeVito. (*See* Elice Dep. 84, 111, 115–16, 128–30, June 24, 2011, ECF No. 748-21). There is more evidence of Defendants' access to the Work adduced, but the evidence already recounted is sufficient for Corbello to avoid summary judgment on the issue.

### b.    Substantial Similarity

The Court will conduct the extrinsic test under the *Apple Computer* framework, i.e., it will determine which alleged similarities are in fact articulable and concrete, which of those are based on protectable aspects of the Work, and the scope of protection to which the collection of articulable, concrete, protectable similarities may be entitled as a whole for the purposes of the jury's application of the intrinsic test. Exhibit 8, the expert report of Richard Krevolin (the "Krevolin Report"), is the most comprehensive piece of evidence as to substantial similarity, and the Report is sufficient, without more, for Plaintiff to avoid summary judgment on the substantial similarity theory of infringement, at least as to "thin" protection.

The Court is satisfied Krevolin is an expert on adapting other media into screenplays. (*See* Krevolin Report 1–3, ECF No. 748-8 (noting *inter alia* that Krevolin has master's degrees

in both screenwriting and playwriting and fiction from UCLA and USC, respectively; that he has worked for over 20 years as a writer, playwright, screenwriter, lecturer, consultant, and professor; and that he has published a book entitled *How to Adapt Anything Into a Screenplay*")). Although not dispositive, his expertise will be helpful to the Court's and jury's comparisons of the scripts to the Work. Even if he were not admitted as an expert witness for his opinions, his report is a useful guideline as to various alleged similarities.

Krevolin identifies many similarities between the Work and several versions of the script and pre-script materials. For the purposes of substantial similarity, the relevant comparisons are those of the Work to the La Jolla *Jersey Boys* Script and the *Jersey Boys Broadway* Script. (*See id.* 52–138, ECF No. 748-8). Krevolin opines that the scripts for the London, Las Vegas, Toronto, Melbourne, Chicago, First National Tour, and (based on his understanding that no separate script was created for the Sydney production) the Sydney productions of *Jersey Boys* contain no material differences as between themselves or with the *Jersey Boys Broadway* Script. (*See id.* at 139).

As to the La Jolla *Jersey Boys* Script, Krevolin identifies 68 similarities with the Work. (*See id.* 54–59). As to the *Jersey Boys Broadway* Script, Krevolin identifies 90 similarities with the Work. (*See id.* 62–70). Krevolin ultimately opines that at least thirty percent (30%) of *Jersey Boys* is attributable to the Work. (*See id.* at 148). As to *Jersey Boys* products apart from the performances, he opines that the Libretto beginning on page 86 of the *Jersey Boys Book* is an abridged version of the *Jersey Boys Broadway* Script that shares all of the *Jersey Boys Broadway* Script's similarities to the Work but three, (*see id.* at 140), and that the *Jersey Boys Cast*

*Recording* contains little dialogue from *Jersey Boys* but does contain elements from the Work, (*see id.* at 140–41).[1]

The Court has examined each of the similarities and determined that a reasonable jury could find most of them to be concrete, articulable similarities, but that most of them are based on historical fact or ordinary phrases without any creative element having been supplied by the Work and reproduced in the scripts. Where the similarities are based on more than historical fact or ordinary phrases, the creative elements in the scripts are typically not those that appear in the Work. The following similarities[2] are based on historical fact, with any creative element having been provided by the accused work(s), not the Work: LJ4–7, LJ10–19, LJ21–25, LJ27–30, LJ32–42, LJ44–47, LJ50–57, LJ61–62, LJ64, LJ66, B4–8, B11, B13–25, B27–31, B33–51, B53–58, B60, B62–76, B81–84, B86, and B88.[3] The following similarities, to the extent they are not

---

1 The Court has already granted summary judgment on the infringement issue as to the *Jersey Boys Cast Recording*, (*see* Third Summ. J. Order 20–21, ECF No. 780), and the Court of Appeals did not upset that ruling.

2 The similarities are not numbered in the Krevolin Report but listed as "bullet" points. The Court will refer to the similarities in the order Krevolin lists them as LJ1, LJ2, etc. for the similarities between the La Jolla *Jersey Boys* script and the Work and as B1, B2, etc. for the similarities between the *Jersey Boys Broadway* script and the Work.

3 DeVito's recollected perceptions of other real person's characteristics and personalities, as well as recollections of real places where real events are alleged to have occurred, are still claims of historical fact, not creative elements. Events, persons, and places depicted as historical fact are simply not protected by copyright except to the extent a historical work may be entirely appropriated; characterizing aspects of a work as setting, plot, character, etc. does not make unprotectable elements such as claims of historical fact protectable no matter how concrete and articulable the similarities are. Of course, wholesale appropriation of even a historical work is infringement, but that is "thin" protection. Moreover, in this case, many of the similarities, particularly settings and characterizations of persons, are repeated in Krevolin's analysis more than once, and many historical similarities that could be characterized as single events are characterized as multiple events. The numbers 68 and 90 are therefore inflated even if the Court were to rule that each of the similarities represented a concrete, articulable similarity based on a protected aspect of the Work. Next, the fact that the scripts contradict the Work in some places tends to show that the scripts were created at least in part from other, contradictory sources or

based on historical accounts, are based on ordinary phrases: LJ3, LJ8, LJ20, LJ31, LJ49, LJ58–60, LJ63, LJ65, LJ 67–68, B3, B9–10, B26, B61, B77–80, B85, B87, and B89–90.  The following similarity is based on a stock scene: LJ1.  The following similarities are not based on concrete, articulable aspects of plot, theme, etc: LJ2, B2, and B32.

