1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

_____
)
DONNA CORBELLO,                      )
                                     )
          Plaintiff,                 )
                                     )          2:08-cv-00867-RCJ-PAL
     vs.                             )
                                     )          **ORDER**
THOMAS GAETANO DEVITO et al.,        )
                                     )
          Defendants.                )
_____)

Plaintiff Donna Corbello is the widow and heir of Rex Woodard, who assisted Defendant Thomas Gaetano "Tommy" DeVito in writing his unpublished autobiography (the "Work"). Plaintiff alleges that DeVito and others wrongfully appropriated the Work to develop the screenplay for *Jersey Boys*, a hit musical based on the band The Four Seasons that has played in the United States, Canada, England, and Australia. Corbello has sued several companies and individuals for copyright infringement, and she has sued DeVito for an accounting and under several state law causes of action. The Court granted summary judgment to certain Defendants and certified the order for immediate appeal. The Court of Appeals reversed and remanded for further proceedings. Pending before the Court are four motions for summary judgment.

///

///

1

I.        FACTS AND PROCEDURAL HISTORY

2

A.        Factual Background

3

1.        The Work

4

Rex Woodard was an attorney, author, and avid Four Seasons fan who finally met

5 Defendant and founding Four Seasons member Tommy DeVito for an interview on December 9,

6 1981 as a result of the publicity generated from an article Woodard had written about the band in

7 *Goldmine* magazine earlier that year (the "1981 Article") that focused on the years between the

8 band's breakup in 1970 and reconstitution in 1975. (*See* Third Am. Compl. ¶¶ 26–29, ECF No.

9 457).  On December 23, 1981, Woodard interviewed Tommy's brother Nick DeVito, and on

10 January 8, 1982 he interviewed Nick Massi, another founding member of The Four Seasons. (*Id.*

11 ¶ 29).  The result of these three interviews was a second article published in *Goldmine* in June of

12 1982 (the "1982 Article"), which focused on the band's earliest incarnation, The Four Lovers.

13 (*Id.*).

14          Woodard kept in touch with DeVito and founding Four Seasons member Frankie Valli

15 throughout the 1980s, and in November of 1988 Woodard flew to Las Vegas, Nevada for a series

16 of interviews (the "1988 Interviews") with DeVito that sowed the seeds of the present litigation.

17 (*See id.* ¶ 31–32).  During these interviews, DeVito explained to Woodard that except for Valli

18 and final Four Seasons founding member Robert "Bob" Gaudio, the members of the band

19 (DeVito and Massi) had spent several years engaged in criminal enterprises and in prison and

20 retained "underworld contacts" throughout the band's era of popularity. (*See id.* ¶ 32).  Because

21 this revelation was in stark contrast to the clean-cut image of the band presented in the popular

22 media, Woodard realized the journalistic value of the story, and DeVito offered Woodard the

23

24

opportunity to write his authorized biography with full credit and an equal share in any profits. (*See id.*).

Woodard returned to Beaumont, Texas to begin writing DeVito's authorized biography (the "Work"), which has never been published. (*See id.*).  On December 1, 1988, Woodard sent DeVito a letter (the "Letter Agreement") memorializing their previous verbal understandings concerning creation of the Work. (*Id.* ¶ 33).  DeVito signed the Letter Agreement beneath the word "APPROVED" and mailed it back to Woodard. (*See id.*; Letter Agreement, Dec. 1, 1988, ECF No. 457-11).  The Letter Agreement reads in full:

December 1, 1988

Mr. Tommy DeVito
[street address]
Las Vegas, Nevada [zip code]

Dear Tommy:

I am making progress on the taped interviews we did.  You suggested that I prepare a written memorandum of our arrangement for future reference.  I will do so by this letter.

I agreed to write your authorized biography based on the recorded interviews you gave me, plus any other relevant information which would benefit the book.  You and I will be shown as co-authors, with you receiving first billing. I will do all of the actual writing, but you will have absolute and exclusive control over the final text of this book.

We have further agreed that we will share equally in any profits arising from this book, whether they be in the form of royalties, advances, adaptations fees, or whatever.  This agreement will be binding upon our heirs, both as to obligations and benefits, in the event one or both of us should die.

If this letter accurately sets forth our agreement as you understand it, sign the enclosed photocopy where indicated and return it to me in the enclosed self-addressed, stamped envelope.  Keep this original letter in your own file.

Thank you for asking me to work with you on this project.  I look forward to working with you over the next several months.

Sincerely,
[signed Rex Woodard]
Rex Woodard

RW/ml
Enclosures

APPROVED:
[signed Tommy DeVito]
TOMMY DEVITO

(Letter Agreement).  Over the next two years, Woodard used the 1988 Interviews and all of his other knowledge about the band to create the Work, including his past interviews with band members, newspaper articles, magazine articles, album linings, Freedom of Information Act requests he filed with law enforcement agencies, and questionnaires he sent to DeVito. (Third Am. Compl. ¶ 34).  Woodard compiled all of this information into the Work, resulting in a first-person, narrative-style biography told from DeVito's perspective. (*See id.*).  Woodard remained in close contact with DeVito throughout his creation of the Work and sent DeVito each chapter for approval and editing as they were completed. (*Id.* ¶ 35).

