**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DONNA CORBELLO, | ) |
| Plaintiff, | ) |
| vs. | ) 2:08-cv-00867-RCJ-PAL |
| THOMAS GAETANO DEVITO et al., | ) **ORDER** |
| Defendants. | ) |

Plaintiff Donna Corbello is the widow and heir of Rex Woodard, who assisted Defendant Thomas Gaetano "Tommy" DeVito in writing his unpublished autobiography *Tommy DeVito — Then and Now* ("the Work"). Plaintiff sued DeVito and others when they used the Work to develop the screenplay for *Jersey Boys* ("the Play"), a hit musical based on the band The Four Seasons that has played in the United States, Canada, England, and Australia. Corbello sued several Defendants for copyright infringement, and she sued DeVito for an accounting. The Court granted summary judgment to Defendants. The Court of Appeals reversed in part and remanded for trial. At the close of Plaintiff's evidence, Defendants orally moved for judgment as a matter of law, and the Court granted the motion in part and denied it in part, ruling that Defendants Frankie Valli and Robert Gaudio were entitled to judgment as a matter of law against the claims of copyright infringement, and that all Defendants were entitled to judgment as a

matter of law against enhanced damages for willful copyright infringement.  The jury returned a verdict for Plaintiff.  Three post-trial motions are pending before the Court.

## I.      FACTS AND PROCEDURAL HISTORY

### A.      Factual Background

#### 1.      The Work

Rex Woodard was an attorney, author, and avid Four Seasons fan.  He finally met Defendant and founding Four Seasons member Tommy DeVito for an interview on December 9, 1981, as a result of the publicity generated from an article Woodard had written about the band in *Goldmine* magazine earlier that year (the "1981 Article") that focused on the years between the band's breakup in 1970 and reconstitution in 1975. (*See* Third Am. Compl. ¶¶ 26–29, ECF No. 457).  On December 23, 1981, Woodard interviewed Tommy's brother Nick DeVito, and on January 8, 1982, he interviewed Nick Massi, another founding member of The Four Seasons. (*Id.* ¶ 29).  The result of these three interviews was a second article published in *Goldmine* in June of 1982 (the "1982 Article"), which focused on the band's earliest incarnation, The Four Lovers. (*Id.*).

Woodard kept in touch with DeVito and founding Four Seasons member Frankie Valli throughout the 1980s, and in November of 1988 Woodard flew to Las Vegas, Nevada for a series of interviews (the "1988 Interviews") with DeVito that sowed the seeds of the present litigation. (*See id.* ¶ 31–32).  During these interviews, DeVito explained to Woodard that except for Valli and final Four Seasons founding member Robert "Bob" Gaudio, the members of the band (DeVito and Massi) had spent several years engaged in criminal enterprises and in prison and retained "underworld contacts" throughout the band's era of popularity. (*See id.* ¶ 32).  Because this revelation was in stark contrast to the clean-cut image of the band presented in the popular

media, Woodard realized the journalistic value of the story, and DeVito offered Woodard the opportunity to write his authorized biography with full credit and an equal share in any profits. (*See id.*).

Woodard returned to Beaumont, Texas to begin writing DeVito's authorized biography (the "Work"), which has never been published. (*See id.*). On December 1, 1988, Woodard sent DeVito a letter (the "Letter Agreement") memorializing their previous verbal understandings concerning creation of the Work. (*Id.* ¶ 33). DeVito signed the Letter Agreement beneath the word "APPROVED" and mailed it back to Woodard. (*See id.*; Letter Agreement, Dec. 1, 1988, ECF No. 457-11). The Letter Agreement reads in full:

December 1, 1988

Mr. Tommy DeVito
[street address]
Las Vegas, Nevada [zip code]

Dear Tommy:

I am making progress on the taped interviews we did. You suggested that I prepare a written memorandum of our arrangement for future reference. I will do so by this letter.

I agreed to write your authorized biography based on the recorded interviews you gave me, plus any other relevant information which would benefit the book. You and I will be shown as co-authors, with you receiving first billing. I will do all of the actual writing, but you will have absolute and exclusive control over the final text of this book.

We have further agreed that we will share equally in any profits arising from this book, whether they be in the form of royalties, advances, adaptations fees, or whatever. This agreement will be binding upon our heirs, both as to obligations and benefits, in the event one or both of us should die.

If this letter accurately sets forth our agreement as you understand it, sign the enclosed photocopy where indicated and return it to me in the enclosed self-addressed, stamped envelope. Keep this original letter in your own file.

Thank you for asking me to work with you on this project. I look forward to working with you over the next several months.

Sincerely,
[signed Rex Woodard]
Rex Woodard

RW/ml
Enclosures

APPROVED:
[signed Tommy DeVito]
TOMMY DEVITO

(Letter Agreement). Over the next two years, Woodard used the 1988 Interviews and all of his other knowledge about the band to create the Work, including his past interviews with band members, newspaper articles, magazine articles, album linings, Freedom of Information Act requests he filed with law enforcement agencies, and questionnaires he sent to DeVito. (Third Am. Compl. ¶ 34). Woodard compiled all of this information into the Work, resulting in a first-person, narrative-style biography told from DeVito's perspective. (*See id.*). Woodard remained in close contact with DeVito throughout his creation of the Work and sent DeVito each chapter for approval and editing as it was completed. (*Id.* ¶ 35).

### 2. Woodard's and DeVito's Publication Attempts

As the Work neared completion in late 1990, Woodard and DeVito attempted to find a publisher and even provided an outline of the Work to actor Joe Pesci to explore adaptation to a screenplay. (*See id.* ¶ 36). Plaintiff provides a copy of what she claims is a cover sheet to a January 1991 version of the Work, which reads in full:

UNTITLED
TOMMY DEVITO/FOUR SEASONS
BIOGRAPHY

. . . .

(*See* January 1991 Work Cover Page, ECF No. 457-15).

Though he never smoked, Woodard had been diagnosed with lung cancer in 1989, and his condition had begun seriously to worsen by late 1990. (*Id.* ¶ 39). By February or March of 1991, he was bedridden, and he died on May 25, 1991, at age forty-one. (*Id.* ¶ 40). Woodard had hoped that income generated from the Work would support his wife and children. (*Id.* ¶ 41).

### 3. Plaintiff's and Ceen's Publication Attempts

In accordance with Woodard's wishes, Plaintiff and Woodard's sister Cindy Ceen continued to seek publication after Woodard's death independently of DeVito; however, public interest in The Four Seasons had waned, making it difficult to find a publisher. (*Id.* ¶ 42). In September 2005, Ceen decided to contact DeVito for his assistance in publishing the Work. (*See id.*). Ceen first contacted a prominent member of an Internet Four Seasons fan group named Charles Alexander to facilitate contact with DeVito. (*See id.* ¶ 43). On September 22, 2005, Alexander responded to Ceen that he had met with DeVito the previous day, had told DeVito of Ceen's desire to publish the Work, and that DeVito had agreed to help. (*See id.*). Ceen called DeVito the same day at a telephone number provided by Alexander, and DeVito indicated that he wanted to update the Work with post-1990 events and restore some "obscene" language Woodard had omitted. (*Id.*). DeVito also claimed he had lost his copy of the Work and asked Ceen for a replacement, which she mailed to DeVito the next day, along with a letter memorializing their telephone conversation and informing DeVito that Plaintiff was considering self-publishing the Work if a traditional publisher could not be found. (*Id.*). Neither Plaintiff nor Ceen heard from DeVito again. (*Id.* ¶ 44). DeVito's attorney Jay Julien left Ceen a voicemail

message on November 2, 2005, and Ceen returned his call the next day, during which conversation Julien told Ceen that he had spoken with DeVito regarding the Work and concluded that it was "not saleable." (*Id.*). Ceen was surprised by this conclusion, because the play *Jersey Boys* was scheduled to open on Broadway a few days later. (*Id.*). Julien did not disclose that the Work had been used or exploited in any way or that rights in the Work had been licensed or assigned. (*Id.*).