The remaining similarities are: LJ9 (dialogue, theme), LJ26 (mood), LJ43 (dialogue), LJ48 (theme), B1 (mood), B12 (dialogue, theme), B52 (dialogue), and B59 (theme).  These concrete, articulable similarities based on protectable material are not enough for the Work to have "thick" copyright protection.  As a whole, the Work is entitled to "thin" copyright protection—at least Corbello is entitled to argue that to the jury.  The Work is a work of historical fact, as recounted by DeVito with the assistance of Woodard's writing skills.  The creative aspects of the Work do not generally concern things like character, plot, and setting, but rather writing style and presentation.  Neither DeVito nor Woodard created or even claimed to have created any characters, plot lines, settings, etc.  The Prologue of the Work is emphatic that previous biographies about The Four Seasons are "bogus" and that the Work represents "the whole story," i.e., the truth as DeVito sees it. (Work i, ECF No. 629-5, at 3).  DeVito simply recounted the historical facts as he perceived them, and Woodard contributed his writing style.  Interpretations of historical events, like the facts of history themselves, are uncopyrightable ideas. *Hoehling*, 618 F.3d at 978.  After all, every relation of a historical fact beyond direct observation is tainted to some degree by some person's interpretation, so distinguishing between

---

that the authors of the script chose their own creative additions over the Work's historical representations in the relevant places, not that the Work was intended to be fiction.  Nor do Valli's and others' deposition testimony that parts of the Work are false make the Work fiction for the purposes of copyright where DeVito explicitly presents it as his earnest interpretation of historical events.  It is not unusual for historical works to contradict one another, particularly where the events occurred during the lifetimes of the authors, and especially where the authors were themselves involved in the events and therefore may have personal motivations to recount the events differently from one another.

historical facts and "interpretations" of those facts in the context of copyright would destroy the rule that historical facts are unprotected.  That does not mean the Work is unprotected by copyright.  Clearly, DeVito and Woodard created something that did not exist before their collaboration.  The overall expression of the Work as a whole is protected, and Defendants were not entitled to copy the Work wholesale.

### 2.    Direct Copying

Defendants are not entitled to summary judgment on a direct copying theory.  A reasonable jury could find direct copying from the evidence of access to the Work in late January 2004, the early February 2004 meeting at which Brickman, Elice, and McAnuff poured over, annotated, and began to adapt the Work, and the Krevolin Report's comparisons of the Work to the evolving scripts, i.e., the February 13, 2004 Outline, the March 11, 2004 Outline, the March 19, 2004 Outline, the April 7, 2004 Outline, the May 28, 2004 Draft Script, the July 7, 2004 Draft Script, the La Jolla *Jersey Boys* Script of October 2004, and the Broadway *Jersey Boys* Script of November 2005. (*See id.* at 13–138).  The jury must be instructed, of course, that even if the Work was directly copied, it is only the *expression* of the authors of the Work that is protected from copying, and in this case that expression consists of the overall presentation of the Work as a whole. *See Narell*, 872 F.2d at 910–12.

### C.    Summary of Ruling

Under the law of the case, the jury must be instructed that the 1999 Agreement was a transfer of ownership whereby Valli and Gaudio became joint owners with Corbello, and that Valli and Gaudio cannot be liable for infringement while they were joint owners.  The jury must determine whether the 1999 Agreement's reversionary clause was ever triggered such that Valli and Gaudio might be liable for infringement thereafter.  If that occurred, the jury must also

determine whether DeVito granted Valli and Gaudio an implied nonexclusive license such that they cannot have been liable for infringement even after their ownership interest reverted to DeVito.  Finally, the jury must determine infringement under direct copying or substantial similarity theories.  Under the latter theory, the jury must first perform the extrinsic test.  The Court has granted summary judgment in part as to the extrinsic test, finding that regular, "thick" copyright protection does not apply as a matter of law, so the jury must be instructed that if the Work passes the extrinsic test, it must apply "thin" protection under the intrinsic test.[4]

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 626) is GRANTED IN PART and DENIED IN PART.  The Work is entitled to "thin" copyright protection as against the La Jolla *Jersey Boys* Script, the *Jersey Boys Broadway* Script, and the Libretto in the *Jersey Boys Book*.

IT IS SO ORDERED.

Dated this 29th day of September, 2015.

_____
ROBERT C. JONES
United States District Judge

---

4 The Court will not instruct the jury using the legal jargon of "thin," which could be confusing or prejudicial, but rather with the relevant legal standards the word denotes.