**2.  Woodard's and DeVito's Publication Attempts**

As the Work neared completion in late 1990, Woodard and DeVito attempted to find a publisher and even provided an outline of the Work to actor Joe Pesci to explore adaptation to a screenplay. (*See id.* ¶ 36).  Plaintiff provides a copy of what she claims is a cover sheet to a January 1991 version of the Work, which reads in full:

UNTITLED
TOMMY DEVITO/FOUR SEASONS
BIOGRAPHY

. . . .

TOMMY DEVITO
REX WOODARD
©, January, 1991

(*See* January 1991 Work Cover Page, ECF No. 457-15).

Though he never smoked, Woodard had been diagnosed with lung cancer in 1989, and his condition had begun seriously to worsen by late 1990. (*Id.* ¶ 39).  By February or March of 1991, he was bedridden, and he died on May 25, 1991 at age forty-one. (*Id.* ¶ 40).  Woodard had hoped that income generated from the Work would support his wife and children. (*Id.* ¶ 41).

### 3.    Plaintiff's and Ceen's Publication Attempts

In accordance with Woodard's wishes, Plaintiff and Woodard's sister Cindy Ceen continued to seek publication after Woodard's death independently of DeVito; however, public interest in The Four Seasons had waned, making it difficult to find a publisher. (*Id.* ¶ 42).  In September 2005, Ceen decided to contact DeVito for his assistance in publishing the Work. (*See id.*).  Ceen first contacted a prominent member of an Internet Four Seasons fan group named Charles Alexander to facilitate contact with DeVito. (*See id.* ¶ 43).  Alexander responded to Ceen on September 22, 2005 that he had met with DeVito the previous day, had told DeVito of Ceen's desire to publish the Work, and that DeVito had agreed to help. (*See id.*).  Ceen called DeVito the same day at a telephone number provided by Alexander, and DeVito indicated that he wanted to update the Work with post-1990 events and restore some "obscene" language Woodard had omitted. (*Id.*).  DeVito also claimed he had lost his copy of the Work and asked Ceen for a replacement, which she mailed to DeVito the next day, along with a letter memorializing their telephone conversation and informing DeVito that Plaintiff was considering self-publishing the Work if a traditional publisher could not be found. (*Id.*).  Neither Plaintiff nor Ceen heard from DeVito again. (*Id.* ¶ 44).  DeVito's attorney Jay Julien left Ceen a voice mail message on November 2, 2005, and Ceen returned his call the next day, during which conversation Julien told Ceen that he had spoken with DeVito regarding the Work and concluded that it was "not

saleable." (*Id.*).  Ceen was surprised by this conclusion, because the play *Jersey Boys* was scheduled to open on Broadway a few days later. (*Id.*).  Julien did not disclose that the Work had been used or exploited in any way or that rights in the Work had been licensed or assigned. (*Id.*).

### 4.   *Jersey Boys* and Plaintiff's Discovery of the Alleged Infringements

By late 2006, *Jersey Boys* had become a Broadway hit, earning four Tony Awards. (*Id.* ¶ 45).  Plaintiff had not seen the show, but she and Ceen estimated that the show's success would revive interest in the band and make publication of the Work viable. (*Id.*).  Plaintiff and Ceen engaged counsel to confirm the registration of Woodard's and DeVito's copyright in the Work, to register the copyright if not yet registered, and to contact Julien to see if DeVito had changed his mind about joint publication of the Work in light of *Jersey Boys*'s success. (*Id.*).  A January 3, 2007 search of the U.S. Copyright Office's online records indicated no registration of the Work to Woodard but showed that on January 11, 1991 (four months before Woodard's death) DeVito had registered a literary work entitled *Tommy DeVito - Then and Now*, Reg. No. Txu 454 118 (the "DeVito Work"). (*Id.* ¶ 46).  Plaintiff's counsel ordered a copy of the registration and discovered that DeVito had registered the DeVito Work in his own name only, claiming that the work was unpublished and that he wrote it in its entirety in 1990. (*Id.* ¶ 47).  Plaintiff's counsel ordered a copy of the DeVito Work itself and discovered that the DeVito Work was identical to the Work, and in fact appeared to be a photocopy of the manuscript typed by Woodard's secretary Myrtle Locke, with two exceptions. (*Id.* ¶¶ 48–49).  First, the original cover page from the January 1991 version of the Work had been replaced with a cover page in a different font and font size, reading:

TXu 454 118

. . . .