### 4. *Jersey Boys* and Plaintiff's Discovery of the Alleged Infringements

By late 2006, *Jersey Boys* had become a Broadway hit, earning four Tony Awards. (*Id.* ¶ 45). Plaintiff had not seen the show, but she and Ceen estimated that the show's success would revive interest in the band and make publication of the Work viable. (*Id.*). Plaintiff and Ceen engaged counsel to confirm the registration of Woodard's and DeVito's copyright in the Work, to register the copyright if not yet registered, and to contact Julien to see if DeVito had changed his mind about joint publication of the Work in light of *Jersey Boys*'s success. (*Id.*). A January 3, 2007 search of the U.S. Copyright Office's online records indicated no registration of the Work to Woodard but showed that on January 11, 1991 (four months before Woodard's death), DeVito had registered a literary work entitled *Tommy DeVito - Then and Now*, Reg. No. Txu 454 118 (the "DeVito Work"). (*Id.* ¶ 46). Plaintiff's counsel ordered a copy of the registration and discovered that DeVito had registered the DeVito Work in his own name only, claiming that the work was unpublished and that he wrote it in its entirety in 1990. (*Id.* ¶ 47). Plaintiff's counsel ordered a copy of the DeVito Work itself and discovered that the DeVito Work was identical to the Work, and in fact appeared to be a photocopy of the manuscript typed by Woodard's secretary Myrtle Locke, with two exceptions. (*Id.* ¶¶ 48–49). First, the original cover page from

the January 1991 version of the Work had been replaced with a cover page in a different font and font size, reading:

TXu 454 118

. . . .

Tommy DeVito - Then and Now
by
Tommy DeVito

(*Id.* ¶ 49; *see* DeVito Work Cover Page, ECF No. 457-23).  Second, the first page of Chapter 41 (page 264 of the Work) was missing. (*See* Third Am. Compl. ¶ 49).  Plaintiff concluded in light of the Letter Agreement and her dealings with DeVito and his counsel after Woodard's death that DeVito had registered the Work without credit to Woodard or disclosure to Woodard or his heirs. (*Id.* ¶ 50).

Plaintiff also soon discovered that the writers of and several actors in *Jersey Boys* had access to the Work and that DeVito had received royalties or other profits from *Jersey Boys*, and she concluded that the Work had "inspired the form, structure, and content of the musical . . . ." (*See id.* ¶ 51).  As support for this conclusion, Plaintiff notes that Defendant Des McAnuff, the director of *Jersey Boys*, was quoted in a July 8, 2006 report in *Backstage* magazine as stating that Defendants Marshall Brickman and Eric Elice had relied in part on "an unpublished autobiography by DeVito" in creating the libretto. (*See id.* ¶ 52).  Plaintiff notes that Christian Hoff, the first actor to play DeVito in *Jersey Boys*, stated in what appears to be an online interview that he was provided with a synopsis of the Work for his audition and a full copy for background research. (*See id.*).  Plaintiff also cites to a Wikipedia entry for support that the Work served as a basis for the musical. (*See id.*).  Plaintiff also notes an exchange on a *Jersey Boys* podcast website indicating that one fan had reported to another that the musical was based on

DeVito's unpublished biography. (*See id.*). Plaintiff also saw public reports of DeVito's financial profits from the musical. (*See id.*).

5.      **Pre-Litigation Negotiations**

On June 13, 2007, Plaintiff's counsel wrote Julien by email and overnight courier demanding that DeVito execute an application for supplementary registration with the U.S. Copyright Office to add Woodard as a coauthor and co-claimant of the Work and demanding an accounting of profits in accordance with the Letter Agreement. (*Id.* ¶ 53). Counsel conferred with one another by email and telephone between June and October 2007, and Julien admitted at one point that DeVito had provided a copy of the Work "to Jersey Boys" and expressed interest in the possibility of a joint copyright infringement action against "Jersey Boys," but later decided that Plaintiff's only recourse was a suit against DeVito because he had authorized the use of the Work. (*Id.* ¶ 54). Although DeVito initially considered filing a supplemental registration of the Work to credit Woodard, he later refused, claiming that he in fact was the sole author and that Woodard had been a mere scribe. (*Id.*).

On July 2, 2007, Plaintiff filed her own supplementary application with the U.S. Copyright Office to add Woodard as a coauthor and co-claimant of the Work, but the office rejected the application because DeVito, the original claimant, had not signed it. (*Id.* ¶ 55). Under 17 U.S.C. § 201(a), the office could not permit a non-author, non-claimant of an original registration, i.e., a "basic registration," to supplement the basic application. However, such a person could apply to register her own work, in which case the office would consider the new claim to be adverse to the existing claim if the claims purported to register the same work exclusively to different claimants. (*See* Copyright Office Letter, June 16, 2008, ECF No. 457-27, at 7). However, the Copyright Office Review Board granted Plaintiff's appeal based on a closer

examination of regulations and practices, determining that her supplemental registration could be accepted, and that a certificate of registration would be issued after processing. (*See* Copyright Office Letter, Mar. 27, 2009, ECF No. 457-28). The amended certificate, Reg. No. Txu1 372-636, lists Woodard and DeVito as coauthors of the entire text of the Work and co-claimants thereto. (*See* Certificate of Registration TXu1 372-636, July 3, 2007, ECF No. 457-29).

Thereafter, further indication of the connection between *Jersey Boys* and the Work emerged through public sources such as public interviews of certain Defendants. (*See* Third Am. Compl. ¶ 56). Plaintiff alleges that the evidence that the musical was an adaptation of the Work means that *Jersey Boys* is a "derivative work" of the Work under 17 U.S.C. § 101. (*See id.* ¶ 57). Plaintiff recounts various similarities between Jersey Boys and the Work. (*See id.*).

### 6. The "Cover-Up"

DeVito and Julien then took steps to conceal the fact that DeVito had exploited the Work to create and profit from *Jersey Boys*. (*See id.* ¶ 58). First, DeVito withdrew his quotes from Charles Alexander's forward to the upcoming *Jersey Boys* book, because the use of those quotations would have linked the book, and hence the musical, to the Work. (*See id.*). Second, DeVito reported in an interview that he had never shown the Work to anyone except Brickman, Elice, and McAnuff, the writers and director of Jersey Boys. (*Id.*). Third, DeVito "dismantled" his website (www.tommydevito.com) to remove reference to "his SMASH HIT Jersey Boys." (*Id.*). Fourth, he stated in an interview that he had dictated the Work to a lawyer and that the book was not to be published yet. (*Id.*).

### 7. DeVito's Licensing of the Work

Certain documents made public during Valli's divorce proceedings in July 2008 revealed that DeVito had granted Valli and Gaudio an exclusive, irrevocable, perpetual, worldwide,

assignable license (the "1999 Agreement") freely to use and adapt certain "Materials," including his "biographies," for the purpose of creating a musical based on the "life and music" of The Four Seasons. (*Id.* ¶ 59). The 1999 Agreement included the right to "ancillary and subsidiary exploitations thereof including, without limitation, cast albums, motion picture and televised versions, merchandise, and/or other works . . . in all media now existing or later devised." (*Id.*). The 1999 Agreement waived any claim of copyright infringement by DeVito, provided that DeVito would be entitled to 20% of any royalties Valli and Gaudio obtained through exploitation of the Materials, and provided that Massi would be entitled to 5% of any such royalties. *(See id.*). Plaintiff suspects that Valli and Gaudio further licensed the Materials, which included the Work, to one or more unknown authors in 1999 for adaptation into an early version of *Jersey Boys* called Walk Like a Man. (*See id.*). When the original producer rejected Walk Like a Man, Valli and Gaudio fired its authors, permitted their agreement with the original producer to lapse, and further licensed the Materials to Brickman and Elice, who used them to write Jersey Boys. (*See id.*). Plaintiff implies that Valli's and Gaudio's joint ventures related to their exploitation of the Materials constitute a general partnership as a matter of law that Plaintiff refers to as "The Four Seasons Partnership." (*See id.* ¶ 4–5).