Tommy DeVito - Then and Now
by
Tommy DeVito

(*Id.* ¶ 49; *see* DeVito Work Cover Page, ECF No. 457-23).  Second, the first page of Chapter 41

(page 264 of the Work) was missing. (*See* Third Am. Compl. ¶ 49).  Plaintiff concluded in light

of the Letter Agreement and her dealings with DeVito and his counsel after Woodard's death

that DeVito had registered the Work without credit to Woodard or disclosure to Woodard or his

heirs. (*Id.* ¶ 50).

Plaintiff also soon discovered that the writers of and several actors in *Jersey Boys* had

access to the Work and that DeVito had received royalties or other profits from *Jersey Boys*, and

she concluded that the Work had "inspired the form, structure, and content of the musical . . . ."

(*See id.* ¶ 51).  As support for this conclusion, Plaintiff notes that Defendant Des McAnuff, the

director of *Jersey Boys*, was quoted in a July 8, 2006 report in Backstage magazine as stating that

Defendants Marshall Brickman and Eric Elice had relied in part on "an unpublished

autobiography by DeVito" in creating the libretto. (*See id.* ¶ 52).  Plaintiff notes that Christian

Hoff, the first actor to play DeVito in *Jersey Boys*, stated in what appears to be an online

interview that he was provided with a synopsis of the Work for his audition and a full copy for

background research. (*See id.*).  Plaintiff also cites to a Wikipedia entry for support that the Work

served as a basis for the musical. (*See id.*).  Plaintiff also notes an exchange on a *Jersey Boys*

podcast website indicating that one fan had reported to another that the musical was based on

DeVito's unpublished biography. (*See id.*).  Plaintiff also saw public reports of DeVito's

financial profits from the musical. (*See id.*).

///

///

5.        **Pre-Litigation Negotiations**

On June 13, 2007, Plaintiff's counsel wrote Julien by email and overnight courier demanding that DeVito execute an application for supplementary registration with the U.S. Copyright Office to add Woodard as a coauthor and co-claimant of the Work and demanding an accounting of profits in accordance with the Letter Agreement. (*Id.* ¶ 53).  Counsel conferred with one another by email and telephone between June and October 2007, and Julien admitted at one point that DeVito had provided a copy of the Work "to Jersey Boys" and expressed interest in the possibility of a joint copyright infringement action against "Jersey Boys," but later decided that Plaintiff's only recourse was a suit against DeVito because he had authorized the use of the Work. (*Id.* ¶ 54).  Although DeVito initially considered filing a supplemental registration of the Work to credit Woodard, he later refused, claiming that he in fact was the sole author and that Woodard had been a mere scribe. (*Id.*).

On July 2, 2007, Plaintiff filed her own supplementary application with the U.S. Copyright Office to add Woodard as a coauthor and co-claimant of the Work, but the office rejected the application because DeVito, the original claimant, had not signed it. (*Id.* ¶ 55).  The office could not under 17 U.S.C. § 201(a) permit a non-author, non-claimant as to an original registration, i.e., a "basic registration," to supplement the basic application, but such a person could apply to register her own work, in which case the office would consider the new claim to be adverse to the existing claim if the claims purported to register the same work exclusively to different claimants. (*See* Copyright Office Letter, June 16, 2008, ECF No. 457-27, at 7).  However, the Copyright Office Review Board granted Plaintiff's appeal based on a closer examination of regulations and practices, determining that her supplemental registration could be accepted, and that a certificate of registration would be issued after processing. (*See* Copyright

Office Letter, Mar. 27, 2009, ECF No. 457-28).  The amended certificate, Reg. No. Txu1 372-636, lists Woodard and DeVito as coauthors of the entire text of the Work and co-claimants thereto. (*See* Certificate of Registration TXu1 372-636, July 3, 2007, ECF No. 457-29).

Thereafter, further indication of the connection between *Jersey Boys* and the Work emerged through public sources such as public interviews of certain Defendants. (*See* Third Am. Compl. ¶ 56).  Plaintiff alleges that the evidence that the musical was an adaptation of the Work means that *Jersey Boys* is a "derivative work" of the Work under 17 U.S.C. § 101. (*See id.* ¶ 57). Plaintiff recounts various similarities between Jersey Boys and the Work. (*See id.*).

### 6.      The "Cover-Up"

DeVito and Julien then took steps to conceal the fact that DeVito had exploited the Work to create and profit from *Jersey Boys*. (*See id.* ¶ 58).  First, DeVito withdrew his quotes from Charles Alexander's forward to the upcoming *Jersey Boys* book, because the use of those quotations would have linked the book, and hence the musical, to the Work. (*See id.*).  Second, DeVito reported in an interview that he had never shown the Work to anyone except Brickman, Elice, and McAnuff, the writers and director of Jersey Boys. (*Id.*).  Third, DeVito "dismantled" his website <www.tommydevito.com> to remove reference to "his SMASH HIT Jersey Boys." (*Id.*).  Fourth, he stated in an interview that he had dictated the Work to a lawyer and that the book was not to be published yet. (*Id.*).