### 8. *Jersey Boys*

The *Jersey Boys* foundational production agreement (the "Jersey Boys Agreement") is dated May 1, 2004. (*See id.* ¶ 61; Jersey Boys Agreement 1, ECF No. 457-34, at 2). The Jersey Boys Agreement lists five parties: Valli and Gaudio as "Owner," Brickman and Elice as "Bookwriter," and Dodger Stage Holding Theatricals, Inc. (now known as DSHT, Inc.) as "Producer." (*See* Jersey Boys Agreement 1). The copies of the signature page of the Jersey Boys Agreement attached to the Third Amended Complaint ("TAC") include signatures by all of these

parties except Brickman, and DSHT's signature is typewritten, without the handwritten signature of any natural person as an agent of DSHT. (*See id.* at 24, ECF No. 457-34, at 25–26). The signatures are not dated. (*See id.*). The Jersey Boys Agreement is comprehensive and appears to govern the worldwide exploitation of *Jersey Boys*. (*See generally id.*). The details of the twenty-three-page agreement need not be recounted here, but will be noted where relevant to the determination of claims. The Jersey Boys Agreement includes a schedule and two exhibits as attachments, all of which the base agreement identifies. Schedule A is a table of musical compositions to be used in the musical along with details of authorship and copyright ownership. Exhibit A is the 1999 Agreement. Exhibit B is a list of "payment instructions" consisting of addresses for mailing payments to the signatories and other beneficiaries.

Plaintiff believes that DSHT further assigned or licensed its rights under the Jersey Boys Agreement to Defendant Dodger Theatricals, Ltd., which is the primary producer of *Jersey Boys* on Broadway, tours throughout the United States, and in London, U.K. (*See* Third Am. Compl. ¶ 62). Plaintiff believes that DSHT and/or Dodger Theatricals further licensed their rights to others and eventually assigned them to Defendant Jersey Boys Broadway Limited Partnership, which in turn licensed them to several parties, including Defendants JB Viva Vegas and Jersey Boys Records Limited Partnership. (*See id.*). Plaintiff alleges that *Jersey Boys* has earned profits of approximately $150 million per year, with a life expectancy of at least ten years, and believes she is entitled to at least $6.5 million. (*See id.* ¶ 70).

## B. Procedural History

### 1. The Present Lawsuit

In December 2007, Plaintiff sued DeVito in the U.S. District Court for the Eastern District of Texas on three causes of action: (1) declaratory judgment; (2) equitable accounting;

and (3) breach of contract.  That court transferred the case to this District in 2008 pursuant to 28 U.S.C. § 1404(a), without deciding whether it had personal jurisdiction over DeVito, and it denied Plaintiff's motion to reconsider.  The TAC, filed in March 2011, lists fourteen Defendants and twenty causes of action: (1) declaratory judgment (DeVito); (2) equitable accounting (DeVito); (3) breach of contract (DeVito); (4) unjust enrichment (DeVito); (5) breach of the covenant of good faith and fair dealing (DeVito); (6) constructive fraud (DeVito); (7) fraud (DeVito); (8) conversion (DeVito); (9) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (DeVito); (10) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (DeVito); (11) copyright infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (DeVito); (12)–(13) declaratory judgment (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (14) equitable accounting (Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway, in the alternative) (15) copyright infringement under 17 U.S.C. § 501(a) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, JB Viva Vegas, and Jersey Boys Records); (16) vicarious copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, Jersey Boys Broadway, Jersey Boys Records, Skunk, and Getting Home); (17) contributory copyright infringement under 17 U.S.C. § 502 (Valli, Gaudio, Brickman, Elice, McAnuff, Michael S. David, DSHT, Dodger Theatricals, Jersey Boys Broadway, and Jersey Boys Records); (18) copyright infringement under § 16(2) of the Copyright, Designs, and Patents Act of 1988 (U.K.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); (19) copyright infringement under § 27(1) of the Copyright Act, R.S.C. 1985 (Can.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway); and (20) copyright

infringement under §§ 115(1), 36, and 39 of the Copyright Act of 1968 (Cth) (Austl.) (Valli, Gaudio, Brickman, Elice, McAnuff, DSHT, Dodger Theatricals, and Jersey Boys Broadway).

## 2. The First Summary Judgment Order (ECF No. 300)

On March 31, 2010, the Court issued an order resolving ten pretrial motions as against the Second Amended Complaint ("SAC"). The Court denied DeVito's motion to dismiss, or in the alternative for summary judgment, finding that certain state law defenses were preempted by the Copyright Act and that in any case there was no evidence of an attorney–client relationship but only of a business relationship between DeVito and Woodard. The Court also found that there remained genuine issues of material fact as to the eligibility of the Work or certain parts of it for copyright protection and as to what parts of the Work were used to create *Jersey Boys*. The Court granted Corbello's cross motion for summary judgment as to DeVito's state law defenses but denied it as to infringement for the same reasons the Court denied DeVito's motion.

The Court denied Valli's, Gaudio's, Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals', and JB Viva Vegas, LP's (collectively, "New Defendants") motion to dismiss counts 15–17 for copyright infringement. New Defendants argued that DeVito had waived and released any right to sue them and that they had an implied nonexclusive license from DeVito. Finding no New York law to the contrary, the Court ruled in accordance with Ninth Circuit precedent that a failed attempt to grant an exclusive license could result in a nonexclusive license and that that was what happened in this case according to undisputed facts. The Court denied the motion to dismiss, however, because it had been sufficiently alleged that New Defendants had sublicensed the work beyond the scope of their own license.

The Court denied Brickman's, Elice's, McAnuff's, DSHT's, Dodger Theatricals', and JB Viva Vegas, LP's other motion to dismiss counts 15–17 for copyright infringement. Movants

argued that the alleged similarities were unprotectable under copyright law, that many alleged similarities were not similarities, and that there was no "bodily appropriation" or "wholesale appropriation" of the Work by the *Jersey Boys* script. The Court found the claims to have been sufficiently alleged.

The Court denied Valli's, Gaudio's, DSHT's, and Dodger Theatricals' motion to dismiss counts 13–14 for declaratory judgment and an equitable accounting, finding that Corbello had sufficiently alleged in the alternative that DeVito had assigned his copyright in the Work via the 1999 Agreement such that movants could authorize others to use it but would owe Corbello, a joint owner, an accounting for any profits thereby obtained.

### 3.    The Second Summary Judgment Order (ECF No. 661)

On October 27, 2011, the Court granted in part and denied in part two summary judgment motions. Corbello and Defendants Valli, Gaudio, DSHT, Dodger Theatricals, and Jersey Boys Broadway filed cross motions for summary judgment as to counts 12–14 for declaratory judgment and an equitable accounting. As to count 12 for a declaration that DeVito as a joint owner of the Work lacked the legal ability to grant Valli and Gaudio an exclusive license and that the 1999 Agreement was therefore either void, a nonexclusive license, or a transfer of DeVito's rights in the Work, the Court denied summary judgment, ruling that the 1999 Agreement was not a transfer of ownership but a license that was exclusive as against DeVito but nonexclusive as against Corbello. As to count 13 for an alternative declaration that the 1999 Agreement permitted Valli and Gaudio to further transfer or license the Work, that they did transfer or license the Work to DSHT and/or Dodger Theatricals via the Jersey Boys Agreement, and that Dodger Theatricals thereafter transferred or licensed the Work to Jersey Boys Broadway, the Court granted summary judgment to Plaintiff in part, ruling that the 1999

Agreement permitted further assignment and that Valli and Gaudio had further assigned the rights in the Work to DSHT via the Jersey Boys Agreement, but that it was not clear whether there had been any further assignment. The Court granted summary judgment to Defendants as to count 14 for an accounting because there had been no transfer of the Work, and the relevant agreements included no duty to account.