### 7.      DeVito's Licensing of the Work

Certain documents made public during Valli's divorce proceedings in July 2008 revealed that DeVito had granted Valli and Gaudio an exclusive, irrevocable, perpetual, worldwide, assignable license (the "1999 Agreement") freely to use and adapt certain "Materials," including his "biographies," for the purpose of creating a musical based on the "life and music" of The

Four Seasons. (*Id.* ¶ 59).  The 1999 Agreement included the right to "ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised versions, merchandise, and/or other works . . . in all media now existing or later devised." (*Id.*).  The 1999 Agreement waived any claim of copyright infringement by DeVito, provided that DeVito would be entitled to 20% of any royalties Valli and Gaudio obtained through exploitation of the Materials, and provided that Massi would be entitled to 5% of any such royalties. (*See id.*).  Plaintiff suspects that Valli and Gaudio further licensed the Materials, which included the Work, to one or more unknown authors in 1999 for adaptation into an early version of *Jersey Boys* called Walk Like a Man. (*See id.*).  When the original producer rejected Walk Like a Man, Valli and Gaudio fired its authors, permitted their agreement with the original producer to lapse, and further licensed the Materials to Brickman and Elice, who used them to write Jersey Boys. (*See id.*).  Plaintiff implies that Valli's and Gaudio's joint ventures related to their exploitation of the Materials constitutes a general partnership as a matter of law that Plaintiff refers to as "The Four Seasons Partnership." (*See id.* ¶ 4–5).

### 8.   *Jersey Boys*

The *Jersey Boys* foundational production agreement (the "Jersey Boys Agreement") is dated May 1, 2004. (*See id.* ¶ 61; Jersey Boys Agreement 1, ECF No. 457-34, at 2).  The Jersey Boys Agreement lists five parties: Valli and Gaudio as "Owner," Brickman and Elice as "Bookwriter," and Dodger Stage Holding Theatricals, Inc. (now known as DSHT, Inc.) as "Producer." (*See* Jersey Boys Agreement 1).  The copies of the signature page of the Jersey Boys Agreement attached to the Third Amended Complaint ("TAC") include signatures by all of these parties except Brickman, and DSHT's signature is typewritten, without the handwritten signature of any natural person as an agent of DSHT. (*See id.* at 24, ECF No. 457-34, at 25–26).  The

signatures are not dated. (*See id.*).  The Jersey Boys Agreement is comprehensive and appears to govern the worldwide exploitation of *Jersey Boys*. (*See generally id.*).  The details of the twenty-three-page agreement need not be recounted here, but will be noted where relevant to the determination of claims.  The Jersey Boys Agreement includes a schedule and two exhibits as attachments, all of which the base agreement identifies.  Schedule A is a table of musical compositions to be used in the musical along with details of authorship and copyright ownership.  Exhibit A is the 1999 Agreement.  Exhibit B is a list of "payment instructions" consisting of addresses for mailing payments to the signatories and other beneficiaries.

Plaintiff believes that DSHT further assigned or licensed its rights under the Jersey Boys Agreement to Defendant Dodger Theatricals, Ltd., which is the primary producer of *Jersey Boys* on Broadway, tours throughout the United States, and in London, U.K. (*See* Third Am. Compl. ¶ 62).  Plaintiff believes that DSHT and/or Dodger Theatricals further licensed their rights to others and eventually assigned them to Defendant Jersey Boys Broadway Limited Partnership, which in turn licensed them to several parties, including Defendants JB Viva Vegas and Jersey Boys Records Limited Partnership. (*See id.*).  Plaintiff alleges that *Jersey Boys* has earned profits of approximately $150 million per year, with a life expectancy of at least ten years, and believes she is entitled to at least $6.5 million. (*See id.* ¶ 70).

### B.    Procedural History

#### 1.    The Present Lawsuit

In December 2007, Plaintiff sued DeVito in the U.S. District Court for the Eastern District of Texas on three causes of action: (1) declaratory judgment; (2) equitable accounting; and (3) breach of contract.  That court transferred the case to this District in 2008 pursuant to 28 U.S.C. § 1404(a), without deciding whether it had personal jurisdiction over DeVito, and it

denied Plaintiff's motion to reconsider.  The TAC, filed in March 2011, lists fourteen Defendants and twenty causes of action: (1) declaratory judgment (DeVito); (2) equitable accounting (DeVito); (3) breach of contract (DeVito); (4) unjust enrichment (DeVito); (5) breach of the covenant of good faith and fair dealing (DeVito); (6) constructive fraud (DeVito); (7) fraud (DeVito); (8) conversion (DeVito); (9) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (DeVito); (10) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (DeVito); (11) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (DeVito); (12)–(13) declaratory judgment (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (14) equitable accounting (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, in the alternative) (15) copyright infringement under 17 U.S.C. § 501(a) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey Boys Records); (16) vicarious copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home); (17) contributory copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, Michael S. David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records); (18) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (19) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); and (20) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway).