### 4. The Third Summary Judgment Order (ECF No. 780)

On January 31, 2012, the Court adjudicated seven of the seventeen claims then remaining and entered judgment in favor of all Defendants except DeVito and David. Jersey Boys Records had moved for summary judgment based on personal jurisdiction and failure to state a claim. The Court found that it had personal jurisdiction over Jersey Boys Records but granted the motion on the merits, ruling that Plaintiff had adduced no evidence that Jersey Boys Records had control over any other Defendant, that there was no allegation that Jersey Boys Records was aware of any infringement (so it could not be liable for contributory infringement), and that the album at issue did not pass the extrinsic test as to substantial similarity to the Work. The Court denied two motions for summary judgment based on the statute of limitations. The Court denied David's motion for summary judgment based on personal jurisdiction. The Court denied a motion for summary judgment on the merits of the infringement issue as moot because the Court contemporaneously granted another motion based on the Defendants' having licenses to use the Work. The Court granted a motion for summary judgment as against the claims of infringement under foreign law, following the Second Circuit's persuasive ruling that the Berne Convention did not provide choice-of-law rules for copyright claims, finding that U.S. law governed issues of copyright ownership and licensing in this case even if foreign law governed substantive infringement claims and that the licenses under U.S. law protected Defendants from the foreign

infringement claims.  The Court granted Corbello's motion for summary judgment as to declarations that the Work was a joint work, that Woodard was a co-owner of the Work, and that DeVito held a 50% interest in the Work in constructive trust for Corbello, as successor-in-interest to Woodard.

**5.      Further District Court Proceedings**

At that point, claims 2–11 against DeVito remained for trial.  On July 9, 2012, the Court denied fees to Defendants, added David to the Judgment, and certified the Third Summary Judgment Order and the present order for immediate appeal under Rule 54(b).

**6.      The Appeal and Remand**

Corbello appealed the certified orders, and on February 10, 2015, the Court of Appeals reversed in part, ruling that the 1999 Agreement had been a transfer of ownership such that Valli and Gaudio became joint owners with Corbello in 1999, *Corbello v. DeVito*, 777 F.3d 1058, 1064 (9th Cir. 2015), and that although Valli and Gaudio could not be liable for infringement while they were joint owners, there remained a genuine issue of material fact whether the 1999 Agreement's reversionary clause had later been triggered such that Valli and Gaudio might be liable for infringement for their use of the Work thereafter, *id.* at 1066–67.  The Court of Appeals also ruled there remained a genuine issue of material fact as to whether DeVito had granted Valli and Gaudio an implied nonexclusive license upon reversion. *Id.* at 1067–68.

**7.      The Fourth Summary Judgment Order (No. 872)**

Before trial, the parties requested that the Court determine certain issues as a matter of law, i.e., whether certain parts of the Work were protected at all, whether the Work was entitled to "thick" versus "thin" copyright protection, and whether Defendants were entitled to summary judgment on the infringement issue under the extrinsic test.  The Court ruled that under the law

of the case, the jury would have to be instructed that the 1999 Agreement was a transfer of ownership whereby Valli and Gaudio became joint owners with Corbello, and that Valli and Gaudio could not be liable for infringement while they were joint owners. The jury would also have to determine whether the 1999 Agreement's reversionary clause was ever triggered such that Valli and Gaudio might be liable for infringement thereafter. If the exclusive license had reverted, the jury would also have to determine whether DeVito had granted Valli and Gaudio an implied nonexclusive license such that they could not have been liable for infringement even after their ownership interest reverted to DeVito. Finally, the jury would have to determine infringement under direct copying or substantial similarity theories. To find liability under the latter theory, the jury would first have to perform the extrinsic test. The Court granted summary judgment in part as to the extrinsic test, finding that regular "thick" copyright protection did not apply as a matter of law, so the jury would have to be instructed that if the Work passed the extrinsic test, the jury would then have to apply "thin" protection under the intrinsic test. *See Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076–77 (9th Cir. 2006); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). The Court also noted at a status conference that it intended to bifurcate the trial into infringement and damages phases and intended to hold accounting proceedings without a jury if any Defendant were found to be liable for infringement or an accounting.

### 8.    The Fifth Summary Judgment Order (No. 972)

The parties filed four additional motions for summary judgment. Plaintiff asked the Court to grant her summary judgment against the affirmative defense of an implied nonexclusive license and whether the 1999 Agreement had reverted. Defendants asked the Court to grant them

summary judgment based on fair use and against the UK, Canadian, and Australian infringement claims. The Court denied all four motions.

### 9. The Trial

After 15 days of trial, the Court mostly denied Defendants' motion for a judgment as a matter of law but granted the motion in favor of Valli and Gaudio as to infringement and in favor of all Defendants as to willful infringement. The jury found: (1) Tommy DeVito did not grant Defendants an implied nonexclusive license to use the Work to create the Play; (2) the Play infringed the Work; (3) the use of the Work in the Play did not constitute fair use; (4) 10% of the success of the Play was attributable to infringement of the Work; and (5) the remaining Defendants were liable for direct infringement (as opposed to vicarious or contributory infringement).

## II. DISCUSSION

Three substantive motions are pending before the Court. First, DeVito has asked the Court to vacate part of a previous order requiring his royalty payments from Defendants to be placed into escrow, because he has settled with Plaintiff. Second, Defendants have renewed their motion for judgment as a matter of law. Third, Defendants have moved for a new trial.

### A. DeVito's Motion

The Court grants DeVito's motion and will separately enter the proposed order attached thereto. No party has objected (although Defendants have "replied" to the motion in order to make additional arguments against the outcome of the trial).

### B. Renewed Motion for Judgment as a Matter of Law

Defendants note that during trial, the Court stated it believed Defendants were entitled to a directed verdict on the fair use issue but did not want to risk a retrial in the case of reversal, and

it therefore denied the Rule 50(a) motion but intended to grant a Rule 50(b) motion. Plaintiff

notes that the Court later opined that it believed the fair use issue was properly a jury question.

The Court has closely examined the evidence under the relevant standards and concludes

Defendants are entitled to a judgment as a matter of law on the fair use issue.

Fair use is a mixed question of law and fact determined by four nonexclusive statutory

factors: "(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the

substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect on

the potential market for or value of the copyrighted work." *Harper & Row Publishers, Inc. v.

Nation Enters.*, 471 U.S. 539, 560–61 (1985) (citing 17 U.S.C. § 107).

### 1.     Effect on the Potential Market for or Value of the Copyrighted Work

The fourth *Harper & Row* factor is the most important, *id.* at 566 (citing 3 M. Nimmer,

Copyright § 13.05[A], at 13–76 (1984)), so the Court will begin there. The evidence at trial

indicated that before the Play debuted, the Work had no market value. Woodard, DeVito,

Plaintiff, and Plaintiff's sister had been unable to find any company interested in publishing the

Work despite their various attempts to do so between 1990 and 2005, because interest in the Four

Seasons was not great enough to make sales of the Work profitable. Under these circumstances,

the fourth and most important *Harper & Row* factor "greatly favors" a defendant. *Blanch v.

Koons*, 467 F.3d 244, 258 (2nd Cir. 2006) (affirming summary judgment under similar

circumstances even where the infringing use was commercial and successfully so, the

copyrighted work was an artistic photograph created for a magazine advertisement, and the third

factor did not favor either party). Plaintiff only discovered that DeVito had registered the Work

when she attempted to register it herself in 2007, having been motivated by the success of the

Play, which had opened in 2006. To the extent the Work may be profitable today, it is almost

certainly only because of the Play, which—and this is important under the third *Harper & Row* factor—consists of over 50% musical works (by running time) in which Plaintiff has no copyright, and the remainder of which (the non-musical script of the Play) is comprised of less than 1% of creative expression found in the Work and uses less than 1% of the Work. If anything, the Play has increased the value of the Work. The fourth, most important factor strongly favors a finding of fair use.