2.      **The First Summary Judgment Order (No. 300)**

On March 31, 2010, the Court issued an order resolving ten pretrial motions as against the Second Amended Complaint ("SAC"). The Court denied DeVito's motion to dismiss, or in the alternative for summary judgment, finding that certain state law defenses were preempted by the Copyright Act and that in any case there was no evidence of an attorney–client relationship but only of a business relationship between DeVito and Woodard. The Court also found that there remained genuine issues of material fact as to the eligibility of the Work or certain parts of it for copyright protection and as to what parts of the Work were used to create *Jersey Boys*. The Court granted Corbello's cross motion for summary judgment as to DeVito's state law defenses but denied it as to infringement for the same reasons the Court denied DeVito's motion.

The Court denied Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals', and JB Viva Vegas, LP's (collectively, "New Defendants") motion to dismiss counts 15–17 for copyright infringement. New Defendants argued that DeVito had waived and released any right to sue them and that they had an "implied nonexclusive license" from DeVito. Finding no New York law to the contrary, the Court ruled in accordance with Ninth Circuit precedent that a failed attempt to grant an exclusive license could result in a nonexclusive license and that that was what happened in this case according to undisputed facts. The Court denied the motion to dismiss, however, because it had been sufficiently alleged that New Defendants had sublicensed the work beyond the scope of their own license.

The Court denied Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals', and JB Viva Vegas, LP's other motion to dismiss counts 15–17 for copyright infringement. Movants argued that the alleged similarities were unprotectable under copyright law, that many alleged similarities were not similarities, and that there was no "bodily appropriation" or "wholesale

appropriation" of the Work by the *Jersey Boys* script.  The Court found the claims to have been sufficiently alleged.

The Court denied Valli's, Gaudio's, DSHT's, and Dodger Theatricals' motion to dismiss counts 13–14 for declaratory judgment and an equitable accounting.  The Court denied the motion, finding that Corbello had sufficiently alleged in the alternative that DeVito had assigned his copyright in the Work via the 1999 Agreement such that movants could authorize others to use it but would owe Corbello, a joint owner, an accounting for any profits thereby obtained.

The Court denied three of Corbello's motions to strike and granted two of them in part, striking DeVito's affidavit as to certain purposes and ordering an exhibit to be placed under seal.

### 3.        The Second Summary Judgment Order (No. 661)

On October 27, 2011, the Court granted in part and denied in part two summary judgment motions.  Corbello and Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway filed cross motions for summary judgment as to counts 12–14 for declaratory judgment and an equitable accounting.  As to count 12 for a declaration that DeVito as a joint owner of the Work lacked the legal ability to grant Valli and Gaudio an exclusive license and that the 1999 Agreement was therefore either void, a nonexclusive license, or a transfer of DeVito's rights in the Work, the Court denied summary judgment, ruling that the 1999 Agreement was not a transfer but a license that was exclusive as against DeVito but nonexclusive as against Corbello.  As to count 13 for an alternative declaration that the 1999 Agreement permitted Valli and Gaudio to further transfer or license the Work, that they did transfer or license it to DSHT and/or Dodger Theatricals via the Jersey Boys Agreement, and that Dodger Theatricals thereafter transferred or licensed to Jersey Boys Broadway, the Court granted summary judgment to Plaintiff in part, ruling that the 1999 Agreement permitted further

assignment and that Valli and Gaudio had further assigned the rights in the Work to DSHT via the Jersey Boys Agreement, but that it was not clear whether there had been any further assignment.  The Court granted summary judgment to Defendants as to count 14 for an accounting because there had been no transfer of the Work and the relevant agreements included no duty to account.

      **4.**        **The Third Summary Judgment Order (No. 780)**

      On January 31, 2012, the Court adjudicated seven of the seventeen claims then remaining and entered judgment in favor of all Defendants except DeVito and David.  Jersey Boys Records had moved for summary judgment based on personal jurisdiction and failure to state a claim. The Court found that it had jurisdiction over Jersey Boys Records but granted the motion on the merits, ruling that Plaintiff had adduced no evidence that Jersey Boys Records had control over any other Defendant, that there was no allegation that Jersey Boys Records was aware of any infringement, so it could not be liable for contributory infringement, and that the album at issue did not pass the extrinsic test as to substantial similarity to the Work.  The Court denied two motions for summary judgment based on the statute of limitations.  The Court denied David's motion for summary judgment based on personal jurisdiction.  The Court denied a motion for summary judgment on the merits of the infringement issue (Motion No. 626) as moot because it granted another motion based on the Defendants' having licenses to use the Work.  The Court granted a motion for summary judgment as against the claims of infringement under foreign law, following the Second Circuit's persuasive ruling that the Berne Convention did not provide choice-of-law rules for copyright claims, and finding that U.S. law governed issues of copyright ownership and licensing in this case even if foreign law governed substantive infringement claims, and that the licenses under U.S. law protected Defendants from the foreign infringement

claims.  The Court granted Corbello's motion for summary judgment as to declarations that the Work was a joint work, that Woodard was a co-owner of the Work, and that DeVito held a 50% interest in the DeVito Work in constructive trust for Corbello, as successor-in-interest to Woodard.