## 2. Purpose and Character of the Use

Commercial use, as here, generally weighs against a finding of fair use. *Harper & Row Publishers, Inc.*, 471 U.S. at 562. The first factor weighs against fair use in the present case as it does in most cases, because the producers of the Play have profited from exploitation of the copyrighted material without paying the customary price. *See id.*

## 3. Nature of the Copyrighted Work

This factor depends on the extent of the Work's creativity and whether it is published. The biographical nature of the Work (which is claimed therein to constitute a factual relation of events as contrasted with other allegedly untrue accounts of events) weighs in favor of a finding of fair use. *See id.* at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."). The unpublished nature of a work normally weighs against a finding of fair use. *Id.* at 564 ("[T]he scope of fair use is narrower with respect to unpublished works [because of] the author's right to control the first public appearance of his expression."). As Defendants note, however, in this case the publication of (small parts of) the Work did not diminish its value by preempting Plaintiff's right to control the first public appearance of the Work. The reason the Work was not yet published was because it was simply not publishable despite years of effort. As the Supreme Court has noted, the Senate reasoned

that "[t]he applicability of the fair use doctrine to unpublished works is narrowly limited since, although the work is unavailable, this is the result of a *deliberate choice* on the part of the copyright owner." S. Rep. No. 94–473, p. 64 (1975) (emphasis added).  A work that is only unpublished because it is unpublishable despite great efforts, however, is an atypical situation. Such a work is not unavailable to the public because of a deliberate choice by the copyright owner, but because it is not commercially viable.  In this case, the unpublished nature of the Work does not overshadow its biographical nature.  The Court finds that this factor weighs in favor fair use.

### 4. Substantiality Used in Relation to the Copyrighted Work as a Whole

After discounting those similarities based on unprotected elements of the Work or where the corresponding element of the Play was original to the Play, the jury was permitted to consider 12 similarities between the Work and the Play. (*See* Jury Instr. No. 27, ECF No. 1076). As recounted in detail, *infra*, the amount of protectable, creative material potentially copied in relation to the Work as a whole is very small, less than 1%, even if the jury were to have applied "thick" as opposed to "thin" copyright protection.

### a. Tommy DeVito's Introduction

Tommy DeVito's introduction in the Play concerning his background copies no creative words form the Work and accounts for approximately one minute of the Play from 5:09 to 6:50 (excluding a musical interlude from 5:30 to 6:07).[1]  Chapter 1 of the Work is a five-page tale of a fourteen-year-old Tommy DeVito and four of his friends stealing a car for a joyride and their subsequent arrest.  Before the story about the car begins, the first three sentences (consisting of

---

1 The Court has painstakingly reviewed Exhibit 602 (a DVD of a Broadway performance of the Play) from the trial and compared it to Exhibit 13 (the Work).

33 words) sets the scene of Tommy DeVito and his friends "hanging out on a Jersey Street Corner . . . puff[ing] on cigarettes and dar[ing] anyone to mess with [them] . . . cool beyond belief." That is the copyrightable comparison—DeVito's "voice, cool demeanor, and braggadocio"—allegedly copied form the Work as the DeVito character addresses the audience at the outset of the Play, after the opening musical performance. The Play does not recreate the scene of DeVito and his teenage friends on the street corner, however, and copies no words from the Work.

### b. The Dialogue Surrounding the Song Title and Subject Matter of the Song "Walk Like a Man"

In the Play, DeVito argues with Gaudio over the title to the song, saying he doesn't "get it." "Walk like a man? As opposed to what? A woman?!" DeVito gives Gaudio a comical concerned look as if to imply the song has homosexual overtones. Gaudio explains that the message is not for young boys to act like men instead of girls but to act like men instead of boys. Band manager Bob Crewe then explains the song is "an anthem for any guy who's ever been twisted around a girl's little finger." The scene then shifts to the band performing the song. Although the Work indicates that the band was only "kid[ding]" Gaudio, as opposed to it having been a legitimate argument with DeVito, and that Gaudio, not Crewe, made the comment about being twisted around a girl's little finger, the dialogue is very similar. Assuming the jury believed the dialogue was not a historical recounting but a creation of DeVito and Woodard—a finding that is unlikely and perhaps not even permissible given the Work's claim of historical accuracy—the closely copied dialogue consists of about 65 words.

### c. The Beatles Line

The Work contains the protectable lines, "[T]he Beatles come to represent a whole social movement. We never aspire to be more than entertainers."

In the Play, Gaudio says, "Around this time, there's a little dust-up called the British Invasion.  Britannia's ruling the airwaves.  So we start our own American Revolution.  The battle begins on a Sunday night at eight o'clock, and the whole world is watching."  The scene shifts to historical footage of Ed Sullivan introducing the band, and then to the band performing the song "Dawn" onstage.  That is, the actors in the Play perform the song onstage with a studio camera crew, as if on the Ed Sullivan Show.  The live footage, from the perspective of the camera crew, is displayed on a screen behind the band in black-and-white, mimicking what was presented to the TV audience of the time, along with what are presumably clips from the actual 1964 studio audience watching the actual 1964 performance.  The band finishes the song, and Gaudio says:

> We weren't a social movement like the Beatles.  Our fans didn't sit and put flowers in their hair and try to levitate the Pentagon.  Maybe they should have.  Our people were the guys who were shipped overseas, and their sweethearts.  They were factory workers, the truck drivers, the kids pumping gas, flipping burgers.  The pretty girl with circles under her eyes behind the counter at the diner.  They're the ones who really got us, who pushed us over the top.

The line about the Beatles being a "social movement" by contrast to the Four Seasons is arguably protectable as original expression in the Work beyond bare historical fact.

### d.  The Creative Expression Within the Description of the Rock & Roll Hall of Fame Induction Ceremony

In the Play, Crewe briefly introduces the band, noting that it had been over 20 years since they last played together onstage.  The band rises up from below the stage, performing "Rag Doll."  They pause, and DeVito says, "Is this like bein' in a fuckin' time machine, or what?"  Valli asks DeVito how Las Vegas is.  DeVito gives his condolences to Valli about his daughter's untimely death.  Gaudio says Valli has a new family now, "three boys."  DeVito invites Valli and Gaudio to his room after the event.  Valli accepts.  Massi asks if they ever thought they'd be standing on the same stage, and DeVito responds that he never thought he'd be standing,

"period." DeVito explains that the Rock and Roll Hall of Fame is the best honor an artist can receive. Other awards, such as the Oscars or the Emmys, can be bought, but the Hall of Fame is an affirmation by the fans. The band then finishes performing "Rag Doll."

In the Work, DeVito recalls how he took a phone call from Valli the morning of the ceremony (January 17, 1990, in New York City) and held a small gathering in his room. Family and friends attended, including Massi, but not Valli, whom DeVito didn't see until the press conference. Before the press conference, DeVito was reunited in the same room with Valli, Massi, and Gaudio for the first time since 1965. "I felt like I was stepping from a time machine." He recalled a "rush of good feelings and warm memories." Crewe introduced the band at the ceremony. DeVito recalls playing a free-for-all "jam session" on stage but does not recount the band having played "Rag Doll" or any other song together as a band at the ceremony.

The events recounted in both the Work and the Play, apart from the basic fact of the induction ceremony, include the gathering in DeVito's room and the "time machine" line. The gathering in DeVito's room, however, is a historical event that was not created by the authors of the Work, and the Court has already ruled that the "time machine" line is an ordinary phrase that is not protectable.