### 5.   Further District Court Proceedings

At that point, claims 2–11 against DeVito remained for trial.  On July 9, 2012, the Court denied fees to Defendants, added David to the Judgment, and certified Orders No. 780 and the current Order No. 809 for immediate appeal under Rule 54(b).

### 6.   The Appeal and Remand

Corbello appealed Orders No. 780 and 809.  On February 10, 2015, the Court of Appeals reversed, ruling that the 1999 Agreement was a transfer of ownership such that Valli and Gaudio became joint owners with Corbello in 1999, *Corbello v. DeVito*, 777 F.3d 1058, 1064 (9th Cir. 2015), and that although Valli and Gaudio could not be liable for infringement while they were joint owners, there remained a genuine issue of material fact whether the 1999 Agreement's reversionary clause had later been triggered such that Valli and Gaudio might be liable for infringement for their use of the Work thereafter, *id.* at 1066–67.  The Court of Appeals also ruled there remained a genuine issue of material fact as to whether DeVito had granted Valli and Gaudio an implied nonexclusive license upon reversion. *Id.* at 1067–68.

### 7.   The Fourth Summary Judgment Order (No. 872)

The case will now proceed to trial, but the parties requested that the Court first determine certain issues as a matter of law, i.e., whether certain parts of the Work were protected at all, whether the Work was entitled to "thick" versus "thin" copyright protection, and whether Defendants were entitled to summary judgment on the infringement issue under the extrinsic test.

1    The Court ruled that under the law of the case, the jury must be instructed that the 1999

2    Agreement was a transfer of ownership whereby Valli and Gaudio became joint owners with

3    Corbello, and that Valli and Gaudio could not be liable for infringement while they were joint

4    owners.  The jury must determine whether the 1999 Agreement's reversionary clause was ever

5    triggered such that Valli and Gaudio might be liable for infringement thereafter.  If that occurred,

6    the jury must also determine whether DeVito granted Valli and Gaudio an implied nonexclusive

7    license such that they cannot have been liable for infringement even after their ownership interest

8    reverted to DeVito.  Finally, the jury must determine infringement under direct copying or

9    substantial similarity theories.  To find liability under the latter theory, the jury must first

10   perform the extrinsic test.  The Court granted summary judgment in part as to the extrinsic test,

11   finding that regular "thick" copyright protection did not apply as a matter of law, so the jury

12   must be instructed that if the Work passed the extrinsic test, the jury must apply "thin" protection

13   under the intrinsic test.  The Court also noted at a status conference that it intended to bifurcate

14   the trial into infringement and damages phases and intended to hold accounting proceedings

15   without a jury if any Defendant is found to be liable for an accounting.  The parties have now

16   filed four additional motions for summary judgment.

17   **II.    SUMMARY JUDGMENT STANDARDS**

18   A court must grant summary judgment when "the movant shows that there is no genuine

19   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

20   Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson*

21   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if

22   there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

23

24

*id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court needn't consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the nonmoving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the

assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## III.    ANALYSIS

### A.    Plaintiff's Motions

First, Plaintiff asks the Court to grant her summary judgment against the affirmative defense of "implied nonexclusive license."  The Court denies the motion.  The Court of Appeals specifically stressed the uncertainty of this issue. *See Corbello v. DeVito*, 777 F.3d 1058, 1067–68 (9th Cir. 2015).  Second, Plaintiff asks the Court to grant her summary judgment on the issue of whether the 1999 Agreement lapsed under its reversionary clause.  The Court denies the motion, because the Court of Appeals specifically found there to be a genuine issue of material fact on that point to be resolved at trial. *See id.* at 1066–67.  That does not preclude the

availability of a future Rule 50(a) motion, but the Court perceives the law of the case to require these issues to be tried.

At the hearing, counsel also argued that the Court's previous finding of "thin" protection was in error, reasoning that if biographies had only "thin" protection, no biography could ever be infringed unless copied word-for-word.  But that isn't so.  "Thin" versus "thick" protection concerns differing standards for a finding of substantial similarity, which in combination with proof of access to a work can show infringement as an alternative to showing direct copying. But one need only resort to a substantial similarity analysis in the absence of evidence of direct copying. *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006).  Plaintiff has survived summary judgment on the direct copying issue in this case based on the evidence of access to the Work in late January 2004, the early February 2004 meeting at which Brickman, Elice, and McAnuff poured over, annotated, and began to adapt the Work, and the Krevolin Report's comparisons of the Work to the evolving scripts, i.e., the February 13, 2004 Outline, the March 11, 2004 Outline, the March 19, 2004 Outline, the April 7, 2004 Outline, the May 28, 2004 Draft Script, the July 7, 2004 Draft Script, the La Jolla Jersey Boys Script of October 2004, and the Broadway Jersey Boys Script of November 2005.  The substantial similarity test is an alternative method for a plaintiff to show infringement via circumstantial evidence. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000). The "thick" versus "thin" issue concerns differing standards of showing "substantial similarity" based on the prevalence of protectable elements within a copyrighted work as a whole. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994).