  **e.**  **The Creative Expression Within the Description of the "Roman Orgy" Scene**

In the Play, Gaudio sings the song "December, 1963 (Oh, What a Night)" while DeVito and Massi make out with one or more women (Valli is not present in the scene). Gaudio breaks to explain that the record company had set up a party in Chicago with some women around Christmastime during the band's first nationwide tour. Gaudio explains that he was a virgin at the time, but he eventually takes a girl "downstairs" after DeVito tells him to "grab some Christmas cheer." DeVito and Nick Massi look "downstairs" and report Gaudio's progress play-

by-play to the audience with comically obscene space travel metaphors. Gaudio returns "upstairs" and finishes the song.

In the Work, the record company sets up the party in Detroit. DeVito compares the scene to a "Roman orgy." DeVito tells Gaudio to "Grab a girl and have a good time," and Gaudio leaves with a girl. DeVito does not claim in the book that Gaudio was a virgin, but that he was a "naïve kid." The only dialogue potentially copied form the Work into the Play is the "[g]rab a girl" line, which is not reproduced exactly. Even assuming it were not a historical fact that DeVito said that line, the Play added creative elements to it. The word "grab" and the image of Gaudio bowed over with his hands on his knees are protectable if not meant to be historically accurate, about 20 words worth. The event itself is an unprotectable historical event.

### f. The Creative Expression Regarding the Introduction of the Song "Sherry"

The Play, like the Work, recounts how Bob Gaudio arrived late to a rehearsal excited about a new song he just wrote. In the Play, contrary to Gaudio's and Valli's enthusiasm for the song, DeVito thinks the song is no good, "bullshit," and that it was a "fuckin' insult" Gaudio wrote it "fifteen minutes ago." The band calls Crewe, who loves it. The scene shifts to disc jockey "Barry Belson" praising the record and announcing the band's upcoming appearance on American Bandstand. The scene then shifts to the band performing "Sherry" on stage.

In the Work, Gaudio arrives late to the rehearsal and announces he thinks he wrote a hit. He plays "Sherry" on the piano. DeVito recalls he liked the song but "didn't think [they] could get away with it," because the song was about a girl much younger than the band members. Crewe, however, was at the rehearsal and heard "Sherry" the same time the band members did. He added it to the recording session because he though it had potential. The band released the song on their album but didn't yet perform it on stage. Disc jockey "Murry the K" played the

song in New York City for a call-in poll, but the song came in third.  The band was dejected, but soon found out the record had sold 180,000 copies.  They then play "Sherry" onstage, and the audience "goes nuts."

The dialogue in the Play is not copied from the Work.  Only the unprotectable historical facts of Gaudio having written the song at the last minute and the song being a hit are potentially copied from the Work.  The dialogue is completely different, as is DeVito's initial reaction to the song.

### g. The Creative Expression Regarding the Introduction of the Song "Big Girls Don't Cry"

In the Play, Gaudio recounts to the audience that he was wondering where his next hit would come from as he was watching a John Payne movie.  Payne's character slapped Rhonda Flemming's character and asked her what she thought about it, to which she replied, "Big girls don't cry."  In the Play, Gaudio finishes the story with the words, "and she says…."  The line "Big girls don't cry" is then sung by Valli as the band begins the song onstage.

In the Work, DeVito relates that it was Crewe who was inspired by the Rhonda Flemming line and that Crewe co-wrote the song with Gaudio.  The only similarity is the unprotectable historical fact that the song was inspired by the Rhonda Flemming line.

### h. The Creative Expression Regarding the Introduction of the Song "Walk Like a Man"

This issue is redundant with "The Dialogue Surrounding Song Title and Subject Matter of the Song 'Walk Like a Man.'" *See supra.*

### i. The Creative Expression Regarding the Introduction of the Song "Dawn"

The introduction of the song "Dawn" in the Play is described, *supra*, in connection with "The Beatles Line."  The Work recounts that Sandy Lindzer approached Gaudio with a partially

written "Dawn," and that Gaudio recognized its potential and finished it. The Work notes that the Beatles had "hit the public consciousness like a load of bricks" when "Dawn" was ready for release. The Work recounts the billboard competition between the Beatles and the Four Seasons for several pages, but the Play does not address this. In summary, the Court cannot identify any protectable expression in the Work concerning the release of "Dawn" that appears in the Play, apart from the "social movement" line noted *supra*.

j.      **The Creative Expression Regarding Devito's Introduction of Valli to Mary and the Characterization of Mary**

In the Work, Valli's introduction to Mary and his interest in her is recounted for about half a page on pages 58–59, and his further interest in her, as well as his mother's disapproval stated to DeVito, is recounted for a little more than half a page on page 62. Valli's first encounter with Mary in the Play is three minutes long from 17:05 to 20:05. In the Work, Valli inquires about Mary to DeVito as they drive home from a show where Valli had noticed her, and DeVito warns him away but ultimately agrees to help him with her. In the Play, Valli notices Mary at the show, and DeVito warns him away, but Valli ultimately leaves with Mary on a date that comprises most of the three-minute scene. No dialogue appears to have been copied, only the unprotectable historical facts that Valli first noticed Mary at a show and that DeVito warned Valli away when Valli inquired about her.

In the Work, Valli's mother later calls DeVito and asks him to "get Frankie away from this whore." In the Play, DeVito recounts immediately after the date scene that Valli has now married Mary and that he wanted to buy her some jewelry, which leads into the fake murder scene, without any indication that Valli's mother asked DeVito to try to break up Valli and Mary.

On pages 67–71 of the Work, DeVito recounts how Mary took advantage of Valli's devotion to her and sometimes criticized and ridiculed Valli to his face, even in front of his

friends, causing him to become more reserved and transforming him "into a different type of person." In DeVito's opinion, the change made Valli less likeable but also perhaps fueled his drive for perfection and success. Ultimately, DeVito was unable to "forgive Mary for her role in quenching the sparkle in his eye." He wrote that Mary, like some other women involved with rock band members, had "profoundly test[ed] the group." The Play depicts an argument between Valli and Mary where Mary complains that he is rarely home with the family, and Valli complains about her substance abuse. But apart from Mary once insulting Valli as "a dumb wop from Jersey who never even graduated high school," the only similarity is the fact of some sort of conflict. The Play does not depict Mary criticizing Valli into timidity or berating him in front of others. Gaudio, who is narrating the Play at that point, does not indicate that Mary had changed Valli's personality through any kind of prolonged emotional abuse. To the contrary, he notes that Valli had told the band members that his divorce from Mary had been "for the best," but that they knew "that wasn't the whole story." The scene then shifts to Valli singing "My Eyes Adored You," with Mary watching from the side of the stage and eventually joining Valli in the song, followed by the other members of the band. It is a song about unrequited childhood love that does not perfectly fit the story, but which clearly enough expresses the Play's authors' message that Valli was unhappy about the divorce, had genuinely loved Mary, and perhaps still did. The Play's narrative is contrary to the Work's narrative about Valli having been beaten down emotionally by Mary.

In summary, the Play copied no creative expression from the Work in relation to Valli's introduction to or relationship with Mary. The Play used its own creative expression in telling the story of Valli's interest in Mary, DeVito having warned him away, and any conflict between Valli and Mary. The historical facts of these events are not protectable by copyright.

### k. The Creative Expression Regarding Devito's Intercession After Valli's Arrest at The Request of Valli's Mother

The Play recounts DeVito's intercession after Valli's arrest (excluding a musical interlude), for a total of about one minute. The Work recounts the incident for about one page. No creative expression from the Work relating to this event is copied into the Play. In the Play, Valli's mother tells DeVito that Valli looks up to him, and DeVito promises to look out for Valli. Valli's interrogation by the police and release by the judge at DeVito's urging follows, and although Valli's mother appears as an observer in the courtroom scene, there is no indication she specifically asked DeVito to intercede after Valli's arrest, as recounted in the Work. Rather, she had only given DeVito a general admonition to look out for Valli. Valli's mother's only dialogue in the scene is original to the Play. She has no dialogue in the Work as to this incident.