///

///

**B.      Defendants' Motions**

**1.      Fair Use**

First, Defendants ask the Court to grant them summary judgment based on fair use.  They argue: (1) any use of the Work was fair use, particularly the "Walk Like a Man" dialogue and "Social Movement" reference; (2) any use of the "Einstein" or "cool" references were de minimis; and (3) if the Court agrees with (1) and (2), then the only four similarities between the Work and the LaJolla or Broadway *Jersey Boys* scripts remaining after the Court's previous "thick" versus "thin" analysis will have been shown to be unprotectable for other reasons, no intrinsic question will remain for the jury, and Defendants will accordingly be entitled to summary judgment on the infringement issue altogether.

The Copyright Act does not grant a copyright holder exclusive rights to reproduce his or her work. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432–33, 104 S. Ct. 774, 78 L.Ed.2d 574 (1984).  Section 107 of the Copyright Act explains that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107.  In determining whether the use of a copyrighted work is fair, we consider:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* When conducting a fair use analysis, we are not restricted to these factors; rather, the analysis is a flexible one that we perform on a case-by-case basis. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577, 114 S. Ct. 1164, 127 L.Ed.2d 500 (1994) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S. Ct. 2218, 85 L.Ed.2d 588 (1985)).  Moreover, we do not consider these factors in isolation but weigh them together, in light of the copyright law's purpose "to promote the progress of science and art by protecting

artistic and scientific works while encouraging the development and evolution of new works." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799–800 (9th Cir. 2003) (citing *Campbell*, 510 U.S. at 575–76, 114 S. Ct. 1164).

Fair use is a mixed question of law and fact, *Harper & Row Publishers*, 471 U.S. at 560, 105 S. Ct. 2218, but it is well established that a court can resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute. *See Mattel*, 353 F.3d at 800 (citing *Harper & Row Publishers*, 471 U.S. at 560, 105 S. Ct. 2218).

*Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 529–30 (9th Cir. 2008).

The alleged use here was commercial. Although such use is not categorically excluded from the fair use doctrine, "[c]ommercial use is a 'factor that tends to weigh against a finding of fair use' because 'the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012) (quoting *Harper & Row Publishers*, 471 U.S. at 562). Whether the alleged infringer profits from the use is one of four enumerated statutory factors to consider. *See* 17 U.S.C. § 107(1) ("the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"). The other factors are the nature of the copyrighted work, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and the effect of the use upon the potential market for or value of the copyrighted work. *See id.* § 107(2)–(4). The second factor also weighs against a finding of fair use in this case, where the Work is unpublished. *See Harper & Row Publishers*, 471 U.S. at 554 (citing S. Rep. No. 94–473, p. 64 (1975); 3 M. Nimmer, *Copyright* § 13.05, at 13–62, n.2 (1984); W. Patry, *The Fair Use Privilege in Copyright Law* 125 (1985)) ("We conclude that the unpublished nature of a work is '[a] key, though not necessarily determinative, factor' tending to negate a defense of fair use."). The third factor weighs in favor of a finding of fair use, because the two references constituted a small fraction of the Work. The effect of the use on the market

value of the Work was likely to have increases its value and likely didn't decrease it by much, if at all.  The fourth factor therefore weighs in favor of a finding of fair use.  The Court finds that there is at least a genuine issue of material fact whether the "Walk Like a Man" dialogue and "Social Movement" reference were fair use in this case, leaves the issue for the jury, and denies the motion, accordingly.

### 2.       The Foreign Infringement Claims

Second, Defendants ask the Court to grant them summary judgment against the UK, Canadian, and Australian infringement claims in Counts 18–20, respectively.  They argue that they are entitled to summary judgment: (1) to the extent that the Court has granted them summary judgment as against the U.S. claims, i.e., on the issue of "thick" versus "thin" protection; (2) that as to the accounting claim, a choice of law provision in the 1999 Agreement would require that U.S. law control any alleged infringing uses anywhere in the world; and (3) that U.S. courts cannot constitutionally apply or enforce foreign copyright laws with a narrower scope of fair use or a broader scope of protection to non-original elements than U.S. law.