In summary, there is nothing creative in the Work as to this scene that was copied into the Play, but only the unprotectable historical fact of DeVito's intervention. The Play does not even recount the details of the intervention accurately, but creates a slightly different scene in order to abbreviate the incident and merge it with a recounting of DeVito's return to prison. That is, the Work recounts DeVito's indirect intervention via a probation officer he knew, whereas the Play depicts DeVito directly intervening with the judge during a hearing, after which the judge gives DeVito his own sentence. Only the broad, unprotectable historical fact of intervention by DeVito on behalf of Valli is potentially copied from the Work.

### l. The Creative Expression Regarding the Fake Murder in Valli's Car

The fake murder scene runs from 20:40 to 25:20 in the Play, approximately 1:20 for the fake murder itself in the car, 1:00 for DeVito's discussion with Valli explaining it was a scam, and 2:20 for the scene with Gyp DeCarlo, who had fixed the problem for Valli. In the Play, there are two men in the front of Valli's car, with Valli in the back. The two men are ostensibly

driving Valli to a jewelry store to buy gifts for Mary. The argument between the driver and the front passenger erupts based on a disagreement over driving directions. Ultimately, the passenger "shoots" the driver after they call one another "asshole," then tells Valli to get out of the car and that he will take care of it and call him the next day. Valli leaves, and the two men laugh. The scene shifts to Valli telling DeVito that the passenger wants $25,000 to get rid of the "body" and the car. DeVito tells Valli it was a scam and that he will take care of it without bothering Gyp DeCarlo, a local organized crime boss. DeVito then explains to the audience that he indeed called Gyp DeCarlo to fix the situation. The scene shifts to DeCarlo, DeVito, and Valli. After giving DeVito some tasks, DeCarlo asks Valli to sing "My Mother's Eyes." Valli says he doesn't sing that song anymore but agrees after DeCarlo patiently explains that Valli owes him a favor because DeCarlo took care of the fake murder situation and got his car back. The scene implies that Valli didn't initially realize DeCarlo was the one who had fixed the situation (because DeVito had previously told Valli that he would handle it himself without bothering DeCarlo).

   In the Work, the scene comprises the entirety of Chapter 23, five pages. There are two men in the front of Valli's car, but they pick up a third man who joins Valli in the back. The driver is ostensibly returning Valli's car after having borrowed it. The plan is to pick up Valli, drive to the driver's house, and have Valli drive his car back home. The argument between the driver and the front passenger erupts based on a disagreement over some unspecified illegal "business." The driver pulls over and calls the passenger a "mother-fucker," and the passenger calls the driver an "asshole." The driver then shoots the passenger, rejoins traffic, and tells Valli he'll dump the car in the river and that he should report it stolen. Valli tells DeVito what happened, and DeVito tells Valli to wait for the driver's call and to tell DeVito exactly what he

says.  The driver calls three days later and tells Valli that the man in the back seat is going to go to the police unless they pay him an unspecified amount.  Valli tells DeVito, and DeVito goes directly to DeCarlo, who tells DeVito to tell Valli not to worry about it and to meet him on the golf course the next day.  On the golf course, DeCarlo has Valli retell the whole story, then tells Valli everything will be fine.  Valli's car shows up at his house unharmed two days later.

There is very little creative expression here that may have been copied from the Work into the Play.  The incident recounted is historical, which is not protectable.  Many details are recounted differently, in any case, i.e., created by the authors of the Play (the number of people in the car, the reason for the trip, who shoots whom, the explanation of the need for money, whether DeVito told Valli he would not involve DeCarlo, the dialogue with DeCarlo, and whether Valli spoke to DeCarlo before or after the problem was fixed).  The only protectable element that may have been copied is the "asshole" line.  Assuming that line was fabricated in the Work (as opposed to having been recounted as a historical fact) and copied into the Play, it consists only of the ten words, "Well, asshole, what do you plan to do about it?"  And only the gist of the line is copied—it is not copied word-for-word.  The line in the Play is, "Oh yeah, asshole, what are you gonna do about it?"

### m.    Summary of the Substantiality Factor

In summary, at most, the jury could have found about 145 creative words to have been copied from the Work into the Play, whether as dialogue or creative descriptions of events.  Those 145 words constitute about 0.2% of the approximately 68,500 words in the Work (approximately 250 words per page times 274 pages).  This factor strongly weighs in favor of a finding of fair use, at least where the "heart" of the Work was not infringed.  *See Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 630 (9th Cir. 2003).  Because the Work is

biographical in nature, its "heart" consists of unprotected facts (in this case, those facts DeVito

claimed in the Work had previously been hidden or distorted). It is that collection of

uncopyrightable facts that was "the most likely to be newsworthy and important in licensing

serialization." *Id.* Woodard's writing style, which is the only aspect of the Work producing

protectable elements, although necessary to production of the Work, was not the heart of the

Work. An author's writing style could perhaps constitute the "heart" of a biographical work in

an extreme case, for example where the facts of the subject's life were already known to the

reader or mostly uninteresting but where a highly skilled writer celebrated for his wit and

commentary had written the biography. But that is not the case here. Here, the interest of a

reader of the Work would be in the facts revealed by DeVito, not in Woodard's writing skills.

That is not to say that Woodard was not a good (or even excellent) writer, but there is no

evidence that there was any market for his writing in-and-of-itself. He was not a known author.

The "heart" of the Work—that aspect of the Work likely to attract buyers—was the unprotected

historical information conveyed by DeVito.

### 5. Transformation

Finally, "[T]he more transformative the new work, the less will be the significance of

other factors, like commercialism, that may weigh against a finding of fair use." *Monge v. Maya

Magazines, Inc.*, 688 F.3d 1164, 1174–75 (9th Cir. 2012) (quoting *Campbell v. Acuff–Rose

Music, Inc.*, 510 U.S. 569, 579 (1994)). That is, a work is "transformative" to the extent it adds a

different purpose and/or character to the expression in an original work, e.g., a parody. *Id.* at

1173–75. Such a "transformation" of purpose or character is important to fair use because a

parody, for example, is not likely to affect the market for the parodied work, the effect on the

market for a work being the most important consideration under a fair use analysis. *Id.* at 1182 (citing *Campbell*, 510 U.S. at 591).

The "transformation" in the present case is both a change of purpose and a change of character. The Play takes on a different purpose from the Work when the script (most of which was not taken from the Work) is incorporated into musical performances using material in which Plaintiff has no copyright. The purpose of the Work is primarily to inform. Tommy DeVito set out to vindicate his perspective and reveal hidden truths. Woodard's writing skills made the Work readable, even if the material was ultimately not commercially publishable. The purpose of the Play, however, is primarily to entertain. Even if the purpose of the Play were primarily to inform, the Play takes on a different character from the Work by the incorporation of Tommy DeVito's singular perspective into a more complete and balanced description of events based on competing perspectives of all four band members. The Play is structured around this concept, with the characters of DeVito, Gaudio, Massi, and Valli sequentially narrating the Play from their own perspectives during the respectively titled Spring, Summer, Fall, and Winter portions of the play, i.e., the figurative "four seasons" of the history of the band. And in doing so, the Play adds creative expression beyond mere republication. *See L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 939 (9th Cir. 2002). The transformative nature of the use in this case is significant. To the extent the character and purpose of the Play differ from the character and purpose of the Work, the importance of any factors counseling against a finding of fair use are diminished. *See Monge*, 688 F.3d at 1174–75.