### a.       "Thick" versus "Thin" Protection

Defendants argue that historical and biographical works have lesser protection under the law of the Commonwealth nations, just as under U.S. law, such that the Court should grant Defendants partial summary judgment against the foreign claims to the same extent.  The Court declines to do so at this time, but leaves open the possibility of a future Rule 50(a) motion. Without deciding whether Defendants are generally correct, the contours of the foreign claims are not likely exactly the same as those of the U.S. claims.  Indeed, the case law under which the Court based its previous "thick" versus "thin" ruling was particular not only to U.S. law generally, but also to the law of this Circuit.  The Court will in its discretion await expert

testimony at trial before determining the precise contours of copyright protection under the laws of the relevant nations and will instruct the jury accordingly. *See* Fed. R. Civ. P. 44.1. At this stage, there is expert testimony supporting both sides. (*Compare* Burshtein Report, ECF No. 632-1 (opining that the protection of historical and biographical works under Canadian law is no broader than that under U.S. law); *with* Second Guay Report, ECF No. 756-6 (opining that Burshtein has misunderstood or mischaracterized the relevant Canadian law)),[1] and the Court prefers to permit the parties to cross-examine one another's experts in the context of an evidentiary hearing during trial.

### b.    Choice of Law as to an Accounting

Defendants argue that for the purposes of the accounting claim, the 1999 Agreement specifies that U.S. law controls infringing uses, regardless of the place of infringement. Defendants argue that the Court has already so ruled, and that the ruling was not upset by the Court of Appeals' reversal on other issues. But Defendants concede that this conclusion only follows if the transfer of ownership under the 1999 Agreement did not revert, and the Court of Appeals has ruled that the reversion issue must be tried. The Court therefore will not rule on the choice-of-law issue as to the accounting claim at this time. Furthermore, only if the jury finds that one or more of the accused *Jersey Boys* products infringed the Work will there be any accounting. That accounting will be conducted by the Court, if necessary, and only at that time the Court will conduct any choice-of-law analysis based on the 1999 Agreement.

### c.    Constitutional Limits on the Foreign Claims

Finally, Defendants argue that a U.S. court cannot constitutionally apply or enforce foreign copyright laws with a narrower scope of fair use or a broader scope of protection to non-

---

1 Although Defendants argue against all of the foreign claims, the evidence they cite in the present motion (the Burshtein Report) focuses on Canadian law.

1    original elements than U.S. law.  The first case Defendants rely on is a statutory-interpretation

2    case, not a judicial-review case. *See generally Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,

3    499 U.S. 340 (1991).  The *Feist* Court cited Article I of the Constitution as an aid in interpreting

4    the Copyright Act to respect the limits of Congress' constitutional power to protect copyright

5    under U.S. law. *See id.* at 346, 349–50.  That case did not concern First Amendment-based or

6    other putative constitutional limitations on a U.S. court's application of foreign copyright law, as

7    Defendants appear to imply.  The second case Defendants rely on is a Second Circuit case. *See*

8    *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474 (2nd Cir. 2007).  In that case, the

9    defendant had defaulted in the French courts as to a French copyright claim, and the only

10   remaining issue was whether enforcing the judgment would be against New York policy under

11   the statutes of that state. *See id.* at 478–79.  The court noted that laws antithetical to the federal

12   First Amendment implicated New York's public policy exception against enforcing foreign

13   judgments under New York law. *See id.* at 480.  The Court did not rule that foreign copyright

14   claims brought directly in the U.S. courts are limited by the First Amendment.  It ruled only that

15   under New York law, a foreign judgment cannot be enforced by the courts of that state where the

16   underlying cause of action is repugnant to the First Amendment.

17          Defendants' First Amendment argument may ultimately have merit, but Defendants have

18   not cited any relevant case law.  There is no doubt, as Plaintiff notes in response, that the

19   "national treatment principle" of the Berne Convention makes the controlling law the law of the

20   state in which the infringement occurred. *See Subafilms, Ltd. v. MGM–Pathe Comm.*, 24 F.3d

21   1088, 1097 (9th Cir. 1994) (en banc) (quoting 3 David Nimmer and Melville B. Nimmer,

22   *Nimmer on Copyright* § 17.05 at 17–39 (1994)).  That, however, does not answer the question of

23   whether the U.S. courts can apply foreign law that is repugnant to the Constitution.  They cannot.

24

*Reid v. Covert*, 354 U.S. 1, 17 & n.33 (1957) (collecting cases).  The Court therefore will have to consult any applicable constitutional limitations on foreign copyright claims when authoring the jury instructions.  The Court will not attempt to do that at this time but will leave it to Defendants to identify any alleged limitations along with their proposed jury instructions.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motions for Summary Judgment (ECF Nos. 928, 933, 934, 935) are DENIED.

IT IS FURTHER ORDERED that the unopposed Motions to Seal (ECF Nos. 927, 931) are GRANTED.

IT IS SO ORDERED.

Dated this 2nd day of August, 2016.

_____
ROBERT C. JONES
United States District Judge