In summary, the first factor weighs against fair use as in any typical case of commercial use, the second factor weighs in favor of fair use, the third factor weighs heavily in favor of fair use, the fourth (most important) factor weighs heavily in favor of fair use, and the transformative

nature of the use diminishes the significance of the sole factor weighing against fair use.  To

permit a finding of no fair use based purely on the fact of commercial use where the importance

of that factor is significantly diminished by the transformative nature of the use and the other

factors weigh in favor of fair use (two of them heavily so, including the most important factor),

would be to impermissibly treat the first factor as conclusive. *See Campbell v. Acuff-Rose*, 510

U.S. 569, 585 (1994).  A finding of no fair use, where such a tiny part of the creative elements of

a biographical work with little to no market value were copied, and where the use was

significantly transformative, would hinder rather than further the purposes of copyright. *See id.* at

579.  The Court finds that Defendants are entitled to a judgment of fair use as a matter of law.[2]

The Court denies the renewed motion for judgment as a matter of law on the other

grounds presented.  There was evidence adduced at trial of direct copying and more than de

minimis use.  The evidence of access to the Work in January 2004; the February 2004 meeting at

which Brickman, Elice, and McAnuff examined the Work; and the Krevolin Report's

comparisons of the Work to the evolving scripts provided sufficient evidence to find direct

copying.  Next, the jury could have properly found that the average audience familiar with the

Work would recognize the protected, copied portions in the Play; audience recognition is the test

for de minimis copying, regardless of how minimal the copying is in relation to the infringing

---

2 Having heard the trial evidence and many times examined similar evidence submitted with pre-
and post-trial motions over the last decade, the Court is of the overall impression that the only
bad actor in this case was DeVito.  He was deceitful with Plaintiff regarding his registration and
licensing of the joint Work, and he was deceitful with New Defendants as to his alleged sole
ownership of the Work.  Plaintiff, however, has chosen to settle her claims against DeVito,
basically allowing him to keep royalties and waiving any accounting against him.  New
Defendants were ignorant of DeVito's obligations to Plaintiff and unaware of any potential
copyright infringement via their use of the Work based on DeVito's representations in the 1999
Agreement and otherwise.  New Defendants are as much victims of DeVito's actions as Plaintiff.

work or the copyrighted work as a whole. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 878 (9th Cir. 2016) (quoting *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004)).

### C. Motion for a New Trial

After a jury trial, a district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)–(a)(1)(A). Although a court of appeals may only overturn a jury verdict on appeal for excessiveness if it is "grossly excessive or monstrous," a trial court may grant a new trial if the verdict is against the clear weight of the evidence. *Siebrand v. Gossnell*, 234 F.2d 81, 94–95 (9th Cir. 1956); *Bradley Mining Co. v. Boice*, 194 F.2d 80, 83 (9th Cir. 1951); *S. Pac. Co. v. Guthrie*, 186 F.2d 926, 932 & n.10 (9th Cir. 1951)). The Court is compelled to find this to be the case here. Specifically, the finding that 10% of the success of the Play was attributable to protected elements copied from the Work cannot be supported by the evidence adduced at trial.

As recounted in detail, *supra*, after subtracting those potential similarities based on unprotected elements of the Work or where the corresponding creative element was not copied from the Work but original to the Play, the Court permitted the jury to consider only 12 similarities between the Work and the Play. Those 12 similarities constituted approximately 0.4% of the Play's script, which itself accounted for less than half of the Play's running time, the remainder being comprised of music for which Plaintiff does not own the copyright. Therefore, assuming that the music that comprised roughly half of the running time of the Play accounts for roughly half of its success, a finding of 10% implies that the few words copied from the Work (which account for approximately 0.2% of the running time of the Play) account for roughly 20% of the success of the Play attributable to the dialogue. That assessment is unsupportable. Of course, determining the percentage of the Play attributable to infringement of the Work is not a

strict, mathematical calculation. But the verdict must be supported by sufficient evidence, and the Court cannot find under the present circumstances that a figure of 10% could be reached based on the evidence adduced at trial.

The Court's analysis under the substantiality factor of the fair use test, *supra*, leads the Court to find that the verdict of 10% is against the clear weight of the evidence. Roughly 0.2% of the Work was both protectable by copyright and copied into the Play, and the copied portions accounted for no more than 1% of the running time of the Play. Importantly, there is no evidence that the copied creative elements were disproportionately important to the Play's success. Additionally, the jury appears to have disregarded the evidence of the limited effect on the success of the Play due to its use of parts of the Work. There was substantial evidence admitted at trial to the effect that many additional elements contributed to the worldwide success and profits of the Play: the additional inventive material in the script, the stagecraft used in live production, the use of copyrighted music in the Play for which Plaintiff has no copyright, direction and production efforts (including the employment of world-renowned writers, directors, and producers), and advertising and promotion efforts, among other elements. The jury cannot have reached the conclusion it did without disregarding these elements that contributed to the success of the Play, even assuming the 10% figure were an accurate calculation of the amount of the infringed material as compared to the Play as a whole, a conclusion that itself is not supported by the evidence.

The jury also failed to focus on the relevant facts as to the remanded question of an implied nonexclusive license, although the Court accepts some responsibility for the error. In the Court's summary judgment analysis of an implied nonexclusive license, the Court had found an implied nonexclusive license based upon the sole factor of DeVito's delivery of the Work to the

authors of the Play. The Court of Appeals reversed on that issue, clarifying that delivery may be considered but cannot be a sole basis for a finding of an implied nonexclusive license. The Court finds that the verdict of no implied nonexclusive license is against the clear weight of the evidence given DeVito's attendance at the Play and continued receipt of royalties therefrom.

The Court of Appeals' remand on the implied nonexclusive license issue cannot be construed as requiring jury consideration solely on the factor of delivery. There can be no implied license where an express license is given. In this case, an express license was given by DeVito in the 1999 Agreement, which gave full license to use of the Work in creating and producing a play, but that express license terminated by its own terms on December 10, 2004, before the Play debuted. No implied license may be found during the period from the execution date of the 1999 Agreement until its termination, which time period includes DeVito's delivery of the Work to the writers of the Play in January 2004. The basis for an implied license therefore cannot be found in the circumstances surrounding delivery of the Work to the writers of the Play, but only in the facts that DeVito continued to receive royalty payments and personally attended productions of the Play after the 1999 Agreement had terminated without ever objecting to the (albeit minimal) use of the Work therein, which DeVito would have recognized. *See supra*, discussion concerning *de minimis* copying. When DeVito's delivery of the Work and his intent when doing so are discounted as irrelevant (because the express license was then in effect), the only evidence as to implied license was DeVito's attendance at the Play in La Jolla in 2004 and on Broadway in 2005 and his receipt of royalties without objection. These factors must be considered as part of the totality of the parties' conduct. *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A][7], at 10-55 (2015). Neither the Court's Instructions, nor the evidence, nor the parties' closing arguments, focused on these facts. The Court, the

parties, and the jury therefore failed to focus on the factual issues directly relevant to implied license as directed by the Court of Appeals. For all of these reasons, the Court grants the motion for a new trial on the implied license issue, as well.

## CONCLUSION

The Court appreciates the jury's service in this complex case. Comparisons of a several-hundred-page book to a several-hour play are tedious and complex. Those comparisons are made even more difficult when they must be guided by over 40 pages of technical legal instructions. Even for a court, such a task is difficult, because the law in this area is not totally clear in all respects. The Court therefore appreciates the difficulty of the task with which the jury was charged, but the law and evidence compels the result the Court reaches today. Defendants are entitled to a judgment as a matter of law on the fair use issue. Even if they were not, a new trial would be required on the implied nonexclusive license issue and the damages award.

IT IS HEREBY ORDERED that the Motion to Vacate (ECF No. 1108) is GRANTED.

IT IS FURTHER ORDERED that the Renewed Motion for Judgment as a Matter of Law (ECF No. 1112) is GRANTED IN PART as to fair use but is otherwise denied.

IT IS FURTHER ORDERED that the Motion for New Trial (ECF No. 1113) is GRANTED IN PART with respect to Questions 1 and 4 of the Verdict but is otherwise denied.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 13th day of June, 2017.

_____
ROBERT C. JONES
United States District Judge